# Attachment B

No. 19-_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

────────────────

IN RE TÜRKIYE HALK BANKASI A.Ş.

*Petitioner.*

────────────────

On Petition for a Writ of Mandamus to the
United States District Court for the
Southern District of New York,
*United States v. Türkiye Halk Bankasi A.Ş.*, No. 1:15-CR-00867-RMB

────────────────

**PETITION FOR A WRIT OF MANDAMUS**

────────────────

Andrew C. Hruska
William F. Johnson
Richard H. Walker
Katherine Kirkpatrick*
KING & SPALDING LLP
1185 Avenue of the Americas
New York, New York 10036
Telephone: (212) 556-2278
Facsimile: (212) 556-2222
ahruska@kslaw.com
wjohnson@kslaw.com
rwalker@kslaw.com
kkirkpatrick@kslaw.com

*Admissions pending/forthcoming

*Attorneys for Specially-Appearing Defendant-Petitioner
Türkiye Halk Bankasi A.Ş.*

December 17, 2019

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, counsel for the undersigned certifies as follows:  Petitioner Türkiye Halk Bankasi A.Ş. is 51% owned by the non-party Turkish Wealth Fund, which is owned by the Turkish government.  No publicly-held corporation owns 10% or more of the stock of non-party Turkish Wealth Fund.

Dated: December 17, 2019     King & Spalding LLP

By: /s/ Andrew C. Hruska

Andrew C. Hruska
William F. Johnson
Richard H. Walker
Katherine Kirkpatrick*
KING & SPALDING LLP
1185 Avenue of the Americas
New York, New York 10036
Telephone: (212) 556-2278
Facsimile: (212) 556-2222
ahruska@kslaw.com
wjohnson@kslaw.com
rwalker@kslaw.com
kkirkpatrick@kslaw.com

*Admissions pending/forthcoming

*Counsel for Specially-Appearing Defendant Türkiye Halk Bankasi A.Ş.*

# TABLE OF CONTENTS

INTRODUCTION..............................................................................1

STATEMENT OF ISSUES PRESENTED.................................3

STATEMENT OF RELIEF REQUESTED ..............................3

STATEMENT OF FACTS .........................................................4

   I.  Background on Halkbank ..................................................4

   II.  The District Court Avoided Halkbank's Procedural Request
      by Prematurely Rejecting the Merits of Halkbank's
      Anticipated Personal Jurisdiction Motion, Denying
      Halkbank's Opportunity to Protect Its Constitutional Rights.......5

STANDARD OF REVIEW.........................................................9

ARGUMENT ...........................................................................11

   I.  Halkbank's Right to Mandamus is Clear and Indisputable ........12

      A.  Personal Jurisdiction Is an Essential Threshold Issue
          that Must Be Decided Before Arraignment .............................13

      B.  The District Court Adopted the Erroneous Logic of a
          Single District Court to Support Its Flawed Reasoning.........15

      C.  Special Appearances Are the Routine and Necessary
          Procedure to Challenge Threshold Issues................................20

      D.  Without Mandamus, Halkbank Risks Waiver of Its
          Fundamental Rights................................................................23

      E.  The District Court Cannot Bind Appellate Courts that
          Could Consider a General Appearance as Waiver of the
          Right to Challenge Personal Jurisdiction ..............................25

   II.  Mandamus Will Appropriately Resolve an Unsettled Legal
      Issue and End Ongoing Irreparable Harm................................26

      A.  Courts Have Ordered Mandamus to Address Analogous
          Legal Issues ............................................................................27

      B.  A District Court's Unjustified Denial of a Special
          Appearance Is a Novel Legal Issue that Is Likely to
          Evade Review, Blocking Future Defendants from
          Asserting Their Constitutional Rights....................................31

C.  Only Mandamus Will Prevent Ongoing Irreparable
    Harm to the Bank ................................................................ 36

III. Halkbank Has No Other Adequate Means to Protect Its
     Right to Challenge Personal Jurisdiction Without Risking
     Waiver ............................................................................... 39

CONCLUSION ............................................................................ 39

STATEMENT REGARDING ORAL ARGUMENT ................................ 41

CERTIFICATE OF COMPLIANCE ..................................................... 42

CERTIFICATE OF SERVICE ............................................................ 43

APPENDIX AND TABLE OF CONTENTS ......................... A1-A168

# TABLE OF AUTHORITIES

## Cases

*Abelesz v. OTP Bank,*
  692 F.3d 638 (7th Cir. 2012) ............................................................... 38

*Arbaugh v. Y&H Corp.,*
  546 U.S. 500 (2006) ........................................................................... 18

*Arizona v. Washington,*
  434 U.S. 497 (1978) ........................................................................... 36

*Balintulo v. Daimler AG,*
  727 F.3d 174 (2d Cir. 2013) ............................................................... 26

*Bankers Life & Cas. Co. v. Holland,*
  346 U.S. 379 (1953) ........................................................................... 10

*Benton v. Maryland,*
  395 U.S. 784 (1969) ........................................................................... 17

*Cheney v. United States Dist. Court,*
  542 U.S. 367 (2004) ........................................................................... 10

*Dynegy Midstream Servs. v. Trammochem,*
  451 F.3d 89 (2d Cir. 2006) ................................................................. 25

*Frisbie v. Collins,*
  342 U.S. 519 (1952) ........................................................................... 17

*Hughes v. Thompson,*
  415 U.S. 1301 (1974) ......................................................................... 13

*In re Arawak Trust Co. (Cayman) Ltd.,*
  489 F. Supp. 162 (E.D.N.Y. 1980) ..................................................... 14

*In re Ellis,*
  356 F.3d 1198 (9th Cir. 2004) ............................................................ 36

*In re Grand Jury Subpoenas,*
  72 F. Supp. 1013 (S.D.N.Y. 1947) ..................................................... 14

*In re Hijazi*,
589 F.3d 401 (7th Cir. 2009) ...................................................... passim

*In re Marc Rich*,
707 F.2d 663 (2d Cir. 1983) ........................................................... 14

*In re Pangang Grp. Co., Ltd.*,
901 F.3d 1046 (9th Cir. 2018) .................................................. 33, 34

*In re Roman Catholic Diocese of Albany, New York, Inc.*,
745 F.3d 30 (2d Cir. 2014) ....................................................... 10, 26

*In re Sealed Case*,
832 F.2d 1268 (D.C. Cir. 1987) ..................................................... 14

*In re The City of New York*,
607 F.3d 923 (2d Cir. 2010) .......................................................... 36

*In re United States*,
680 F.2d 9 (2d Cir. 1982) .............................................................. 10

*In re Vasquez-Ramirez*,
443 F.3d 692 (9th Cir. 2006) .......................................................... 36

*In re von Bulow*,
828 F.2d 94 (2d Cir. 1987) ............................................................ 26

*Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*,
456 U.S. 694 (1982) ...................................................................... 19

*Int'l Harvester Co. v. Kentucky*,
234 U.S. 579 (1914) .............................................................. passim

*Int'l Shoe Co. v. Washington*,
326 U.S. 310 (1945) ................................................................ 13, 14

*Linde v. Arab Bank, PLC*,
706 F.3d 92 (2d Cir. 2013) ............................................................ 27

*Rochin v. California*,
342 U.S. 165 (1952) ...................................................................... 17

*United States v. $6,976,934.65 Plus Interest*,
478 F. Supp. 2d 30 (D.D.C. 2007)....................................................30, 31

*United States v. Adamov*,
CR No. 05-129, 2008 WL 1943550 (W.D. Pa. May 2, 2008) ...............23

*United States v. Al Kassar*,
660 F.3d 108 (2d Cir. 2011).................................................................19

*United States v. Alvarez-Machain*,
504 U.S. 655 (1992) .............................................................................17

*United States v. Atilla*,
No. 1:15-cr-00867-RMB (S.D.N.Y. Jan. 3, 2018), ECF No. 440 ...........1

*United States v. Beadon*,
49 F.2d 164 (2d Cir. 1931)............................................................18, 24

*United States v. Bodmer*,
342 F. Supp. 2d 176 (S.D.N.Y. 2004) ..................................................18

*United States v. Chitron Elecs. Co. Ltd.*,
668 F. Supp. 2d 298 (D. Mass. 2009) ..................................................14

*United States v. Kassian Mar. Navigation Agency, Ltd.*,
No. 2:13-cr-00070 (E.D. Va. June 24, 2013), ECF No. 38...................14

*United States v. Lussier*,
929 F.2d 25 (1st Cir. 1991)............................................................17, 18

*United States v. Maruyasu Indus. Co., Ltd.*,
229 F. Supp. 3d 659 (S.D. Ohio 2017).........................................passim

*United States v. Mullet*,
822 F.3d 842 (6th Cir. 2016) ...............................................................32

*United States v. Nippon Paper Indus. Co.*,
944 F. Supp. 55 (D. Mass. 1996) .........................................................14

*United States v. Noriega*,
683 F. Supp. 1373 (S.D. Fla. 1988) ...............................................21, 37

*United States v. Prado,*
   933 F.3d 121 (2d Cir. 2019) .................................................. 18

*United States v. Prevezon Holdings Ltd.,*
   839 F.3d 227 (2d Cir. 2016) .................................................. 10

*United States v. Rendon,*
   354 F.3d 1320 (11th Cir. 2003) ........................................... 17

*United States v. Shalhoub,*
   855 F.3d 1255 (11th Cir. 2017) ........................................... 39

*United States v. Shimek,*
   445 F. Supp. 884 (M.D. Pa. 1978) ....................................... 23

*United States v. Siriwan,*
   No. CR 09-81, 2011 WL 13057709 (C.D. Cal. July 28, 2011) ............. 22

*United States v. Stein,*
   435 F. Supp. 2d 330 (S.D.N.Y. 2006) ................................... 32

*United States v. Tucor Int'l, Inc.,*
   No. 4:92-cr-00425 (N.D. Cal. Oct. 20, 1997), ECF No. 102 ............. 21

*United States v. Van Der End,*
   No. 17-2926, 2019 WL 5991546 (2d Cir. Nov. 14, 2019) ................. 20

*United States v. Yang,*
   144 F. App'x 521 (6th Cir. 2005) ......................................... 30

*United States v. Yousef,*
   327 F.3d 56 (2d Cir. 2003) .......................................... 17, 19

*Will v. United States,*
   389 U.S. 90 (1967) ............................................................ 10

**Statutes**

28 U.S.C. § 1292 ................................................................... 39

28 U.S.C. § 1651 ................................................................ 3, 9

28 U.S.C. § 2466 ................................................................ 30, 31

**Other Authorities**

H.R. REP. NO. 107-250(I) (2001) ............................................. 31

Mem. and Report of the Advisory Comm. on Crim. Rules at 6 (May 6, 2015) ................................................................................. 33

Mem. Regarding Proposed Amendments to Rule 4 from Jonathan J. Wroblewski, Dir., Office of Policy and Legislation, U.S. Dep't of Justice to Judge David M. Lawson, Chair, Subcomm. of Advisory Comm. on Crim. Rules (Feb. 20, 2015) ......................................... 24, 35

**Rules**

FED. R. APP. P. 21 .................................................................. 3

FED. R. CIV. P. 12 ................................................................. 32

FED. R. CRIM. P. 4 ............................................................. 8, 33

## INTRODUCTION

The purpose of this Petition is to stop the District Court from preventing petitioner Türkiye Halk Bankasi A.Ş. ("Halkbank" or the "Bank") from protecting its constitutional due process rights.  To avoid waiver of these rights, the Bank sought leave to enter a special appearance for the limited purpose of challenging the court's personal jurisdiction and to seek recusal of the District Judge.[1]

Halkbank is a foreign corporate defendant with no offices, employees, or operations in the United States.  Rather than grant what should have been an uncontroversial procedure, the District Court denied the request, conditioning the Bank's ability to file any motions on first appearing at arraignment and entering a plea, which risks

---

[1] District Judge Richard Berman presided over a related case in which former Bank employees and members of the Turkish government were charged, and one former Bank employee was convicted after trial.  *See United States v. Atilla*, No. 1:15-cr-00867-RMB (S.D.N.Y. Jan. 3, 2018), ECF No. 440 (Jury Verdict).  The Bank's recusal motion will show that Judge Berman has expressed views both in and out of the courtroom that would cause a reasonable person to question his impartiality.  Although a special appearance would not ordinarily be necessary for recusal, it is required in this case because recusal should be addressed before personal jurisdiction.  All references to the Bank's request for leave to make a special appearance to contest personal jurisdiction include the preliminary issue of recusal.

waiver of the very rights the Bank seeks to protect.  Further, the

District Court reached beyond the procedural request for a special

appearance and prematurely ruled that the Bank cannot challenge the

District Court's personal jurisdiction, even though this issue was not

briefed.

Without personal jurisdiction over the Bank, the District Court

has no basis to proceed.  The Bank seeks to challenge personal

jurisdiction without waiving it.  Without a special appearance, the Bank

has no procedural opportunity to do so without risking waiver.  Courts

have found that even minimal participation in a proceeding—including

entering a plea—consents to the court's jurisdiction.  Requiring the

Bank to appear and enter a plea before determining whether the

District Court has the constitutional authority to exercise personal

jurisdiction over the Bank risks waiver of the very rights the Bank is

seeking to preserve and vindicate.  Mandamus relief is required to order

the District Court to accept the Bank's special appearance and allow the

Bank to properly move to dismiss the indictment for lack of personal

jurisdiction and to seek recusal.

## STATEMENT OF ISSUES PRESENTED

Should this Court grant mandamus relief to direct the District Court to allow a foreign corporate criminal defendant with no offices, employees, or operations in the United States to enter a special appearance to challenge personal jurisdiction and to seek recusal of the District Judge, or must a corporate criminal defendant risk waiving its rights in order to assert them?

## STATEMENT OF RELIEF REQUESTED

Halkbank respectfully requests that this Court issue a writ of mandamus pursuant to the All Writs Act, 28 U.S.C. § 1651(a), and Federal Rule of Appellate Procedure 21, directing the United States District Court for the Southern District of New York to grant Halkbank's counsel leave to enter a special appearance and to subsequently allow Halkbank to file a motion seeking recusal of the District Judge followed by a motion seeking dismissal of the indictment for lack of personal jurisdiction. Because the District Court has ruled (without briefing) that Halkbank cannot challenge personal jurisdiction, the Bank further requests that the District Court be directed to

recognize that corporate criminal defendants are protected by due process from the unreasonable exercise of personal jurisdiction.

## STATEMENT OF FACTS

## I.    Background on Halkbank

Halkbank is a Turkish bank organized under Turkish law and traded on the Istanbul stock exchange.  Its primary place of business is in Turkey.  It has never had a branch, representative office, or any other physical place of business in the U.S.  None of Halkbank's more than 20,000 employees are employed in the U.S., and Halkbank has no U.S. subsidiaries or affiliates.  Halkbank has never issued securities or debt in the U.S., and it provides no services and sells no financial products in the U.S.  Halkbank has never filed, or been required to file, corporate or regulatory filings in the U.S.  The Bank conducts nearly all its business within Turkey.  The Bank is owned 51% by the Turkish Wealth Fund, the Bank's deposit base comes from Turkish retail operations, and a major part of its loan portfolio is focused on Turkish small and medium-sized enterprises.

The allegations in the indictment took place almost entirely outside the U.S. and have no legally relevant connection to the U.S.

Instead, the allegations focus on purported schemes to provide access to Iranian oil and gas proceeds deposited at the Bank, including: (1) foreign transactions at Halkbank conducted among foreigners in foreign currencies, and (2) transactions unknown and unrelated to Halkbank by third parties that were processed between various banks other than Halkbank.  During the period relevant to the indictment, the Bank's only contacts with the U.S. were five U.S. correspondent accounts and a handful of business trips tied to foreign transactions scattered over time (both unrelated to the allegations), and meetings with U.S. Treasury officials regarding compliance with U.S. sanctions.

## II.   The District Court Avoided Halkbank's Procedural Request by Prematurely Rejecting the Merits of Halkbank's Anticipated Personal Jurisdiction Motion, Denying Halkbank's Opportunity to Protect Its Constitutional Rights

On October 15, 2019, the prosecution filed a Superseding Indictment against Halkbank.  App. at A1-45.  On November 4, 2019, before appearing for arraignment, entering a plea, or otherwise appearing or participating in its defense, the Bank sought leave from the District Court for its counsel to enter a special appearance for the

5

limited purpose of filing a motion to dismiss for lack of personal jurisdiction and a motion seeking Judge Berman's recusal.

At a November 5, 2019, status conference, Halkbank's counsel raised its informed concern that a general appearance might waive the Bank's rights to contest personal jurisdiction, citing a recent case where a criminal defendant waived its right to challenge personal jurisdiction by, among other things, appearing for arraignment. App. at A67:13-21 (citing *United States v. Maruyasu Indus. Co., Ltd.*, 229 F. Supp. 3d 659 (S.D. Ohio 2017)). At the end of the hearing, Judge Berman ordered further briefing "devoted to the issue of whether or not [the Bank] can make a special appearance for the purpose of filing two motions." App. at A84:7-9. Judge Berman did not request, and the parties did not present, briefing on the merits of the underlying motions. Briefing was completed by December 2, 2019. *See* App. at A120-29.

On December 5, 2019, Judge Berman denied Halkbank's motion for a special appearance (the "Decision"), finding that criminal defendants cannot challenge personal jurisdiction and rejecting the non-controversial practice of allowing special appearances in criminal cases. App. at A145. Instead of grappling with the body of relevant case law,

the District Court relegated most of its discussion of the precedent cited by the Bank to an abbreviated case chart attached as "Exhibit B" to the Decision.  The District Court brushed the cases supporting the Bank's argument aside as "outside the Second Circuit" (a mantra repeated in Exhibit B) or on the irrelevant basis that the underlying motions to dismiss were ultimately denied after a special appearance was granted, among other reasons.  App at. A159-65.

The District Court later compounded this error, improperly linking the special appearance procedural issue to the underlying merits question and finding that few special appearance cases have been decided because "it is improper to make a personal jurisdiction motion based upon the absence of minimum U.S. contacts in a criminal case."  App. at A145.  The Decision thus reverse-engineered its denial of the Bank's request by incorrectly rejecting the substantive basis for which the special appearance was sought.  Moreover, in reaching the conclusion that the minimum contacts test does not apply, the Decision conflates personal jurisdiction with the entirely separate concepts of service and subject matter jurisdiction.  *See, e.g.*, App. at A143-44.  The Decision also suggests that courts can hear any case against any foreign

7

defendant so long as a federal statute proscribes the conduct alleged
and notice has been given consistent with recently revised Rule 4.  App.
at A142.  If true, there would be no constitutional limitation on personal
jurisdiction in a criminal context.  Even though the issue has not been
briefed, based on the Decision, the Bank would not be permitted to
challenge the unconstitutional exercise of personal jurisdiction even if it
appeared and entered a plea.  App. at A152.

By addressing the issue of personal jurisdiction, the Decision goes
well beyond the procedural issue of whether the Bank can enter a
special appearance and prematurely rejects the merits of the personal
jurisdiction issue.  *See, e.g.*, App. at A135 (assuming without record
basis that Halkbank has had "extensive commercial dealings with the
U.S."); App. at A137-38 (purporting to describe, without citation,
"Unusual Contacts").  The Decision states that the Bank can file a
motion "consistent" with the Decision "for the Court's recusal and/or
relating to the Court's jurisdiction" after arraignment.  App. at A141.
The District Court's statement that the Bank can file a motion
"relating" to the Court's jurisdiction "consistent" with the Decision is an
empty promise because the Court prematurely ruled that personal

8

jurisdiction cannot be challenged—instead, this invitation was to challenge subject matter jurisdiction based on extraterritoriality.  App. at A145 (arguing it is "improper to make a personal jurisdiction motion based upon the absence of minimum U.S. contacts in a criminal case"); A152 (noting "the Court's rejection of Halkbank's personal jurisdiction claim based upon minimum contacts").

On December 9, 2019, the District Court set a contempt hearing for February 10, 2020.  App. at A167-68.  In advance of the hearing, the District Court requested briefing from the prosecution and the Bank "if appearing through counsel of record."  App. at A168.

## STANDARD OF REVIEW

The All Writs Act empowers "all courts established by Act of Congress" to "issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law."  28 U.S.C. § 1651(a).  A writ of mandamus should issue when: "(1) 'the party seeking issuance of the writ must have no other adequate means to attain the relief [it] desires'; (2) 'the issuing court, in the exercise of its discretion, must be satisfied that the writ is appropriate under the circumstances'; and (3) the petitioner must demonstrate that

the 'right to issuance of the writ is clear and indisputable.'"  *In re*

*Roman Catholic Diocese of Albany, New York, Inc.*, 745 F.3d 30, 35 (2d

Cir. 2014) (quoting *Cheney v. United States Dist. Court*, 542 U.S. 367,

380-81 (2004)).

Mandamus allows this Court to correct "exceptional circumstances

amounting to a judicial 'usurpation of power' or a 'clear abuse of

discretion'."  *In re Roman Catholic Diocese*, 745 F.3d at 35 (quoting *Will

v. United States*, 389 U.S. 90, 95 (1967) and *Bankers Life & Cas. Co. v.

Holland*, 346 U.S. 379, 383 (1953)).  Mandamus is also warranted to

"confine" the District Court "to a lawful exercise of its prescribed

jurisdiction."  *Cheney*, 542 U.S. at 380 (citations and quotations

omitted).  Mandamus is particularly necessary in cases like this one,

which "present[] exceptional circumstances" and have "extraordinary

significance," *In re United States*, 680 F.2d 9, 12 (2d Cir. 1982), and

which involve novel and significant questions of law, including legal

issues whose resolution will aid in the administration of justice.  *United

States v. Prevezon Holdings Ltd.*, 839 F.3d 227, 238 (2d Cir. 2016).

## ARGUMENT

The Court should grant mandamus relief because the District Court is violating Halkbank's due process rights by refusing to allow the Bank to challenge personal jurisdiction.  By wrongly denying the Bank's request for a special appearance for the limited purpose of contesting the District's Court unconstitutional exercise of personal jurisdiction over it and, first, for recusal of the District Judge, the District Court's action would eliminate the Bank's ability to protect its rights without risking waiver.

Halkbank, like all defendants sued in an American court, has a due process right to be free from the unreasonable exercise of personal jurisdiction by a U.S. District Court.  In most criminal cases, the exercise of personal jurisdiction is reasonable based on arrest, voluntary appearance, extradition, or waiver.  In contrast, this case involves an issue that does not frequently arise—whether a U.S. District Court can exercise personal jurisdiction over a foreign corporate defendant absent any of these traditional jurisdictional bases and absent minimum contacts.  In an analogous scenario from another circuit that the District Court relegates to a brief reference in Exhibit B, the Seventh

Circuit issued mandamus to allow a foreign defendant to seek pre-arraignment dismissal of an indictment, just as Halkbank seeks to do here. *In re Hijazi*, 589 F.3d 401, 414 (7th Cir. 2009).  If the Decision is allowed to stand, it would mark a radical departure from personal jurisdiction jurisprudence because the Bank would, in effect, be barred from challenging personal jurisdiction—if it cannot raise the challenge without waiving it, the right is eliminated.

## I.     Halkbank's Right to Mandamus is Clear and Indisputable

Halkbank has a constitutional right to challenge a court's unreasonable exercise of personal jurisdiction, but this right is conditional.  Despite the District Court's refusal to acknowledge the prospect of waiver, a defendant can intentionally or inadvertently consent to the personal jurisdiction of a court.  A special appearance is the proper way to challenge threshold matters without threat of waiver.  Because mandamus is required to compel the District Court to allow the Bank's counsel to specially appear and avoid the risk of waiving its constitutional rights, Halkbank's right to mandamus is clear and indisputable.

## A.     Personal Jurisdiction Is an Essential Threshold Issue that Must Be Decided Before Arraignment

Courts must have a reasonable basis to exercise personal jurisdiction over a corporate criminal defendant. *Int'l Harvester Co. v. Kentucky*, 234 U.S. 579, 585-86, 589 (1914) (assessing whether Kentucky state court could exercise personal jurisdiction over corporate criminal defendant indicted under state law). Personal jurisdiction is a threshold issue, and a court has the power to dismiss the case before arraignment. *See In re Hijazi*, 589 F.3d at 406, 409 (citing *Hughes v. Thompson*, 415 U.S. 1301 (1974)).

In the absence of a traditional basis like arrest, voluntary appearance, or extradition, the standard for assessing personal jurisdiction over criminal defendants is the familiar "minimum contacts" test set forth in *International Shoe*, where the Supreme Court favorably cited *International Harvester*—a criminal case—no less than five times. *Int'l Shoe Co. v. Washington*, 326 U.S. 310, at 314-15, 317, 319 (1945). *International Harvester* itself cited civil cases, demonstrating that the Supreme Court views similarly personal jurisdiction jurisprudence in both civil and criminal cases. 234 U.S. at

583, 586, 588 (citing civil cases).[2]  In the criminal context, courts also use this test to evaluate whether to compel foreign corporations to comply with grand jury subpoenas.  *In re Sealed Case*, 832 F.2d 1268, 1273-74 (D.C. Cir. 1987), *abrogated on other grounds*, *Braswell v. United States*, 487 U.S. 99 (1988); *In re Marc Rich*, 707 F.2d 663, 666-70 (2d Cir. 1983); *In re Arawak Trust Co. (Cayman) Ltd.*, 489 F. Supp. 162, 165 (E.D.N.Y. 1980); *In re Grand Jury Subpoenas*, 72 F. Supp. 1013, 1019-20 (S.D.N.Y. 1947) (citing *Int'l Shoe,* 326 U.S. at 316, and *Int'l Harvester*, 234 U.S. 579).  By implication, if a grand jury subpoena recipient is afforded the protections of the "minimum contacts" test, then a criminal defendant should receive at least the same protection. *In re Sealed Case*, 832 F.2d at 1274 (characterizing showing needed to

---

[2] "Minimum contacts" are rarely an issue in criminal cases, which primarily involve individual defendants or companies with U.S. operations.  But this is not the first case involving the minimum contacts test in a criminal setting.  *United States v. Nippon Paper Indus. Co.*, 944 F. Supp. 55, 60-61 (D. Mass. 1996) (applying minimum contacts test), *rev'd on other grounds*, 109 F.3d 1 (1st Cir. 1997); *United States v. Chitron Elecs. Co. Ltd.*, 668 F. Supp. 2d 298, 303-04 (D. Mass. 2009) (applying minimum contacts test); *United States v. Kassian Mar. Navigation Agency, Ltd.*, No. 2:13-cr-00070 (E.D. Va. June 24, 2013), ECF No. 38 (declining to rule on personal jurisdiction pre-trial).  *But see Maruyasu*, 229 F. Supp. 3d at 669, 671-74 (declining to apply minimum contacts test and alternatively finding minimum contacts test satisfied).

enforce grand jury subpoena as "lower hurdle" than that needed to exercise personal jurisdiction over criminal defendant).

**B.    The District Court Adopted the Erroneous Logic of a Single District Court to Support Its Flawed Reasoning**

In ruling on a procedural request to enter a special appearance, the Decision wrongly concludes that personal jurisdiction cannot be challenged in criminal cases, which is legally incorrect and goes to the merits of a motion that the Bank has not yet filed.  App. at A145.  In so doing, the District Court failed to address key, controlling authorities, including *International Harvester*.  Instead, the District Court relied principally on a single case from the Southern District of Ohio, *United States v. Maruyasu*.

In *Maruyasu*, the court mistakenly found that the "body of law" on whether the minimum contacts test applies in a criminal prosecution "appears to be limited to four cases."  229 F. Supp. 3d at 669.  Despite that all four of these cases concluded that the minimum contacts test *applies* in the criminal context, the court distinguished these decisions or found them inapposite.  The court found instead that a federal court has the power to try any defendant that is *present* or brought before the court on a federal indictment charging violation of a federal law.  *Id.* at

670.  The court went on to find that the defendant in that case, unlike

the Bank here, had both appeared and participated by, among other

things, entering a plea of not guilty.  As a result, the court concluded

that the defendant had consented to the court's personal jurisdiction

over it.  *Id.* at 671.

*Maruyasu* stands in sharp contrast to the present case.  Halkbank

has *not* consented to jurisdiction and, in fact, seeks to make a special

appearance for the singular purpose of *avoiding* consent while at the

same time preserving its constitutional challenge that the *Maruyasu*

court found to have been waived.  Moreover, *Maruyasu*'s holding that

personal jurisdiction exists over any criminal defendant who is

"present" before the court raises the question of how a foreign corporate

defendant such as Halkbank—without U.S. offices, employees, or

operations—can be "present" or effectively challenge its presence

without automatically waiving its right to do so by appearing to assert

the challenge.

Both the District Court and the *Maruyasu* court reached their

flawed decisions by citing the same line of authority involving the *Ker-*

*Frisbie* doctrine.  This narrow doctrine concerns whether the

government may prosecute individual defendants who were abducted abroad and forcibly brought to court—an issue entirely absent in this case. *See* App. at A145-47 (citing *United States v. Alvarez-Machain*, 504 U.S. 655 (1992); *Frisbie v. Collins*, 342 U.S. 519 (1952); *United States v. Lussier*, 929 F.2d 25 (1st Cir. 1991); *United States v. Rendon*, 354 F.3d 1320 (11th Cir. 2003)); *see also Maruyasu*, 229 F. Supp. 3d at 669-70 (citing the same cases). The *Ker-Frisbie* doctrine does not address whether the Bank can challenge personal jurisdiction, and the District Court's misguided application of *Ker-Frisbie* as an *exclusive* statement of criminal due process rights ignores other due process rights in criminal cases[3] and disregards the difference between individuals and corporations.[4] The District Court's incomplete statement of the law—

---

[3] This oversimplification ignores the due process question of whether U.S. courts have subject matter jurisdiction over extraterritorial conduct, *United States v. Yousef*, 327 F.3d 56, 111-12 (2d Cir. 2003), other fundamental due process issues applicable under the incorporation doctrine, *Benton v. Maryland*, 395 U.S. 784, 794 (1969), prohibitions on official conduct which "shocks the conscience," *Rochin v. California*, 342 U.S. 165, 172 (1952), and limits on personal jurisdiction, *Int'l Harvester*, 234 U.S. at 583.

[4] Further ignoring the difference between corporations and individuals, the District Court argues that "the issue of 'minimum contacts' does not arise in criminal cases" by citing *dicta* from *Bodmer*, which, in context, noted that personal jurisdiction derives from an individual defendant's arrest, voluntary appearance in court, or lawful extradition. App. at

that a district court has personal jurisdiction over any party who appears before it—also cannot be squared with the many examples where corporations have challenged personal jurisdiction in a criminal context.  App. at A147 (citing *Lussier*, 929 F.2d at 27); *Int'l Harvester*, 234 U.S. at 583; *United States v. Beadon*, 49 F.2d 164, 167 (2d Cir. 1931).  *See also supra* at 13-14.

This Court has noted that "'[j]urisdiction is a chameleon word . . . having many, too many, meanings."  *United States v. Prado*, 933 F.3d 121, 132 (2d Cir. 2019) (citing *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 510 (2006)).  The Decision here exemplifies that observation through the District Court's conflation of cases involving subject matter jurisdiction, legislative or prescriptive jurisdiction, and personal jurisdiction.  *Prado*, 933 F.3d at 132-33.  Subject matter jurisdiction is an Article III and a statutory requirement that restricts federal power and cannot be waived, whereas personal jurisdiction stems from the Due Process Clause, "recognizes and protects an individual liberty interest," and can,

---

A145-46 (citing *United States v. Bodmer*, 342 F. Supp. 2d 176, 188 (S.D.N.Y. 2004)).

like other individual rights, be waived. *Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702-03 (1982).

The Decision mischaracterizes the Bank's argument as going to subject matter rather than personal jurisdiction. *See, e.g.*, App. at A144 ("Construed in the light most favorable to Halkbank, the defense appears to challenge the extraterritoriality and/or the lack of a connection or nexus between Halkbank and the U.S."). The Due Process Clause separately protects criminal defendants from both the unreasonable exercise of personal jurisdiction, *Int'l Harvester*, 234 U.S. at 589, and from the extraterritorial application of U.S. law to foreign conduct that lacks a sufficient nexus with the United States, *Yousef*, 327 F.3d at 111-12. Foreign defendants may challenge personal jurisdiction, or subject matter jurisdiction under the "nexus test," or both—one does not displace the other. *Id.* at 115 (separately evaluating both issues). Individual defendants have even challenged extraterritorial application of U.S. law *after* appearing in court or on appeal *following* a guilty plea—both procedures that would be waived regarding personal jurisdiction. *United States v. Al Kassar*, 660 F.3d 108, 117-18 (2d Cir. 2011); *United States v. Van Der End*, No. 17-2926,

19

2019 WL 5991546, at *4 (2d Cir. Nov. 14, 2019) (defendant did not

waive challenge to extraterritoriality by pleading guilty).

## C.   Special Appearances Are the Routine and Necessary Procedure to Challenge Threshold Issues

When criminal defendants seek to challenge threshold issues such

as personal jurisdiction, courts routinely permit them to do so by

appearing specially.  Halkbank reviewed all federal criminal cases

available in online legal databases, including many unpublished

opinions and orders, where defendants sought a special appearance.

The search identified twenty-two instances in which defense counsel

have either requested or noticed a special appearance in criminal cases,

and in the vast majority of those cases, special appearances were

granted.  *See* App. at A99-103.  Of the twenty-two cases identified, in

sixteen cases the court permitted a special appearance.  Of those

sixteen cases, in seven cases the defendant entered a notice of special

appearance with no objection from the prosecution, and in nine cases

courts granted requests over the prosecution's objection.  *Id.*

Courts have granted special appearances through written opinions

in three instances.  These cases all involved foreign defendants located

abroad and courts who deemed it unnecessary to compel their

appearance in the United States to challenge their indictments.  In *United States v. Tucor Int'l, Inc.*, the court granted the foreign defendants' request for a special appearance to challenge the indictment.  No. 4:92-cr-00425 (N.D. Cal. Oct. 20, 1997), ECF No. 102 (Order Granting Mot. for Leave to Make Special Appearance).  The court stated that ramifications that extended "beyond the parties to the action" necessitated ruling on the motion to dismiss before arraignment, including, in that case, the "strong views of the Philippines government" that the indictment infringed upon its sovereignty and violated U.S. treaty obligations.  *Id.* at 5-6.  The court in *United States v. Noriega* reached a similar conclusion, stressing that "delicate issues" in a case "fraught with political overtones" weigh in favor of allowing the foreign defendant the opportunity to challenge the indictment through a special appearance despite finding that the defendant was a fugitive.  683 F. Supp. 1373, 1374-75 (S.D. Fla. 1988).  Finally, in *United States v. Siriwan*, the prosecution challenged the defendant's ability to enter a special appearance under the fugitive disentitlement doctrine, which gives courts discretion to decline to rule on a fugitive defendant's motions.  The court determined that the doctrine did not apply to the

21

foreign citizen and resident defendants, because they were never present in the United States and thus did not flee the jurisdiction. No. CR 09-81, 2011 WL 13057709, at *1 (C.D. Cal. July 28, 2011).[5]

The District Court dismissed these authorities because, again, they arose "outside the Second Circuit," or involved individual defendants. App. at A147, A160-62. But the District Court itself identifies *no* Second Circuit decisions where a special appearance request to address minimum contacts in a criminal matter was denied. Instead, the District Court engaged in judicial gerrymandering of precedential authority to support its ruling: It selectively relied on out-of-circuit precedent, cited passages deemed favorable to its desired outcome, ignored passages in the same cases supporting Halkbank's position, or cited cases involving individual defendants, yet rejected Halkbank's cited precedent as "unpersuasive" or "outlier(s)." App. at A147.[6] The right to make a special appearance to preserve a

---

[5] The court also noted: "Substantive arguments as to whether the indictment should in fact be dismissed would not be before the Court until it decides whether to permit the special appearances in the first place." *Siriwan*, 2011 WL 13057709, at *1 n.1.

[6] Of the six additional special appearance cases identified, twice the court found that the defendant had waived the right to enter a special appearance and in four instances the court denied a defendant's request

fundamental constitutional challenge that might otherwise be waived

through a general appearance should not be subject to the vagaries of

differing precedents in differing circuits.

### D. Without Mandamus, Halkbank Risks Waiver of Its Fundamental Rights

Halkbank's clear and indisputable right to mandamus derives

from the nature of the rights it seeks to protect.  Personal jurisdiction is

a conditional right that can be waived and must be challenged with a

timely objection to avoid risking waiver.  *E.g.*, *Maruyasu*, 229 F. Supp.

at 671.

Remarkably, despite the fact that Halkbank made clear that the

purpose of its request for a special appearance was to avoid waiving its

rights, the Decision does not address waiver—the term is mentioned

---

for leave to enter a special appearance.  App. at A102-03.  The four
denials arose in different contexts inapplicable here.  Two cases were
decided under the fugitive disentitlement doctrine, which does not apply
to Halkbank.  App at A102; *infra* at 29-31.  In the other two cases, one
involved a defendant's attempt to use findings made during his co-
defendant's sentencing to undermine the allegations, *United States v.
Adamov*, CR No. 05-129, 2008 WL 1943550, at *3 (W.D. Pa. May 2,
2008), and the other involved a *pro se* defendant purportedly
challenging the "territorial jurisdiction of the Court" (*i.e.*, not personal
jurisdiction) who had already appeared by filing numerous pre-trial
motions and a counter-complaint, *United States v. Shimek*, 445 F. Supp.
884, 887, 893 (M.D. Pa. 1978).

only *once* in the body of the Decision, in passing, when noting the Bank's desire to avoid waiver in its summary of the procedural history. App. at A140. Yet the Decision's ultimatum forces the Bank to waive its constitutional rights or not appear and "face any attendant risks." App. at A141 (citing DOJ Memo, *infra* at 35). The Decision ignores the multiple federal criminal cases which have found that participating in proceedings by, among other things, entering a plea waived a personal jurisdiction challenge. For example, in a case within the Second Circuit buried in Exhibit B, this Court found that waiver had occurred in *United States v. Beadon*, where three corporate defendants appealed their convictions, contending that they were not "in court" and that no valid verdict could be rendered against them for that reason. The Second Circuit found that personal jurisdiction had been accepted because counsel had entered general appearances for the corporations. 49 F.2d at 167.

Federal courts have also found that defendants waive the ability to enter a special appearance by participating in the case. For example, in *Maruyasu*, the court found that the defendant's participation in the litigation, "including pleading not guilty," amounted to a waiver of

personal jurisdiction.  229 F. Supp. 3d at 671.  *Maruyasu* stands in sharp contrast to the present case—Halkbank has *not* yet entered a plea and seeks to file a special appearance for the singular purpose of *avoiding* waiver.

### E.   The District Court Cannot Bind Appellate Courts that Could Consider a General Appearance as Waiver of the Right to Challenge Personal Jurisdiction

The Decision purports to allow Halkbank to "file a motion for the Court's recusal and/or *relating to* the Court's jurisdiction" following arraignment.  App. at A141 (emphasis added).  But, as previously noted, the reasoning of the Decision effectively forecloses any right to assert a due process challenge to the exercise of personal jurisdiction. *Supra* at 6-8.  Moreover, the District Court does not have the power to make the "no waiver" guarantee in any event because it cannot bind another District Judge, this Court, or the Supreme Court.  *See Dynegy Midstream Servs. v. Trammochem*, 451 F.3d 89, 94 (2d Cir. 2006) (reviewing personal jurisdiction *de novo*).  If the Bank were to enter a plea or file other pre-trial motions, another judge or court may later determine that the Bank had waived its right to challenge personal jurisdiction.  And if Halkbank's recusal motion is granted, there *will* be

another District Judge—with his or her own views as to waiver—who

will rule on the personal jurisdiction motion.

## II.  Mandamus Will Appropriately Resolve an Unsettled Legal Issue and End Ongoing Irreparable Harm

The Second Circuit has found mandamus appropriate to resolve

issues of first impression and to prevent ongoing irreparable harm.

Mandamus protects parties against "a judicial usurpation of power or a

clear abuse of discretion."  *In re Roman Catholic Diocese*, 745 F.3d at 35

(citations and quotations omitted).  But mandamus is also appropriate

to resolve this issue of first impression.  Mandamus would address this

unsettled, novel legal question—it would serve a "corrective and

didactic" role.  *Balintulo v. Daimler AG*, 727 F.3d 174, 187 n.18 (2d Cir.

2013) (citations and quotations omitted).  Mandamus is particularly

appropriate since this "important, undecided issue will forestall future

error in trial courts, eliminate uncertainty and add importantly to the

efficient administration of justice."  *In re von Bulow*, 828 F.2d 94, 98-99

(2d Cir. 1987) (citations and quotations omitted).  Moreover, mandamus

is proper to stop ongoing irreparable harm that, "for mandamus

purposes typically involves an interest that is both important to and

distinct from the resolution of the merits of the case." *Linde v. Arab Bank, PLC*, 706 F.3d 92, 117 (2d Cir. 2013).

## A.   Courts Have Ordered Mandamus to Address Analogous Legal Issues

This case presents a novel issue before this Court, as discussed below.  But the Seventh Circuit granted mandamus in a similar case, *In re Hijazi*, to allow a foreign defendant to seek the pre-arraignment dismissal of an indictment.  589 F.3d at 414.  In *Hijazi*, the defendant was a foreign citizen and resident who had never been physically present in the court's jurisdiction and was lawfully in Kuwait at the time of the indictment.  The court described the issue before it as a narrow one:

> [I]s [defendant] entitled to a ruling at this time, or must he voluntarily travel to the United States and present himself for arraignment before the court takes his motions under advisement?  Put simply, does the district court, under the circumstances of this case, have a duty to rule now on the authority of the United States to apply its law to [defendant's] conduct?

*Id.* at 406.

The court answered this question in the affirmative and granted mandamus, ordering the district court to rule on his

27

motion to dismiss the indictment even though defendant had not entered an appearance.  *Id.* at 408, 411, 414.

The prosecution in *Hijazi* argued that a writ of mandamus should not be available because the defendant could obtain the relief he desired by showing up in court and making a general appearance.  This is the same argument adopted by the District Court here.  But the *Hijazi* court of appeals rejected that argument:

> [The prosecution's] reasoning overlooks the entire point of [defendant's] attack on the indictment.  [Defendant] was lawfully in Kuwait at the time of the indictment and remains so today.  The government cites no support for the proposition that [defendant] has no right to stay there, and in that way, to refuse to cooperate with the U.S. proceeding. In fact, the reach of the statutes that [defendant] allegedly violated and the district court's authority to command his appearance are precisely the issues [defendant] wants the district court to resolve.

*Id.* at 407.

In these circumstances, the court found that "ordinary proceedings" of making an appearance and entering a plea did not provide the defendant with an adequate remedy and that the relief he was requesting was "well within the power of the district court."  *Id.* at 408.

28

By denying Halkbank's request for a special appearance, the District Court is doing exactly what the Seventh Circuit found improper in *Hijazi*—conditioning Halkbank's assertion of its constitutional rights on a commitment by Halkbank that it first subject itself to the jurisdiction of the Court, thereby waiving the very right it seeks to assert. App. at A141. Consistent with its gerrymandering treatment of other cases that do not support its reasoning, the District Court relegates its analysis of *Hijazi* to Exhibit B. There, in *dicta*, the District Court suggests *Hijazi* was limited by subsequent cases where individual defendants were determined to be fugitives under the fugitive disentitlement doctrine. *See* App. at A158-65. However, even under this reasoning, *Hijazi* still applies to this case because the Bank cannot be a fugitive.

The District Court's application of the fugitive disentitlement doctrine, although *dicta*, is also wrong. Halkbank is a corporate defendant that has never been present in the United States, cannot be arrested or extradited, and is therefore not a fugitive. Every one of the District Court's cited cases involved individual defendants. *See id.* In support of its ruling, the Decision mischaracterizes the Bank's briefing

on this issue before the District Court.  *Compare* App. at A154, *with*
App. at A90-91.  For example, the District Court ignores the context in
which the Sixth Circuit found that the fugitive disentitlement doctrine
does not apply to corporate defendants (App. at A128; *United States v.*
*Yang*, 144 F. App'x 521, 523 (6th Cir. 2005)), ignores that *Hijazi*
addressed and rejected concerns about a lack of "mutuality" in
litigation, 589 F.3d at 414, and refuses to acknowledge that the fugitive
disentitlement doctrine has never been applied to deny a foreign
corporate defendant a special appearance.

In its desperation to apply the fugitive disentitlement doctrine to a
corporate entity, the District Court completely misapplies 28 U.S.C. §
2466, a statute that incorporates the doctrine into asset forfeiture
actions in specific circumstances.  By its terms, this provision relates
only to forfeiture proceedings.  App. at A154-55.  Even in that limited
context, it only applies where an individual fugitive is a majority
shareholder of a corporate entity.  These facts are entirely absent in this
case.  Although the District Court claims that *United States v.*
*$6,976,934.65 Plus Interest*, 478 F. Supp. 2d 30, 43 (D.D.C. 2007) found
that this statute extended the fugitive entitlement doctrine to

corporations, it does not sweep as broadly as the District Court suggests.  In that case, the court noted that 28 U.S.C. § 2466(b) "clarifies that a natural person who is a fugitive may not circumvent this provision by filing, or having another person file, a [forfeiture] claim on behalf of a corporation that the fugitive controls."  *Id.* at 42 (quoting H.R. REP. NO. 107-250(I), at 69 (2001)).  According to the court, "[a]ll that subsection (b) appears to add is a presumption that a fugitive's disentitlement will be imputed to a corporation of which he is a majority shareholder or on behalf of whom he files a [forfeiture] claim."  *United States v. $6,976,934.65 Plus Interest*, 478 F. Supp. 2d at 43.  This is not a forfeiture proceeding, and there is no individual fugitive who is a majority shareholder of Halkbank.  Thus, the narrow asset forfeiture statute does not apply to Halkbank.

> ### B.   A District Court's Unjustified Denial of a Special Appearance Is a Novel Legal Issue that Is Likely to Evade Review, Blocking Future Defendants from Asserting Their Constitutional Rights

The Second Circuit has never reviewed whether a District Court can deny leave to enter a special appearance in these circumstances, which could thwart a criminal defendant's opportunity to assert its constitutional rights.  No statute or rule supports the District Court's

reasoning that Halkbank should be required to "travel to New York and answer the charges or have its legal counsel do so" to protect its due process rights.  App. at A147.  Indeed, other cases "outside the Second Circuit" such as *Hijazi* have reached the opposite conclusion.

In the civil context, FED. R. CIV. P. 12(b)(2) specifically permits a defendant to bring a motion to dismiss for lack of personal jurisdiction and therefore obviates the need for a special appearance.  Unlike the revised Civil Rules, the Criminal Rules lack an express rules-based mechanism for defendants to challenge certain threshold issues like personal jurisdiction absent a special appearance.  No express safe harbor in the Criminal Rules protects against waiver as does Civil Rule 12.  Criminal Rule 12 permits a challenge to jurisdiction at any time while the case is pending, but this provision refers only to *subject matter* jurisdiction, not personal jurisdiction.  *United States v. Mullet*, 822 F.3d 842, 847-48 (6th Cir. 2016).  Only a challenge through a special appearance avoids potential waiver.  *See also United States v. Stein*, 435 F. Supp. 2d 330, 378 n.235 (S.D.N.Y. 2006), *aff'd*, 541 F.3d 130 (2d Cir. 2008) (finding actions by non-party may have constituted general appearance and waived objection to personal jurisdiction).

As the Decision notes, in December 2016, Criminal Rule 4 was amended to provide prosecutors with more flexibility to serve organizations located outside the United States.  App. at A141-42.  The changes to Criminal Rule 4 removed the need to enter a special appearance to contest *notice* of the summons but did not eliminate the need to enter a special appearance to contest personal jurisdiction. Multiple authorities acknowledge that amended Criminal Rule 4 was narrowly aimed to address issues with notice of the summons only and did not otherwise impact the availability of special appearances.

First, according to the final Advisory Committee Report describing the rule change, the proposed amendment only eliminated the need for special appearances to contest notice of a summons.[7]  The Advisory Committee Report noted that challenges to other threshold issues via a special appearance remained available and appropriate.  *Id.*

Second, the Ninth Circuit acknowledged the availability of special appearances in criminal cases just last year in *In re Pangang Grp. Co., Ltd.*, 901 F.3d 1046, 1052 (9th Cir. 2018), a case cited seven times by

---

[7] *See* Mem. and Report of the Advisory Comm. on Crim. Rules at 6 (May 6, 2015), https://www.uscourts.gov/sites/default/files/2015-05-criminal_rules_report_0.pdf.

the District Court even though it is "outside the Second Circuit."  The

Ninth Circuit denied a petition for mandamus seeking to review a

motion to quash service of a summons (which is *not* at issue here) and

found there was not a "longstanding historical practice" of special

appearances in criminal cases, but the court noted that amended

Criminal Rule 4 only affected the availability of special appearances to

contest *notice* of the summons.  *Id*. at 1057.  The court explained that

"Criminal Rule 4 would not eliminate the possibility of special

appearances entirely," citing the Advisory Committee Report.  *Id*. at

1059.

Third, the Department of Justice itself acknowledged that, even

with amended Criminal Rule 4, criminal defendants could still make

special appearances to contest issues such as personal jurisdiction.  In a

letter from the Department to the Advisory Committee, the Department

noted that amended Criminal Rule 4 would eliminate the need to enter

a special appearance only to contest notice of a summons but not for

other threshold issues, including to contest personal jurisdiction.  *See*

Mem. Regarding Proposed Amendments to Rule 4 from Jonathan J.

Wroblewski, Dir., Office of Policy and Legislation, U.S. Dep't of Justice

to Judge David M. Lawson, Chair, Subcomm. of Advisory Comm. on Crim. Rules, at 2 (Feb. 20, 2015) ("DOJ Memo").

The DOJ Memo explicitly noted that the availability of a special appearance for other threshold issues remained intact and gave several non-exhaustive examples of instances where special appearances were appropriate, including to contest personal jurisdiction. *Id.* The Department therefore validated the use of special appearances to challenge threshold issues besides service. *Id.* The District Court's gerrymandering approach to legal analysis cited the DOJ Memo on the irrelevant issue of contesting service but declined even to acknowledge this pertinent part of the DOJ Memo describing other grounds for seeking a special appearance.

These authorities make indisputably clear that special appearances in the criminal context have not been eliminated. Unless the prosecution is disavowing the reassurances provided to the Rules Committee in the DOJ Memo to support changing Rule 4, then based on the DOJ Memo, the Department must concede that special appearances are appropriate, at a minimum, to allow a criminal defendant to properly contest personal jurisdiction without threat of waiver. The

Court should therefore grant the petition for mandamus to settle this important legal issue.

## C.   Only Mandamus Will Prevent Ongoing Irreparable Harm to the Bank

The District Court's denial of Halkbank's procedural motion bars the Bank from fully asserting its constitutional rights without risking waiver, causing significant harm to the Bank that will only intensify unless this Court grants mandamus relief.  *See In re Vasquez-Ramirez*, 443 F.3d 692, 701 (9th Cir. 2006) (finding mandamus relief appropriate where defendant would have irreparably suffered prejudice of additional and unnecessary trial); *In re Ellis*, 356 F.3d 1198, 1211 (9th Cir. 2004) (same) (citing *Arizona v. Washington*, 434 U.S. 497, 503-05 (1978)).

Because of Halkbank's unique economic role in Turkey, the Bank's indictment has had a severe and negative impact on the people of Turkey, especially Turkey's small businesses.  Halkbank's further deterioration could harm the Turkish economy and risks leaving these clients without a lender.  Harm to innocent third parties, including ordinary citizens, provides compelling support for mandamus.  *In re The City of New York*, 607 F.3d 923, 950 (2d Cir. 2010) (granting petition for

mandamus to prevent disclosure of undercover police reports in part because of potential threat to safety of New York civilians).  The quicker this issue is resolved, the sooner Halkbank can mitigate the harm to its customers and partners.

The irreparable harm caused by the District Court's erroneous order is also heightened by the political stakes of this dispute.  This litigation involves key issues in U.S.-Turkish relations.  In other cases involving significant issues of international politics, courts have emphasized the importance of addressing questions about impartiality.  In *Noriega*, the court remarked:

> [T]he best way to avoid the appearance that this indictment has assumed the character of a political proceeding, rather than a legal one, is to determine its legal validity upon the arguments of counsel.  In that way, the integrity of our legal system will best be served.  Counsel suggested at oral argument on this motion that the world is watching this case.  In the unlikely event that such an observation is accurate, it is all the more important that our frequent protestations about due process, presumptions of innocence and fair play be given meaning.  Indeed, any procedure which will negate the perception that this prosecution may have been politically motivated should be welcomed by the Government.

683 F. Supp. at 1375.  The District Court quietly ignores *Noriega* (citing it only in Exhibit B) which, combined with its irrelevant citation to

multiple *New York Times* articles referencing political issues, fuels the perception that this case has "assumed the character of a political proceeding." *See, e.g.*, App. at A130, A131, A138-39 (news articles), A160 (discussion of *Noriega*). Worse, in its cursory treatment of *Noriega* in Exhibit B, the District Court improperly dismisses its importance because it is "outside the Second Circuit" and because that court ultimately denied the defendant's motion to dismiss. App. at A160. The merits of that defendant's motion to dismiss—like the merits of the Bank's personal jurisdiction motion—were not at issue on the special appearance request.

There is no reason for the Bank to endure this ongoing harm, especially when personal jurisdiction and recusal necessarily must be decided first before the merits of the case are addressed. *Abelesz v. OTP Bank*, 692 F.3d 638, 651-52 (7th Cir. 2012) (granting petition for mandamus to dismiss case for lack of personal jurisdiction, in part, to avoid wasting resources).

### III.   Halkbank Has No Other Adequate Means to Protect Its Right to Challenge Personal Jurisdiction Without Risking Waiver

This Petition is the only adequate means to compel the District Court to grant the Bank's request for a special appearance.  A special appearance, in turn, is the only way for Halkbank to challenge personal jurisdiction without risking waiver and, ancillary to that request, to move for Judge Berman's recusal.  This Petition is therefore the only adequate means for the Bank to protect its fundamental rights.

Mandamus relief is also the only means by which this Court can intervene.  Review of a request for special appearance is not directly appealable, not subject to civil certification, and not otherwise subject to review.  *See* 28 U.S.C. § 1292(b); *United States v. Shalhoub*, 855 F.3d 1255, 1261 (11th Cir. 2017), *cert. denied*, 138 S. Ct. 381 (2017).

## CONCLUSION

For the foregoing reasons, the Petition for mandamus should be granted, and the District Court should be directed to enter the Bank's special appearance for the limited purpose of filing a motion to dismiss for lack of personal jurisdiction and a motion for recusal.

Respectfully submitted,

Dated: December 17, 2019

King & Spalding LLP

By: /s/ Andrew C. Hruska

Andrew C. Hruska, Esq.
William F. Johnson, Esq.
Richard H. Walker, Esq.
Katherine Kirkpatrick, Esq.*
KING & SPALDING LLP
1185 Avenue of the Americas
New York, New York 10036
Telephone: (212) 556-2278
Facsimile: (212) 556-2222
ahruska@kslaw.com
wjohnson@kslaw.com
rwalker@kslaw.com
kkirkpatrick@kslaw.com

*Admissions pending/forthcoming

*Counsel for Defendant*
*Türkiye Halk Bankasi A.Ş.*

## STATEMENT REGARDING ORAL ARGUMENT

Oral argument is requested.  This petition involves an unprecedented denial of a criminal defendant's right to challenge the personal jurisdiction of the court, as well as to seek recusal.  Further, this petition presents novel issues of law which have never been addressed by this Circuit.  Therefore, Halkbank's counsel respectfully would appreciate the opportunity to address any questions from the Court.

## CERTIFICATE OF COMPLIANCE

I certify that this petition complies with the page limitations of FED. R. APP. P. 21(d) and that this petition complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6) because it contains 7,781 words and has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook.

/s/ Andrew C. Hruska
Andrew C. Hruska

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing petition with the Clerk of the Court for the United States Court of Appeals for the Second Circuit by using the appellate CM/ECF system on December 17, 2019.  In addition, I hereby certify that on December 17, 2019, I served the foregoing document on the District Court and on the counsel below as indicated:

<u>By E-Mail and U.S. Mail:</u>

Michael Dennis Lockard, Esq.
Sidhardha Kamaraju, Esq.
David William Denton, Jr., Esq.
Jonathan Rebold, Esq.
Kiersten Fletcher, Esq.
United States Attorney's Office
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

<u>By Hand:</u>

Honorable Richard M. Berman
United States District Judge
Daniel Patrick Moynihan United States Courthouse
Courtroom 17B
500 Pearl St.
New York, New York 10007

<u>/s/ Andrew C. Hruska</u>
Andrew C. Hruska

No. 19-_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT
────────────────

IN RE TÜRKIYE HALK BANKASI A.Ş.

*Petitioner.*
────────────────

On Petition for a Writ of Mandamus to the
United States District Court for the
Southern District of New York,
*United States v. Türkiye Halk Bankasi A.Ş.*, No. 1:15-CR-00867-RMB
────────────────

## APPENDIX TO PETITION FOR A WRIT OF MANDAMUS
────────────────

Andrew C. Hruska
William F. Johnson
Richard H. Walker
Katherine Kirkpatrick*
KING & SPALDING LLP
1185 Avenue of the Americas
New York, New York 10036
Telephone: (212) 556-2278
Facsimile: (212) 556-2222
ahruska@kslaw.com
wjohnson@kslaw.com
rwalker@kslaw.com
kkirkpatrick@kslaw.com

*Admissions pending/forthcoming
*Attorneys for Specially-Appearing Defendant-Petitioner
Türkiye Halk Bankasi A.Ş.*

December 17, 2019

# TABLE OF CONTENTS

**DOCUMENT**                                                    **PAGE**

Superseding Indictment (Oct. 15, 2019), ECF No. 562 .................A1-A45

Halkbank's Letter with Request to Enter Special
Appearance (Nov. 4, 2019), ECF No. 570 ....................................A46-A49

Government's Letter in Response to Halkbank's Request to
Enter Special Appearance (Nov. 4, 2019), ECF No. 571 ..............A50-A57

Transcript of Hearing Regarding Halkbank's Request to
Enter Special Appearance (Nov. 5, 2019), ECF No. 575 ..............A58-A84

Halkbank's Letter with Additional Authorities in Support of
Its Request to Enter Special Appearance (Nov. 19, 2019),
ECF No. 577 ...................................................................................A85-A104

Government's Letter in Opposition to Halkbank's Request to
Enter Special Appearance (Nov. 26, 2019), ECF No. 578 ........A105-A119

Halkbank's Reply to Government's Letter in Opposition
to Request to Enter Special Appearance (Dec. 2, 2019),
ECF No. 579 ..............................................................................A120-A129

Court's Order Denying Halkbank's Request to Enter Special
Appearance (Dec. 5, 2019), ECF No. 581 .................................A130-A165

Court's Order for Halkbank to Show Cause Why It Should
Not be Held in Contempt of Summonses and Why Sanctions
Should Not be Imposed (Dec. 9, 2019), ECF No. 582 ...............A166-A168

ORIGINAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - x
                                      :
UNITED STATES OF AMERICA              :        **SUPERSEDING INDICTMENT**
                                      :
        - v. -                        :        S6 15 Cr. 867 (RMB)
                                      :
TÜRKİYE HALK BANKASI A.S.,            :
    a/k/a "Halkbank,"                 :
                                      :
            Defendant.                :
                                      :
- - - - - - - - - - - - - - - - - - - x

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  OCT 1 5 2019
```

## BACKGROUND

1.     The charges in this Indictment arise out of a
multi-year scheme by TÜRKİYE HALK BANKASI A.S., a/k/a
"Halkbank," the defendant (hereinafter, "HALKBANK"), a Turkish
bank majority-owned by the Government of Turkey, to violate and
evade U.S. national security controls against the Government of
Iran.  HALKBANK and its officers, agents, and co-conspirators
directly and indirectly used money service businesses and front
companies in Iran, Turkey, the United Arab Emirates, and
elsewhere to violate and to evade and avoid prohibitions against
Iran's access to the U.S. financial system, restrictions on the
use of proceeds of Iranian oil and gas sales, and restrictions
on the supply of gold to the Government of Iran and to Iranian
entities and persons.  HALKBANK knowingly facilitated the
scheme, participated in the design of fraudulent transactions

intended to deceive U.S. regulators and foreign banks, and lied to U.S. regulators about HALKBANK's involvement.

2.   High-ranking government officials in Iran and Turkey participated in and protected this scheme.  Some officials received bribes worth tens of millions of dollars paid from the proceeds of the scheme so that they would promote the scheme, protect the participants, and help to shield the scheme from the scrutiny of U.S. regulators.

3.   The proceeds of Iran's sale of oil and gas to Turkey's national oil company and gas company, among others, were deposited at HALKBANK, the defendant, in accounts in the names of the Central Bank of Iran, the National Iranian Oil Company ("NIOC"), and the National Iranian Gas Company.  Because of U.S. sanctions against Iran and the anti-money laundering policies of U.S. banks, it was difficult for Iran to access these funds in order to transfer them back to Iran or to use them for international financial transfers for the benefit of Iranian government agencies and banks.

4.   HALKBANK, the defendant, participated in several types of illicit transactions for the benefit of Iran that, if discovered, would have exposed HALKBANK to sanctions under U.S. law, including (a) allowing the proceeds of sales of Iranian oil and gas deposited at HALKBANK to be used to buy gold for the

A2

benefit of the Government of Iran; (b) allowing the proceeds of sales of Iranian oil and gas deposited at HALKBANK to be used to buy gold that was not exported to Iran, in violation of the so-called "bilateral trade" rule; and (c) facilitating transactions fraudulently designed to appear to be purchases of food and medicine by Iranian customers, in order to appear to fall within the so-called "humanitarian exception" to certain sanctions against the Government of Iran, when in fact no purchases of food or medicine actually occurred.  Through these methods, HALKBANK illicitly transferred approximately $20 billion worth of otherwise restricted Iranian funds.

5.    Senior officers of HALKBANK, the defendant, acting within the scope of their employment and for the benefit of HALKBANK, concealed the true nature of these transactions from officials with the U.S. Department of the Treasury ("Treasury") so that HALKBANK could supply billions of dollars' worth of services to the Government of Iran without risking being sanctioned by the United States and losing its ability to hold correspondent accounts with U.S. financial institutions.

6.    The purpose and effect of the scheme in which HALKBANK, the defendant, participated was to create a pool of Iranian oil funds in Turkey and the United Arab Emirates held in the names of front companies, which concealed the funds' Iranian

3

A3

nexus.  From there, the funds were used to make international payments on behalf of the Government of Iran and Iranian banks, including transfers in U.S. dollars that passed through the U.S. financial system in violation of U.S. sanctions laws.

### The Defendant

7.   At all times relevant to this Indictment, HALKBANK, the defendant, was a foreign financial institution organized under the laws of and headquartered in Turkey.  The majority of HALKBANK's shares are owned by the Government of Turkey.  From approximately 2011 until 2014, Suleyman Aslan, a co-conspirator not charged as a defendant herein, was HALKBANK's General Manager (i.e., the chief executive).  From approximately 2011 until 2017, Mehmet Hakan Atilla, a co-conspirator not charged as a defendant herein, was HALKBANK's Deputy General Manager for International Banking, and was responsible for maintaining the bank's correspondent banking relationships, including its U.S. correspondent accounts, and for the bank's relationships with Iranian banks, including the Central Bank of Iran.  During their tenures, Aslan and Atilla were the executives principally responsible for communicating with Treasury's Under Secretary for Terrorism and Financial Intelligence and its Director of the Office of Foreign Assets Control ("OFAC") about HALKBANK's compliance with U.S. sanctions

4

A4

against Iran.  From approximately 2011 until 2013, Levent Balkan, a co-conspirator not charged as a defendant herein, headed HALKBANK's Foreign Operations Department, which was responsible for processing international banking transactions. In undertaking the actions and agreements described below, Aslan, Atilla, Balkan, and other officers and employees of HALKBANK were acting within the scope of their employment and for the benefit of HALKBANK.

8.   At all times relevant to this Indictment, HALKBANK, the defendant, was the sole repository of proceeds from the sale of Iranian oil by NIOC to Turkey.  Principally as a result of U.S. sanctions restricting the use of Iranian oil proceeds, as of in or about 2012, billions of dollars' worth of funds had accumulated in NIOC's and the Central Bank of Iran's accounts at HALKBANK.

### The International Emergency Economic Powers Act

9.   The International Emergency Economic Powers Act ("IEEPA"), codified at Title 50, United States Code, Sections 1701 to 1706, confers upon the President authority to deal with unusual and extraordinary threats to the national security and foreign policy of the United States.  Section 1705 provides, in part, that "[i]t shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of

5

A5

any license, order, regulation, or prohibition issued under this title." 50 U.S.C. § 1705(a).

10. Beginning with Executive Order No. 12170, issued on November 14, 1979, the President has found that "the situation in Iran constitutes an unusual and extraordinary threat to the national security, foreign policy and economy of the United States" and declared "a national emergency to deal with that threat."

**The Iranian Transactions and Sanctions Regulations**

11. On March 15 and May 6, 1995, the President issued Executive Orders Nos. 12957 and 12959, prohibiting, among other things, the exportation, reexportation, sale, or supply, directly or indirectly, to Iran of any goods, technology, or services from the United States or by a United States person, and on August 19, 1997, issued Executive Order No. 13059 clarifying the previous orders (collectively, the "Executive Orders"). The Executive Orders authorized the United States Secretary of the Treasury to promulgate rules and regulations necessary to carry out the Executive Orders. Pursuant to this authority, the Secretary of the Treasury promulgated the Iranian Transactions Regulations (renamed in 2013 the Iranian Transactions and Sanctions Regulations, or "ITSR"), implementing the sanctions imposed by the Executive Orders.

6

A6

12.   Title 31, Code of Federal Regulations, Section 560.204 of the ITSR prohibits, among other things, the exportation, reexportation, sale, or supply, directly or indirectly, from the United States, or by a United States person, of goods, technology, or services to Iran or the Government of Iran (with certain limited exceptions), including the exportation, reexportation, sale, or supply of goods, technology, or services to a third country knowing that such goods, technology, or services are intended for Iran or the Government of Iran, without a license from OFAC.

13.   The ITSR provide that the transfer of funds, directly or indirectly, from the United States or by a U.S. person to Iran or the Government of Iran is a prohibited export, reexport, sale, or supply of services to Iran or the Government of Iran.   See 31 C.F.R. § 560.427(a).

14.   The ITSR further prohibit transactions that evade or avoid, have the purpose of evading or avoiding, cause a violation of, or attempt to violate the ITSR.   See 31 C.F.R. § 560.203.

### Sanctions Concerning Proceeds of Iranian Oil Sales and the Supply of Gold to Iran

15.   On December 11, 2011, the National Defense Authorization Act for Fiscal Year 2012 was enacted (the "2012 NDAA"), requiring the imposition of sanctions on foreign

7

A7

financial institutions—including banks and money service business, among others—following a determination by the President that a foreign financial institution violated certain prohibitions with respect to the Central Bank of Iran or another Iranian financial institution designated under the IEEPA.  These prohibitions applied to government-owned foreign financial institutions with respect to transactions for the sale or purchase of petroleum or petroleum products to or from Iran conducted or facilitated on or after 180 days from the enactment of the 2012 NDAA, unless the foreign country significantly reduced its volume of petroleum and petroleum products purchased from Iran.  These prohibitions included an exception for transactions for the sale of food, medicine, or medical devices to Iran.

16.  On July 30, 2012, the President issued Executive Order 13622 to take additional steps with respect to the national emergency declared in Executive Order 12957.  The President, among other things, imposed additional restrictions with respect to the sale of Iranian petroleum and petroleum products, authorizing the Secretary of the Treasury to impose sanctions on a foreign financial institution that knowingly conducted or facilitated any significant financial transaction with NIOC, the Naftiran Intertrade Company Ltd. ("NICO"), or the

8

A8

Central Bank of Iran, or for the purchase or acquisition of petroleum or petroleum products from Iran, unless the President determined the foreign country had significantly reduced its volume of petroleum and petroleum products purchased from Iran pursuant to the 2012 NDAA.  The available sanctions included prohibitions and conditions on opening or maintaining U.S. correspondent and payable-through accounts of the foreign financial institution.  Exec. Order 13622, 77 Fed. Reg. 45897 (Jul. 30, 2012).

17.  Executive Order 13622 also authorized the Secretary of the Treasury to block property and property interests in the United States of any person who "materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services in support of, NIOC, NICO, or the Central Bank of Iran, or the purchase or acquisition of U.S. bank notes or precious metals by the Government of Iran."  Exec. Order 13622, 77 Fed. Reg. 45897 (Jul. 30, 2012).  Executive Order 13622 prohibited any transaction that evaded or avoided, had the purpose of evading or avoiding, caused a violation of, or attempted to violate any of the prohibitions set forth in that order.

18.  On August 10, 2012, the Iran Threat Reduction and Syria Human Rights Act of 2012, codified at 22 U.S.C. §§ 8711 et

A9

seq. (the "Iran Threat Reduction Act" or "ITRA"), extended the
sanctions against Iranian oil sales.  The ITRA amended the 2012
NDAA by imposing a "bilateral trade" restriction on Iranian oil
proceeds:  Financial transactions by foreign financial
institutions with respect to the sale or purchase of petroleum
or petroleum products to or from Iran were permitted only for
trade between the foreign country and Iran, with any funds owed
to Iran deposited in an account within that foreign country.
See 22 U.S.C. § 8513a(d)(4)(D).  In other words, the proceeds of
Iranian oil sales to Turkey had to be deposited into accounts in
Turkey and could be used only for trade between Turkey and Iran;
otherwise, any foreign financial institution facilitating non-
compliant transactions faced U.S. sanctions.  These requirements
went into effect on or about February 6, 2013.

    19.  On January 2, 2013, the Iranian Freedom and
Counterproliferation Act (the "IFCA"), imposed additional
restrictions on supplying gold to Iran.  The IFCA broadened the
prohibition in Executive Order 13622 on supplying precious
metals to the Government of Iran to prohibit the sale, supply,
or transfer of precious metals, directly or indirectly, to the
country of Iran, including non-Government entities.  See 22
U.S.C. § 8804(a)(1)(A).  The available sanctions included
prohibitions and conditions on opening or maintaining U.S.

correspondent and payable-through accounts of the foreign financial institution.  The IFCA also extended the ITRA's bilateral trade restriction to the proceeds of Iranian natural gas sales.  The IFCA's restrictions went into effect on or about July 1, 2013.

20.  On June 3, 2013, the President implemented, among other things, the IFCA's prohibition on dealings in precious metals on behalf of Iran pursuant to his authorities under the IFCA, the IEEPA, and other statutes, as well as the ITRA's "bilateral trade" and other restrictions on transactions relating to petroleum and petroleum productions from Iran. Exec. Order 13645, 78 Fed. Reg. 33945 (June 3, 2013).  Executive Order 13645 prohibited any transaction that evaded or avoided, had the purpose of evading or avoiding, caused a violation of, or attempted to violate any of the prohibitions set forth in that order.

21.  The Secretary of the Treasury promulgated the Iranian Financial Sanctions Regulations (the "IFSR") implementing the sanctions imposed by the Executive Orders 13622 and 13645, the 2012 NDA, the IFCA, and the ITRA, among others. See 31 C.F.R. §§ 561.203, 204, 205.  The IFSR prohibited, among other things, transactions that evaded or avoided, had the purpose of evading or avoiding, caused a violation of, or

11

A11

attempted to violate any of the provisions of the IFSR.  See 31

C.F.R. § 561.205.

## Designated or Identified Entities and Individuals

22.  Appendix A to the ITSR contained a list of

persons determined to be the Government of Iran.  At all times

relevant to this Indictment, NIOC was an Iranian Oil Company on

the list in Appendix A.  At all times relevant to this

Indictment, NICO and Naftiran Intertrade Company Sarl ("NICO

Sarl") were on the list in Appendix A.

23.  At all times relevant to this Indictment, Bank

Sarmayeh, Bank Parsian, Bank Pasargad, Bank Saman, Credit

Institution for Development, and Eghtesad Novin Bank were

Iranian financial institutions and, beginning on July 12, 2012,

were identified as Iranian financial institutions by OFAC.  At

all times relevant to this Indictment, Sarmayeh Exchange was a

money services business in Iran owned and controlled by Bank

Sarmayeh.  At all times relevant to this Indictment, Bank

Keshavarzi was an Iranian financial institution owned or

controlled by the Government of Iran and listed in Appendix A to

the ITSR.

24.  On or about July 12, 2012, OFAC designated Hong

Kong Intertrade Company ("HKICO") as a "Specially Designated

National" ("SDN") pursuant to the ITSR.  OFAC further identified

12

A12

NIOC as an agent or affiliate of Iran's Islamic Revolutionary Guard Corp ("IRGC") pursuant to Executive Order 13599 on or about September 24, 2012.  On or about May 23, 2013, OFAC designated Seifollah Jashnsaz, chairman of NICO, NICO Sarl, and HKICO; Ahmad Ghalebani, managing director of NIOC and a director of both Petro Suisse Intertrade Company SA and HKICO; Farzad Bazargan, managing director of HKICO; Hashem Pouransari, NICO official and managing director of Asia Energy General Trading LLC; and Mahmoud Nikousokhan, NIOC finance director and a director of Petro Suisse Intertrade Company SA as SDNs under Executive Order 13382 and the Weapons of Mass Destruction Non-Proliferation Sanctions Regulations, 31 C.F.R. Part 544.  At all times relevant to this Indictment after on or about July 12, 2012, HKICO was an SDN. At all times relevant to this Indictment after May 23, 2013, Jashnsaz, Ghalebani, Bazargan, Pouransari, and Nikousokhan were each an SDN.  At all times relevant to this Indictment after September 24, 2012, NIOC was identified as an agent or affiliate of the IRGC.

### The Gold Export Scheme

25.  As alleged above, in 2012 the U.S. sanctions relating to the sale of Iranian oil and the supply of currency and precious metals to Iran and the Government of Iran grew more restrictive.  In response, HALKBANK, the defendant, and others

13

A13

devised a scheme to use exports of Turkish gold to allow Iran access to the proceeds of Iranian oil sales to Turkey, to evade those restrictions, and to deceive foreign banks and U.S. regulators.

26.   First, HALKBANK, the defendant, conspired with Reza Zarrab, a co-conspirator not named as a defendant herein, and others to transfer Iranian oil proceeds at HALKBANK to exchange houses and front companies controlled by Zarrab in order for those exchange houses and front companies to buy gold for export from Turkey.  After being exported from Turkey, the gold could be converted into cash or currency and remitted to Iran or used to conduct international financial transfers on behalf of Iranian persons and entities.  Although these gold purchases were made by or on behalf of the Government of Iran -- including NIOC, the Central Bank of Iran, and Iranian banks owned or controlled by the Government of Iran -- in violation of Executive Order 13622, Aslan and Atilla represented to Treasury officials that the gold purchases were permissible transactions by private Iranian companies and individuals.

27.   Second, HALKBANK, the defendant, conspired with Zarrab and others to use false documentation and misrepresentations to make it appear that, after gold had been purchased in Turkey with the proceeds of Iranian oil sales

deposited at HALKBANK, the gold was then exported to Iran when,

in fact, the gold was exported to Dubai and sold there, in

violation of the ITRA, 22 U.S.C. § 8513a(d)(4)(D), in order to

obtain U.S. dollars, Euros, and other currencies that could be

used to fund the activities of the Government of Iran and

Iranian companies and persons.  This continued after the IFCA

broadened the gold prohibitions to include supply to private

Iranian companies and individuals.

### HALKBANK Agrees with the Government of Iran and Zarrab to Execute the Gold Export Scheme

28.  Reza Zarrab, an Iranian-Turkish businessman,

operated, among other things, money services businesses and

trading companies in the United Arab Emirates and Turkey.

Zarrab had a contract with Sarmayeh Exchange, a money services

business owned and controlled by Bank Sarmayeh, to conduct

currency exchange and wire transfers for that entity.  In or

about early 2012, Zarrab learned from a representative of

Sarmayeh Exchange that NIOC and the Central Bank of Iran held

billions of dollars' worth of proceeds of sales of Iranian

petroleum in accounts maintained at HALKBANK, the defendant.

29.  Accordingly, in or about March 2012, Zarrab

approached Aslan about opening business accounts at HALKBANK,

the defendant, in order to extract the Iranian oil proceeds to

Dubai through gold exports, using Sarmayeh Exchange and Bank

15

A15

Sarmayeh as intermediaries between Zarrab's companies and the Government of Iran accounts.   Aslan, however, was concerned that Zarrab's high public profile in Turkey would draw attention creating a risk that the scheme would be detected.

30.   Zarrab then met with Turkey's then-Minister of Economy, Mehmet Zafer Cağlayan, a co-conspirator not charged herein, about Aslan's concern.   Zarrab explained the scheme to Cağlayan and enlisted his help.   Cağlayan agreed to help Zarrab execute the gold export scheme through HALKBANK, the defendant, but demanded that Zarrab give Cağlayan half of Zarrab's profits. Zarrab agreed.   Over the course of 2012 and 2013, Zarrab paid Cağlayan bribes totaling at least approximately $70 million in U.S. dollars, Euro, and Turkish lira, as well as luxury watches and other items, in exchange for Cağlayan's support of the gold export scheme's execution.

31.   In addition to benefiting the Government of Iran by evading restrictions on the use of oil proceeds, the gold scheme would also benefit the Government of Turkey:   By converting the otherwise-restricted Iranian oil proceeds at HALKBANK, the defendant, into gold and exporting that gold, the scheme would artificially inflate Turkey's export statistics, making its economy appear stronger than it in fact was.   For example, in 2011, the year before the scheme began, Turkey

16

A16

reported exporting approximately $55 million in gold to Iran.
In 2012, after, as discussed below, the gold scheme was
implemented, Turkey reported exporting approximately $6.5
billion in gold to Iran.  Similarly, Turkey's reported exports
of gold to the U.A.E. rose from approximately $280 million in
2011 to approximately $4.6 billion in 2012.  The funds laundered
from HALKBANK, the defendant, through Zarrab and his companies
were responsible for the vast majority of this increase.

32.  After obtaining Cağlayan's agreement to use his
influence to help the scheme, Zarrab met again with Aslan.
After Cağlayan conveyed his support of the gold export scheme to
Aslan, Aslan agreed that Zarrab could participate in the gold
scheme through HALKBANK, the defendant.

33.  During the summer of 2012, executives with
HALKBANK, the defendant, discussed the gold scheme and its
operation.  For example, Balkan sent emails to Aslan and other
bank officers tracking Zarrab's and others' gold export volumes
and confirming the bank's understanding of the scheme.  In one
such email, sent on or about June 20, 2012, Balkan summarized
the scheme, writing:

> It is understood that this gold, which is
> left in Dubai, can be used in all kinds of
> foreign payments of Iran, either in gold or
> in foreign currency. The fact that these
> gold deposits are collected in the various
> fiduciary accounts and used for

17

A17

international payments of the forbidden
Iranian banks in Dubai (such as Bank Melli,
Bank Sedarat) or Bank Mellat in Turkey. The
gold transaction volume has reached
remarkable dimensions in terms of
international Iran sanctions.

34. In October 2012, Zarrab arranged meetings
between, among others, Iranian government officials and Iranian
bank executives at the Istanbul offices of HALKBANK, the
defendant, to discuss ways to increase the amount of Iranian oil
proceeds that could be laundered through the scheme.

35. In particular, on or about October 4, 2012,
Aslan, Atilla, Zarrab, and a representative of Sarmayeh Exchange
met with Mahmoud Nikousokhan, then the finance director of NIOC,
and other Iranian oil officials.  The participants discussed,
among other things, the following:

a.   NIOC sought to transfer its oil revenues
held in banks in other countries to HALKBANK, the defendant, so
that these funds could also be laundered through the gold system
in place at HALKBANK.

b.   NIOC officials also asked that HALKBANK make
international financial payments on behalf of NIOC using its oil
proceeds directly, rather than laundering them through Zarrab's
front companies.  Aslan and Atilla declined the request, telling
NIOC that those payments should continue to be made through "the
existing system" -- meaning the laundering of Iranian oil funds

18

A18

through the gold system with Zarrab, which concealed HALKBANK's participation in the scheme.

### HALKBANK's General Manager Accepts Bribes to Support the Gold Export Scheme

36.   On October 6, 2012, Aslan and Zarrab met in Alsan's office at HALKBANK, the defendant.  At this meeting, Aslan told Zarrab that he was under scrutiny by U.S. officials relating to HALKBANK's Iran-related business, and that while Cağlayan directed that the gold export scheme should be conducted through HALKBANK, it was Aslan who bore the risks.

37.   After this meeting, Zarrab sought and obtained Cağlayan's permission to bribe Aslan.  Cağlayan agreed.  In an intercepted telephone conversation on October 6, 2012, Zarrab told Abdullah Happani, a co-conspirator not named as a defendant herein and an employee of Zarrab, that Cağlayan knew Zarrab would pay bribes to Aslan, and described how Aslan's bribes would be structured using the "same system" as Cağlayan's bribe payments.

38.   On October 8, 2012, officers of HALKBANK, the defendant, held another meeting with Iranian and Turkish government officials.  In an intercepted telephone call, Aslan described the meeting to Zarrab, stating that the Iranian officials had again asked HALKBANK to allow the government of Iran to conduct transfers of their funds out of the bank.  Aslan

19

A19

told Zarrab that: "I [Aslan] defended the matter just like we had talked about yesterday," and that he had told the Iranians that HALKBANK would continue to move their money "through the existing system" with Zarrab. The next day, Reza Zarrab directed Happani to arrange to pay a €2 million bribe to Suleyman Aslan. A few days later, one of Zarrab's employees delivered the bribe. Over the course of the following year, Zarrab arranged for regular deliveries of cash, packaged in shoe boxes, to Aslan at Aslan's residence. These bribes totaled at least approximately $8.5 million in U.S. dollars, Euro, and Turkish lira.

39. Zarrab arranged additional meetings in Turkey between Cağlayan, Aslan, others at HALKBANK, the defendant, and Iranian government banking and oil officials. In May 2013, these meetings included the then-Iranian Minister of Oil; Ahmad Ghalebani, the then-managing director of NIOC; Mahmoud Nikousokhan; and Seifollah Jashnsaz, the then-chairman of NICO. At these meetings the participants discussed, among other things, arranging for the Turkish national oil company to make its payments to NIOC for Iranian oil at an account held by Bank Sarmayeh at HALKBANK. Because of Zarrab's contract with Sarmayeh Exchange, he would have preferential access to these Iranian oil revenues.

A20

## HALKBANK Protects the Gold Export Scheme from Detection by OFAC

40.   Throughout the scheme, senior executives from HALKBANK, the defendant, took steps to prevent U.S. authorities, particularly OFAC, from detecting the illicit nature of the transfers being conducted through Zarrab's companies.

41.   On or about October 24, 2012, Zarrab and Balkan spoke in an intercepted telephone call.   During that conversation, Zarrab and Balkan discussed a transfer of U.S. dollars between Zarrab's account at HALKBANK, the defendant, and another account held by Zarrab's gold trading company, Safir Altin.   Balkan warned Zarrab about the transfer because it was conducted by a U.S. financial institution through its correspondent account in the United States ("U.S. Bank-1"). Balkan expressed his concern about drawing attention to HALKBANK's involvement in Zarrab's illicit gold-trading business as a result of the direct transfer from HALKBANK to the United States, stating:   "I mean I'm talking about, one, an American Bank.  Two, dollars.  Three, Safir.  I mean, many factors are all bundled up here."   Zarrab asked if the transfer would cause an issue, and Balkan replied:   "I just wanted to share it with you.  When I mentioned strategic thinking, I meant we should assess this together briefly. . . .  The balance, the balance is not important.  What's more important is security."

21

A21

42.   On or about February 12, 2013, Treasury representatives met in Turkey with Atilla and other officials of HALKBANK, the defendant.  During this meeting, among other things, Treasury representatives, including the then-Director of OFAC, specifically warned Atilla about HALKBANK's involvement in Iranian attempts to evade sanctions.  The OFAC Director specifically cautioned Atilla about (a) the use of false invoices concealing the true purchaser or destination of goods as a means of allowing Iran to launder oil proceeds through phony purchases, and (b) the requirement that trade between Turkey and Iran financed with Iranian oil proceeds be "bilateral," that is, restricted Iranian funds at HALKBANK could be used only to buy Turkish goods for shipment to Iran.  The Director pulled Atilla aside for a private meeting to warn Atilla that HALKBANK was in a "category unto themselves," reflecting OFAC's particular concern about the magnitude of the bank's potential involvement in Iranian sanctions evasion.

43.   Shortly after the meeting with OFAC, Atilla, HALKBANK's Deputy General Manager for International Banking, instructed Zarrab to alter the way the gold transactions were reflected in the customs paperwork submitted to the bank, changing the purported destination of the gold from the United Arab Emirates to Iran.  In August 2012, Atilla had directed

22

A22

Zarrab to change the documents to reflect that the gold was being exported to Dubai rather than Iran, to reduce the risk that HALKBANK, the defendant, would be sanctioned under the regulations against supplying gold to the Government of Iran. Now, Atilla wanted the documentation to be changed again because of the tightened restrictions on the use of oil proceeds for bilateral trade. In an intercepted telephone call between Zarrab and Happani on February 21, 2013, Zarrab relayed that he "talked to Mr. Hakan," referring to Atilla.  Zarrab stated that Atilla had informed him that "there was a problem but it has been resolved . . . for the exports, write 'transit to Iran through Dubai' on the declarations again . . . .  That is what the regulations indicate" -- referring to the requirement described in the February 12, 2013 meeting between Atilla and OFAC.  The change directed by Atilla made it appear as if the shipments of gold purchased with Iranian oil proceeds complied with the regulations, though the gold in fact continued to be sent to Dubai in order to make NIOC oil proceeds available for Iran's international financial payments there.

44.  On or about May 6, 2013, Zarrab and Aslan spoke in an intercepted telephone call.  During this conversation, Aslan told Zarrab that Atilla had reported that NIOC transferred 70 million Turkish lira directly to an account controlled by

Zarrab at HALKBANK, the defendant.  This transfer contradicted the agreement among HALKBANK, NIOC, and Zarrab that NIOC's oil proceeds would be transferred to Zarrab indirectly through another Iranian bank account held at HALKBANK.  Zarrab complained, "No, not direct.  No.  They made a mistake.  It will go to . . . Bank Shahr.  You stop it, and I will get it corrected.  They are stupid.  They are retarded . . . .  Please process this as a null transaction, as if it never happened."  Aslan agreed to void the transaction, and told Zarrab that HALKBANK would not report the violation.  Because reporting the transaction would have revealed that the money Zarrab and his companies were laundering through the gold scheme belonged to NIOC, Zarrab and Aslan's agreement to nullify and not report this transaction protected the scheme from detection.

### HALKBANK Continued the Gold Export Scheme While Lying to OFAC

45.  On or about July 1, 2013, the day IFCA's restrictions on the supply of precious metals to Iran went into effect, see supra ¶ 19, Atilla sent an email to the then-Director of OFAC, purporting to inform him that HALKBANK, the defendant, had stopped allowing Iranian gold transactions as of June 10, 2013.

46.  In fact, however, HALKBANK, the defendant, continued to allow Zarrab to use proceeds of Iranian oil and gas

24

A24

sales at HALKBANK to buy gold for export from Turkey in order to give the Government of Iran and Iranian banks access to these funds after July 1, 2013.  On or about November 11, 2013, for example, a HALKBANK representative emailed Zarrab's employees spreadsheets of transactions relating to exports of gold from Turkey to the United Arab Emirates and Iran that purported to show tens of millions of Euros' worth of gold being exported by Zarrab's companies, Royal Denizcilik and Safir Altin Ticaret, to Iran as recently as October 2013, including to Iranian financial institutions.

47.  On or about September 16, 2013, Zarrab and Aslan spoke in an intercepted telephone conversation.  Aslan reported on a meeting that he recently had with the then-Prime Minister of Turkey, Caǧlayan, and other Turkish government officials. Aslan was asked to increase Turkey's gold exports.  Aslan reported, "That's their request, um, last year they exported $11 billion in gold."  Zarrab responded, "They are asking for the same to be done again, aren't they?"  Aslan replied, "I mean, they're saying, 'do something, whatever the method is, but help us out, take care of this job,' you know."  Aslan also stated, "I said, 'Iran -- it would not be through Iran, but we, um, we will find a way, don't you worry. They said, 'if you can find a

way, do it.'"  Zarrab responded in part, "We have a method, we
will do it.  We need to sit down and talk about that in person."

48.  Zarrab and others caused gold purchased with the
proceeds of Iranian oil and gas sales and exported from Turkey
to be sold in Dubai rather than reexported to Iran, and further
caused the proceeds to be transferred back to companies owned
and controlled by Zarrab in Turkey, where they could be further
transferred secretly on behalf of and for the benefit of the
Government of Iran and Iranian companies and persons.  On other
occasions, Zarrab and others would cause the gold to be
repurchased by companies owned and controlled by Zarrab in
Turkey and imported back to Turkey, where it could be sold.
These transactions to sell gold in Dubai or to repurchase and
reimport the gold to Turkey on behalf of and for the benefit of
the Government of Iran and Iranian companies and persons were
often conducted in U.S. dollars.  Between at least approximately
December 2012 and October 2013, more than $900 million in such
transactions were conducted by U.S. financial institutions
through correspondent accounts held in the United States.

49.  At all times relevant to the gold export scheme,
Aslan, Atilla, Balkan, and other officers and employees of
HALKBANK, the defendant, were acting within the scope of their
employment at HALKBANK and for the benefit of HALKBANK.

### The Fraudulent Food and Medicine Trade Scheme

50.  In response to the broadened prohibition against the supply of gold to include private Iranian companies and individuals and heightened restrictions limiting the use of Iranian oil proceeds for bilateral trade, HALKBANK, the defendant, and others also conspired to transfer Iranian oil revenues held at HALKBANK outside Turkey by falsely pretending that these transfers were in connection with the sale of food and medicine to Iran from Dubai, which would qualify for humanitarian exceptions to the sanctions restrictions.

51.  Aslan, Atilla, and others at HALKBANK, the defendant, designed the fraudulent food and medicine scheme with Zarrab, Happani, and others.  In addition to helping design the scheme, Aslan and Atilla concealed the scheme from Treasury officials in order to avoid potential sanctions against HALKBANK pursuant to the 2012 NDAA, the ITSR, the IFCA, and the IFSR. Cağlayan and other Turkish government officials both approved of and directed that the fraudulent food and medicine scheme be adopted and implemented.

52.  On or about March 26, 2013, Zarrab met with Aslan again.  At this meeting, Aslan told Zarrab that HALKBANK, the defendant, would stop processing the fraudulent gold transactions in the next month-and-a-half, but that Aslan could

27

A27

extend that deadline by another month or two.  Aslan instructed
Zarrab instead to begin conducting food transactions, even
though Zarrab had no history conducting such transactions with
HALKBANK.  When Zarrab asked how it would be possible for him to
start food trade with the bank now, Aslan also told Zarrab
during the meeting that Zarrab should provide HALKBANK with
whatever documentation Zarrab could for these food transactions,
even if that involved submitting fraudulent documents.  In other
words, as the deadline for IFCA's tightened regulations on gold
trade approached, Aslan instructed Zarrab that Zarrab should
instead pursue a fraudulent food trade.

53.  Zarrab arranged meetings in Turkey between
approximately April 9 and 10, 2013, among Cağlayan, Aslan, and
others, and Iranian government banking and oil officials,
including Mahmoud Nikousokhan and Seifollah Jashnsaz.  At these
meetings the participants discussed, among other things,
designing fraudulent transactions with the proceeds of Iranian
oil sales held at HALKBANK, the defendant, to make them appear
to be for the purpose of importing food into Iran, when in
reality they were a vehicle for further evasion of U.S.
sanctions.

54.  Aslan and Atilla devised methods to mask the true
purpose of the purported food trade so as to avoid detection,

28

A28

and to create a compliance record to protect HALKBANK, the defendant, while excusing Zarrab from records he could not provide because the transactions were not genuine.  For example, in or about April 2013, Zarrab met with Atilla and Aslan in Aslan's office at HALKBANK's headquarters.  During that meeting, the participants discussed documentation Zarrab would provide in connection with the fraudulent food transactions.  When Zarrab stated that he could provide bills of lading, Atilla informed Zarrab that bills of lading were traceable.  Zarrab then retracted his representation, and the participants agreed that Zarrab would not be required to provide such documents.  Zarrab later purported to use small, wooden vessels that would not provide traceable bills of lading to cover for this deficiency in his documentation.

    55.  On or about July 2, 2013, Zarrab and Atilla spoke in an intercepted telephone call.  During that conversation, Atilla cautioned Zarrab about errors made by Zarrab's employees in falsifying the documents submitted to HALKBANK, the defendant, that could result in the scheme's detection by regulators.  For example, Atilla instructed Zarrab that the quantities of the purported shipments were unrealistic in light of the small size of the vessels Zarrab purported to use because of his inability to provide bills of lading:  "I'm thinking that

29

A29

it is a little difficult to move a shipment of 140, 150 thousand tons, on things with five-thousand ton capacity." Zarrab apologized for the error and promised to correct it.

56.   On or about July 9, 2013, Zarrab and Atilla spoke again during an intercepted telephone call.  Zarrab and Atilla discussed, among other things, more errors in the false supporting documents submitted in connection with Zarrab's transfers of Iranian oil proceeds at HALKBANK, the defendant. Atilla explained that the falsified documents now either (a) still claimed to load quantities of goods on the vessels larger than the purported capacities of the ships, or (b) purported to use vessels that were large enough to be able to provide the bills of lading that Zarrab could not, in fact, provide.  Atilla explained:  "Now, these vessels, um, some of them are very large vessels . . . .  I mean, there is one that is 50,000 tons.  There are those that are 80,000, 90,000 tons . . . .  These are not small vessels . . . .  I would kindly ask that the guys take a look at compliance between the loads and the tonnages."  ZARRAB acceded:  "Of course.  Do you mean that they should look at the ones involving large vessels?" Atilla warned of the even greater risks of documents identifying smaller ships:

> They should look at the opposite, the small
> ones, as well.  Now, for example, the bill

30

> of lading may be somewhat doable, you know,
> with the large vessels, since the vessel is
> large.  As for the small ones, the
> relatively smaller ones, such as vessels
> with capacities between 13,000 and 14,000
> tons, when their loads are 20,000, then that
> becomes different and odd.  You get that
> reviewed . . . .   There are those large
> loads on small tonnage [vessels].

Zarrab asked:  "Is there anything I need to do about them?"

Atilla instructed:  "They need to keep an eye on this . . . .

The load should match up."

57.   In electronic communications on or about July 1, 2013, Zarrab explained to Aslan the underlying reason for the errors in the forged documents:  Zarrab had tried to move too much Iranian oil money at once through the fake food scheme at HALKBANK, the defendant, resulting in unrealistic purported food quantities that made the documents' falsity obvious.  Zarrab told Aslan, "Mr. minister [Cağlayan] told me to step on the gas and I think I over did it."  Zarrab and Aslan agreed that Zarrab would limit the amount of money he would move each time going forward.

58.   On or about September 16, 2013, Zarrab and Aslan spoke in a recorded telephone conversation, as described in paragraph 47 above.  During this conversation, Zarrab and Aslan discussed, among other things, the fact that HALKBANK, the defendant, intended to preclude non-Turkish companies, including

31

A31

two specifically identified American companies, from selling
food to Iran in exchange for the proceeds of Iranian oil and gas
sales held at HALKBANK, in order to increase the amount of funds
available to Zarrab.

### HALKBANK Continues the Scheme After the Arrests of Zarrab and Aslan

59.    In or about December 2013, Zarrab, Aslan, and
others were arrested by Turkish law enforcement officials in
connection with a Turkish public corruption investigation into,
among other things, the bribe payments Zarrab made to Aslan,
Cağlayan, and others in furtherance of the scheme to launder
Iranian funds through HALKBANK, the defendant.  See supra ¶¶ 30,
36-38.  At the time of the arrests, Turkish law enforcement
officers conducted searches of Zarrab's and Aslan's homes and
offices, among other places, during which they recovered, among
other things:

        a.    millions of dollars' worth of cash, in
multiple currencies, including U.S. dollars, stored in shoeboxes
in Aslan's home.

        b.    documents in Aslan's home and his office at
HALKBANK reflecting exceptions from documentation ordinarily
required by HALKBANK that Zarrab's companies had received in
connection with falsified food trade transactions; and

c.    a diagram of the transactions associated with the food scheme found in Aslan's office at HALKBANK.

60.   Zarrab paid bribes, through his attorney, to secure his release and the release of his co-defendants from prison in February 2014 and, ultimately, the dismissal of the case in October 2014.

61.   In mid-2014, after Zarrab was released from prison but before the case was dismissed as a result of bribe payments, Zarrab approached HALKBANK, the defendant, including its new general manager, a co-conspirator not named as a defendant herein ("Halkbank General Manager-1"), and Atilla, among other HALKBANK employees, to restart the sanctions-evasion scheme.

62.   Though some at HALKBANK, the defendant, supported continuing the scheme, Halkbank General Manager-1 initially was reluctant to do so because of concern that Zarrab's arrest and notoriety would draw unnecessary attention to the scheme.  At Zarrab's request, however, the then-Prime Minister of Turkey and his associates, including a relative of the then-Prime Minister who later held multiple Turkish cabinet positions, instructed HALKBANK to resume the scheme, and HALKBANK agreed.  The only change to the scheme was the addition of one new forged document:  Zarrab would provide forged inspection certificates

33

A33

as part of the fake food scheme.  HALKBANK continued executing

the evasion and money-laundering scheme until at least in or

about March 2016, when Zarrab was arrested in the United States.

    63.  After the continuation of the scheme following

Zarrab's arrest, officials at HALKBANK, the defendant, continued

to deceive Treasury officials about the bank's relationship with

Zarrab.  For example, on or about October 10, 2014, Treasury

representatives met with Atilla, Halkbank General Manager-1, and

other HALKBANK officials.  During this meeting, the Treasury

representatives asked about HALKBANK's dealings with Zarrab.

Atilla lied about the scope of Zarrab's business:  he failed to

disclose Zarrab's gold export business for the Government of

Iran or Zarrab's fraudulent food trade for the Government of

Iran, and instead described Zarrab as the recipient of certain

bank loans and someone involved in unspecified foreign trade.

    64.  As a result of the gold export and fake food

schemes, at least approximately $1 billion was laundered through

unwitting U.S. financial institutions on behalf of NIOC, the

Central Bank of Iran, and other Iranian entities.

    65.  At all times relevant to the fraudulent food and

medicine scheme, Aslan, Halkbank General Manager-1, Atilla,

Balkan, and other officers and employees of HALKBANK, the

defendant, were acting within the scope of their employment at HALKBANK and for the benefit of HALKBANK.

### STATUTORY ALLEGATIONS

### COUNT ONE

### (Conspiracy to Defraud the United States)

The Grand Jury charges:

66.   The allegations contained in paragraphs 1 through 65 of this Indictment are repeated and realleged as if fully set forth herein.

67.   From at least in or about 2012, up to and including in or about 2016, in the Southern District of New York, Turkey, the United Arab Emirates, and elsewhere, TÜRKİYE HALK BANKASI A.S., a/k/a "Halkbank," the defendant, and others known and unknown, knowingly and willfully combined, conspired, confederated, and agreed together and with each other to defraud the United States and an agency thereof, to wit, to impair, impede, and obstruct the lawful and legitimate governmental functions and operations of the U.S. Department of the Treasury in the enforcement of economic sanctions laws and regulations administered by that agency.

### Overt Acts

68.   In furtherance of the conspiracy and to effect the illegal object thereof, TÜRKİYE HALK BANKASI A.S., a/k/a

35

A35

"Halkbank," the defendant, and its coconspirators committed the overt acts set forth in paragraphs 25 to 64 of this Indictment, among others, which are fully incorporated by reference herein.

(Title 18, United States Code, Section 371.)

### COUNT TWO

**(Conspiracy to Violate the
International Emergency Economic Powers Act)**

The Grand Jury further charges:

69.   The allegations contained in paragraphs 1 through 65 of this Indictment are repeated and realleged as if fully set forth herein.

70.   From at least in or about 2012, up to and including in or about 2016, in the Southern District of New York, Turkey, the United Arab Emirates, and elsewhere, TÜRKİYE HALK BANKASI A.S., a/k/a "Halkbank," the defendant, and others known and unknown, knowingly and willfully combined, conspired, confederated, and agreed together and with each other to violate, and to cause a violation of, licenses, orders, regulations, and prohibitions issued under the International Emergency Economic Powers Act.

71.   It was a part and an object of the conspiracy that TÜRKİYE HALK BANKASI A.S., a/k/a "Halkbank," the defendant, and others known and unknown, would and did provide and cause others to provide financial services to Iran and to the

36

A36

Government of Iran prohibited by U.S. law, without first

obtaining the required approval of OFAC, and to evade and avoid

the requirements of U.S. law with respect to the provision of

financial services to Iran and to the Government of Iran, in

violation of Executive Orders 12959, 13059, 13224, 13599, 13622,

and 13645 and Part 31 of the Code of Federal Regulations,

Sections 560.203, 560.204, 560.205, 561.203, 561.204, and

561.205.

> (Title 50, United States Code, Section 1705;
> Executive Orders 12959, 13059, 13224, 13599, 13622, & 13645;
> Title 31, Code of Federal Regulations, Sections 560.203,
> 560.204, 560.205, 561.203, 561.204, & 561.205.)

## COUNT THREE

### (Bank Fraud)

The Grand Jury further charges:

72.   The allegations contained in paragraphs 1 through

65 of this Indictment are repeated and realleged as if fully set

forth herein.

73.   From at least in or about 2012, up to and

including in or about 2016, in the Southern District of New

York, Turkey, the United Arab Emirates, and elsewhere, TÜRKİYE

HALK BANKASI A.S., a/k/a "Halkbank," the defendant, and others

known and unknown, did knowingly execute and attempt to execute

a scheme or artifice to defraud a financial institution, the

deposits of which were then insured by the Federal Deposit

37

Insurance Corporation (the "FDIC"), and to obtain moneys, funds, credits, assets, securities, and other property owned by and under the custody and control of such financial institution, by means of false and fraudulent pretenses, representations, and promises, and aided and abetted the same, to wit, inducing U.S. financial institutions to conduct financial transactions on behalf of and for the benefit of the Government of Iran and Iranian entities and persons using money and property owned by and under the custody and control of such financial institutions, by deceptive means.

(Title 18, United States Code, Sections 1344 & 2.)

## COUNT FOUR

### (Conspiracy to Commit Bank Fraud)

The Grand Jury further charges:

74.  The allegations contained in paragraphs 1 through 65 of this Indictment are repeated and realleged as if fully set forth herein.

75.  From at least in or about 2012, up to and including in or about 2016, in the Southern District of New York, Turkey, the United Arab Emirates, and elsewhere, TÜRKİYE HALK BANKASI A.S., a/k/a "Halkbank," the defendant, and others known and unknown, knowingly and willfully combined, conspired, confederated, and agreed together and with each other to commit

38

bank fraud, in violation of Title 18, United States Code, Section 1344.

76.   It was a part and an object of the conspiracy that TÜRKİYE HALK BANKASI A.S., a/k/a "Halkbank," the defendant, and others known and unknown, would and did knowingly execute and attempt to execute a scheme or artifice to defraud a financial institution, the deposits of which were then insured by the FDIC, and to obtain moneys, funds, credits, assets, securities, and other property owned by and under the custody and control of a financial institution, by means of false and fraudulent pretenses, representations, and promises, in violation of Title 18, United States Code, Section 1344.

(Title 18, United States Code, Section 1349.)

## COUNT FIVE

### (Money Laundering)

The Grand Jury further charges:

77.   The allegations contained in paragraphs 1 through 65 of this Indictment are repeated and realleged as if fully set forth herein.

78.   From at least in or about 2012, up to and including in or about 2016, in the Southern District of New York, Turkey, the United Arab Emirates, and elsewhere, TÜRKİYE HALK BANKASI A.S., a/k/a "Halkbank," the defendant, and others

39

A39

known and unknown, in an offense involving and affecting interstate and foreign commerce, did knowingly transport, transmit, and transfer, and attempt to transport, transmit, and transfer, monetary instruments and funds to places in the United States from and through places outside the United States, in amounts exceeding $10,000, and aided and abetted the same, with the intent to promote the carrying on of specified unlawful activity, to wit, (i) the illegal export of services to Iran as charged in Count Two of this Indictment, (ii) bank fraud as charged in Counts Three and Four of this Indictment, and (iii) an offense against a foreign nation involving bribery of a public official.

(Title 18, United States Code, Sections 1956(a)(2)(A) & 2.)

## COUNT SIX

### (Conspiracy to Commit Money Laundering)

The Grand Jury further charges:

79.   The allegations contained in paragraphs 1 through 65 of this Indictment are repeated and realleged as if fully set forth herein.

80.   From at least in or about 2012, up to and including in or about 2016, in the Southern District of New York, Turkey, the United Arab Emirates, and elsewhere, TÜRKİYE HALK BANKASI A.S., a/k/a "Halkbank," the defendant, and others

40

known and unknown, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to violate Title 18, United States Code, Section 1956(a)(2)(A).

81.   It was a part and an object of the conspiracy that TÜRKİYE HALK BANKASI A.S., a/k/a "Halkbank," the defendant, and others known and unknown, in an offense involving and affecting interstate and foreign commerce, would and did transport, transmit, and transfer, and attempt to transport, transmit, and transfer, monetary instruments and funds to places in the United States from and through places outside the United States, in amounts exceeding $10,000, with the intent to promote the carrying on of specified unlawful activity, to wit, (a) the illegal export of services to Iran as charged in Count Two of this Indictment, (ii) bank fraud as charged in Counts Three and Four of this Indictment, in violation of Title 18, United States Code, Sections 1344 and 1349, and (iii) an offense against a foreign nation involving bribery of a public official, in violation of Title 18, United States Code, Section 1956(a)(2)(A).

(Title 18, United States Code, Section 1956(h).)

41

## FORFEITURE ALLEGATION

### (Counts Two, Three, and Four)

82.  As a result of committing the offenses alleged in Counts Two, Three, and Four of this Indictment, TÜRKİYE HALK BANKASI A.S., a/k/a "Halkbank," the defendant, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461, all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of the offenses alleged in Counts Two, Three, and Four of this Indictment, including but not limited to a sum of money representing the amount of proceeds obtained as a result of the offenses.

### Substitute Assets Provision

83.  If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

    a)   cannot be located upon the exercise of due
         diligence;

    b)   has been transferred or sold to, or
         deposited with, a third person;

    c)   has been placed beyond the jurisdiction of
         the court;

    d)   has been substantially diminished in value;
         or

42

A42

e)   has been commingled with other property
     which cannot be subdivided without
     difficulty;

it is the intent of the United States, pursuant to Title 21,

United States Code, Section 853(p), to seek forfeiture of any

other property of said defendant up to the value of the above

forfeitable property.

## FORFEITURE ALLEGATION

### (Counts Five and Six)

84.   As a result of committing the money laundering

offenses alleged in Counts Five and Six of this Indictment,

TÜRKİYE HALK BANKASI A.S., a/k/a "Halkbank," the defendant,

shall forfeit to the United States, pursuant to Title 18, United

States Code, Section 982, all property, real and personal,

involved in the money laundering offenses and all property

traceable to such property, including but not limited to, a sum

of money representing the amount of property that was involved

in the money laundering offenses or is traceable to such

property.

## Substitute Assets Provision

85.   If any of the above-described forfeitable

property, as a result of any act or omission of the defendant:

a)   cannot be located upon the exercise of due
     diligence;

43

A43

b)   has been transferred or sold to, or
     deposited with, a third person;

c)   has been placed beyond the jurisdiction of
     the court;

d)   has been substantially diminished in value;
     or

e)   has been commingled with other property
     which cannot be subdivided without
     difficulty;

it is the intent of the United States, pursuant to Title 21,

United States Code, Section 853(p), to seek forfeiture of any

other property of said defendant up to the value of the above

forfeitable property.

        (Title 18, United States Code, Sections 981, 982;
           Title 21, United States Code, Section 853;
           Title 28, United States Code, Section 2461.)


Foreperson                         GEOFFREY S. BERMAN
                                   United States Attorney

44

A44

Form No. USA-33s-274 (Ed. 9-25-58)

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

### UNITED STATES OF AMERICA

v.

### TÜRKİYE HALK BANKASI A.S.,
### a/k/a "Halkbank,"

Defendant.

### SUPERSEDING INDICTMENT

S6 15 Cr. 867 (RMB)

(18 U.S.C. § 371, 1344, 1349, 1956, &
2; 50 U.S.C. § 1705; 31 C.F.R.
§§ 560.203, 560.204, 560.205, 561.203,
561.204, & 561.205.)

GEOFFREY S. BERMAN
United States Attorney.

A TRUE BILL

Foreperson.

KL
TO/15/19

Filed Superseding Indictment

Stewart D Aaron
USMJ

A45

USDC
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 11/4/19

# KING & SPALDING

King & Spalding LLP
1185 Avenue of the Americas
New York, New York 10036-4003
www.kslaw.com

Andrew C. Hruska
Direct Dial: (212) 556-2278
Direct Fax: (212) 556-2222
ahruska@kslaw.com

November 4, 2019

**VIA HAND DELIVERY**



Honorable Richard M. Berman, U.S.D.J.
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007

> Re:    United States v. Türkiye Halk Bankasi A.S., a/k/a/ "Halkbank"
>        U.S. District Court for the Southern District of New York
>        S6 15-cr-00867 (RMB)

Dear Judge Berman:

As the Court is aware, defendant Türkiye Halk Bankasi A.Ş. ("Halkbank" or the "Bank") has not yet responded to the superseding indictment filed on October 15, 2019 by the U.S. Attorney's Office for the Southern District of New York ("USAO") or otherwise made an appearance. Halkbank has retained us to represent it in the above-referenced matter for a limited purpose, and we do not concede the acceptance of service nor enter a general appearance on behalf of Halkbank by submitting this request.

The Bank has refused to accept service and has not stipulated to service by any means. Service should be made by the Ministry of Justice and should be received 30 days in advance of an appearance in line with the terms of the mutual legal assistance treaty between Turkey and the U.S. Nonetheless, counsel for Halkbank respectfully requests leave to enter a limited and special appearance for the purpose of filing a motion to dismiss for lack of personal jurisdiction and a motion seeking this Court's recusal from this case. Because the decision on the recusal motion would determine which United States district judge will consider the personal jurisdiction motion, we respectfully request that the Court decide the recusal motion first.

A46

November 4, 2019
Page 2

It is within this Court's authority and appropriate to permit a special appearance in this case. Courts have broad discretion to allow special appearances. *See, e.g.*, *United States v. Pangang Grp. Co.*, 879 F. Supp. 2d 1052, 1055 (N.D. Cal. 2012), Dkt. No. 46 (permitting defendants to enter a special appearance to move to dismiss the indictment); *United States v. Kolon Industries, Inc., et al.*, 3:12-cr-00137 (E.D. Va. 2012), Dkt. No. 20 (permitting defendant to enter a special appearance to move to dismiss the indictment for lack of personal jurisdiction).

Recusal and jurisdiction constitute key threshold issues that must be examined before any issue on the merits is resolved. "The requirement that jurisdiction be established as a threshold matter springs from the nature and limits of the judicial power of the United States and is inflexible and without exception." *In re Rationis Enterprises, Inc. of Panama*, 261 F.3d 264, 267 (2d Cir. 2001) (citing *Steel Co. v. Citizens for a Better Envt*, 523 U.S. 83, 94-95 (1998)). Similarly, a court must promptly address requests for recusal as the purpose of the recusal statute is to avoid "even the appearance of impropriety whenever possible." *Liljeberg v. Health Svcs. Acquisition Corp.*, 486 U.S. 847, 865 (1988). It is "well-settled that a party must raise its claim of a district court's disqualification at the earliest possible moment after obtaining knowledge of facts demonstrating the basis for such a claim." *Weisshaus v. Fagan*, 456 F. App'x. 32, 34 (2d Cir. 2012); *see also In re Int'l Bus. Machines Corp.*, 45 F.3d 641, 643 (2d Cir. 1995) ("[I]t is important to present recusal applications promptly.")

Halkbank is a Turkish corporation headquartered in Istanbul with no U.S. offices or physical operations in the United States. The Bank's conduct alleged in the indictment has no connection to the U.S. sufficient to create jurisdiction. As more fully demonstrated in our forthcoming motion to dismiss (should the Court grant leave to file pursuant to a special and limited appearance), the Bank's incidental contacts with the U.S. are insufficient to establish either general or specific personal jurisdiction over the Bank. *See Bristol-Myers Squibb Co. v. Super. Ct. of Cal.*, 137 S. Ct. 1773 (2017); *Daimler AG v. Bauman*, 571 U.S. 117 (2014).

As an initial matter, we respectfully request that the Court recuse itself from this case. Recusal is warranted if "a reasonable person, knowing all the facts, would question the judge's impartiality." *United States v. Yousef*, 327 F.3d 56, 169 (2d Cir. 2003) This Court has made statements both in and out of the courtroom that call into question the Court's impartiality

November 4, 2019
Page 3

regarding key factual and legal issues relevant to the indictment. Therefore, the Court's continued supervision over this matter would cause an objective observer to have reasonable questions concerning the Court's impartiality.

Where, as here, defendant's attorneys seek leave to resolve threshold issues such as jurisdiction and recusal, leave to enter a special appearance is routinely granted. *See, e.g., United States v. Dotcom*, No. 12-cr-00003 (E.D. Va. Oct. 5, 2012), Dkt. No. 148 (granting foreign defendant leave to enter limited appearance to move to dismiss indictment for lack of personal jurisdiction); *United States v. Tucor Int'l, Inc.*, 35 F. Supp. 2d 1172, 1176 (N.D. Cal. 1998), *aff'd*, 189 F.3d 834 (9th Cir. 1999) (granting defendant's motion for leave to make a special appearance for the limited purpose of filing a motion to dismiss the indictment); *United States v. Noriega*, 683 F. Supp. 1373, 1374 (S.D. Fla. 1988) (granting foreign defendant's motion to make special appearance to contest court's jurisdiction and attack sufficiency of indictment); *see also* Memorandum Regarding Proposed Amendments to FED. R. CRIM. P. 4 from Jonathan J. Wroblewski, Director, Office of Policy and Legislation, U.S. Department of Justice to Judge David M. Lawson, Chair, Subcommittee of Advisory Committee on Criminal Rules at p. 74 (February 20, 2015) ("The purpose of a 'special appearance' is to avoid automatically waiving threshold issues by operation of law").

The instant case also presents several unique circumstances that weigh in favor of granting the defendant an opportunity to challenge the indictment. First, the matter presents an issue of first impression in this Circuit, namely whether this Court has personal jurisdiction in a criminal matter over Halkbank, a foreign entity with no physical operations in the U.S. Second, because this case has been widely publicized and brought in a highly-charged atmosphere between the U.S. and Turkey, it is essential to address reasonable questions regarding the Court's impartiality (and appearance of impartiality) and to demonstrate that U.S. courts are fair and neutral arbiters of fact and law. Precedent allows a special appearance in similarly unusual circumstances. In one similar case, the court granted defendant's request for special appearance and stated:

> The present indictment is surrounded with special circumstances which militate in favor of allowing the defendant to attack its validity. Specifically, this appears to be a case of first impression. Arguments of counsel will be helpful in resolving the

November 4, 2019
Page 4

delicate issues presented. The case is fraught with political overtones. I do not propose to engage in any political inquiries beyond those properly raised by legal argument. However, the best way to avoid the appearance that this indictment has assumed the character of a political proceeding, rather than a legal one, is to determine its legal validity upon the arguments of counsel. In that way, the integrity of our legal system will best be served.[1]

For the foregoing reasons, counsel for Halkbank respectfully requests leave to appear on a limited and special basis to argue on behalf of Halkbank the merits of the proposed submissions without waiving any objections to this Court's jurisdiction. Should the Court grant Halkbank's request for a limited and special appearance, we propose a schedule for the recusal motion consistent with Local Criminal Rule 49.1, with the Government's response to Halkbank's recusal motion due fourteen days after service of motion papers, and Halkbank's reply due seven days after service of opposing papers.

Respectfully,

Andrew C. Hruska
AH3224

cc:   Michael Lockard, Esq.
      Sidhardha Kamaraju, Esq.
      David Denton, Esq.
      Jonathan Rebold, Esq.
      Kiersten Fletcher
      Richard Walker, Esq.
      William Johnson, Esq.
      Katherine Kirkpatrick, Esq.
      (all by electronic mail)

> The AUSA (SDNY) is respectfully requested to respond to the above letter Forthwith.
>
> SO ORDERED:
> Date: 11/4/19          Richard M. Berman
>                        Richard M. Berman, U.S.D.J.

---

[1] *Noriega*, 683 F. Supp. at 1374-5.

A49

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

November 4, 2019

**BY ECF**

Honorable Richard M. Berman
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, NY 10007

> Re:   **United States v. Turkiye Halk Bankasi A.S.,**
> **S6 15 Cr. 867 (RMB)**

Dear Judge Berman,

The Government respectfully submits this letter in connection with the arraignment of the defendant, Turkiye Halk Bankasi A.S. ("Halkbank"), scheduled in this matter for November 5, 2019 at 11:00 a.m. This letter will respond to a letter delivered to the Court today by King & Spalding LLP, U.S. counsel for Halkbank, requesting permission to enter a limited and special appearance; and will also outline the Court's civil contempt authority to compel compliance with its orders, specifically the summonses directing Halkbank's appearance in court to respond to the charges against it in the superseding indictment, S6 15 Cr. 867 (RMB) (the "Indictment"). For the reasons discussed more fully below, Halkbank has been properly served with the Indictment and two summonses to appear pursuant to Rule 4 of the Federal Rules of Criminal Procedure. King & Spalding's request to enter a special appearance should be denied, and that request does not excuse Halkbank's obligation to comply with the validly served summonses.

### Halkbank's Noncompliance with the Court's Summons and Service of Second Summons

As the Court knows, a superseding indictment, S6 15 Cr. 867 (RMB) (the "Indictment"), was filed on October 15, 2019 charging Halkbank with conspiring to obstruct the lawful functions of the U.S. Department of the Treasury, conspiring to violate the International Emergency Economic Powers Act ("IEEPA") and national security controls established thereunder, bank fraud and conspiring to commit bank fraud, and money laundering and conspiring to launder money. A summons (the "First Summons") was issued directing Halkbank to appear on October 22, 2019 at 9:15 a.m. to answer to the charges in the Indictment. As the Court has found, Halkbank had notice of the Indictment and First Summons, but failed to appear for arraignment. (D.E. 563, 566 (the "October 23 Order") at 1). Indeed, though Halkbank has been represented by U.S. legal counsel, King & Spalding LLP, for at least two years in connection with the Government's investigation of Halkbank, when the Indictment and First Summons were delivered to King & Spalding the firm

advised the Court that it was not authorized by Halkbank to accept service or to file a notice of appearance. (D.E. 564).

In order to provide Halkbank with an opportunity to cure its noncompliance with the First Summons, the Court issued a new summons (the "Second Summons") on October 23, 2019, directing Halkbank to appear on November 5, 2019 at 11:00 a.m. (D.E. 566 at 13-14). The Court ordered the Government to serve the Second Summons pursuant to Rule 4 of the Federal Rules of Criminal Procedure, including by electronic transmission to Halkbank's counsel, King & Spalding, or delivery by mail or parcel service to Halkbank's principal place of business. (*Id.* at 3-4).[1]

The Second Summons has since been served pursuant to Rule 4, which authorizes service on an organization that is not within a judicial district of the United States by certain specified methods or by "any other means that gives notice." FED. R. CRIM. P. 4(c)(3)(D)(ii); *see In re Pangang Group Co. Ltd.*, 901 F.3d 1046, 1053 & 1055 (9th Cir. 2018). Service has been accomplished by confirmed electronic delivery and attempted delivery by parcel service. In addition, the Department of Justice has requested that the Turkish Ministry of Justice cause the Second Summons and related documents be served on Halkbank under Turkish law, and the Second Summons and the November 5, 2019 conference date have been reported in the news media.

On October 23, 2019, the day the Second Summons issued, electronic copies of the Second Summons, the Indictment, the October 23 Order, and the transcript of the October 22, 2019 proceedings were delivered by email to King & Spalding. The same day, electronic copies of the Second Summons, the October 23 Order, and the Indictment were delivered by email to (1) the email account "halkbank.ir@halkbank.com.tr," an account identified on halkbank's website and in its 2018 Annual Report[2] as the bank's corporate email address, *see, e.g.*, 2018 Annual Report at 136, 300, 470; and (2) the email account for Tahsin Yazar, a member of the Turkish Ministry of Treasury and Finance, an Advisor to the Turkish Wealth Fund (the Turkish governmental authority that owns 51% of Halkbank's shares), and an individual who has participated in meetings and conversations, together with Halkbank executives and attorneys from King & Spalding, with U.S. Department of Justice officials regarding the criminal investigation of Halkbank.

In addition to this electronic delivery, copies of the Second Summons, the October 23 Order, and the Indictment were also sent for delivery by FedEx to the address of Halkbank's headquarters, where its Legal Affairs Department is also located. *See* 2018 Annual Report at 470. The Government has been advised by FedEx that delivery was attempted but refused on October 29, 2019.

Finally, on November 1, 2019, electronic copies of the Second Summons, the October 23 Order, and the Indictment, both in English and in Turkish, were transmitted electronically by the

---

[1] The October 23 Order also provided for service on any registered agent of Halkbank in the United States. To date, the Government has not identified any such registered agent.

[2] Available at https://www.halkbank.com.tr/images/channels/English/investor_relations/ financial_info/Annual_reports/2018%20annualreporteng.pdf.

Department of Justice's Office of International Affairs to the Turkish Ministry of Justice with a request that they be served on Halkbank pursuant to Turkey's domestic law.

The October 23 Order, including the Second Summons, was posted to the electronic docket in this matter on October 23, 2019. The issuance of the Second Summons was also reported in the media. *See, e.g.*, Humeyra Pamuk, *Turkey's Halkbank may face sanctions if it fails to appear in U.S. court*, REUTERS (Oct. 23, 2019);[3] *U.S. judge says may sanction Turkey's Halkbank if it fails to appear in court*, AHVAL NEWS (Oct. 23, 2019).[4]

### King & Spalding's Request to Make a Special Appearance

Earlier today, November 4, 2019, Andrew C. Hruska, Esq., of King & Spalding sent a letter to the Court (the "K&S Ltr.") requesting permission to enter a special appearance for purposes of filing (1) a recusal motion and (2) a motion to dismiss the Indictment for lack of personal jurisdiction. In his letter, Mr. Hruska states:

> [Halkbank] has not yet responded to the [Indictment] . . . or otherwise made an appearance. Halkbank has retained us to represent it in the above-referenced matter for a limited purpose, and we do not concede the acceptance of service nor enter a general appearance on behalf of Halkbank by submitting this request.
>
> The Bank has refused to accept service and has not stipulated to service by any means. Service should be made by the [Turkish] Ministry of Justice and should be received 30 days in advance of an appearance in line with the terms of the mutual legal assistance treaty between Turkey and the U.S.

(K&S Ltr. at 1). Mr. Hruska requests permission to "enter a limited and special appearance" for the purpose of filing the two motions. *Id.* Mr. Hruska does not state that he intends to file a notice of appearance, and does not state that King & Spalding will appear on November 5, 2019 at 11:00 a.m.

Mr. Hruska's letter conclusively establishes that Halkbank has been served the First Summons and Second Summons pursuant to Rule 4(c)(3)(D)(ii). Indeed, Mr. Hruska's letter brings this matter squarely within the Ninth Circuit's decision in *Pangang*. There, a group of companies in China were indicted and the government served summonses by delivering copies to U.S. counsel for the defendant companies, among other things.[5] *Pangang*, 901 F.3d at 1053. The defendant

---

[3] Available at https://www.reuters.com/article/us-usa-turkey-halkbank/turkeys-halkbank-may-face-sanctions-if-it-fails-to-appear-in-u-s-court-idUSKBN1X222A.

[4] Available at http://ahval.co/en-6288.

[5] The government had attempted to serve summonses in connection with an earlier, underlying indictment pursuant to the provisions of Rule 4 prior to its amendment in 2016, which were unsuccessful. *Id.* at 1048-1050. U.S. counsel successfully moved to quash the prior summonses.

companies failed to appear at the hearing stated in the summonses or at a subsequent status hearing, and the government moved for civil contempt sanctions. *Id.* The U.S. law firm moved to quash service of the summons and opposed sanctions. The district court denied the motion to quash, finding that the defendants had received actual notice of the summonses and that delivery to U.S. counsel for the defendants, who had represented the defendants in their motions to quash prior summonses, satisfied Rule 4(c)(3)(D)(ii).

The Ninth Circuit affirmed, holding that Rule 4(c)(3)(D)(ii) permits service of a summons by any means that provides notice to the defendant and is not limited to formal service under domestic or foreign law, *id.* at 1055-57; and that delivering a summons to U.S. counsel who had previously been permitted to make a special appearance to quash a prior summons in no way contravened the rule. *Id.* at 1057-59. With respect to special appearances, the *Panang* court noted the absence of any evidence "of a longstanding historical practice of allowing special appearances in criminal cases," *id.* at 1057, and observed that even the tradition of special appearances in civil cases had been superseded by Rule 12 of the Federal Rules of Civil Procedure. *Id.* at 1058. The court held that the 2016 amendment to Rule 4(c)(3)(D)(ii) made no effort to avoid impinging on the practice of special appearances, *id.*; rather, "the point of the amendment is to provide a means of service that gives notice, and there is no legitimate interest in allowing a procedure in which an institutional defendant can feign lack of notice." *Id.* at 1059 (quoting Advisory Comm. on Criminal Rules, March 2015 Minutes, at 11 (March 16-17, 2015) ("Advisory Committee Minutes")). The Advisory Rules Committee expressly noted that a defendant cannot make a special appearance to argue that it lacked notice of the summons and indictment. *Id.*

Accordingly, Mr. Hruska's letter acknowledging that the defendant has retained King & Spalding for the purposes of making a recusal motion and challenging personal jurisdiction and his request for permission to enter a special appearance conclusively demonstrates that the First Summons and Second Summons have been served under Rule 4, notwithstanding Mr. Hruska's protestations that Halkbank has refused to accept service and that Halkbank insists on formal service under the procedures of Turkish law. (K&S Ltr. At 1). Halkbank is not entitled to choose its preferred method of service. The defendant has notice of the charges and the Court's orders to appear, and is required to comply.

Mr. Hruska's request to enter a "limited and special appearance" does not excuse Halkbank's refusal to comply with the First Summons, and does not satisfy Halkbank's obligation to comply with the Second Summons. As an initial matter, there is no established tradition of special appearances in criminal cases, but rather a mere handful of isolated instances from other Circuits where a special appearance was made with little in the way of discussion or analysis of the legal authority for doing so. *See Pangang*, 901 F.3d at 1057-58; *see also United States v. Stein*, 435 F. Supp. 2d 330, 379 n. 235 (S.D.N.Y. 2006), *aff'd*, 541 F.3d 130 (2d Cir. 2008) ("The Federal Rules of Civil Procedure, and many modern state codes, go further, abolishing the distinction between general and special appearances and permitting a defendant to preserve a personal jurisdiction objection by answer or timely motion to dismiss. These rules, however, do not apply in a criminal case."). Moreover, those isolated instances all predate the 2016 amendment to Rule 4. To the extent it may have been unclear before, it is now perfectly clear that Rule 4 does not permit special appearances in criminal matters to contest service. *Id.* at 1059. Mr. Hruska's letter misleadingly cites a memorandum from the DOJ Office of Policy and Legislation regarding the

2016 amendment to Rule 4 in support of Halkbank's position that "leave to enter a special appearance is routinely granted," but fails to inform the Court that this same letter notes that the amendment eliminates special appearances to contest notice of a summons: "[T]his is not a flaw in the amendment, it is the point of the amendment. If the defendant corporation has notice of a summons, it ought to be considered served, and there ought not to be an avenue to present a factual claim that is, by definition, without merit." Advisory Comm. on Criminal Rules, Agenda (Mar. 16-17, 2015) at 74 (available at https://www.uscourts.gov/sites/default/files/fr_import/CR2015-05.pdf); *see also* Advisory Comm. Minutes at 11 (agreeing with DOJ's response). The memo observes: "A foreign organization acting lawfully in this situation has two reasonable choices: it can either appear in a U.S. court to raise any legitimate defense or it can choose not to appear and face any attendant risks." *Id.* at 75. The DOJ memo does contemplate the possibility of a special appearance for extremely narrow purposes: to challenge the constitutionality of Rule 4 or its retroactive application, or to establish that a defendant corporation is dissolved. *Id.* King & Spalding does not advance any of these narrowly circumscribed issues.

King & Spalding's proposed "limited and special appearance" is not supported by common practice or tradition, and would serve no legitimate purpose. Where special appearances were allowed, they were for the purpose of allowing a defendant to contest issues that it would otherwise waive by appearing. (Advisory Comm. on Criminal Rules, Agenda (Mar. 16-17, 2015) at 74). This concern has been eliminated in the civil context by Rule 12, which preserves a defendant's ability to challenge personal jurisdiction. The matters that Halkbank seeks to raise through a limited appearance require no special appearance at all. Halkbank's two proposed motions—for recusal, and to dismiss the Indictment for lack of personal jurisdiction—can be raised after the defendant complies with the summonses and appears in this matter. No special appearance is required.

Nor is there any reason to expect that the proposed motions have any merit. Civil concepts of personal jurisdiction are inapposite in criminal prosecutions. *See United States v. Ali*, 718 F.3d 929, 944 (D.C. Cir. 2013) ("It is true courts have periodically borrowed the language of personal jurisdiction in discussing the due process constraints on extraterritoriality. But Ali's flawed analogies do not establish actual standards for judicial inquiry; the law of personal jurisdiction is simply inapposite."). Rather, a defendant can challenge whether charges in the U.S. violate constitutional due process for lack of fair warning that the defendant's conduct exposed him or her to criminal prosecution. *See, e.g., United States v. Al Kassar*, 660 F.3d 108, 119 (2d Cir. 2011). But it is constitutionally irrelevant whether or not the defendant reasonably understood that prosecution could occur *in the United States*, *id.*, and that argument is not waived by Halkbank's appearance.

Moreover, to the extent that Halkbank seeks to raise challenges to the Indictment based on extraterritoriality, those arguments are hardly an "issue of first impression in this Circuit." They are not even issues of first impression in this case: Zarrab and Atilla each challenged the charges on jurisdictional and extraterritoriality grounds. (*See* D.E. 66 & 67; 280, 281, 306 & 307). This Court, after careful consideration, denied the motions to dismiss. (D.E. 90; November 16, 2017 Tr. at 13-22). Notably, while Atilla has appealed his conviction and sentence, he has not challenged the Court's jurisdiction on appeal. And there is even less reason to believe that Halkbank can raise a meritorious jurisdictional claim, where the evidence introduced at the trial of Atilla showed, among other things, that Halkbank repeatedly met and spoke with senior Treasury officials both

in Turkey and in Washington D.C. over the course of several years; that Halkbank repeatedly lied to those Treasury officials in meetings, phone calls, and written communications in order to conceal and protect the sanctions-evasion scheme that it devised with its clients, Zarrab and the Government of Iran; and that Halkbank made these lies in order to avoid being sanctioned and to protect its ability to conduct financial transactions in and through the United States, including through correspondent accounts Halkbank held at banks located in the United States.

Halkbank is no more likely to make a meritorious recusal motion. Mr. Hruska's letter, for example, identifies no statements or actions by the Court whatsoever that could cause a reasonable person to question the Court's impartiality, and the Government is aware of none. To the extent that the Court has issued rulings or made findings in connection with those rulings in the prior proceedings, those are not a basis for recusal. *See United States v. Pugliese*, 805 F.2d 1117, 1125 (2d Cir. 1986) ("The rule of law . . ., without belaboring the point, is that what a judge learns in his judicial capacity—whether by way of guilty pleas of codefendants or alleged coconspirators, or by way of pretrial proceedings, or both—is a proper basis for judicial observations, and the use of such information is not the kind of matter that results in disqualification.") (quoting *United States v. Bernstein*, 533 F.2d 775, 785 (2d Cir. 1976)); *see also Brown v. Oil States Skagit Smatco*, 664 F.3d 71, 81 (5th Cir. 2011) ("[F]acts learned by a judge in his or her judicial capacity regarding the parties before the court, whether learned in the same or a related proceeding, cannot be the basis for disqualification[.]") (quoting *Conkling v. Turner*, 138 F.3d 577, 592 (5th Cir. 1998)). Indeed, the Court has previously been faced with a recusal motion (D.E. 79 & 80), which was denied. (D.E. 87). The Court's conduct of the proceedings throughout has provided no basis for any reasonable observer to question its impartiality.

Most important, however, with respect to King & Spalding's request for a limited and special appearance is the fact that Halkbank would not waive its jurisdictional or recusal motions by appearing as required by the summonses. Those arguments can be raised after Halkbank appears, and cannot be raised before then. Those arguments would be meritless, but regardless of their merit Halkbank has ample ability and opportunity to raise them without a special appearance. The only apparent purpose to the request is to attempt to permit Halkbank to challenge this Court's impartiality and jurisdiction, while allowing Halkbank to seek to evade that very jurisdiction if its motions are denied. This is not a legitimate purpose, and the request should not be granted.

### The Court's Contempt Authority

The Supreme Court has long observed that "[t]here can be no question that courts have inherent power to enforce compliance with their lawful orders through civil contempt." *Shillitani v. United States*, 384 U.S. 364, 370 (1966). "An adjudication of civil contempt is coercive—to compel obedience to a lawful court order[.]" *In re Grand Jury Witness*, 835 F.2d 437, 440 (2d Cir. 1987); *see also Matter of Dickinson*, 763 F.2d 84, 87 (1985) ("The primary purpose of the imposition of a sanction for civil contempt is to coerce the contemnor into future compliance and to remedy past non-compliance, rather than to punish him.").

Civil contempt sanctions may be imposed on "notice and an opportunity to be heard," and "[n]either a jury trial nor proof beyond a reasonable doubt is required." *United Mine Workers of America v. Bagwell*, 512 U.S. 821, 828 (1994). To impose contempt sanctions, a district court must

(1) find that the order that the party allegedly failed to comply with is clear and unambiguous; (2) find that proof of noncompliance is clear and convincing, and (3) find that the contemnor was not reasonably diligent in attempting to comply. *United States v. Local 1804-1 Int'l Longshoremens Ass'n AFL-CIO*, 44 F.3d 1091, 1096 (2d Cir. 1995)

A district court has "wide discretion" in "fashioning a remedy for civil contempt." *Matter of Dickenson*, 763 F.2d at 87. That discretion "clearly permits the imposition of a fine." *Id.* at 88 (citing *Marc Rich & Co. A.G. v. United States*, 707 F.2d 663, 670 (2d Cir. 1983)). A "per diem" fine, "imposed for each day a contemnor fails to comply with an affirmative court order," is a civil contempt sanction that "exert[s] a constant coercive pressure, and once the jural command is obeyed, the future, indefinite, daily fines are purged." *Bagwell*, 512 U.S. at 829.

"[W]hen the civil contempt order imposes a fine, the contemnor's financial resources must be weighed in order to decide whether the sanctions appropriately compel obedience to the order." *In re Grand Jury Witness*, 835 F.2d at 443. In order to determine an appropriately coercive contempt sanction, a district court should consider "(1) the character and magnitude of the harm threatened by continued contempt, (2) the probable effectiveness of the proposed sanction, and (3) the financial consequence of that sanction upon the contemnor." *Id.* (citing *United States v. United Mine Workers of America*, 330 U.S. 258, 304 (1947); *Perfect Fit Indus., Inc. v. Acme Quilting Co.*, 673 F.2d 53, 57 (2d Cir. 1982)).

## Conclusion

Accordingly, the Court has the authority to impose civil contempt sanctions against Halkbank for its knowing violations of the First Summons and—in the event the bank fails to appear for the November 5, 2019 arraignment in response to the Second Summons—the Second Summons on notice to the bank and with an opportunity to be heard, based on clear and convincing evidence of the bank's noncompliance and its lack of reasonable diligence in attempting to comply. A *per diem* fine for each day of Halkbank's continued noncompliance (*i.e.*, its failure to appear in this action through counsel to answer the charges in the Indictment) may be imposed based on the character and magnitude of the harm threatened by the bank's continued contempt, the probable effectiveness of the fine, and the financial consequences to Halkbank in light of the defendant's financial resources and other relevant circumstances. Should Halkbank fail to appear on November 5, the Government respectfully submits that the defendant should be ordered to show cause why contempt sanctions should not be imposed and a potential hearing date scheduled.

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney


by: _____/s/_____
Michael D. Lockard / Sidhardha Kamaraju / David
    W. Denton, Jr. / Jonathan Rebold / Kiersten A.
    Fletcher
Assistant United States Attorney
(212) 637-2193/-6523/-2744/-2512/-2238

cc: Counsel of Record (by ECF)
    Drew Hruska, Esq. (by email)

JB5FTURC

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  UNITED STATES OF AMERICA,

4            v.                        15 Cr. 867(RMB)

5  TURKIYE HALK BANKASI A.S.,
   a/k/a "Halkbank,"
6

7            Defendant.

8                                     Conference

   ------------------------------x
9
                                     New York, N.Y.
10                                   November 5, 2019
                                     12:35 p.m.
11

12 Before:

13
                    HON. RICHARD M. BERMAN,
14
                                     District Judge
15
                         APPEARANCES
16 GEOFFREY S. BERMAN
        United States Attorney for the
17      Southern District of New York
   BY:  SIDHARDHA KAMARAJU
18      MICHAEL D. LOCKARD
        DAVID DENTON
19      JONATHAN REBOLD
        KIERSTEN FLETCHER
20      Assistant United States Attorneys
   KING & SPALDING
21      Attorneys for Defendant
   BY:  ANDREW C. HRUSKA
22      WILLIAM JOHNSON
        RICHARD WALKER
23      JACOB GERBER

24
   Also Present:
25 FBI Agent Jennifer McReynolds

JB5FTURC

1              (Case called)

2              THE COURT:  At least for my benefit, if we could start

3      by having the defense table tell us who they are and who is

4      appearing here today.

5              MR. HRUSKA:  Yes, your Honor.  I am Andrew Hruska from

6      King & Spalding.  As we have outlined in our letter we are

7      requesting a need to make a special appearance.

8              THE COURT:  We will get to that.  I just want to know

9      who is at the table.

10             MR. HRUSKA:  Sure.  Andrew Hruska, Willian Johnson,

11     Richard Walker, and Jacob Gerber; all from King & Spalding.

12             MR. LOCKARD:  Your Honor, for the government Michael

13     Lockard, Sidhardha Kamaraju, David Denton, Jonathan Rebold,

14     Kiersten Fletcher, and also with us at counsel table is

15     Jennifer McReynolds, a supervisory special agent for the FBI.

16             THE COURT:  Thank you all for being here.  Sorry again

17     for the delay.  Not to play favorites, but I am particularly

18     glad to see Mr. Hruska here today and your colleagues from King

19     & Spalding an behalf of Halkbank.  Frankly, I had little or no

20     doubt that you would be here.  One of the reasons you should

21     know why I authorized a second summons for Halkbank was to give

22     the bank additional time to respond to the Court's directives,

23     in this case the two summonses, and to cure its noncompliance.

24     Important financial institutions such as Halkbank, which is one

25     of the Republic of Turkey's leading banks, and for that matter

JB5FTURC

1    a great internationally important country such as the Republic

2    of Turkey which is the majority owner of the stock of Halkbank,

3    in my experience usually never default on their commercial and

4    legal responsibilities.  It's good to have you here.  We still

5    have a few issues to sort out but your being here, that is the

6    King & Spalding team, is a significant start.  Today's

7    proceeding is, at least from my point of view, intended to

8    enable the parties orally to present their views on the

9    question of whether or not Halkbank can make what is called a

10   special appearance and I assume presumably also avoid being

11   arraigned on the criminal indictment.  Such an appearance would

12   presumably be for the purpose of filing a motion to dismiss the

13   indictment and a motion to recuse the Court from presiding over

14   further proceedings.  So my goal today is to hear briefly in

15   the order of the defense first, assuming they wish to be heard,

16   and followed by the government, assuming they wish to be heard

17   orally.  What I mean by that is each side has submitted letter

18   correspondence which I think everybody is aware of, and they

19   may decide they wish to rest on the letters.  But I'm happy to

20   give them the opportunity to be heard.  I won't entertain the

21   merits of the proposed motions today, that is to say the

22   proposed motion to dismiss and motion to recuse.  I think it

23   was the contemplation of the defense that if and when there

24   were such motions they would follow briefing.  Likely, I will

25   not rule on the application by the defense to make the special

JB5FTURC

1   appearance at today's proceeding.  Instead, at the end of the

2   presentations today it's my intention to invite the parties

3   each to submit in writing a proposed order which they believe

4   is called for with authorities as we go forward following

5   today's oral arguments.

6           I think I'll stop there for now.  I will call upon Mr.

7   Hruska on behalf of Halkbank to be heard.

8           MR. HRUSKA:  Thank you, your Honor.  My purpose is to

9   make sure that nothing that we do or say should be inferred as

10  acceptance of the Court's jurisdiction, that is why we have

11  made this application to be permitted to appear especially.  I

12  think I can clarify a few points.  We would welcome the

13  opportunity to brief this further.  Thank you, your Honor.  But

14  because the discussion of this issue has been relatively

15  informal in letters I think I can save some time by briefly

16  addressing a few things.  One is, I do want to make clear that

17  we are not requesting a need to make a special appearance in

18  order to challenge summons.  That's not our intention.  We do

19  not think the bank has been properly served.

20          THE COURT:  I am not sure I understand the

21  distinction.

22          MR. HRUSKA:  That is what I would like to address,

23  your Honor.  We will address this at greater length in the

24  brief.  I just to point out there is a distinction between the

25  noticed purpose of service and the acceptance of jurisdiction.

JB5FTURC

1    I want to be clear that because we have researched the case law

2    and we have seen some cases in which some judges have

3    determined that if a criminal defendant has been served, then

4    the Court's jurisdiction necessarily follows.  We disagree with

5    that, but we want to make sure that nothing we do conflates

6    those issues and that it cannot be argued against us that by

7    accepting notice or by accepting service, which we have not

8    done, that we have therefore accepted the personal jurisdiction

9    of the Court.  That is the important point that I want to

10   emphasize.

11        THE COURT:  You are aware that in the related case of

12   Mr. Mehmet Hakan Atilla and also in the related case involving

13   Mr. Zarrab that they were free to and in fact did each file

14   jurisdictional motions, notwithstanding I think they also, if I

15   remember correctly, may have challenged their arrest.  In the

16   analogous situation what I would say to you is, at least in

17   this court, by accepting the summons would not waive your right

18   to challenge jurisdiction.

19        MR. HRUSKA:  Your Honor, thank you for that.  But I'm

20   concerned that not all courts haven seen this the same way.  We

21   have seen examples where participation in aspects of court

22   process beyond challenge of jurisdiction has led to courts

23   concluding that there has been a waiver of jurisdiction.  We

24   are seeking to avoid that, especially because each court has,

25   as your Honor well knows, the independent responsibility to

JB5FTURC

1    assess its own jurisdiction.  We don't want to wind up in some

2    place where we are being told that my having accepted service

3    or appeared for a general appearance that should be interpreted

4    as acceptance of the court's jurisdiction.

5          THE COURT:  You mean your appearance, defense

6    counsel's appearance.

7          MR. HRUSKA:  Correct, your Honor.

8          THE COURT:  Am I correct in saying you are not

9    intending to have the client appear to respond to the

10   indictment?

11         MR. HRUSKA:  Your Honor, we have been authorized by

12   the client to appear for this limited purpose, and no further,

13   to challenge jurisdiction and also to file the recusal motion

14   which is necessarily prior issue in the sequencing.

15         THE COURT:  They are not intending to appear.  They

16   are certainly not appearing today for the purpose or having

17   some representative respond, be arraigned for example, on the

18   indictment.

19         MR. HRUSKA:  Correct, your Honor.  We are the

20   representative of the client for this limited purpose.  There

21   is no other client representative who intends to appear.  I

22   hope it goes without saying, but I think it's implicit in what

23   we are doing that we are not authorized to enter a plea.

24         THE COURT:  I understand.  Keep going.

25         MR. HRUSKA:  I think we will largely rely on our

JB5FTURC

1    letter.  Perhaps one other point might help clarify matters.
2    At the risk of distraction, and I realize it is a risk because
3    these are a complex series of law in which the law has not been
4    fully fleshed out, it must be the case that there is a vehicle
5    to challenge personal jurisdiction.  We reject the notion that
6    jurisdictional principles cease to operate in criminal cases.
7    We think it is a constitutional fundamental, regardless of how
8    the rules are developed.  Both the Department of Justice's
9    position in response to the debate over the revision of
10   Criminal 4 a few years ago seem to acknowledge this, seem to
11   acknowledge the continuation of the viability and importance of
12   special appearances.  I know both the prosecutors, and we have
13   referred specifically to that in our letters to the Court, and
14   I will just very briefly point out that in that letter the
15   Justice Department cites specifically to the purpose of the
16   special appearance in which they say, and I am quoting, "The
17   purpose of the special appearance is to avoid automatically
18   waiving issues by an operation of law not to prevent fact
19   finding."  Stopping the quote.  In which I think they are
20   addressing this service issue, which is not our purpose here.
21   The first example they cite is a practice commentary.  "Prior
22   to the federal rules the practice was for counsel to appear
23   especially for the purpose of objecting by motion to the
24   jurisdiction of the Court over the defendant or its property."
25   And then listed some additional examples.  I think the Justice

JB5FTURC

1    Department isn't recognizing that this is an important mode for

2    the situation where a criminal defendant has grounds to and

3    seeks to challenge personal jurisdiction.

4         THE COURT:  I notice in your letter, I don't think you

5    cited any cases from the Second Circuit, where there is a

6    special appearance in a criminal matter.  My understanding of

7    the change in the rule with respect to civil matters is, and

8    you'll correct me if I'm wrong, but the purpose was or is to

9    not slow down or delay a proceeding, be it criminal or civil.

10   The way that is accomplished is by saying that you don't waive

11   specifically the argument that there is no jurisdiction.  It

12   would be an extraordinary conclusion that you waive

13   jurisdiction just by participating where you state at the

14   outset that you feel that there is an infirmity in the

15   jurisdiction.  I am not aware of a single case in the Second

16   Circuit that supports your position.  I can't say I read every

17   case, but I felt we did a pretty thorough canvass and we

18   couldn't find it.  Just to understand, forget the rule for the

19   moment, if you know, is your or your client's fear that by

20   responding to the indictment they will not be able to assert

21   that personal or that jurisdiction is defective?  Is that the

22   fear?

23        MR. HRUSKA:  We are concerned, yes, your Honor.  We

24   are concerned that by responding or perhaps otherwise

25   participating that a court might find, because some courts have

JB5FTURC

1    appeared to have found this, that the defendant has waived the

2    opportunity to object to personal jurisdiction and challenge

3    that before the Court.

4          THE COURT:  In the personal jurisdiction claim that

5    you have, not to precipitate that, that is going to be for

6    another day, what exactly is the issue with the personal

7    jurisdiction?

8          MR. HRUSKA:  The claim is that the Court cannot

9    properly address Halkbank as a defendant, that the allegations

10   in the case do not properly make out jurisdiction which is the

11   obligation of the prosecution to prove.

12         THE COURT:  That is personal jurisdiction, is what you

13   are saying that is the problem?

14         MR. HRUSKA:  Correct, your Honor.  There are a number

15   of other problems.

16         THE COURT:  Just talking about the jurisdictional

17   issue now.

18         MR. HRUSKA:  All I am talking about is jurisdiction.

19   I am not intending to argue facts or argue the many, many other

20   illegal issues which we see as being debilitating problems in

21   the indictment.  Our purpose is to focus on jurisdiction and

22   not to go beyond that at this point.  Personal jurisdiction, it

23   is an issue which just doesn't present itself, your Honor, in

24   situations where an individual defendant is physically present

25   before the Court.  It's an issue which comes up where a

JB5FTURC

1    corporation, especially a foreign corporation which has no US

2    business, is run in Turkey, run largely in Turkey, and we want

3    to challenge the Court's ability and it's constitutional

4    ability to bring this defendant before this court for these

5    charges.

6          THE COURT:  And you think that me or somebody else is

7    going to say now that you have responded to the indictment and

8    entered a plea of not guilty you can no longer bring a

9    jurisdictional challenge.  Is that what you think?

10         MR. HRUSKA:  We are concerned about that, yes, your

11   Honor.

12         THE COURT:  Where has it happened?

13         MR. HRUSKA:  I want to make sure I had a case that was

14   following the change in the criminal rule and the one that

15   brings the issue most to bear is a 2017 case from Ohio,

16   Southern District of Ohio, United States versus Mary Asu

17   Industries.  In that case that is what happened.  The

18   defendant, a foreign corporation, a Japanese corporation, had

19   participated to some extent in proceedings and then sought to

20   challenge personal jurisdiction and was told by the court, the

21   court ruled that they waived that issue.

22         THE COURT:  O.K.  Go ahead.

23         MR. HRUSKA:  Nothing else, your Honor.  We look

24   forward to the opportunity to briefing the issue.

25         THE COURT:  To be clear, I think what you said that

JB5FTURC

1   Halkbank in no way is suggesting that it doesn't have notice of

2   the details of the charges or claims against it, is that right?

3         MR. HRUSKA:  Your Honor, I want to be careful, and I

4   am not trying to play a game here.  I want to make sure that

5   nothing I'm saying should be inferred as acceptance of

6   jurisdiction.  We are here.  We wish to argue these issues.

7   Obviously the court will reach conclusions about other issues

8   and those aren't the ones that we want to bring to the Court's

9   attention on the special appearance.

10        THE COURT:  I get that.  But you don't have a view as

11  to whether Halkbank has notice of claims that the government

12  has against the bank?

13        MR. HRUSKA:  Your Honor, I don't wish to take a potion

14  on that point.

15        THE COURT:  We'll turn to the government.

16        MR. LOCKARD:  Thank you, Your Honor.  Your Honor, I

17  think just to start briefly with the last question that the

18  court raised.  I think it is clear from King & Spalding's

19  appearance here today and the arguments that they have

20  previewed about the jurisdictional issues that they wish to

21  waive to the indictment that the firm and its client are very

22  familiar with the charges that are contained in the indictment.

23        THE COURT:  Halkbank, that's the client, and King &

24  Spalding.

25        MR. LOCKARD:  Yes, your Honor.  The jurisdictional

JB5FTURC

1   arguments that Mr. Hruska has described are very reminiscent of

2   the same arguments which, as the court pointed out, Halkbank's

3   codefendants, both Mr. Zarrab and Mr. Atilla, also raised in

4   pre-trial motions to dismiss the indictment based on arguments

5   about the foreign location of the defendant, based on the

6   foreign conduct of the defendant, based on purportedly limited

7   contacts with the United States.  All of those were the basis

8   of the motions to dismiss that the bank's codefendants filed

9   following their arrest and following their arraignment on the

10  charges.

11          Just to back up very briefly, I think our letter from

12  yesterday outlined the diligent efforts that the government had

13  undertaken to serve both the indictment, the summons that was

14  issued when the indictment was filed, and the second summons

15  which, again, as the Court already noted, was issued in order

16  to give the bank an additional opportunity to respond to the

17  charges.  I think it's clear, both from the nature of those

18  efforts which included service on the bank itself, on counsel

19  for the bank, on a representative of the bank's majority

20  shareholder, from the attempted physical delivery which was

21  refused by the bank's legal department.  It's clear that the

22  bank had notice and the services had been accomplished under

23  Rule 4.  I understand Mr. Hruska is saying that he is not

24  challenging that service had been accomplished under Rule 4

25  which is not dependent on the bank's acknowledgement or

JB5FTURC

1    acceptance of service.

2          THE COURT:  I got a letter, from you I think, this

3    morning indicating that the bank or somebody at the bank when

4    somebody went to serve the summons and the indictment refused,

5    for one thing, and wrote on it that service is defective.  You

6    can better explain that than I.  I just got the letter.

7          MR. LOCKARD:  Yes, your Honor, as did we.  We had

8    followed up with Fed Ex, which was the delivery service, on the

9    attempts to physically deliver a copy of the indictment and the

10   summonses to the bank to its legal department at its

11   headquarters address in Istanbul.  As we learned the details of

12   that attempt earlier today, Fed Ex was given a written

13   communication by someone from the legal department refusing

14   delivery of the package acknowledging that it was sent by the

15   U.S. Attorney's office for the Southern District of New York

16   and refusing delivery on the grounds that the Fed Ex delivery

17   did not comply with treaty service under the mutual legal

18   assistance treaties between United States and Turkey, which of

19   course under Rule 4 is not a required method of service.  It is

20   an acceptable method of service, but it's not the exclusive

21   method of service.  The defendant is not entitled to select

22   their preferred method of service as long as service is

23   accomplished.  I think what that refusal shows is there is

24   certainly an air of gamesmanship here with the bank's request

25   to make a special appearance.  I think there has been no

JB5FTURC

1    argument by Mr. Hruska that a recusal motion is a motion that

2    would be waived by an appearance.  There has been the

3    contention that a personal jurisdiction argument might be

4    waived by an appearance.  I think the court has noted that none

5    of us are aware of any illegal authority for that prospect.

6    The government is not aware that jurisdictional issues will be

7    waived simply by appearing.  Jurisdictional arguments to the

8    extent that they can be waived are not waived if they are

9    promptly asserted, which it is clear that all the bank intends

10   to do, and I'm not aware of any basis for the government to

11   argue that if Halkbank did appear, answer the charges and move

12   to dismiss, that it would have waived any jurisdictional

13   challenges to the indictment.  Instead, it appears that what

14   Halkbank is trying to do is to deny the jurisdiction of the

15   Court to attempt to move to dismiss the indictment with no

16   commitment whatsoever that it is going to remain in the case

17   and answer the charges if it does not get its preferred ruling.

18   I think the same thing goes for the recusal motion.  There is

19   similarly no indication that whether that motion were granted

20   or denied that the bank has any intention of fully

21   participating in these proceedings.  So I think it is clear for

22   the reasons described at our letter that a special appearance

23   is not appropriate here.  It is not permitted under the rules.

24   It is not necessary to further any legitimate interests with

25   any further court or the public has.  Once the bank answers the

JB5FTURC

1   charges it will be fully permitted to make the motion to

2   dismiss a motion for refusal or any of the other challenges

3   that every criminal defendant is entitled to raise in a federal

4   criminal prosecution of the United States.

5           THE COURT:  Thank you.  Let me pose the question to

6   defense counsel.  Assume for the moment that you could make

7   such a motion and let's assume the motion were denied.  Then

8   Halkbank come right over here and respond to the indictment and

9   enter a plea of guilty or not guilty?

10          MR. HRUSKA:  Your Honor, I'll need to consult with my

11  client on that issue.

12          THE COURT:  I know, but why would anybody entertain?

13  It's like heads I win tails you lose, or whatever that

14  expression is.  Why would we go through the motion, so to

15  speak, of entertaining a motion if the bank is going to take

16  the same position no matter what the outcome is of the motion?

17  That is kind of crazy, isn't it.

18          MR. HRUSKA:  Your Honor, the court has a

19  constitutionally required duty to assess its jurisdiction.

20          THE COURT:  I have already said, for me I would

21  certainly plan to do that and entertain that motion following

22  their appearance and arraignment.  You are not able to say

23  today whether if the bank lost the jurisdictional motion, that

24  is to say that the court found that there was jurisdiction,

25  even then your client might not come and address the

JB5FTURC

1   indictment.  That seems to be your position.

2           MR. HRUSKA:  Your Honor, I can't answer that

3   hypothetical question.

4           THE COURT:  Wouldn't the court be irresponsible if it

5   didn't ask the question and say, well, could you go back and

6   ask your client if they lose the motion they plan to come here

7   and participate?

8           MR. HRUSKA:  No, your Honor.  I don't think it would

9   be irresponsible.  I think that courts and clients need to

10  address legal issues as they arise and then move on based on

11  the decisions made in the case.  I think this is one of those

12  points.

13          THE COURT:  I actually think just based on memory,

14  albeit dim, I have to concede that the principle purpose or one

15  of the principle purposes for not allowing a special appearance

16  is precisely the situation that you are presenting which is

17  that it only serves to delay the case because we go through

18  this motion practice and then we still could be faced with the

19  prospect which your client apparently has not looked at

20  squarely in the eye and decided they would be here.  That's all

21  it would do, would be to obfuscate.  Why would any court do

22  that and why does that make any sense practicality-wise?

23          I have another case, by the way, right now, not quite

24  this case but it's someone who is saying they can't comment to

25  the jurisdiction at this point in time.  They are not allowed

JB5FTURC

1    by the authorities in the country in which they live.  But the

2    lawyers showed up and he wants to make a whole slew of motions

3    like you do, attacking jurisdiction and whatever else he wants

4    to do.  I think the law, it's not quite the same as this case,

5    but I think the law that applies there is that he can't until

6    he presents himself in court.  This is an individual.  It is a

7    criminal case.  It's not exactly your case, but in doing some

8    research, we haven't finished, but in doing some research in

9    that case the point is that why would or should somebody be

10   allowed to gin up the court's apparatus and do a motion to

11   dismiss.  A big deal.  It can be.  And a motion for recusal,

12   without even knowing if there is ever going to be a case here,

13   why would any judge recuse himself in favor of another judge if

14   there is not going to be any case.  Put recusal aside, because

15   that involves this court and I don't want to involve myself in

16   that discussion at this point in time, but the same is true for

17   a jurisdiction.  Why would anybody go through the bother and

18   trouble of entertaining?  A lawyer would say also, as you are

19   saying, Judge, this is all I can say in the court right now is

20   exactly what I said in my papers.  Who would do that and why

21   should any court?  Courts are busy and courts are in the

22   business of moving cases along.  We don't give advisory

23   opinions really.  That essentially is what I think you are

24   asking for.  I haven't seen any authority for why a court is

25   compelled or obliged to do that.

JB5FTURC

1          MR. HRUSKA:  May I respond, your Honor?

2          THE COURT:  Yes.

3          MR. HRUSKA:  We welcome the opportunity to provide

4    authorities to the court in the briefing that your Honor

5    suggested at the beginning of today's hearing.  I will say that

6    it is the prosecution that has ginned up the apparatus of the

7    court.  They brought the indictment.  The indictment makes

8    assertions and allegations that are outside of the jurisdiction

9    of this court.  There has to be a vehicle for a defendant to

10   challenge that jurisdiction which necessarily comes before

11   everything else.  We cannot enter a plea under an arraignment

12   because that act would be acknowledging the jurisdiction of the

13   court.  We have to address this legal issue as a threshold

14   matter.  That is why we are requesting the special appearance.

15         THE COURT:  I think I get it, but I must say it's not

16   that clear to me what in fact is going on.

17         MR. HRUSKA:  We will try to clarify in our papers,

18   your Honor.

19         THE COURT:  I'm trying to understand what is served by

20   having a motion but not having the client here to stand up in

21   support of that motion.  That is the part I'm having trouble

22   with.  I do frankly understand, if it were an individual, I

23   could understand that an individual defendant would be hesitant

24   to travel from one country to the other because they would be

25   concerned that they are going to be put in jail in a criminal

JB5FTURC

1    case.  One could easily understand that.  But this is a

2    corporation.  The corporation, nobody is going to jail in a

3    case like that.  The question is whether the Republic of Turkey

4    has any responsibility or legal obligation to respond to the

5    United States which claims that it, Republic of Turkey,

6    Halkbank, which happens to be state-owned so I don't know if

7    it's the Republic of Turkey, but Halkbank let's say, a

8    corporation, what happens to Halkbank?  They may or may not if

9    they were convicted be responsible for some financial penalty I

10   suppose.  You can't put them in jail so the remedy would be

11   financial penalty.  You don't want to say that either?

12       MR. HRUSKA:  Yes.  In theory the punishment available

13   under the United States sentencing guidelines and the Court's

14   discretion for a corporate defendant include financial

15   penalties.  Yes, your Honor.

16       THE COURT:  But from what I have been told by the

17   government and even in the media is that the Republic of Turkey

18   and Halkbank, together or separately, have been negotiating

19   that very point whether there should be financial penalties and

20   how much they should be for two years.  I don't know if two

21   years is exactly the right amount of time.  You, as an attorney

22   at King & Spalding, would know better than I because I think

23   you have represented Halkbank in those proceedings.  At least

24   it seems like the principles have been gotten well past

25   whatever issue you are raising on their own.  They didn't

JB5FTURC

1    succeed.  They didn't come to an agreement.  But it certainly

2    is not as if I wasn't there, so I have no idea.  I can't

3    imagine those ongoing discussions and negotiations, or whatever

4    they were, for such a long period of time would not have

5    involved first the government of the United States saying,

6    look, this is what we think we can prove here and this is what,

7    if we did prove it, this is what we would be looking for from

8    Halkbank.  The parties themselves are way beyond where we are

9    here today in court.  You got to have a special appearance but

10   no bank just to figure out if there is jurisdiction.

11        MR. HRUSKA:  I'm sorry, your Honor.  What's the

12   question?

13        THE COURT:  It's not a question.  I am saying I don't

14   get it.  I don't get your position in light of the reality, the

15   facts on the ground, as to what Halkbank has been doing since

16   Mr. Atilla was convicted of five out of six counts of criminal

17   fraud.  I'll tell you exactly what it was.  Conspiracy to

18   defraud the United States, bank fraud, conspiracy to commit

19   bank fraud, conspiracy to commit money laundering, and

20   conspiracy to violate the law which is referred to as IEEPA.

21   They are well past this preliminary fencing or shadow boxing,

22   whatever it is that is going on here, which says we want to

23   make a motion about jurisdiction.  I would think, first of all,

24   we have said that your client would not waive jurisdictional

25   arguments, number one.  Number two, they would have the

JB5FTURC

1   opportunity to contest whether they have done anything wrong.

2   It strikes me that in light of the facts on the ground that

3   that is probably something that one would think everybody would

4   like to do expeditiously.  This just throws a whole road block

5   into any criminal proceeding, not a roadblock but a slow down,

6   especially since you told me that your client would not even

7   represent that if it lost the motion that you wish to make then

8   it would come and respond to the indictment.

9            MR. HRUSKA:  Your Honor, one point of clarification,

10   please.  What is the thing that your Honor would like everyone

11   to do expeditiously?

12           THE COURT:  Have the case proceed, including motions.

13   If the motions are won, the case is over.  If the motions are

14   lost, go on and have a trial.

15           MR. HRUSKA:  What is the connection between that

16   process and, I think your Honor referred to it as, negotiations

17   a moment ago?

18           THE COURT:  I'm referring to what I read in the

19   newspapers including the New York Times and what the government

20   has said on a couple of occasions here in court that there have

21   been negotiations between Turkey and the United States, I

22   suspect although I don't particularly know, between the US

23   Department of Treasury and Halkbank as to whether there was

24   involvement in the conspiracies that were just referred to such

25   that they are culpable and, if so, whether there is a penalty

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A78

JB5FTURC

1    to be applied and how much it is.  Don't you think everybody

2    would like to get to that point quickly without waiving any

3    rights that they have?

4              MR. HRUSKA:  We are concerned about waiver of rights.

5              THE COURT:  I am telling you that there would be no

6    waiver of rights.  Is your client prepared to say that if there

7    is no waiver of rights they would respond to the indictment?

8              MR. HRUSKA:  I will have to consult with my client.

9              THE COURT:  If you don't know that, we are not going

10   to get very far, honestly.

11             MR. HRUSKA:  Your Honor, jurisdiction must precede

12   everything else in the case.

13             THE COURT:  I am happy to do it.  I'm happy to do it.

14             MR. HRUSKA:  Then please grant our request to have a

15   special appearance, Your Honor.

16             THE COURT:  You haven't convinced me that you are

17   entitled to that without your client responding to the criminal

18   indictment.  That is where we are.  I'm going to look up the

19   cases myself and look over your materials.  One of the first

20   things I can remember when I was a beginning associate in

21   litigation was that there are no more special appearances,

22   particularly in criminal cases.  You have been showing me that

23   there are.  The Second Circuit for example has probably got the

24   most of those kinds of cases than anywhere else.

25             MR. HRUSKA:  Your Honor, we do look forward to

JB5FTURC

1    briefing this.

2            THE COURT:  Is there one case from the Second Circuit

3    that you can point to which supports your position?  I didn't

4    see that.  You cited about three or four cases from states

5    other than the Second Circuit.  One would think usually in a

6    letter like this you get to preview your strongest arguments.

7    You would say boom.  The Second Circuit said last year such and

8    such, special appearances in criminal cases are thoroughly

9    permissible, whatever they might say.

10           MR. HRUSKA:  Your Honor, I don't have a Second Circuit

11   authority.  But I do have a Ninth Circuit authority that the

12   prosecution keeps referring to.

13           THE COURT:  Who cares at this point in time.  We are

14   in the Second Circuit.  The Second Circuit Court of Appeals is

15   right next door.  You know as an experienced litigator that you

16   always, when you come to the Second Circuit, pull out a case

17   from the Second Circuit which supports your legal position.

18   Anyway, I get it.

19           Anything else anybody wants to add?

20           MR. HRUSKA:  Your Honor, two things.  One,

21   administrative.  Very quickly.  The prosecution has several

22   times referred to the Pangang case.  In that case the Ninth

23   Circuit has said that special appearances are still possible.

24           THE COURT:  What does it say, specifically?

25           MR. HRUSKA:  It says, therefore Criminal Rule 4 would

JB5FTURC

1   not eliminate the possibility of special appearances entirely.

2           THE COURT:  In criminal cases?

3           MR. HRUSKA:  This is a criminal case.  It's a decision

4   from last year.  The ministerial point, your Honor, is that in

5   terms of the presentation of briefs we would appreciate in

6   order to make it more administratively convenient the ability

7   to file by ACF without having to file a notice of appearance,

8   or at least for the court's ruling that filing such a notice

9   doesn't constitute a general appearance.

10          THE COURT:  We have different issues here.  You as

11  counsel have to file a notice of appearance.  I think that is

12  the rule.  You had better check with the clerk's office.

13          MR. HRUSKA:  We have, your Honor.  This is an usual

14  situation.

15          THE COURT:  It's very unusual, but my understanding is

16  that you are obliged to file a notice of appearance of counsel.

17  If it gets to that you would then say that is who you are and

18  here is who your client is and then you are filing a special

19  appearance, whatever.  Yes, you have to file a notice of

20  appearance is my understanding.  If there are circumstances

21  where lawyers can come in here and represent somebody without

22  it, I would be surprised.  I'm happy to be convinced otherwise.

23  It doesn't make sense to me.  Did you ever have a case in the

24  Southern District that you didn't have to file a notice of

25  appearance?

JB5FTURC

1        MR. HRUSKA:  No, your Honor.  But I would appreciate

2   if it was made clear on the record that by so doing, at least

3   provisionally for the purposes of arguing this issue, that

4   doesn't constitute a general appearance.

5        THE COURT:  But you are the lawyer for Halkbank and

6   you have to figure out legally what you have to do to serve

7   your client. I can't give you legal advice as to what you

8   should write on the notice of appearance.  It is usually a

9   pretty *pro forma* item.

10        MR. HRUSKA:  It is usually, your Honor.  However, in

11  this case when we file our notice that indicates our desire to

12  seek a special appearance.  I would just like to be clear on

13  the record that the court has not ruled that that will

14  constitute a general appearance.

15        THE COURT:  I'm going to be like your client and I'm

16  going to say until I see all the facts I'm not going to give

17  you a ruling, which I would do in any case because I honestly

18  don't know enough about the law to say it would or it wouldn't.

19  You are the one who is telling me that there is no question

20  that you are allowed to file a special appearance.  I don't

21  know that.  I'm not going to tell you how to go about even

22  doing that preliminary matter which is filing counsel's notice

23  of appearance.

24        MR. HRUSKA:  Thank you, your Honor.  We will file on

25  paper.

JB5FTURC

1            THE COURT:  Just let me understand what it is

2       everybody is filing.  Do you all want to file more than a

3       proposed order for me to sign as to next steps in this case, or

4       do you want to brief limited to the right to file the special

5       appearance?

6            MR. HRUSKA:  Your Honor, the latter.  We appreciate

7       the opportunity to brief the special appearance issue,

8       specifically.

9            THE COURT:  Is that O.K. with the government too to

10      have further briefing?  What is your goal here?

11           MR. LOCKARD:  If the Court would find further briefing

12      helpful, then we would be happy to do it.  We would ask for a

13      relatively shortened briefing period, both because these issues

14      have already been raised in letters submitted to the court and

15      today on the record, and also because we are in an unusual

16      situation where both the court and the government are of the

17      opinion that the defendant's appearance would not waive a

18      jurisdictional claim and the defendant arguing very vigorously

19      that it would.  It's a strange situation and one that I think

20      does not require an extensive briefing schedule.

21           MR. HRUSKA:  I agree with that, for sure.

22           THE COURT:  Counsel, how about two weeks to file

23      whatever it is.  By the way, you could file a letter brief too

24      if it's easier for you or expedite it.  There is no magic to a

25      motion.  That would be just fine.  That has already happened.

JB5FTURC

1    How about November 19 and how about a week after that.  The

2    government, is that going to be sufficient or you need more

3    time?

4            MR. LOCKARD:  That is fine, your Honor.

5            THE COURT:  For you it would be November 26 and then a

6    short reply, if any, by December 2.   The understanding is that

7    this is a brief or a letter brief, whatever it is, devoted to

8    the issue of whether or not you all can make a special

9    appearance for the purpose of filing two motions, namely one

10   recusal and one motion to dismiss.  Do I have that correct?

11           MR. HRUSKA:  Yes, your Honor.

12           THE COURT:  Is that your understanding too?

13           MR. LOCKARD:  Yes, your Honor.

14           THE COURT:  The statues quo remains, or is not altered

15   by anything we have done here today.  I look forward to getting

16   those materials.  Thank you.

17           (Adjourned)

18

19

20

21

22

23

24

25

# KING & SPALDING

King & Spalding LLP
1185 Avenue of the Americas, 35th Floor
New York, NY 10036-4003
Tel: +1 212 556 2100
Fax: +1 212 556 2222
www.kslaw.com

Andrew C. Hruska
Partner
Direct Dial: +1 212 556 2278
Direct Fax: +1 212 556 2222
ahruska@kslaw.com

November 19, 2019

**VIA HAND DELIVERY**

Honorable Richard M. Berman, U.S.D.J.
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007

> Re:    **United States v. Türkiye Halk Bankasi A.S., a/k/a/ "Halkbank"**
> **U.S. District Court for the Southern District of New York**
> **No. 1:15-cr-00867-RMB**

Dear Judge Berman:

  We write to submit additional authorities that support our request to enter a special and limited appearance on behalf of Türkiye Halk Bankasi A.Ş. ("Halkbank" or the "Bank") for the limited purpose of filing a motion to dismiss for lack of personal jurisdiction and a motion seeking this Court's recusal from this case.[1]  As set forth more fully below, the Court must address jurisdiction and recusal as threshold matters.  Courts have routinely permitted special appearances to challenge personal jurisdiction and other threshold matters in criminal cases. Denial of the special appearance procedure would unfairly subject Halkbank to the risk of waiving the very rights it seeks to have adjudicated.

---

[1] We do not accept service nor enter a general appearance on behalf of Halkbank by submitting this letter.  As noted in our November 4, 2019 letter, the Bank has not yet responded to the superseding indictment filed on October 15, 2019 by the U.S. Attorney's Office for the Southern District of New York or otherwise made an appearance.

A85

November 19, 2019
Page 2

## I.  The Court Must Assess Personal Jurisdiction and Recusal as Threshold Matters Before Arraignment

The Court must have personal jurisdiction over the defendant to hear the defendant's plea to a charge and so personal jurisdiction must come before an arraignment.  Because a court cannot proceed against a defendant over which it lacks personal jurisdiction, the Bank's fundamental right to a fair proceeding requires determining jurisdiction as a threshold matter.

Halkbank has a constitutional right under the Fifth Amendment's Due Process Clause to challenge a court's unreasonable exercise of personal jurisdiction.  *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 676 (2d Cir. 2013) (finding no personal jurisdiction over foreign bank under Fifth Amendment Due Process Clause where foreign bank had no substantial U.S. operations).  This constitutional protection applies with equal force in both civil and criminal cases.  *Int'l Harvester Co. of Am. v. Kentucky*, 234 U.S. 579, 589 (1914) (finding Kentucky court could exercise personal jurisdiction over corporate defendant indicted under state law).  Personal jurisdiction is a threshold issue, and the District Court has the power to dismiss the case before arraignment.  *See Hughes v. Thompson*, 415 U.S. 1301, 1302 (1974); *In re Rationis Enters., Inc. of Panama*, 261 F.3d 264, 267 (2d Cir. 2001) ("The requirement that jurisdiction be established as a threshold matter springs from the nature and limits of the judicial power of the United States and is inflexible and without exception.") (citing *Steel Co. v. Citizens for a Better Envt*, 523 U.S. 83, 94-95 (1998)).

Personal jurisdiction must be challenged with a timely objection to avoid risking waiver.  *United States v. Gernie*, 228 F. Supp. 329, 339 (S.D.N.Y. 1964) (personal jurisdiction may be waived in a criminal case).  Because several courts addressing this issue, including the Second Circuit, have held that the failure to raise personal jurisdiction before arraignment can waive the defendant's rights by necessarily acknowledging the court's jurisdiction, the Bank seeks to avoid that risk through a special appearance.  The Court's suggestion at the November 5, 2019 hearing (with which the prosecution agreed) that Halkbank's right to challenge personal jurisdiction would not be waived by making a general appearance binds neither the Second Circuit nor Supreme Court were the Bank's motion denied and then later reviewed on appeal.

In a case presenting a strikingly similar dilemma to the one confronting the Bank here, the court in *In re Hijazi* addressed the issue of a pre-arraignment appearance to seek the

November 19, 2019
Page 3

dismissal of an indictment against a non-American defendant who had never been physically present in the court's jurisdiction and was lawfully in Kuwait at the time of the indictment. 589 F.3d 401 (7th Cir. 2009). The court described the issue before it as a narrow one:

> [I]s [defendant] entitled to a ruling at this time, or must he voluntarily travel to the United States and present himself for arraignment before the court takes his motions under advisement? Put simply, does the district court, under the circumstances of this case, have a duty to rule now on the authority of the United States to apply its law to [defendant's] conduct?

*Id.* at 406.

The court answered this question in the affirmative, granted defendant's petition for mandamus, and ordered the district court to rule on his motions to dismiss the indictment, notwithstanding the fact that the defendant had not entered an appearance in the matter.

The prosecution in *Hijazi* argued that a writ of mandamus should not be available because defendant could obtain the relief he desired by showing up in court and making a general appearance. This is precisely the same argument advanced by the prosecution here during the November 5 hearing. Tr. of Status Conference at 14-15, *United States v. Türkiye Halk Bankasi A.S.*, No. 1:15-cr-00867-RMB (S.D.N.Y. Nov. 5, 2019), ECF No. 575. But the court in *Hijazi* decisively rejected that argument, just as this Court should do here:

> But [the prosecution's] reasoning overlooks the entire point of [defendant's] attack on the indictment. [Defendant] was lawfully in Kuwait at the time of the indictment and remains so today. The government cites no support for the proposition that [defendant] has no right to stay there, and in that way, refuse to cooperate with the U.S. proceeding. In fact, the reach of the statutes that [defendant] allegedly violated and the district court's authority to command his appearance are precisely the issues [defendant] wants the district court to resolve.

*In re Hijazi*, 589 F.3d at 407.

In these circumstances, the Court found that "ordinary proceedings" of making an appearance and entering a plea did not provide the defendant with an adequate remedy and that the relief he was requesting was "well within the power of the district court." *Id.* at 408.

November 19, 2019
Page 4

Because the decision on the recusal motion will determine which United States district judge will consider the personal jurisdiction motion, the Court must decide the recusal motion first. Courts must promptly address requests for recusal because the purpose of the recusal statute is to avoid "even the appearance of impropriety whenever possible." *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 865 (1988). "The recusal issue is a threshold issue that must be resolved before the Court may consider any substantive motion." *Barnes v. Harling*, 368 F. Supp. 3d 573, 591 (W.D.N.Y. 2019); *see also Weisshaus v. Fagan*, 456 F. App'x 32, 34 (2d Cir. 2012) (It is "well-settled that a party must raise its claim of a district court's disqualification at the earliest possible moment after obtaining knowledge of facts demonstrating the basis for such a claim."); *In re Int'l Bus. Machines Corp.*, 45 F.3d 641, 643 (2d Cir. 1995) ("[I]t is important to present recusal applications promptly.").

At the hearing on November 5, both the Court and the prosecution appeared to suggest that Halkbank's request for a special appearance should be denied unless conditioned on a commitment by Halkbank that, regardless of the Court's ruling on the jurisdiction motion, Halkbank agrees to subject itself to the jurisdiction of the Court and proceed with the case. Tr. of Status Conference at 15, *United States v. Türkiye Halk Bankasi A.S.*, No. 1:15-cr-00867-RMB (S.D.N.Y. Nov. 5, 2019), ECF No. 575. Such a condition is contrary to due process under the Constitution. A party seeking to assert a constitutional right does not have to agree to a conditional remedy in order to have the asserted right considered and adjudicated. Threshold constitutional issues like personal jurisdiction must be decided first to determine whether a court has the authority over a party to compel it to do anything. Those threshold constitutional rights would indeed be hollow if courts were permitted to extract advance concessions from defendants as a cost of having their rights adjudicated. For example, a criminal defendant has a constitutional right to file a motion to suppress evidence obtained in violation of due process and cannot be forced, as a condition of having that motion adjudicated, to forgo another constitutional right (the right to a jury trial) and agree to plead guilty should the court deny the motion to suppress. In this case, Halkbank should not have to agree to anything further until the Court decides the threshold jurisdictional question.

The Court also expressed its concern that requesting a special appearance would cause a "delay" in the proceeding. *Id.* at 16. But asserting a valid constitutional right is not fairly

November 19, 2019
Page 5

considered a "delay," particularly where the vindication of that right might end the case immediately. Halkbank is asserting a constitutional right through the only mechanism that protects against the risk of waiver and has submitted its request to do so in a timely fashion. *In re Hijazi*, 589 F.3d at 411 (where the defendant requested pre-arraignment determination of jurisdiction, the court stated that "nothing that [defendant] has done has in any way prevented the district court from ruling on his motions to dismiss. He filed the motions in a timely fashion; he is represented by first-rate counsel; and he has followed up appropriately rather than allowing matters to languish."). Moreover, should the Court grant the motion for a special appearance, this would substantially expedite these proceedings if the Court grants the Bank's motion to dismiss, as the Bank believes it should. If, on the other hand, the Court denies the motion, then the case will proceed without delay, as it would have otherwise. Any time spent on these proceedings even if this motion is denied is no reason to prevent the Bank from exercising its rights.

## II.   Courts Routinely Grant Special Appearances in Criminal Cases

Courts routinely permit criminal defendants to appear on a special and limited basis to challenge threshold issues such as jurisdiction. We have reviewed federal criminal cases available in online legal databases, including many unpublished opinions and orders, not limited by time period, in which defendants sought to enter a special appearance. Our search identified twenty-two cases in which defense counsel have either requested or noticed a special appearance in criminal cases. *See* Appendix, *infra* at p. 15. In sixteen cases, the court permitted a special appearance. Of those cases, in seven instances defendants were permitted by the court to enter notices of special appearance on the docket with no objection from the prosecution. *See, e.g.*, *United States v. Sinovel Wind Grp. Co.*, No. 3:13-cr-00084 (W.D. Wis. Feb. 21, 2017) ECF No. 187; *United States v. Pangang Grp. Co., Ltd.,* No. 4:11-cr-00573 (N.D. Cal. Dec. 21, 2011), ECF No. 46; *United States v. Johnson Matthey, Plc.*, 2:06-cr-00169 (D. Utah Jan. 23, 2007), ECF No. 60; *United States v. Pub. Warehousing Co.*, No. 1:09-cr-00490 (N.D. Ga. Nov. 19, 2009), ECF. No. 9; *United States v. Nippon Paper Indus. Co., Ltd.*, No. 1:95-cr-10388 (D. Mass. Jan. 23, 1996), ECF Nos. 16, 17; *United States v. Mitchell*, 377 F. Supp. 1326, 1328-29 (D.D.C. 1974); *United States v. Chitron Elecs. Co. Ltd.*, No. 1:08-cr-10386 (D. Mass. Jun. 5, 2009), ECF No. 46.

November 19, 2019
Page 6

In nine cases, the defendants requested leave of the court to make a special appearance and the court granted the request.  The majority of these courts did not view special appearance as a controversial request and granted it without generating any written opinion on the issue. Like Halkbank, many of the defendants were foreign companies with no U.S. operations.  *See, e.g.*, *United States v. Kassian Mar. Navigation Agency, Ltd.*, No. 2:13-cr-00070 (E.D. Va. June 24, 2013), ECF No. 38 (granting foreign corporate defendant's motion to make special appearance to contest personal jurisdiction); *United States v. Dotcom*, No. 1:12-cr-00003 (E.D. Va. Nov. 20, 2012), ECF No. 148 (granting foreign criminal defendant leave to enter limited appearance to move to dismiss indictment for lack of personal jurisdiction based on insufficient service); *United States v. Kolon Indus., Inc.*, No. 3:12-cr-00137 (E.D. Va. Dec. 13, 2012), ECF No. 20 (same).

Courts have granted special appearances through written opinions in three instances, all of which involved foreign defendants located abroad.  In those cases, the courts deemed it unnecessary to compel the defendants' appearance in the United States to challenge their indictments.  In *United States v. Siriwan*, the prosecution challenged special appearance under the fugitive disentitlement doctrine, and the court determined that it did not apply to the defendants, who were foreign citizens and residents.  No. CR 09-81, 2011 WL 13057709 (C.D. Cal. July 28, 2011).  Under the fugitive disentitlement doctrine, a court may, in its discretion, decline to rule on a fugitive individual's motions until he presents himself physically before the court.  In *Siriwan*, two Thai citizens requested a special appearance in order to make a motion to dismiss the indictment.  The prosecution opposed the motion, claiming they were fugitives and not entitled to the relief sought.  The court disagreed and granted the special appearance, holding that foreign defendants who were not present in the United States did not flee the jurisdiction and, therefore, were not fugitives.  *Id.* at *1 ("They are not United States citizens or residents. Nor did they leave this country post-indictment . . . As such, there is no reason to conclude that they are purposefully staying away from the United States because of the existence of the indictment").

As a corporation, Halkbank cannot be a "fugitive" since it has no physical body to present and can appear before the court in any case only through representatives such as its legal counsel.  *United States v. Yang*, 144 F. App'x 521, 523 (6th Cir. 2005) ("On February 2, 2004, a

November 19, 2019
Page 7

motions panel of this court held that Four Pillars, as a corporate defendant, is not subject to dismissal under the fugitive disentitlement doctrine."). This doctrine therefore has no bearing on the Bank's request. Research confirms that the fugitive disentitlement doctrine has never been applied in any instance of which we are aware—through published or unpublished opinion—to prevent a corporate criminal defendant from making a special appearance.

Even where courts confront foreign criminal defendants residing abroad, they have granted the request to make a special appearance to contest jurisdiction and attack the sufficiency of the indictment. The court in *United States v. Tucor Int'l, Inc.* granted foreign defendants' request for a special appearance to challenge the indictment. No. 4:92-cr-00425 (N.D. Cal. Oct. 20, 1997), ECF No. 102. The court stated that ramifications that extend "beyond the parties to the action" necessitate ruling on the motion to dismiss before arraignment. Specifically, the court noted the "strong views of the Philippines government" that the indictment infringed upon its sovereignty and violated U.S. treaty obligations. *Id.* at 5-6. The court in *United States v. Noriega* reached a similar conclusion, stressing that "delicate issues" in a case "fraught with political overtones" militate in favor of allowing the foreign defendant the opportunity to challenge the indictment through a special appearance despite finding that the defendant was a fugitive. 683 F. Supp. 1373, 1374-75 (S.D. Fla. 1988). The court emphasized the importance of addressing questions about the impartiality of the proceeding:

> [T]he best way to avoid the appearance that this indictment has assumed the character of a political proceeding, rather than a legal one, is to determine its legal validity upon the arguments of counsel. In that way, the integrity of our legal system will best be served. Counsel suggested at oral argument on this motion that the world is watching this case. In the unlikely event that such an observation is accurate, it is all the more important that our frequent protestations about due process, presumptions of innocence and fair play be given meaning. Indeed, any procedure which will negate the perception that this prosecution may have been politically motivated should be welcomed by the Government.

*Id.* at 1375.

Because this case has been widely publicized, it is important to demonstrate the essential fairness of the U.S. legal system by addressing the issues of jurisdiction and reasonable questions regarding the Court's impartiality (and appearance of impartiality) before arraignment.

November 19, 2019
Page 8

The four cases where a court has denied a defendant's request for special appearance arise in different contexts and are inapplicable here.[2] Two were decided under the fugitive disentitlement doctrine which, as previously stated, does not apply to Halkbank. In *United States v. Shalhoub*, an individual criminal defendant residing in Saudi Arabia sought leave of court to enter a special appearance to challenge the indictment. No. 98-cr-00460, 2016 WL 8943847 (S.D. Fla. Jan. 26, 2016), *appeal dismissed*, 855 F.3d 1255 (11th Cir.), *cert. denied*, 138 S. Ct. 381 (2017). The court denied Shalhoub's request finding that he was a fugitive because he constructively fled by failing to return to his home in the Southern District of Florida when he was indicted. *Id.* at 2. In *United States v. Kim*, the court ruled on similar grounds that an American citizen, then pending extradition from Korea, was a fugitive because he failed to surrender to U.S. authorities after his indictment. No. 8:09-cr-00077 (C.D. Cal. Apr. 4, 2011), ECF No. 330. Unlike *Shalhoub* and *Kim*, Halkbank is not an individual defendant, it was never "present" in the United States, and it therefore cannot "flee" the jurisdiction.

Further, the policy concerns about mutuality that underpin the fugitive disentitlement doctrine are not present here. In *In re Hijazi*, an individual criminal defendant residing in Kuwait moved to dismiss the indictment for lack of personal jurisdiction, among other things. 589 F.3d at 403. The district court refused to rule on his motion until the defendant appeared for arraignment. The court expressed concern that there was no "mutuality" in the defendant's motion to dismiss, stating that the defendant had little or nothing to lose from an unfavorable ruling by the court. The Seventh Circuit granted Hijazi's petition for a writ of mandamus and directed the district court to decide the motion to dismiss without the defendant's physical presence. The Seventh Circuit rejected the district court's concern about lack of mutuality, finding that defendant faced adverse consequences, including a "red notice" issued by Interpol and the resulting inability to travel home to Lebanon, that "satisfy any mutuality concerns that may exist." *Id.* at 414. As this Court has acknowledged, the Bank similarly faces substantial consequences, including the possibility of contempt sanctions, should it face an adverse ruling on personal jurisdiction.

---

[2] In two additional cases, defendants attempted special appearances to challenge personal jurisdiction, but the courts found waiver. *See* Appendix, *infra* at p. 19.

November 19, 2019
Page 9

        The remaining two cases denying a special appearance are likewise inapposite.  In *United States v. Adamov,* a foreign criminal defendant who was charged with misappropriating government funds sought leave of the court to enter a special appearance to challenge the indictment.  No. 2:05-cr-00129, 2008 WL 1943550 (W.D. Pa. May 2, 2008).  The defendant filed a motion to dismiss and attempted to use findings made during his co-defendant's sentencing to indicate that the prosecution had failed to prove that the alleged embezzlement had occurred.  The court denied the special appearance request, stating that it refused to entertain a factual challenge to the sufficiency of the indictment via special appearance.  *Id.* at *3.  Unlike the defendant in *Adamov*, Halkbank is not seeking to challenge factual issues as part of this motion.

        In *United States v. Shimek*, the *pro se* defendant, accused of providing false information to the IRS, filed a litany of pre-trial motions along with his request for special appearance to challenge jurisdiction, including claims for "assistance of counsel of choice," "assurance of competent judge," a motion for change of venue, a motion to dismiss, and a "preliminary counter complaint." 445 F. Supp. 884, 887 (M.D. Pa. 1978).  Although the court acknowledged that "[t]hroughout his motions Defendant refers to the making of a 'special appearance' and has filed a document labeled 'Special Appearance,'" *id.* at 893, the court interpreted the *pro se* defendant's request as, in fact, a challenge to the "territorial jurisdiction of the Court." *Id.* Unlike the present case, the defendant in *Shimek* had already appeared by filing numerous pre-trial motions, several of which had already been denied in a previous opinion by the court, and also a "Preliminary Counter Complaint" which had been dismissed.  For this reason, in denying the defendant's special appearance request to challenge jurisdiction and ruling on what the court characterized as a challenge to "territorial jurisdiction," the court in *Shimek* did not even mention personal jurisdiction and did not address Due Process Clause limitations nor the risk of their waiver, as the vast majority of other courts that have addressed personal jurisdiction challenges have done.

**III.     Special Appearances Are Necessary to Properly Challenge Threshold Issues**

        Unlike the Federal Rules of Civil Procedure, the Criminal Rules lack an express rules-based mechanism for defendants to challenge certain threshold issues absent a special appearance.  In the civil context, Fed. R. Civ. P. 12(b)(2) specifically permits a defendant to

November 19, 2019
Page 10

bring a motion to dismiss for lack of personal jurisdiction and therefore obviates the need for a special appearance. But before the Civil Rules came into effect, the only avenue by which defendants could raise a personal jurisdiction defense without risking waiver was through a special appearance. *See* Edmunds, The New Federal Rules of Civil Procedure, 1938, 4 John Marshall L.Q. 291, 304 ("Under the former practice, in raising . . . jurisdictional defenses by motion you had to be very careful to make a special appearance and making a defense to the merits at the same time would waive these.").

Although the practice of challenging personal jurisdiction by special appearance in criminal cases has existed for some time, the Criminal Rules have not added the same express safe harbor as the Civil Rules that creates a method for a defendant to challenge personal jurisdiction. To avoid potential waiver, therefore, that challenge must be done by special appearance. Although Criminal Rule 12(b)(2) permits a motion to challenge jurisdiction at any time while the case is pending, that provision refers only to subject matter jurisdiction, not personal jurisdiction. 2 Orfield's Criminal Procedure Under the Federal Rules, § 12:102 (2d ed. 2016) ("The words 'lack of jurisdiction' in Rule 12(b)(2) refer to jurisdiction of the subject matter.").

Personal jurisdiction is rarely challenged in criminal cases because most defendants are either individuals physically before the court or corporate defendants with domestic operations. However, where a foreign corporate defendant seeks to contest personal jurisdiction, the Criminal Rules' silence means that the only proper mechanism to avoid the risk of waiver is a special appearance. *United States v. Stein* concerned fraud charges against employees of KPMG. 435 F. Supp. 2d 330 (S.D.N.Y. 2006), *aff'd*, 541 F.3d 130 (2d Cir. 2008). The employees moved to dismiss the indictment, claiming that prosecutors pressured KPMG to cut off reimbursement of attorney fees after the employees were indicted. The employees sought a court order for non-party KPMG to advance their defense costs. KPMG objected, claiming lack of personal jurisdiction. The court did not reach the question of jurisdiction because it directed the defendants to file a civil complaint against KPMG, but it noted that actions by KPMG, including attending hearings and making submissions to the court, arguably constituted waiver. *See id.* at 379 n. 235 ("The Federal Rules of Civil Procedure . . . abolish[ ] the distinction between general and special appearances and permit[ ] a defendant to preserve a personal jurisdiction objection by

A94

November 19, 2019
Page 11

answer or timely motion to dismiss.  These rules, however, *do not apply in a criminal case*.  It therefore is arguable that KPMG's actions before the Court constituted a general appearance and thus waived any objection to personal jurisdiction.") (emphasis added).

In 2016, Criminal Rule 4 was amended to provide prosecutors with more flexibility to serve organizations located outside the United States, therefore rendering the need to enter a special appearance *contesting notice of the summons* unnecessary.  But amended Criminal Rule 4 did not eliminate the need for special appearances to contest other threshold issues, such as jurisdiction or recusal.  In fact, the Department of Justice itself acknowledged that criminal defendants could still make special appearances to contest issues such as personal jurisdiction. In a letter from the Department to the Advisory Committee, the Department noted that amended Criminal Rule 4 would eliminate the need to enter a special appearance only in the narrow instance in which a defendant contests notice of a summons.  *See* Memorandum Regarding Proposed Amendments to FED. R. CRIM. P. 4 from Jonathan J. Wroblewski, Director, Office of Policy and Legislation, U.S. Department of Justice to Judge David M. Lawson, Chair, Subcommittee of Advisory Committee on Criminal Rules at 2 (February 20, 2015).  The Department explicitly noted that the availability of a special appearance for other threshold issues remained intact and gave several non-exhaustive examples of instances where special appearance was appropriate, including a specific example involving personal jurisdiction.  The Department explained that counsel for a defendant can seek to enter a special appearance to argue that a foreign corporation was dissolved prior to indictment.  The Department therefore validated the use of special appearance to challenge personal jurisdiction over an entity defendant.  *Id.*; *see, e.g.*, *Schleifer v. Lexus of Manhattan*, No. 17-cv-08789, 2019 WL 4640055 (S.D.N.Y. 2019) (defendant alleged that the entity named in the complaint had been dissolved and brought a motion to dismiss for lack of personal jurisdiction).

The Ninth Circuit likewise acknowledged the availability of special appearances just last year in *In re Pangang Grp. Co., Ltd.*, 901 F.3d 1046, 1052 (9th Cir. 2018), a case cited by the prosecution.  Gov't Letter to J. Berman, *United States v. Türkiye Halk Bankasi A.S.*, No. 1:15-cr-00867-RMB (S.D.N.Y. Nov. 5, 2019), ECF No. 571.  There, the foreign defendants had entered a special appearance to move to quash service of a summons, which is *not* what Halkbank is doing here.  The Ninth Circuit denied the motion, holding that the company had actual notice of

November 19, 2019
Page 12

the summons consistent with amended Criminal Rule 4.  Just as the Department had explained in its letter to the Advisory Committee, the Ninth Circuit noted that amended Criminal Rule 4 only affected the availability of special appearances to contest notice of the summons.  The court explained that the Advisory Committee did not foreclose the use of special appearance to assert other objections.  *Id.* at 1059 ("Criminal Rule 4 would not eliminate the possibility of special appearances entirely.").  Special appearances remain the only mechanism for foreign criminal defendants to properly contest personal jurisdiction and request recusal.

This Court indicated that Hakan Atilla challenged jurisdiction without a special appearance, but Mr. Atilla challenged the *extraterritorial application of U.S. laws*, not personal jurisdiction.  Tr. of Nov. 5, 2019 Status Conference at 5, *United States v. Türkiye Halk Bankasi A.S.*, No. 1:15-cr-00867-RMB (S.D.N.Y. Nov. 5, 2019), ECF No. 575.  Because extraterritoriality is a question of subject matter jurisdiction—which is properly challenged after arraignment—these are two completely different issues.  Mr. Atilla was physically present before the court so personal jurisdiction was not at issue.  Instead, Mr. Atilla claimed that the Due Process Clause protected him from the extraterritorial application of U.S. law to foreign conduct that lacked a sufficient nexus with the United States.  *See, e.g.*, *United States v. Yousef*, 327 F.3d 56, 111-12 (2d Cir. 2003) (citing *United States v. Davis*, 905 F.2d 245, 248-49 (9th Cir. 1990).

Constitutional challenges to the extraterritorial application of U.S. law are analogous to state choice of law issues under the Due Process Clause of the Fourteenth Amendment.[3]  Just as the Fourteenth Amendment constrains one state's application of its own law to conduct that occurred outside its state borders, *see Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 821-22 (1985) (finding that use of Kansas law for all multistate plaintiffs violated Fourteenth Amendment), the Fifth Amendment constrains the U.S.'s application of its own law to conduct that occurred outside its national borders.  *Yousef*, 327 F.3d at 111 (the Due Process Clause of the Fifth Amendment bars extraterritorial application of U.S. law to foreign conduct absent a sufficient nexus).

---

[3] Due process challenges to extraterritoriality should not be confused with the unrelated issue of statutory extraterritoriality.  *See Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247 (2010).

November 19, 2019
Page 13

IV.     **The Bank Must Raise Personal Jurisdiction and Recusal Via Special Appearance To Avoid Risking Waiver**

Unless Halkbank can make a special appearance to contest personal jurisdiction, it risks an eventual decision that it has waived that argument through a general appearance.  Before the adoption of Civil Rule 12, courts found waiver where civil defendants failed to make a special appearance to contest jurisdiction.  *See China Nat. Chartering Corp. v. Pactrans Air & Sea, Inc.*, 882 F. Supp. 2d 579, 589-90 (S.D.N.Y. 2012).  Defendants in the criminal context have even more at stake should they make a general appearance and risk a ruling that they have accepted the court's jurisdiction.

At the hearing on November 5, both the Court and the prosecution noted that entrance of a general appearance would not, in their view, constitute a waiver of a jurisdictional challenge. But the prosecution's concession and this Court's views are not the only considerations.  Another United States District Court or courts of review may conclude that a general appearance waives a challenge to personal jurisdiction.

At least two federal criminal cases have found that participating in proceedings by, among other things, entering a plea and filing a general appearance waived personal jurisdiction. The Second Circuit reached this decision in *United States v. Beadon*, 49 F.2d 164, 167 (2d Cir. 1931), where three corporate defendants appealed their convictions, contending that that they were not "in court" and that no valid verdict could be rendered against them for that reason.  The Second Circuit found that personal jurisdiction had been accepted because counsel had confirmed their appearance for the corporations during a pre-trial colloquy, and thus "the record show[ed] that the corporate defendants were in court from the beginning because they had appeared generally by counsel." *Id.*

In *United States v. Maruyasu Indus. Co.*, 229 F. Supp. 3d 659 (S.D. Ohio 2017), a foreign defendant filed a notice of special appearance, but then proceeded to generally participate in the litigation before contesting the court's jurisdiction.  The court found that the defendant's participation in the litigation, "including pleading not guilty," amounted to a waiver of personal jurisdiction. *Id.* at 671.

The Department's letter to the Advisory Committee itself recognized that special appearance is appropriate to avoid the risk of waiving threshold issues like personal jurisdiction.

A97

November 19, 2019
Page 14

The Department noted that the "purpose of a 'special appearance' is to avoid automatically waiving threshold issues by operation of law" and acknowledged that prior to the change in the Civil Rules, special appearance was a common tool for defendants to challenge personal jurisdiction.  Wroblewski Letter, at 2 ("Prior to the federal rules [for civil procedure], the practice was for counsel to appear specially for the purpose of objecting by motion to the jurisdiction of the court over the defendant . . . a failure to follow the correct procedure for doing so often resulted in a waiver of the defense.") (citation omitted).

Assurances at the district court level that entering a general appearance will not constitute waiver may not ultimately protect the Bank's rights.  Each court must assess for itself whether jurisdiction exists, and a district court's determination on that point does not bind the appellate court. *See Dynegy Midstream Servs. v. Trammochem*, 451 F.3d 89, 94 (2d Cir. 2006) ("We review a district court's assertion of personal jurisdiction de novo.").  If the Bank filed a general appearance, entered a plea at arraignment, and filed pre-trial motions, the Bank would risk the Second Circuit later determining that the Bank had waived its right to challenge personal jurisdiction.

*       *       *       *       *

For the foregoing reasons, this Court should grant counsel for Halkbank leave to appear on a limited and special basis to argue on behalf of Halkbank the merits of the proposed submissions without waiving any objections to this Court's jurisdiction.

Respectfully,

Andrew C. Hruska
AH3224

cc:   Michael Lockard, Esq.
      Sidhardha Kamaraju, Esq.
      David Denton, Esq.
      Jonathan Rebold, Esq.
      Kiersten Fletcher, Esq.
      Richard Walker, Esq.
      William Johnson, Esq.
      Katherine Kirkpatrick, Esq.
      (all by electronic mail)

# APPENDIX

# SPECIAL APPEARANCES IN FEDERAL CRIMINAL CASES

This chart collects all of the special appearances we have identified to date in federal criminal cases.  Additional unpublished cases may exist.

| Case | Individual/ Entity | Issue Raised | Special Appearance |
|---|---|---|---|
| **Special Appearance Granted** | | | |
| *United States v. Noriega*, 683 F. Supp. 1373 (S.D. Fla. 1988) | Individual | Jurisdiction, Sufficiency of the Indictment[4] | Granted |
| *United States v. Swank Corp.*, 797 F. Supp. 497, 499 (E.D. Va. 1992) | Entity | Attorney's Fees | Granted |
| *United States v. Tucor Int'l, Inc.*, No. 4:92-cr-00425 (N.D. Cal. Oct. 20, 1997), ECF No. 102[5] | Entity/ Individual | Failure to State an Offense | Granted |
| *United States v. Alfred L. Wolff GmbH*, No. 1:08-cr-00417, (N.D. Ill. Mar. 17, 2011), ECF No. 126 | Entity | Quash Service of Summons | Granted |
| *United States v. Siriwan*, No. 2:09-cr-00081 (C.D. Cal. Aug. 4, 2011), ECF No. 62[6] | Individual | Failure to State an Offense | Granted |

[4] In the defendant's subsequent motion to dismiss, he also argued that he was immune from prosecution as a head of state and diplomat, and that his alleged narcotics offenses were acts of state not properly reviewable by the Court. *See United States v. Noriega*, No. 88-79-CR, 1990 WL 95527 at *2 (S.D. Fla. June 8, 1990).

[5] The judge's order granting the special appearance is not available on PACER.  For additional information on the issues raised, see *United States v. Tucor Int'l, Inc.*, 35 F. Supp. 2d 1172, 1176 (N.D. Cal. 1998).

[6] *United States v. Siriwan*, No. 2:09-cr-00081, 2011 WL 13057709 at *2 (C.D. Cal. July 28, 2011).

| **Case** | **Individual/ Entity** | **Issue Raised** | **Special Appearance** |
|---|---|---|---|
| *United States v. Dotcom*, No. 1:12-cr-00003 (E.D. Va. Apr. 18, 2012), ECF No. 87 | Entity/ Individual | Data Retention under Protective Order | Granted |
| *United States v. Dotcom,* No. 1:12-cr-00003 (E.D. Va. May 30, 2012), ECF No. 96; (E.D. Va. June 28, 2012), ECF No. 111 | Entity/ Individual | Personal Jurisdiction based on Failure to Serve Summons, Attorney Fees | Granted[7] |
| *United States v. Dotcom,* No. 1:12-cr-00003 (E.D. Va. Nov. 20, 2012), ECF No. 148 | Entity | Return of Seized Property | Granted |
| *United States v. Kolon Indus., Inc.*, No. 3:12-cr-00137 (E.D. Va. Dec. 13, 2012), ECF No. 20 | Entity | Personal Jurisdiction based on Failure to Serve Summons | Granted |
| *United States v. Kassian Mar. Navigation Agency, Ltd.*, No. 2:13-cr-00070 (E.D. Va. June 24, 2013), ECF No. 38 | Entity | Personal Jurisdiction | Granted |
| *United States v. Rafiekian*, No. 1:18-cr-00457 (E.D. Va. June 14, 2019)*, ECF No. 216 | Individual | Attorney-Client Privilege | Granted |
| **Special Appearance Uncontested** | | | |
| *United States v. Mitchell*, 377 F. Supp. 1326, 1328-29 (D.D.C. 1974) | Individual | Quash Subpoena | Uncontested |
| *United States v. Nippon Paper Indus. Co.*, *Ltd.*, No. 1:95-cr-10388 (D. Mass. Jan. 23, 1996), ECF Nos. 16, 17[8] | Entity | Quash Service of Summons, Personal Jurisdiction | Uncontested |

[7] The court denied the defendants' request for special appearance on an attorneys' fees issue because the court found the issue was not yet ripe.

[8] For additional details on this motion, see *United States v. Nippon Paper Indus. Co., Ltd.*, 944 F. Supp. 55 (D. Mass. 1996).

| **Case** | **Individual/ Entity** | **Issue Raised** | **Special Appearance** |
|---|---|---|---|
| *United States v. Johnson Matthey, Plc.*, 2:06-cr-00169 (D. Utah Jan. 23, 2007), ECF No. 60 | Entity | Quash Service of Summons | Uncontested |
| *United States v. Johnson Matthey, Plc.*, 2:06-cr-00169 (D. Utah July 6, 2007), ECF No. 92 | Entity | Quash Service of Summons | Uncontested |
| *United States v. Chitron Elecs. Co. Ltd.*, No. 1:08-cr-10386 (D. Mass. June 5, 2009), ECF No. 46 | Entity | Personal Jurisdiction, Quash Service of Summons | Uncontested |
| *United States v. Pub. Warehousing Co.*, No. 1:09-cr-00490 (N.D. Ga. Nov. 19, 2009), ECF No. 9 | Entity | Quash Service of Summons | Uncontested |
| *United States v. Sinovel Wind Grp. Co.*, No. 3:13-cr-00084, (W.D. Wis. June 27, 2013), ECF No. 20; (W.D. Wis. July 2, 2013), ECF No. 33 | Entity | Quash Service of Summons | Uncontested[9] |
| *United States v. Sinovel Wind Grp. Co.*, No. 3:13-CR-00084, (W.D. Wis. Feb. 21, 2017), ECF No. 187 | Entity | Quash Service of Summons | Uncontested |

[9] A minute entry from a July 31, 2013 hearing indicates that Sinovel maintained its special appearance "over the government's objection."  There is no indication that the government obtained a ruling from the court on this issue.  *United States v. Sinovel Wind Grp. Co.*, No. 3:13-CR-00084 (W.D. Wis. June 27, 2013), ECF No. 45.

| **Case** | **Individual/ Entity** | **Issue Raised** | **Special Appearance** |
|---|---|---|---|
| *United States v. Pangang Grp. Co., Ltd.,* No. 4:11-cr-00573 (N.D. Cal. Dec. 21, 2011), ECF No. 46 | Entity | Quash Service of Summons | Uncontested |
| *United States v. Pangang Grp. Co., Ltd.,* No. 4:11-cr-00573, 2017 WL 3034063, at *1 (N.D. Cal. July 18, 2017), *appeal dismissed*, No. 17-10318, 2017 WL 7065941 (9th Cir. Nov. 15, 2017), *mandamus denied sub nom.*, *In re Pangang Grp. Co., Ltd.*, 901 F.3d 1046 (9th Cir. 2018) | Entity | Quash Service of Summons | Uncontested |
| **Special Appearance Denied** | | | |
| *United States v. Shimek,* 445 F. Supp. 884, 893 (M.D. Pa. 1978) | Individual, *Pro Se* | Special appearance in connection with numerous objections | Denied |
| *United States v. Adamov*, No. 2:05-cr-00129, 2008 WL 1943550 (W.D. Pa. May 2, 2008) | Individual | Factual Insufficiency | Denied |
| *United States v. Kim,* No. 8:09-cr-00077 (C.D. Cal. Apr. 4, 2011), ECF No. 330 | Individual | Failure to State an Offense | Denied |
| *United States v. Shalhoub*, No. 98-cr-00460, 2016 WL 8943847 (S.D. Fla. Jan. 26, 2016), *appeal dismissed*, 855 F.3d 1255 (11th Cir. 2017), *cert. denied*, 138 S. Ct. 381 (2017) | Individual | Failure to State an Offense, Venue, Speedy Trial | Denied |

| **Case** | **Individual/ Entity** | **Issue Raised** | **Special Appearance** |
|---|---|---|---|
| **Special Appearance Waived** | | | |
| *United States v. Yakutat & S Ry Co*, 2 Alaska 628, 631-32 (D. Alaska 1905) | Entity | Personal Jurisdiction | Personal jurisdiction waived for challenging both merits of indictment and personal jurisdiction |
| *United States v. Maruyasu Indus. Co.*, 229 F. Supp. 3d 659, 671 (S.D. Ohio 2017) | Entity | Personal Jurisdiction | Personal jurisdiction waived for participating in litigation, including entry of plea |

**UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| v. | S6 15 Cr. 867 (RMB) |
| TÜRKIYE HALK BANKASI A.Ş., | |
| Defendant. | |

## [PROPOSED] ORDER

UPON CONSIDERATION of the request filed by counsel for TÜRKIYE HALK BANKASI A.Ş. (referred to herein as "Halkbank") and for the reasons stated in support thereof, it is hereby

ORDERED that counsel for Halkbank are granted leave to enter a special and limited appearance on behalf of Defendant Halkbank for the purposes of (a) moving to seek the Court's recusal from this case; and (b) moving to dismiss for lack of personal jurisdiction.

It is further ORDERED that Halkbank submit briefs in support of its recusal motion by _____, the Government's response to be filed fourteen (14) days later, and Halkbank's reply to be filed seven (7) days after that.


SO ORDERED:


_____          _____
HONORABLE RICHARD M. BERMAN               Date
UNITED STATES DISTRICT JUDGE

A104

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

November 26, 2019

**BY ECF**

Hon. Richard M. Berman
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, NY 10007

> Re: ***United States v. Turkiye Halk Bankasi, A.S.,***
> **S6 15 Cr. 867 (RMB)**

Dear Judge Berman:

The Government respectfully submits this letter in opposition to the request by King & Spalding LLP to enter a special appearance on behalf of Turkiye Halk Bankasi, A.S. ("Halkbank" or the "defendant") to file a motion to dismiss the indictment, S6 15 Cr. 867 (RMB) (the "Indictment"), and a motion for recusal. *See* Dkt. Entry No. 577 ("Halkbank Ltr."). Halkbank's request should be denied.

Halkbank was charged with serious national security, bank fraud, and money laundering offenses in an indictment returned on October 15, 2019, and the indictment and two accompanying summonses have been served pursuant to Rule 4 of the Federal Rules of Criminal Procedure. Notwithstanding that the summonses have been served requiring Halkbank's appearance, and the defendant plainly is aware of the charges, the bank has intentionally refused to answer to them. Twice the defendant intentionally failed to appear. Instead, King & Spalding, on Halkbank's instructions, has asked for permission to enter a special appearance in order to challenge the Indictment without the bank appearing before the Court.

The premise of Halkbank's request—that it would waive personal jurisdiction arguments by appearing and being arraigned, and that a special appearance is required to permit it to assert a constitutional right—is wrong and, indeed, illogical. First, concepts of personal jurisdiction found in civil suits simply do not apply in criminal cases: the Court's jurisdiction is established by an indictment that sufficiently alleges violations of federal criminal law, *United States v. Prado*, 933 F.3d 121, 134 (2d Cir. 2014), and the application of the charges to a particular defendant complies with due process so long as there is "a sufficient nexus between the defendant and the United States, so that such application would not be arbitrary or fundamentally unfair." *United States v. Yousef*, 327 F.3d 56, 111 (2d Cir. 2003). It is not unfair or arbitrary to hold Halkbank to account for the serious crimes it has committed through its actions in the United States, the harms it and its

co-conspirators have caused in the United States, and Halkbank's intent to protect its ongoing use of the U.S. financial system by concealing the offenses. *See infra*, 2-4.

Tellingly, Halkbank asserts two distinct and entirely inconsistent theories of personal jurisdiction in an attempt to cloak the vacuity of its request: Halkbank first argues that it must have sufficient "minimum contacts" with the United States in order to be subject to its jurisdiction.[1] *See* Halkbank Ltr. at 2. Then, relying on cases that reject that proposition, Halkbank argues that personal jurisdiction would be "waived" by Halkbank's appearance. *Id.* at 13-14. But that is not waiver, that is simply a lawful and necessary consequence of the charges and summonses. Halkbank can, after appearing, argue that the minimum-contacts test applies and that Halkbank does not meet it, and the Court can resolve that argument on its merits. *United States v. Maruyasu Indus. Cos.*, 229 F. Supp. 3d 659, 665-66 (S.D. Ohio 2017); Rule 12(b)(2), (3), Fᴇᴅ. R. Cʀɪᴍ. Pʀ.; *cf.* Rule 12(b), Fᴇᴅ. R. Cɪᴠ. Pʀ. If the Court rejects the bank's motion, then there is personal jurisdiction and the case will proceed, exactly as the summonses require.

Halkbank's refusal to agree to appear if its motion to dismiss were denied (Nov. 5, 2019 Tr. at 15-16) plainly exposes its request for a special appearance as an empty delay tactic. If Halkbank were correct that the minimum-contacts test applies and that Halkbank's contacts with the United States do not satisfy that test, then, after appearing, its motion would be granted. But Halkbank wants to have its cake and eat it too: even if Halkbank is wrong, the bank still intends to argue that it has not appeared and is not subject to the Court's lawful authority.

King & Spalding attempts to mask Halkbank's gamesmanship by trying to recast the question of appearance as whether the defendant will "condition" the exercise of its constitutional rights. Halkbank Ltr. at 4. That is a flat misrepresentation of the entirely appropriate question the Court put to King & Spalding: if the Court's jurisdiction were established, would the defendant acknowledge that jurisdiction and appear? King & Spalding's evasion of that question (Nov. 5, 2019 Tr. at 15-16) and Halkbank's contumacious conduct provide an unequivocal answer: it will not. The remedy is a contempt hearing, at which the bank can be found in contempt and an appropriate coercive penalty imposed. *See* Rule 4(a), Fᴇᴅ. R. Cʀɪᴍ. Pʀ.

## I.  The Defendant and the Offenses

Halkbank is a Turkish bank majority-owned by the Government of Turkey, currently controlled by the Turkiye Varlik Fonu, or Turkey Wealth Fund. The Wealth Fund, in turn, is under the authority of the Office of the Presidency. The chairman of the Turkey Wealth Fund is the Turkish President; the deputy chairman is the Minister of Treasury and Finance. *Erdogan appoints himself chairman of Turkey's sovereign wealth fund*, Rᴇᴜᴛᴇʀs (Sep. 12, 2018).[2] Prior to 2017, Halkbank was controlled by the Turkish Privatization Administration, which was under the Office

---

[1] As discussed more fully below, Halkbank has not filed a proposed motion to dismiss or even articulated a good-faith basis for arguing that it beyond the jurisdiction of the Court, despite having authorized King & Spalding to file two letters with the Court.

[2] Available at https://www.reuters.com/article/turkey-economy-fund/update-1-erdogan-appoints-himself-chairman-of-turkeys-sovereign-wealth-fund-idUSL5N1VY1SW.

of the Prime Minister. Among other things, Halkbank is and, throughout the time period of the offenses charged in the Indictment, was the principal financial channel for trade between Turkey and Iran. Most significantly, Halkbank held accounts for the Central Bank of Iran and for the National Iranian Oil Company ("NIOC"), where Turkey deposited money to pay for billions of dollars' worth of oil and gas purchases from the Iranian government. (Ind. ¶¶ 3, 8, 26-27, 28, 35.)

Between 2012 and 2016, Halkbank conspired with Turkish government officials; Iranian government officials at NIOC, the Ministry of Oil, and the Central Bank of Iran; Iranian banks; and Turkish businessmen to evade and avoid U.S. sanctions imposed on the Government of Iran for its support for terrorism, its illicit nuclear program, its ballistic missiles development, and its human rights abuses. These sanctions were imposed to deprive the Government of Iran of funding for its deadly and malign activities and to coerce the Government of Iran to participate in diplomatic discussions to limit or abandon those activities. (Tr. 163-65, 179-85, 195, 1081-82, 1409-12.) Dramatically undermining those efforts, Halkbank conspired to secretly give the Government of Iran access to at least approximately $20 billion-worth of oil revenues that were restricted by U.S. and international sanctions. (Ind. ¶ 4.)

This sanctions-evasion conspiracy not only benefitted the Government of Iran; it also benefitted Halkbank by boosting its fees and revenues; it benefitted a corrupt Halkbank chief executive and corrupt Turkish government officials who received tens of millions of dollars' worth of bribes as part of the scheme; and it benefitted the Turkish Government by falsely inflating Turkish economic statistics. (Ind. ¶¶ 30, 31, 36-38, 47, 59, 60, 62.)

Halkbank's profitable participation in the scheme, however, also put the bank at risk of crippling sanctions from the U.S. Department of the Treasury ("Treasury"): the illicit transactions Halkbank was conducting for the Government of Iran could trigger sanctions that would cut Halkbank off from the U.S. financial system. Concealing the scheme from Treasury, accordingly, was essential both to the success of the scheme and to Halkbank's very existence. Halkbank's access to the U.S. financial system was, and remains, critical: without access to correspondent banking accounts in the United States, Halkbank would not be able to conduct U.S.-dollar transactions for itself and its customers. Without access to U.S. capital markets, Halkbank would not be able to raise billions of dollars from corporate bond issuances.

During the time that Halkbank was undermining U.S. sanctions, it benefitted enormously from its access to the U.S. financial system.

- Between 2012 and 2016, Halkbank maintained U.S.-dollar correspondent accounts at multiple U.S. financial institutions. Halkbank used these accounts to conduct transfers totaling billions of U.S. dollars during the time of the offense conduct.

- In 2014, Halkbank retained, among others, U.S. financial advisors and institutions to issue $500 million in U.S.-dollar denominated corporate bonds, and retained the services of a U.S. financial institution in order to act as paying agent for those bonds.

- In 2015 and again in 2016, Halkbank issued two placements of $500 million each U.S.-dollar denominated corporate bonds using, among others, U.S. financial advisors and institutions and a U.S. paying agent.

- In March 2017, Halkbank's former Deputy General Manager for International Banking, co-defendant Mehmet Hakan Atilla, was arrested in the United States while traveling to meet with U.S. financial institutions in furtherance of another prospective bond offering.

- Halkbank participates in a U.S. Department of Agriculture program that provides guaranteed financing for certain buyers of U.S. agricultural exports.

In order to shield its access to these essential U.S. financial markets and facilities, Halkbank went to extraordinary lengths to conceal the scheme from Treasury officials. Because of Halkbank's relationships with the Central Bank of Iran, NIOC, and other Iranian government and private entities, sanctions against the Government of Iran had particular significance for Halkbank and Treasury believed Halkbank was at particular risk of Iranian sanctions-evasion efforts. Accordingly, Treasury officials maintained continuous and in-depth communications with Halkbank's top executives. These included in-person meetings held in Treasury's Washington, D.C. offices and Halkbank's Turkey offices; telephone calls between Halkbank executives in Turkey and Treasury officials in the United States; and letter and email correspondence. (*See, e.g.*, Ind. ¶¶ 5, 26, 42, 63; Tr. 1079-80, 1083-84, 1112-13, 1118, 1126, 1128-29, 1131-32, 1141-42, 1143-44, 1147-48, 1253-66, 1412-13, 1418-19. 1420-22, 1434, 1445-46, 1447, 1452-53, 1457, 1459-60.)

Treasury sought to ensure that Halkbank understood and was complying with sanctions and was alert to Iranian evasion efforts. Halkbank, however, concealed its cooperation with the Government of Iran in evading sanctions and lied to Treasury about its sanctions compliance and business practices. These communications are among the overt acts that Halkbank took in furtherance of the charged conspiracies.

## II.   The Indictment and Summonses

The Indictment was returned on October 15, 2019. The Indictment alleges Halkbank's participation in crimes with which other co-defendants already have been charged or convicted: major Halkbank client and co-conspirator Reza Zarrab was arrested in March 2016, and pleaded guilty in October 2017. Atilla, Halkbank's former Deputy General Manager for International Banking and a co-conspirator in the offenses, was arrested in March 2017 and convicted following a five-week jury trial in January 2018. Additional co-conspirators, including Halkbank's former chief executive, Suleyman Aslan; Haklbank's former Head of Foreign Operations, Levent Balkan; and the former Turkish Minister of Economy, Mehmet Zafer Caglayan, each were indicted in September 2017. (Dkt. Entry No. 293.) King & Spalding has represented Halkbank in the criminal investigation of its participation in the offenses since at least October 2017.

Following the return of the Indictment, the Indictment and a summons (the "First Summons") requiring appearance on October 22, 2019 were delivered by email to King &

Spalding. Halkbank issued a press release contending that the charges were part of a political attack on Turkey. (Dkt. Entry No. 566.) The Government of Turkey reportedly raised the Indictment in a meeting with Vice President Pence and Secretary of State Pompeo. *Id*. In a telephone conversation between attorneys with King & Spalding and the Government, King & Spalding stated that it was discussing with Halkbank whether the firm would appear and asked the Government's consent to adjourn the initial appearance. *Id*. The Government declined to consent to an adjournment, and King & Spalding sent a letter to the Court simply stating that it was not authorized by Halkbank to accept service. *Id*. Halkbank did not appear at the October 22, 2019 conference.

The Court issued another summons (the "Second Summons") directing Halkbank to appear on November 5, 2019, which was delivered by email to King & Spalding; to Halkbank's corporate email address; and to a representative of the Turkish Ministry of Treasury and Finance and an advisor to the Turkey Wealth Fund who had participated in meetings with U.S. government officials about the Halkbank criminal investigation. (Dkt. Entry No. 571.) The Second Summons and Indictment were also sent for delivery to Halkbank's legal department in Istanbul, but the legal department refused to accept delivery. (Dkt. Entry No. 572.) The Second Summons and Indictment were also sent by email to the Turkish Ministry of Justice by the U.S. Department of Justice. (Dkt. Entry No. 571.)

On November 5, 2019, Halkbank again did not appear, and instead King & Spalding attended the conference to request permission to make a special appearance. King & Spalding did not answer the Court's question whether Halkbank was aware of the charges and the content of the Indictment (Nov. 5, 2019 Tr. at 11), but also has not contested that Halkbank has actual knowledge of the Indictment and the summonses.[3] In response to the Court's question whether Halkbank would appear and respond to the charges if its motion to dismiss were denied, King & Spalding claimed to be unable to answer, despite having represented the bank for more than two years with respect to the criminal investigation and despite the Indictment having been returned three weeks prior. (*Id*. at 15-16.)

## III. The Request for a Special Appearance Should Be Denied

Halkbank's request for permission to make a special appearance of counsel should be denied. Halkbank offers essentially two reasons why it should be granted a special appearance: special appearances are routinely granted in criminal cases, Halkbank Ltr. at 5-9; and a special appearance is necessary for it to assert personal jurisdiction arguments. Halkbank Ltr. at 2-5, 9-14. Halkbank is wrong on both counts.

---

[3] King & Spalding would not concede that Halkbank was aware of the charges and the content of the Indictment, but also argued that there were "many other illegal [sic] issues which we see as being debilitating problems in the indictment" (Nov. 5, 2019 Tr. at 9), and that "[t]he indictment makes assertions and allegations that are outside of the jurisdiction of this court." (*Id*. at 18). King & Spalding's refusal to answer the Court notwithstanding, Halkbank clearly is aware of the charges and the content of the allegations.

### A.  A Special Appearance Is Not Warranted

Pointing to slightly over a dozen instances where individual or corporate defendants were permitted to make special appearances in criminal matters, Halkbank attempts to characterize this practice as "routine." Halkbank Ltr. at 5-9, 15-18. But Halkbank is incorrect, and its list is striking for several reasons: first, the list is sparse, and nearly half of the cases it cites involved uncontested requests for limited appearance. *Id.* at 16-18. Second, all but one of the cases in which limited appearances were permitted[4] occurred prior to the December 2016 amendment to Rule 4's service provisions—in fact, many of them represented special appearances that the amendment was intended to preclude. Third, all of the cases concerning corporate defendants involved defendants who had not been served under Rule 4 or who were contesting the validity of service—Halkbank has already been served and is required by the summons to appear. Lastly, not one is from the Second Circuit.

As the Ninth Circuit observed in *Pangang Group Co. Ltd.*, there is no evidence "of a longstanding historical practice of allowing special appearances in criminal cases." 901 F.3d 1046, 1057 (9th Cir. 2018). That court reached this conclusion after considering the same cases that Halkbank offers, including *United States v. Kolon*, 926 F. Supp. 2d 794 (E.D. Va. 2013) (*compare* Halkbank Ltr. at 16); *United States v. Tucor Int'l, Inc.*, 35 F. Supp.2d 1172 (N.D. Cal. 1998) (*compare* Halkbank Ltr. at 7, 15); *United States v. Noriega*, 683 F. Supp. 1373 (S.D. Fla. 1988) (*compare* Halkbank Ltr. at 7, 15); *United States v. Sinovel Wind Grp. Co.*, 794 F.3d 787 (7th Cir. 2015) (compare Halkbank Ltr. at 17), and the district court's prior decision in the Pangang case itself, *United States v. Pangang Group Co., Ltd.*, 11 Cr. 573 (N.D. Cal.) (*compare* Halkbank Ltr. at 18). *See Pangang Group*, 901 F.3d at 1049-50, 1057-58. In many of these cases, defendant corporations sought to challenge the sufficiency of service of a summons without appearing before the court,[5] which Rule 4 now prohibits. *Pangang Group*, 901 F.3d at 1059 ("[T]here is no legitimate interest in allowing a procedure in which an institutional defendant can feign lack of notice.") (quoting Advisory Comm. on Criminal Rules, March 2015 Minutes, at 11 (March 16-17, 2015).

Halkbank places special reliance on *United States v. Siriwan*, *Tucor International*, and *Noriega* in support of its request for a special appearance. Halkbank Ltr. at 6-7. These cases do not bear the weight Halkbank would put on them. Contrary to Halkbank's characterization of *Siriwan*, the order granting a special appearance in that case was by stipulation. *See United States v. Siriwan*, 09 Cr. 81 (GW) (C.D. Cal.) (Dkt. Entry No. 61) (*compare* Halkbank Ltr. at 6). *Tucor Internaional*, from a district court in the Ninth Circuit, was considered by the Ninth Circuit in

---

[4] Halkbank identifies one contested motion for a special appearance that was granted after the Rule 4 amendments: a foreign defendant requested a special appearance to oppose the application of the crime-fraud exception to communications between the defendant and his attorneys. *United States v. Rafiekian*, 18 Cr. 457 (AJT) (E.D. Va.) (Dkt. Entry No. 188, 189 & 213 at 3-4). *Rafiekian* is not relevant to Halkbank's request.

[5] The requests for special appearances often included a proposed motion, *e.g.*, *Tucor Int'l*, 35 F. Supp. 2d 1172, 1176 (N.D. Cal. 1998); *Dotcom*, 12 Cr. 3 (LO) (E.D. Va.) (Dkt. Entry No. 96); *Kassian Maritime*, 13 Cr. 70 (MSD) (TEM) (E.D. Va.) (Dkt. Entry No. 25). .

*Pangang* and found unpersuasive—a case not "embodying a fundamental rule," but rather an example of "a more recent trend of prosecuting criminal defendants who are not amenable to the execution of a warrant." 901 F.3d at 1057-59. Similarly, *Noriega*, from a district court in the Eleventh Circuit, has not been persuasive in its own circuit. In a much more recent case, the district court denied a foreign defendant's request for a special appearance to move to dismiss the indictment. *United States v. Shalhoub*, 98 Cr. 460 (DMM) (S.D. Fla.) (Dkt. Entry No. 16.) The Eleventh Circuit held that the denial was not appealable, the defendant was not entitled to mandamus, and the defendant "has an adequate remedy: appearance in the district court." *United States v. Shalhoub*, 855 F.3d 1255, 1265 (11th Cir. 2017). *Pangang* and *Shalhoub*, rather than the prior district court decisions in *Tucor International* and *Noriega*, reflect the law of those circuits.

Halkbank also relies on the Seventh Circuit's decision in *United States v. Hijazi*, 589 F.3d 401 (7th Cir. 2009). Halkbank Ltr. at 2-3, 8. That case, too, provides little support. *Hijazi* has been closely limited to its facts, and has not been followed by other Circuits or applied in the Second Circuit. In *Hijazi*, the circuit court reversed the district court's denial of a foreign defendant's request to make a special appearance to challenge to the extraterritorial application of the charged offenses. 589 F.3d at 403, 406-12. Hijazi, a foreign national residing in Kuwait, was indicted along with a co-defendant; Hijazi surrendered to Kuwaiti authorities, who refused to turn him over to the custody of the United States. *Id*. at 405. His co-defendant eventually pleaded guilty to a misdemeanor. *Id*. The circuit concluded that Hijazi had been in Kuwait when indicted, would not be extradited despite having surrendered to foreign authorities, and had no duty to voluntarily surrender to the United States. *Id.* at 407. Accordingly, the circuit concluded that "under the unusual circumstances of this case," the district court should have considered his motion to dismiss. *Id*. at 403.

Two other circuits to have considered *Hijazi* and have declined to follow it. In *Shalhoub*, the defendant argued that his circumstances were exactly the same as Hijazi's. *Shalhoub*, 855 F.3d at 1264-65. The Eleventh Circuit distinguished *Hijazi*, finding no indication that Shalhoub's own government had refused to extradite him and that he was alleged to have committed part of the charged offenses in the United States. *Id*. The Eleventh Circuit also rejected the proposition that an overseas defendant may challenge an indictment without appearing: "Notwithstanding what the Seventh Circuit has stated on this issue . . . we submit that Shalhoub has an adequate remedy: appearance in the district court." *Id*. (citing *Hijazi*, 589 F.3d at 407. The Sixth Circuit has also declined to follow *Hijazi*. In *United States v. Martirossian*, the district court held in abeyance a foreign defendant's motion to dismiss the indictment until the defendant either appeared or agreed to submit to the jurisdiction of the court. 917 F.3d 883, 886 (6th Cir. 2019). The Sixth Circuit denied the defendant's appeal and his petition for mandamus, finding that the defendant could obtain the relief he sought—a ruling on his motion—by appearing. *Id*. at 889, 890. "No one who is indicted and who declines to answer the charge has a right to be labeled a non-fugitive." *Id.* at 890. Like the Eleventh Circuit in *Shalhoub*, the Sixth Circuit rejected the application of *Hijazi*, finding that Martirossian's failure to surrender to foreign authorities so that he could be turned over to U.S. custody was sufficient to distinguish *Hijazi*.

At least one district court in this Circuit has also considered *Hijazi* and found it, at best, limited to the specific circumstances of that case. In *United States v. Sindzingre*, Judge Seybert held that foreign defendants were not entitled to move to dismiss the indictment when they had

been neither extradited nor submitted to the court's jurisdiction. *United States v. Sindzingre*, 14 Cr. 474 (JS), 2019 WL 2290494, *2-3, 8-9 (E.D.N.Y. May 29, 2019).[6] Because the defendants had not surrendered to foreign authorities so that they could be turned over to the custody of the United States, *Hijazi* did not apply. *Id.* at *7. *See also United States v. Itriago*, 13 Cr. 20050 (WJZ) (PMH), 2019 WL 1232128 (S.D. Fla. Feb. 8, 2019) (distinguishing *Hijazi* and declining to rule on a motion to dismiss filed by a foreign defendant who had not been extradited or surrendered to the court), *United States v. Itriago*, 13 Cr. 20050 (WJZ) (PMH), 2019 WL 1228000 (S.D. Fla. Mar. 15, 2019) (adopting report and recommendation).

Moreover, Halkbank's circumstances do not compare to Hijazi's. Halkbank, a corporate defendant, cannot be arrested or extradited. It can, however, be served with a summons. It has been served with two. It is legally required to appear, but it has not. Halkbank has intentionally disregarded both summonses. It has not taken any steps to comply with the summonses or submit to the court's authority. "Federal courts do not play 'catch me if you can.' If a defendant refuses to show up to answer an indictment, ignores an arrest warrant, or leaves the jurisdiction, the court may decline to resolve any objections to the indictment in his absence." *Martirossian*, 917 F.3d at 885.

Halkbank argues that cases rejecting a request for a special appearance, or denying a challenge to an indictment, based on the defendant's fugitive status are inapplicable because Halkbank "cannot 'flee' the jurisdiction," Halkbank Ltr. at 8; and because the fugitive disentitlement doctrine does not apply to entities. *Id.* at 6-7. Halkbank cites no authority for either proposition—it cites only an unpublished Sixth Circuit opinion noting that a motions panel had denied a motion to dismiss the appeal of a corporate defendant under fugitive disentitlement. *Id.* at 6 (citing *United States v. Yang*, 144 Fed. Appx. 521 (6th Cir. 2005)). The motions panel decision cited in the unpublished opinion is not available on the electronic docket. But it is nonetheless clear that, unlike Halkbank, that corporate defendant *did* appear and in fact was convicted after trial. *Yang*, 144 Fed. Appx. at 522.

There is no reason—including *Yang*—why a corporate defendant like Halkbank, which has been served with two summonses and intentionally refused to comply with those lawful orders, should be permitted to simultaneously ignore and invoke the court's authority. The principles underlying the disentitlement doctrine apply equally to a corporate defendant as to an individual defendant. Unlike an individual defendant, a corporate defendant does not even need to physically appear, and the appearance of counsel is all that is required. *See* Rule 43(b)(1), FED. R. CRIM. PR. And Halkbank's contention that it cannot be a fugitive because it has never "fled" the jurisdiction misrepresents the scope of the doctrine: it applies not only to individuals who left the jurisdiction in order to avoid prosecution, but also to defendants who, like Halkbank, have intentionally failed to return or appear. *United States v. Catino*, 735 F.2d 718, 779 (2d Cir. 1984) (defendant engaged in "constructive flight from justice" when he "actively resisted the extradition request throughout the proceedings"); *United States v. Hayes*, 118 F. Supp. 3d 620, 624-25 (S.D.N.Y. 2015) ("But defendants need not affirmatively flee to be labeled fugitives.").

---

[6] The district court addressed the merits of certain grounds of the motion to dismiss as an alternative holding. *Id.* at *10-14.

Moreover, because Halkbank is "an organizational defendant [who] fail[ed] to appear in response to a summons," the Court "may take any action authorized by United States law." Rule 4(a), FED. R. CRIM. PR. Whether considered an application of the fugitive disentitlement doctrine, or of Rule 4(a), or the Court's inherent discretion, Halkbank's request should be denied and it should be compelled to appear as required by the summonses.

## B.   A Legitimate Challenge to the Indictment Would Not Be Waived by Appearance

Halkbank's final argument is that it would waive its challenge to personal jurisdiction by appearing. Halkbank cannot articulate a legitimate personal jurisdictional challenge, and in any event its appearance would not waive its incorrect argument that minimum contacts are required.

District courts "have original jurisdiction . . . of all offenses against the laws of the United States." 18 U.S.C. § 3231. "If the indictment alleges an offense under U.S. criminal statutes, the courts of the United States have jurisdiction to adjudicate the claim." *United States v. Prado*, 933 F.3d 121, 134 (2d Cir. 2014); *see also United States v. Williams*, 341 U.S. 58, 65 (1951) ("The District Court had jurisdiction of offenses against the laws of the United States. Hence, it had jurisdiction of the subject matter, to wit, an alleged violation of a federal conspiracy statute, and, of course, of the persons charged."); *United States v. Yousef*, 750 F.3d 254, 259 (2d Cir. 2014). A district court "has jurisdiction of all crimes cognizable under the authority of the United States ... [and] [t]he objection that the indictment does not charge a crime against the United States goes only to the merits of the case." *United States v. Cotton*, 535 U.S. 625, 630-31 (2002) (quoting *Lamar v. United States*, 240 U.S. 60 (1916)) (alterations in original).

The territorial reach of a criminal statute is not a jurisdictional question, but a merits question. *Yousef*, 750 F.3d at 261-62 (citing *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010)). Congress' authority to apply criminal statutes to foreign conduct or foreign defendants is constitutionally limited by the due process clause of the Fifth Amendment: "When Congress so intends, we apply a statute extraterritorially as long as doing so does not violate due process." *United States v. Al Kassar*, 660 F.3d 108, 118 (2d Cir 2011) (citing *United States v. Yousef*, 327 F.3d 56, 86 (2d Cir. 2003)).

The due process limit of Congress' authority in criminal statutes is simply this: "In order to apply extraterritorially a federal criminal statute to a defendant consistently with due process, there must be a sufficient nexus between the defendant and the United States, so that such application would not be arbitrary or fundamentally unfair." *Yousef*, 327 F.3d at 111 (quoting *United States v. Davis*, 905 F.2d 245, 248-49 (9th Cir.1990)). With respect to "non-citizens acting entirely abroad,[7] a jurisdictional nexus exists when the aim of that activity is to cause harm inside the United States or to U.S. citizens or interests." *Al Kassar*, 660 F.3d at 118 (citing *United States v. Peterson*, 812 F.2d 486, 494 (9th Cir. 1987); *Yousef*, 327 F.3d at 112; and *Davis*, 905 F.2d at 249)); *see also United States v. Steinberg*, 62 F.2d 77, 78 (2d Cir. 1932) (per curiam) ("It has long

---

[7] As alleged in the Indictment, Halkbank committed overt acts in furtherance of the charged offenses in the United States, and in direct communication with U.S. government officials. *See supra* at 2-4.

been a commonplace of criminal liability that a person may be charged in the place where the evil results, though he is beyond the jurisdiction when he starts the train of events of which that evil is the fruit.").[8] If the statute applies to the defendant's conduct, and that application is consistent with due process, the appearance of the defendant is all that is needed to try the case. *See, e.g.*, *United States v. Rendon*, 354 F.3d 1320, 1326 (11th Cir. 2003). ("A federal district court has personal jurisdiction to try any defendant brought before it on a federal indictment charging a violation of federal law."). How the defendant's appearance is obtained is irrelevant to the court's jurisdiction. *See United States v. Alvarez-Machain*, 504 U.S. 655, 670 (1992); *Frisbie v. Collins*, 342 U.S. 519, 522 (1952).

This federal criminal due process standard under the Fifth Amendment is different than the civil due process standard under the Fourteenth Amendment embodied in personal jurisdiction doctrine. *United States v. Ali*, 718 F.3d 929, 944 (D.C. Cir. 2013) ("It is true courts have periodically borrowed the language of personal jurisdiction in discussing the due process constraints on extraterritoriality. But . . . the law of personal jurisdiction is simply inapposite."). In the civil context, "[t]he Due Process Clause protects an individual's liberty interest in not being subject to the binding judgments of a forum with which he has established no meaningful 'contacts, ties, or relations.'" *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 471-72 (1985) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S.310, 319 (1945)). In the civil context, the Due Process Clause thus "gives a degree of predictability to the legal system that allows potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit." *Id.* (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)).

As *Rudzewicz* illustrates, the same civil personal jurisdiction standards apply to individuals as to entities. Similarly, the same federal criminal due process standards apply to individuals like Monser Al Kassar and to entities like Halkbank. All that is required is that there is "a sufficient nexus between" Halkbank and the United States so that the application of the charged offenses "would not be arbitrary or unfair." *Yousef*, 327 F.3d at 111. Halkbank intentionally deceived U.S. government officials, including in meetings in the United States and in communications directed to the United States; and did so in order to protect its ability to conduct billions of dollars' worth of financial transactions through the United States; and conspired to deceive United States financial institutions and to launder money through the United States. *See supra*, 2-4. There is plainly nothing "arbitrary or unfair" about the application of the charged offenses to the defendant, and all that is required for the case to proceed to trial is the appearance of the defendant.

---

[8] Halkbank argues that the due process limits on the reach of criminal statutes is analogous to state choice-of-law limitations under the Fourteenth Amendment, citing *Phillips Petroleum v. Shutts*, 472 U.S. 797 (1985). (Halkbank Ltr. at 12). Halkbank mischaracterizes *Phillips Petroleum*. That case concerned "modest restrictions" on the application of state law under both the Full Faith and Credit Clause and the Due Process Clause, based on the forum state's interests in regulating the conduct. *Id.* at 818-19. That is a different question than the fairness to a defendant of being subject to the jurisdiction of a particular court, regardless of what forum's law is applied; that question is governed in the federal criminal context by the Fifth Amendment's Due Process Clause, *see Yousef*, 327 F.3d at 111; and in the state civil context by personal jurisdiction analysis under the Fourteenth Amendment's Due Process Clause. *See Rudzewicz*, 471 U.S. at471-72.

Nor has Halkbank articulated any legitimate basis to believe that its argument that the civil minimum-contacts test applies, or that Halkbank does not meet that standard, would be waived by appearing, as the summonses require. Halkbank argues that Rule 12 of the Federal Rules of Criminal Procedure—unlike the Federal Rules of Civil Procedure—do not protect its ability to make such a challenge after Indictment, citing to Rule 12(b)(2). Halkbank Ltr. at 10. Rule 12(b)(2) permits challenges to subject-matter jurisdiction at any time, including after trial (indeed, even on appeal). Other provisions of Rule 12, however, apply to motions that must be made pretrial: Rule 12(b)(1) provides that "*any* defense, objection, or request that the court can determine without a trial on the merits" may be raised prior to trial (emphasis supplied). Certain challenges—to alleged defects in instituting a prosecution, or a defect in the indictment, must be made prior to trial. Rule 12(b)(3). At arraignment or as soon as practicable afterwards, the Court can set a schedule for pretrial motions. Rule 12(c). Under Rule 12, Halkbank could raise its recusal and jurisdiction motions prior to trial.

The principal case Halkbank relies on to argue that it could be deemed to have "waived" its personal jurisdiction argument if it appears isn't about waiver at all—it is about the lack of merit of Halkbank's jurisdictional argument. Halkbank cites *United States v. Maruyasu Industries Companies*, 229 F. Supp. 3d 659 (S.D. Ohio 2017), Halkbank Ltr. at 13,[9] where a corporate criminal defendant was served with a summons (as Halkbank has been) and made an appearance through counsel (as Halkbank has not). The defendant moved to dismiss the indictment on the same basis that Halkbank proffers—that personal jurisdiction under *International Shoe* and its progeny required the government to show that the defendant satisfies the "minimum contacts" test. The *Maruyasu* court did not find the argument waived: it permitted the defendant to make the motion under Rule 12, 229 F. Supp. 3d at 665-66, and considered the argument on the merits. *Id.* at 666-74. The *Maruyasu* court held that the *International Shoe* test does not apply to criminal cases, *id.* at 669-70,[10] and the defendant's appearance was all that was required for the court to have authority to hear the charges. *Id.* at 671. The defendant argued that it had not appeared, but had only entered a special appearance. Reviewing the procedural history, the court readily concluded that the defendant had appeared. *Id.* at 670-71.

Halkbank's mischaracterization of *Maruyasu* as finding a waiver of the defendant's personal jurisdiction argument is revealing. Halkbank's real concern is not waiving its jurisdictional argument, but rather its desire to try to evade the Court's jurisdiction even if the Court denies its motion to dismiss. But Halkbank simply does not have a choice about whether or

---

[9] Halkbank also cites *United States v. Beadon*, 49 F.2d 164 (2d Cir. 1932). Halkbank Ltr. at 13. Corporate defendants appeared through counsel on the first day of a trial; on the next day, counsel argued that the defendants were not appearing because they had not been served with process, but counsel never sought to withdraw their original appearances. *Id.* at 166-67. The Second Circuit held that the defendants were present at trial. *Id.* at 167. The decision does not indicate that there was ever a motion to challenge or quash service, to dismiss for lack of personal jurisdiction, or any other challenge to personal jurisdiction until after trial had commenced.

[10] In an alternative holding, the court also held that *Maruyasu* satisfied the minimum contacts test if it did apply. *Id.* at 671-75.

not to appear: it has been served with two summonses, and those summonses require Halkbank's appearance in court to answer the charges. Halkbank can seek recusal or challenge the indictment on any ground permitted by law, but it cannot remain a fugitive. Halkbank's refusal to comply with the summonses already provides the Court authority over the defendant to "take any action authorized by United States law." Rule 4(a), FED. R. CRIM. PR. The appropriate action is to set a hearing where, after notice and an opportunity to be heard, Halkbank must appear or be held in contempt.

## IV. Conclusion

For the reasons discussed above, Halkbank's request to make a special appearance should be denied and the Court should promptly schedule a hearing at which it can determine whether Halkbank should be held in contempt.

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney

by: _____/s/_____
Michael D. Lockard/Sidhardha Kamaraju/David W.
Denton, Jr./Jonathan Rebold/Kiersten Fletcher
Assistant United States Attorneys
(212) 637-2193/6523/2744/2512/2238

cc: Counsel of record (by ECF)
    Andrew Hruska, Esq. (by email)

Enclosure: Proposed order

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | **ORDER** |
| - v. - | : | S6 15 Cr. 867 (RMB) |
| TÜRKİYE HALK BANKASI A.S., a/k/a "Halkbank," | : | |
| | : | |
| Defendant. | : | |
| | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

WHEREAS a federal grand jury sitting in the Southern District of New York returned a superseding indictment against TÜRKİYE HALK BANKASI A.S., a/k/a "Halkbank" (referred to herein as "Halkbank"), which was filed on October 15, 2019 (the "Indictment");

WHEREAS the Court issued a summons to Halkbank to appear before the Court for an arraignment on October 22, 2019, at 9:15 a.m. (the "First Summons");

WHEREAS the law firm of King & Spalding LLP ("King & Spalding") submitted a letter to the Court dated October 18, 2019, in which King & Spalding indicated that it had received the summons on October 16, 2019, and wrote that "[a]lthough King & Spalding has represented Halkbank in connection with the Department of Justice's prior investigation regarding Halkbank, at no point has King & Spalding been authorized to accept service of a summons or other legal process on behalf of Halkbank" and "are not authorized to make an appearance in this case;"

WHEREAS the Court held a conference in this matter on October 22, 2019 (the "First Conference"), at which Halkbank did not appear, through counsel or otherwise;

WHEREAS, the Court issued an order dated October 23, 2019 (the "Order"), finding that the Government has properly served the First Summons and the Indictment on

Halkbank and that Halkbank has willfully and knowingly disobeyed the Court's order in the First Summons to appear at the First Conference;

WHEREAS, on October 23, 2019, the Court issued a summons (the "Second Summons") directing Halkbank to appear for an arraignment on November 5, 2019;

WHEREAS, the Government served the Second Summons and Indictment on Halkbank by electronic delivery to Halkbank, King & Spalding, and a representative of the Turkish Ministry of Treasury and Finance; and attempted to deliver the Second Summons and Indictment by commercial carrier to Halkbank's Legal Department at its principal place of business in Istanbul, Turkey but delivery was refused;

WHEREAS, King & Spalding delivered a letter to the Court dated November 4, 2019, requesting permission to make a special and limited appearance on behalf of Halkbank;

WHEREAS, Andrew Hruska, Esq., William Johnson, Esq., Richard Walker, Esq., and Jacob Gerber, Esq., attorneys with King & Spalding, attended the court appearance on November 5, 2019 (the "Second Conference"), denied that they were entering an appearance on behalf of Halkbank, and requested permission to make a special and limited appearance on behalf of Halkbank;

WHEREAS, the Court finds, based on the foregoing, that, pursuant to Federal Rule of Criminal Procedure 4(c)(3)(D)(ii), that the Second Summons and Indictment have been served on Halkbank and that Halkbank had actual knowledge of the Second Conference;

IT IS HEREBY ORDERED that Halkbank's request for counsel to make a special and limited appearance is DENIED;

IT IS FURTHER ORDERED that a hearing will be held in this matter on _____, 20__, at _____ a.m./p.m. at which Halkbank shall show cause why it

should not be held in contempt of the First Summons and the Second Summons and contempt sanctions imposed;

IT IS FURTHER ORDERED that, should counsel of record enter an appearance on behalf of Halkbank prior to the date of the hearing, Halkbank shall be arraigned on the Indictment at the hearing;

IT IS FURTHER ORDERED that the Government shall submit briefing regarding a contempt finding and contempt sanctions on or before _____, 20__; Halkbank, through counsel of record, shall submit briefing regarding a contempt finding and contempt sanctions on or before _____, 20__; and the Government shall submit a reply on or before _____, 20__;

IT IS FURTHER ORDERED that the Government will serve this Order on Halkbank within one day of the issuance of this Order by any means specified; and

IT IS FURTHER ORDERED that, the Government will serve this Order, the Second Summons, and the Indictment on Halkbank within one day of the issuance of this Order, by any means specified under Federal Rule of Criminal Procedure 4. Electronic transmission to King & Spalding shall be sufficient to establish service.

SO ORDERED:


_____          _____
HONORABLE RICHARD M. BERMAN          Date
UNITED STATES DISTRICT JUDGE

3

A119

# KING & SPALDING

King & Spalding LLP
1185 Avenue of the Americas, 35th Floor
New York, NY 10036-4003
Tel: +1 212 556 2100
Fax: +1 212 556 2222
www.kslaw.com

Andrew C. Hruska
Partner
Direct Dial: +1 212 556 2278
Direct Fax: +1 212 556 2222
ahruska@kslaw.com

December 2, 2019

**VIA HAND DELIVERY**

Honorable Richard M. Berman, U.S.D.J.
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007

> Re: **United States v. Türkiye Halk Bankasi A.S., a/k/a/ "Halkbank"**
> **U.S. District Court for the Southern District of New York**
> **No. 1:15-cr-00867-RMB**

Dear Judge Berman:

We submit this reply to the prosecution's opposition to our request to enter a special and limited appearance on behalf of Türkiye Halk Bankasi A.Ş. ("Halkbank" or the "Bank") for the limited purpose of filing a motion to dismiss for lack of personal jurisdiction and a motion seeking this Court's recusal from this case. A special appearance is the only mechanism that Halkbank can use to raise the critical threshold issues of personal jurisdiction and recusal without risking waiver. In support of its request, Halkbank has cited numerous federal cases in which a foreign corporate defendant was permitted to make a special appearance—many without any objection from the prosecution. In the face of that precedent, the prosecution attempts to distract the Court by injecting irrelevant issues and cases, but it has not and cannot identify a single case in which a foreign corporate defendant was denied a special appearance.

Rather than squarely address the legal issue presented, the prosecution devotes most of its response to previewing its arguments against the personal jurisdiction challenge, repeating, summation style, allegations in its indictment against the Bank, and reminiscing (complete with trial transcript citations) about the evidence admitted in a case in which the Bank was not a defendant and which is currently on appeal. The prosecution goes on to repeatedly and unfairly attack Turkish government officials and make allegations that have little to do with the case against the Bank. Since none of this is relevant to the request for a special appearance, we decline to address the substance of these baseless assertions that ignore the long-standing U.S. policy that approved of Turkey's economically necessary energy trade with its neighbor, Iran, that complied with U.S. sanctions. We also stress that Halkbank is entirely innocent of any participation in a scheme to violate U.S. sanctions. The Bank's priority is to resolve these

December 2, 2019
Page 2

charges to protect its constitutional rights, prior to an arraignment, with maximum efficiency to prevent further damage to its business and reputation. The Bank further seeks recusal to ensure impartial treatment by the Court. It is efficient to resolve these matters at the outset, as these issues could and should resolve the case entirely.

The prosecution argues wrongly that the very concept of personal jurisdiction does not apply in criminal cases and cites two *subject matter* jurisdiction cases, *United States v. Prado*, 933 F.3d 121, 134 (2d Cir. 2019) (citing 18 U.S.C. § 3231 and discussing statutory subject matter jurisdiction)[1] and *United States v. Yousef*, 327 F.3d 56, 111 (2d Cir. 2003), as the sole standards limiting the Court's jurisdiction. The holdings of those cases have no bearing on the constitutional, *personal* jurisdiction issue. The Second Circuit in *Prado* did not rule on personal jurisdiction. *Prado*, 933 F.3d at 133 n.6 (first distinguishing legislative and adjudicative jurisdiction, and further distinguishing subject matter and personal jurisdiction as sub-categories of adjudicative jurisdiction). The *Prado* court rejected the statutory subject matter jurisdiction argument raised, but ultimately reversed on other grounds.

Beyond that, the prosecution incorrectly suggests that changes to Fed. R. Crim. P. 4 affected Halkbank's ability to request a special appearance. But Rule 4 eliminated the need for that option solely to challenge notice of the summons, which is not the purpose of the Bank's request. The Justice Department itself—in advocating for the rule change to the Criminal Rule Advisory Committee, and in the face of accusations of jurisdictional overreach—noted that changes to Rule 4 would do nothing to alter the availability of special appearance to contest threshold issues such as personal jurisdiction. *See* Mem. Regarding Proposed Amendments to Fed. R. Crim. P. 4 from Jonathan J. Wroblewski, Dir., Office of Policy and Legislation, U.S. Dep't of Justice to Judge David M. Lawson, Chair, Subcommittee of Advisory Comm. on Criminal Rules at 2 (Feb. 20, 2015) ("DOJ Memo") ("[T]he purpose of a 'special appearance' is to avoid automatically waiving threshold issues by operation of law[.] . . . 'Prior to the federal rules [of civil procedure], the practice was for counsel to appear specially for the purpose of objecting by motion to the jurisdiction of the court over the defendant . . . a failure to follow the correct procedure for doing so often resulted in a waiver of the defense.'") (citation omitted). Remarkably, the Department's prosecutors now fail to even acknowledge their own leadership's position that special appearances are appropriate in the criminal context and that the very purpose is to avoid the risk of waiving threshold issues.

To the extent that there is any "gamesmanship" at play, *United States v. Türkiye Halk Bankasi A.S.*, No. 1:15-cr-00867-RMB (S.D.N.Y. Nov. 4, 2019), ECF No. 578 at 2 ("Gov't Resp."), it is the prosecution's assertion that the Court should erase constitutional limitations on its jurisdiction and adopt the sweeping—and disturbing—position that the Bank should not be permitted to challenge the Court's personal jurisdiction over it until it has already submitted to that jurisdiction. Gov't Resp. at 12. That overbroad assertion stands in sharp contrast both to common practice in which special appearances are routinely granted in criminal cases and to the Department of Justice's own position. As a foreign bank with no physical operations in the U.S.

---

[1] Notably, *Prado* was decided in 2019, not in 2014 as indicated in the prosecution's response. Gov't Resp. at 1.

December 2, 2019
Page 3

whatsoever, the Bank should be permitted to make a special appearance to protect its constitutional right to contest the prosecution's jurisdictional overreach.

## I.    Personal Jurisdiction Defines the Court's Power in Criminal Cases

Courts must assess their jurisdiction over the defendant's person as a threshold issue in all federal cases, including criminal cases. *Int'l Harvester Co. of Am. v. Kentucky*, 234 U.S. 579, 589 (1914) (assessing personal jurisdiction by Kentucky state court over out-of-state corporate criminal defendant); *see also In re Marc Rich & Co., A.G.*, 707 F.2d 663, 666-70 (2d Cir. 1983) (applying minimum contacts test for personal jurisdiction over foreign corporate recipient of grand jury subpoena).  The prosecution failed to address either of these controlling authorities.

Substantial authority spanning the last century confirms that personal jurisdiction must be assessed—and therefore can be contested—in criminal cases, and can be waived through voluntary submission to the court's jurisdiction.  *Ford v. United States*, 273 U.S. 593, 606 (1927) (challenge to personal jurisdiction in criminal case waived by entering plea of not guilty); *Yousef*, 327 F.3d at 115 (challenging personal jurisdiction under doctrine of specialty); *United States v. Beadon*, 49 F.2d 164, 167 (2d Cir. 1931) (challenge to personal jurisdiction in criminal case waived by general appearance).

In most criminal cases, the exercise of personal jurisdiction is reasonable based on arrest, voluntary appearance, extradition, or waiver.  In contrast, this case presents an issue that does not frequently occur in this District—whether this Court can reasonably exercise personal jurisdiction over a foreign corporate criminal defendant in the absence of any traditional basis. The prosecution incorrectly argues that "Halkbank asserts two distinct and entirely inconsistent theories of personal jurisdiction," specifically, minimum contacts and waiver.  Gov't Resp. at 2. There is no inconsistency.  A court's exercise of personal jurisdiction over a corporate defendant is reasonable if the defendant has minimum contacts with the forum.  Alternatively, if the defendant fails to challenge personal jurisdiction, the argument may be waived.

The prosecution argues at length about *subject matter* jurisdiction issues, which are not presently before the Court, while ignoring the *personal* jurisdiction issues that the Bank seeks to raise.  The prosecution appears to argue that the "nexus test" for subject matter jurisdiction adopted in *Yousef*, 327 F.3d at 111-12 and *United States v. Al Kassar*, 660 F.3d 108, 117-20 (2d Cir. 2011) displaces all standards for personal jurisdiction, but this conflates the distinct inquiries into subject matter jurisdiction and personal jurisdiction.

The "nexus test" confirms subject matter jurisdiction by evaluating the extraterritorial application of a statute to ensure it does not violate the Due Process Clause of the Fifth Amendment.[2] *United States v. Saade*, No. 1:11-cr-00111, 2012 WL 2878087, at \*3 (S.D.N.Y.

---

[2] This limit on subject matter jurisdiction was first suggested by the Second Circuit.  *Leasco Data Processing Equip. Corp. v. Maxwell*, 468 F.2d 1326, 1334 (2d Cir. 1972), *abrogated on other grounds by Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247 (2010) (stating under the heading "Subject Matter Jurisdiction" that ". . . if Congress has expressly prescribed a rule with

December 2, 2019
Page 4

July 11, 2012) ("It is well-established that federal subject-matter jurisdiction may be asserted extraterritorially, if such exercise has been authorized by Congress and does not trespass the limits of the Due Process Clause.").

The nexus test does not address personal jurisdiction at all. First, all of the nexus cases cited by the prosecution concerned individual defendants physically present before the court. *Yousef*, 327 F.3d at 111; *Al Kassar*, 660 F.3d at 118; *United States v. Yousef*, 750 F.3d 254, 258 (2d Cir. 2014); *United States v. Ali*, 718 F.3d 929, 944 (D.C. Cir. 2013). It is axiomatic that a court has personal jurisdiction over a criminal defendant physically present in court, absent a challenge to extradition under the doctrine of specialty. *See, e.g.*, *United States v. Pryor*, 842 F.3d 441, 448 (6th Cir. 2016).[3] Notably, the prosecution's reliance on *Yousef*, 750 F.3d at 258-59, is misplaced since it is no longer good law in the Second Circuit. That case held that defendants who pled guilty could not challenge nexus issues on appeal. *Id.* A recent Second Circuit opinion, *United States v. Van Der End*, No. 17-2926, 2019 WL 5991546, at *4 (2d Cir. Nov. 14, 2019), observed that the *Yousef* court's ruling was no longer valid following the Supreme Court's decision in *Class v. United States*, 138 S. Ct. 798, 803 (2018).

Second, the Second Circuit's 2003 opinion in *Yousef*, 327 F.3d at 115—cited by the prosecution as one of its main authorities—separately addresses the "nexus test" and personal jurisdiction, demonstrating this distinction in unmistakeable terms. 327 F.3d at 111-12, 115. Criminal defendants, including Halkbank, are entitled to raise each of these constitutional guarantees at the appropriate juncture. The prosecution also cites *Ali*, which correctly observes that in applying the nexus test, "the law of personal jurisdiction is simply inapposite." 718 F.3d at 944. These legal analyses are distinct.

Third, defendants who plead guilty can still challenge "nexus" at any point, even on appeal, because it presents an issue of subject matter jurisdiction, but defendants who fail to challenge personal jurisdiction waive the argument on appeal. *Compare Van Der End*, 2019 WL 5991546, at *4 (nexus issue can be challenged on appeal after guilty plea) *with United States v. Gernie*, 228 F. Supp. 329, 339 (S.D.N.Y. 1964) (collecting cases on waiver of personal jurisdiction).

---

respect to conduct outside the United States . . . a United States court would be bound to follow the Congressional direction unless this would violate the due process clause of the Fifth Amendment." *Leasco* has a separate discussion on personal jurisdiction.). The Ninth Circuit developed the nexus test, *United States v. Davis*, 905 F.2d 245, 248-49 (9th Cir. 1990), which was adopted by the Second Circuit. *United States v. Yousef*, 327 F.3d 56, 111 (2d Cir. 2003); *Al Kassar*, 660 F.3d at 118 (rejecting defendant's challenge to subject matter jurisdiction based on the nexus test).

[3] This is consistent with three other cases cited by the prosecution demonstrating that courts have personal jurisdiction over individuals physically before the court. *United States v. Alvarez-Machain*, 504 U.S. 655, 670 (1992); *Frisbie v. Collins*, 342 U.S. 519, 522 (1952); *United States v. Rendon*, 354 F.3d 1320, 1326 (11th Cir. 2003).

December 2, 2019
Page 5

As stated before, constitutional challenges to the extraterritorial application of U.S. law are analogous to state choice of law issues under the Fourteenth Amendment. *United States v. Shahani-Jahromi*, 286 F. Supp. 2d 723, 727 (E.D. Va. 2003) (citing *Allstate Ins. Co. v. Hague*, 449 U.S. 302 (1981) and confirming a link between these Due Process standards). The prosecution presents no authority to contradict this point. Gov't Resp. at 10, n.8.

The other cases cited by the prosecution simply do not support its argument. The prosecution cites *United States v. Williams*, 341 U.S. 58, 65 (1951) (citing 18 U.S.C. § 3231) for the same statutory subject matter jurisdiction issue as *Prado*, 933 F.3d at 134, discussed above. Although *Williams* mentions in passing, "jurisdiction . . . of the persons charged," no other text from *Williams* suggests it is addressing personal jurisdiction. *Id.* Further, laws passed by Congress can grant statutory jurisdiction, but Congress is powerless to alter the boundaries of personal jurisdiction set by the Constitution. Thus, *United States v. Cotton*, holding that the failure to allege a quantity of narcotics in an indictment did not merit reversal under the structural error standard, is inapplicable as well. 535 U.S. 625, 630-32 (2002). Halkbank seeks only to challenge personal jurisdiction at this stage, not the merits of the indictment.

## II.     The Change in Criminal Rule 4 Did Not Eliminate Special Appearances to Challenge Threshold Issues

A special appearance is the proper mechanism to challenge threshold issues such as personal jurisdiction and recusal to avoid risking waiver. The prosecution attempts to distinguish the many cases presented in which courts granted special appearances, with or without contest, *United States v. Türkiye Halk Bankasi A.S.*, No. 1:15-cr-00867-RMB (S.D.N.Y. Nov. 19, 2019), ECF No. 577 at 5-6 ("Def. Letter") because many involved challenges to service that the amendment to Fed. R. Crim. P. 4 later eliminated.

The prosecution makes several key statements about special appearance cases that are inaccurate. The prosecution incorrectly states that "all but one of the cases in which limited appearances were permitted occurred prior to the December 2016 amendment to Rule 4's service provisions." Gov't Resp. at 6. However, the specific service provisions at issue in the cases referenced by the prosecution were only in place from 2002 through 2016. Therefore, the prosecution overlooks the seven cases presented in our chart from before 2002. Def. Letter at 15-19. The prosecution also writes, inaccurately, that "all of the cases concerning corporate defendants involved defendants who had not been served under Rule 4 or who were contesting validity of service . . . ." Gov't Resp. at 6. In fact, at least seven special appearances cases with corporate defendants involved issues aside from service or presented other important issues in addition to service. *See, e.g.*, *United States v. Tucor Int'l, Inc.*, No. 4:92-cr-00425 (N.D. Cal. Oct. 20, 1997), ECF No. 102 (special appearance granted to file motion to dismiss for failure to state an offense); *see also* Def. Letter at 15-19.

The change to Rule 4 applied to the narrow issue of what constituted notice for the purpose of *service*. As the Department of Justice itself argued in support of the change, it did nothing to restrict special appearances and both the Advisory Committee and the Department of Justice emphasized that special appearances remained intact as a mechanism to challenge other threshold issues.

A124

December 2, 2019
Page 6

In its November 4 letter to this Court, the prosecution misguidedly suggests that Halkbank is attempting to enter a special appearance to contest service, a challenge it claims is no longer permitted by Rule 4. *United States v. Türkiye Halk Bankasi A.S.*, No. 1:15-cr-00867-RMB (S.D.N.Y. Nov. 4, 2019), ECF No. 571 ("Gov't Letter to J. Berman"). The prosecution states in its letter that Halkbank "misleadingly cites to a memorandum from the DOJ" in support of its position but "fails to inform the Court that this same letter notes that the amendment eliminates special appearances to contest notice of the summons." Gov't Letter to J. Berman at 4-5. First, the purpose of Halkbank's special appearance request is not to contest service, but to challenge personal jurisdiction and request recusal. Second, there is nothing "misleading" about our characterization of the Department's memorandum. As reflected in our opening brief, the memorandum states that special appearances are no longer necessary to challenge notice of the summons. Def. Letter at 11. This is precisely the point. The amendment's purpose was to address a specific issue, namely to allow the Department more flexibility to serve foreign defendants with no U.S. presence. *See* Letter from Lanny A. Breuer, Assistant Attorney General, to Judge Reena Raggi, Chair, Advisory Comm. on Criminal Rules (Oct. 25, 2012). The Advisory Committee and the Department emphasized that other challenges via special appearance remained available and appropriate. *See* DOJ Memo (listing examples of instances in which a special appearance was still appropriate). The prosecution's position that the amendments to Rule 4 affect Halkbank's right to challenge personal jurisdiction and recusal via a special appearance contradicts its own previous position and the intent behind the rule change.

### III.    Special Appearance Remains the Only Way to Challenge Personal Jurisdiction, Request Recusal and Avoid Risk of Waiver

The prosecution's arguments that the caselaw on special appearance is "sparse" and that many requests for a special appearance are uncontested in fact support the Bank's position that a special appearance is appropriate here to address an issue of first impression in this Circuit without risking waiver. The prosecution laments the dearth of authority, but the reason the caselaw is "sparse" is because prosecutors rightfully do not generally charge companies that have no meaningful presence in the United States. The prosecution's own actions here have created this anomalous situation and lack of Second Circuit guidance.

Special appearances are often uncontested because they are routinely granted as uncontroversial remedies to protect defendants' basic rights. Notably, all of the cases in which special appearances were uncontested involved foreign corporations. That many cases involved challenges to service and that the service rules were later changed does nothing to suggest that the Rule eliminated the Bank's ability to challenge other non-service issues.

The prosecution all but ignored the three cases in which courts have generated written opinions granting special appearances. For example, rather than discussing *Siriwan* on the merits, a case where the court allowed foreign defendants to enter a special appearance to challenge their indictments, the prosecution takes issue with our "characterization" of the case because the court's order was by stipulation. Gov't Resp. at 6. That stipulation confirms the Bank's argument that this type of special appearance is routine and accepted. First, according to the stipulation, the prosecution agreed that it would not contest the special appearance request with the "[u]nderstanding that the Court is prepared to grant Defendants' Motion to Appear

A125

December 2, 2019
Page 7

Specially[.]" *See United States v. Siriwan*, 2:09-cr-000081 (C.D. Cal. Aug. 1, 2011), ECF No. 61 at 1. Thus, the prosecution acknowledged that the court was going to rule in the defendant's favor. Second, whether by stipulation or not, the court determined that it was appropriate for the foreign defendants to challenge their indictments through a special appearance.

The prosecution's treatment of *United States v. Noriega* and *Tucor* is similarly superficial and incorrect. The prosecution suggests that *Tucor* has been superseded because it was "considered by the Ninth Circuit in *Pangang* and found unpersuasive." Gov't Resp. at 6-7. The court in *Pangang* cited *Tucor* as part of a string cite with no substantive discussion of the case at all. *In re Pangang Group Co., Ltd.*, 901 F.3d 1046, 1057-58 (9th Cir. 2018). In *Pangang*, the foreign defendants had entered a special appearance to move to quash service of a summons. The Ninth Circuit noted that the defendants pointed to *Tucor* and three other special appearance cases to support their interpretation of the newly amended Rule 4, but ultimately rejected that interpretation and held that the company had actual notice of the summons consistent with amended Criminal Rule 4. *Id. Tucor* and *Pangang* presented different facts and the courts reached different legal conclusions, but nevertheless, Halkbank would welcome this Court to apply *Pangang* in this case. In *Pangang*, whose earlier iteration had directly inspired the change to Rule 4, the Ninth Circuit made clear that the change in Rule 4 only eliminated special appearances contesting service, but the court expressly preserved special appearances contesting other threshold issues. *Id.* at 1059 ("Criminal Rule 4 would not eliminate the possibility of special appearances entirely.").

The court in *Noriega* allowed the defendant to challenge his indictment via a special appearance because of "delicate issues" in a case "fraught with political overtones." 683 F. Supp. 1373, 1374-75 (S.D. Fla. 1988). The prosecution ignores the unique circumstances presented by *Noriega*, instead claiming that the court's opinion in *United States v. Shalhoub* governs. Gov't Resp. at 7. *Noriega* and *Shalhoub* present entirely different factual scenarios, so it is reasonable that courts would reach different legal conclusions. Moreover, *Shalhoub* does not even cite *Noriega*, let alone reverse or otherwise affect its holding. *Shalhoub* involved a custody battle in which the defendant took his daughter from her home in the United States to Saudi Arabia. No. 1:98-cr-00460, 2016 WL 8943847 (S.D. Fla. Jan. 26, 2016), *appeal dismissed*, 855 F.3d 1255 (11th Cir. 2017), *cert. denied*, 138 S. Ct. 381 (2017). The court denied the defendant's request for a special appearance because it deemed him a fugitive, stating that he constructively fled by failing to return to the Southern District of Florida when he was indicted. 2016 WL 8943847, at *2. Unlike *Shalhoub*, Halkbank is not an individual defendant, it was never "present" in the United States, and it therefore cannot "flee" the jurisdiction.

The prosecution spends four paragraphs discussing *Hijazi*, yet instead of distinguishing its facts, it simply asserts that because *Hijazi* involved "unusual circumstances" and was not followed by two other circuits, it must be inapposite. Gov't Resp. at 7. However, Halkbank's case too involves unusual circumstances. Like *Hijazi*, this case involves the issue of pre-arraignment appearance to seek dismissal of an indictment of a foreign defendant who has never been present in the court's jurisdiction and was lawfully abroad at the time of the indictment. 589 F.3d 401, 412 (7th Cir. 2009). Because a general appearance bears the risk of waiving its personal jurisdiction arguments, Halkbank similarly would be denied an adequate remedy by "ordinary proceedings" of making an appearance and entering a plea. *Id.* at 408. The

December 2, 2019
Page 8

prosecution argues that *Shalhoub* and *United States v. Martirossian* apply instead.  Gov't Resp. at 7-8.  Both cases involve individual defendants who were deemed fugitives because they constructively fled by failing to return to the United States after they were indicted.  As the prosecution has acknowledged, Halkbank is a corporate defendant and cannot be arrested or extradited.  Gov't Resp. at 8.  This fact would necessarily distinguish Halkbank's case from those of any individual foreign defendants, including *Martirossian*, *Sindzingre*, and *Itriago*, all of which involve issues of extradition and/or surrender.  This distinction underscores the "unusual circumstances" of a case involving a foreign corporate defendant seeking to appear specially to challenge personal jurisdiction.

The cases that the prosecution seizes on in which courts have denied a special appearance all concern the application of the fugitive disentitlement doctrine to individual defendants, and as discussed below, this doctrine does not apply.  The prosecution has identified no cases in which a foreign corporate defendant was denied a special appearance, and we are aware of none following extensive research.  The mechanism of special appearance exists for the very purpose that Halkbank seeks to use it: to challenge a threshold issue that it might otherwise waive if forced to enter a general appearance and enter a plea at arraignment.

The prosecution argues that there is no risk of waiver here but entirely ignores the Department of Justice's official position on this issue asserted in a successful effort to convince the federal court system to change the service notice rule.  The Department of Justice's letter to the Advisory Committee itself recognized that special appearances are appropriate to avoid the risk of waiving threshold issues like personal jurisdiction.  DOJ Memo at 2.  The prosecution's response tellingly does not address the Department's position, not citing it even a single time.

As the prosecution concedes, seemingly contradicting its position that personal jurisdiction is irrelevant in criminal cases, Rule 12(b)(1) could possibly provide a procedural mechanism for Halkbank to challenge personal jurisdiction and recusal via pre-trial motion.  But precedent indicates that the existence of this procedural avenue does *not* mean that Halkbank can make a personal jurisdiction argument at any time before trial *without risking waiver*.  The court in *United States v. Maruyasu Indus. Co., Ltd.* acknowledged this point when it held that the defendant waived its personal jurisdiction argument, even though its motion to dismiss was filed pre-trial.  229 F. Supp. 3d 659, 671 (S.D. Ohio 2017).  In *Maruyasu*, the defendant, the prosecution, and the court all agreed that a challenge to personal jurisdiction should be brought under Rule 12(b).  Nevertheless, even though the defendant filed its challenge pre-trial, the court found waiver.  *Id.* at 665, 671.

The prosecution inaccurately asserts that *Maruyasu* did not find that the defendant had waived its jurisdictional argument.  Gov't Resp. at 11.  Yet the court explicitly stated that "Maruyasu's participation in the litigation beyond an appearance for purposes other than contesting jurisdiction," including pleading not guilty, amounted to "consent[] to the Court's personal jurisdiction over it."  *Id.* at 671 (stating that cases in which a special appearance was appropriate involved "a request by a party to seek leave for counsel to do so and for the limited purpose of moving to dismiss or contesting personal jurisdiction.") (citations omitted).  Should Halkbank rely on the prosecution's argument that Rule 12 provides a post-arraignment remedy in this instance, it risks the same possibility of waiver that the court found in *Maruyasu*.

December 2, 2019
Page 9

Longstanding authority suggests that the failure to challenge personal jurisdiction before arraignment could risk waiver. *Ford*, 273 U.S. at 606 (challenge to personal jurisdiction in criminal case waived by entering plea of not guilty). *Ford* has been recently cited by both the Second Circuit and the Supreme Court. This Circuit has cited *Ford* in support of its holding that a defendant waived its personal jurisdiction challenge under the doctrine of specialty. *United States v. Yousef*, 327 F.3d 56, 115 (2d Cir. 2003); *see also Alvarez-Machain*, 504 U.S. at 661 n.7 (stating that the *Ford* defendant waived personal jurisdiction challenge). These cases demonstrate that the failure to challenge personal jurisdiction before arraignment can waive the defendant's rights by necessarily acknowledging the court's jurisdiction. The Bank seeks to avoid this risk through a special appearance.

## IV. The Fugitive Disentitlement Doctrine Does Not Apply to the Bank Because the Bank Is Not, and Cannot Be, a Fugitive

The Bank is not, and cannot be, a fugitive. The prosecution suggests that the "principles" underlying the fugitive disentitlement doctrine apply to corporations, but never actually claims that the doctrine applies to Halkbank. Gov't Resp. at 8. Any attempt to apply the doctrine to a corporation would be futile. Corporations cannot be "fugitives." The fugitive disentitlement doctrine has never been applied to deny a foreign corporate defendant a special appearance. Further, we are aware of no case where a corporation was found to be a "fugitive."

The prosecution fails to cite a single instance in which a corporation was deemed a fugitive and instead attempts to distinguish *United States v. Yang* because the corporate defendant appeared at trial and was convicted. The Sixth Circuit's decision in *Yang* confirms Halkbank's position that the fugitive disentitlement doctrine does not apply to corporations. In *Yang*, two individual defendants and a corporate defendant appealed their convictions for conspiracy to steal trade secrets. 144 F. App'x 521, 523 (6th Cir. 2005). The prosecution moved to dismiss the appeals of all three defendants under the fugitive disentitlement doctrine. *Id.* at 522. The defense argued that the definition of a fugitive is rooted in being subject to arrest, which a corporation obviously cannot be. Def's Opp'n to the Gov't Mot. to Dismiss at 2, *United States v. Yang*, No. 03-4093 (6th Cir. Dec. 8, 2003). The defense further argued that the doctrine is intended to discourage escape and encourage voluntary surrenders, considerations that do not apply to corporations. *Id.* In its reply, the prosecution agreed with the defense, conceding that the corporate defendant's appeal should not be dismissed. Gov't Reply to Def's Opp'n to Mot. to Dismiss at 1-2, *United States v. Yang*, No. 03-4093 (6th Cir. Dec. 19, 2003). The *Yang* court determined that the doctrine applied only to the individual defendants in that case. *Yang*, 144 F. App'x at 523.

The *Yang* decision underscores that, contrary to the prosecution's assertions, the principles underlying the fugitive disentitlement doctrine do not apply to corporations. The prosecution itself acknowledges that "Halkbank, a corporate defendant, cannot be arrested or extradited." Gov't Resp. at 8. For these very reasons, the concept of "constructive flight" is inapplicable to corporations and has never been applied to one.

Even if, contrary to logic and precedent, the Court were to determine that a corporation could be a fugitive, Halkbank would still not qualify. *See Siriwan*, 2011 WL 13057709, at *1

December 2, 2019
Page 10

(C.D. Cal. July 28, 2011) (declining to apply the disentitlement doctrine where defendant had no reason to leave home country); *Hijazi*, 589 F.3d at 412-14 (declining to apply the disentitlement doctrine because the defendant had never been to the United States except for a brief visit and therefore did not flee the jurisdiction).

The prosecution premises its characterization of Halkbank as a "fugitive" on the incorrect allegation that it has failed to appear in response to a summons. Gov't Resp. at 12. Even if this were the appropriate standard, the Bank remedied any concern by addressing the Court on November 5 to request a special appearance. Halkbank's request stems from genuine concerns with jurisdictional issues and the potential for waiver, not from any desire to avoid the U.S. judicial process. As a corporate defendant—and one that recently sent its authorized representatives to this Court to protect its rights—the Bank is not, and cannot be, a fugitive.

The prosecution repeatedly suggests that Halkbank has not committed to moving forward in its defense should its special appearance be denied. It is unfortunate and disingenous that the U.S. Department of Justice views a defendant's assertion of constitutional rights as an "empty delay tactic[,]" Gov't Resp. at 2, but due process provides Halkbank the ability to assert those rights and requires this Court to adjudicate them. Defendants are not required to make conditional, hypothetical commitments in open court. Halkbank's participation in the judicial process through its current motion demonstrates its measured consideration of each legal step in response to the Court's decisions as each is rendered.

*      *      *      *      *

For the foregoing reasons and the reasons set forth in Halkbank's opening brief, this Court should grant counsel for Halkbank leave to appear on a limited and special basis to argue on behalf of Halkbank the merits of the proposed submissions without waiving any objections to this Court's jurisdiction.

Respectfully,

Andrew C. Hruska
AH3224

cc:   Michael Lockard, Esq.
      Sidhardha Kamaraju, Esq.
      David Denton, Esq.
      Jonathan Rebold, Esq.
      Kiersten Fletcher, Esq.
      Richard Walker, Esq.
      William Johnson, Esq.
      Katherine Kirkpatrick, Esq.
      (all by electronic mail)

A129

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:__12/5/2019__

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X
UNITED STATES OF AMERICA,

                              Government,                    **DECISION & ORDER**

         -against-                                           S6 15 CR 867 (RMB)

TÜRKİYE HALK BANKASI A.S.,
         a/k/a "Halkbank,"

                              Defendant.
-------------------------------------------------------------X


**I. Background**

On October 15, 2019, Türkiye Halk Bankasi A.S. ("Halkbank") was charged in a six

count Indictment ("Indictment").[1]  This Decision & Order resolves the request of Halkbank by

its counsel, Andrew Hruska of King & Spalding LLP ("King & Spalding"), to enter a "special

appearance" to seek the Court's recusal and to challenge the Court's personal jurisdiction.

Halkbank has, so far, refused to appear in court to enter a plea of "guilty" or "not guilty".

Halkbank is a prominent Turkish state-owned bank.  The Turkish government owns 51%

of Halkbank's stock through the Turkish Wealth Fund.  See Portfolio, Turkey Wealth Fund,

https://www.nytimes.com/2019/10/15/us/politics/halkbank-turkey-iran-indictment.html.

According to the Indictment, "Halkbank and its officers, agents, and co-conspirators directly and

indirectly used money service businesses and front companies in Iran, Turkey, the United Arab

---

[1]      **Count One** is Conspiracy to Defraud the United States in violation of 18 U.S.C. § 371;
**Count Two** is Conspiracy to Violate the International Emergency Economic Powers Act
("IEEPA") in violation of 50 U.S.C. § 1705, Executive Orders 12959, 13059, 13224, 13599,
13622, & 13645, and 31 C.F.R. §§ 560.203, 560.204, 560.205, 561.203, 561.204, & 561.205;
**Count Three** is Bank Fraud in violation of 18 U.S.C. §§ 1344 and 2; **Count Four** is Conspiracy
to Commit Bank Fraud in violation of 18 U.S.C. § 1349; **Count Five** is Money Laundering in
violation of 18 U.S.C. §§ 1956(a)(2)(A) and 2; and **Count Six** is Conspiracy to Commit Money
Laundering in violation of 18 U.S.C. § 1956(h). Indictment, ¶¶ 66–81.

1

A130

Emirates, and elsewhere to violate and to evade and avoid prohibitions against Iran's access to

the U.S. financial system, restrictions on the use of proceeds of Iranian oil and gas sales, and

restrictions on the supply of gold to the Government of Iran and to Iranian entities and persons."

Indictment, ¶ 1.  This alleged conspiracy has been described as "the largest Iran sanctions

violation in United States history." See Eric Lipton, U.S. Indicts Turkish Bank on Charges of

Evading Iran Sanctions, N.Y. Times (Oct. 15, 2019), https://www.nytimes.com/2019/10/15/us/

politics/halkbank-turkey-iran-indictment.html.  According to the U.S. Government, "Halkbank

conspired with Turkish government officials; Iranian government officials at [the National

Iranian Oil Company], the Ministry of Oil, and the Central Bank of Iran; Iranian banks; and

Turkish businessmen, to evade and avoid U.S. sanctions imposed on the Government of Iran for

its support for terrorism, its illicit nuclear program, its ballistic missiles development, and its

human rights abuses." Gov. Letter, dated Nov. 26, 2019, at 3, ECF No. 578.[2]

---

[2]      According to the U.S. Government: "During the time that Halkbank was undermining U.S. sanctions, it benefitted enormously from its access to the U.S. financial system.
- Between 2012 and 2016, Halkbank maintained U.S.-dollar correspondent accounts at multiple U.S. financial institutions. Halkbank used these accounts to conduct transfers totaling billions of U.S. dollars during the time of the offense conduct.
- In 2014, Halkbank retained, among others, U.S. financial advisors and institutions to issue $500 million in U.S.-dollar denominated corporate bonds, and retained the services of a U.S. financial institution in order to act as paying agent for those bonds.
- In 2015 and again in 2016, Halkbank issued two placements of $500 million each U.S.-dollar denominated corporate bonds using, among others, U.S. financial advisors and institutions and a U.S. paying agent.
- In March 2017, Halkbank's former Deputy General Manager for International Banking, co-defendant Mehmet Hakan Atilla, was arrested in the United States while traveling to meet with U.S. financial institutions in furtherance of another prospective bond offering.
- Halkbank participates in a U.S. Department of Agriculture program that provides guaranteed financing for certain buyers of U.S. agricultural exports."

Gov. Letter, dated Nov. 26, 2019, at 3–4.

**Related Proceedings**

Halkbank's involvement in related proceedings predates the Indictment. On January 3, 2018, for example, Halkbank's Deputy General Manager for International Banking and alleged co-conspirator, Mehmet Hakan Atilla ("Atilla"), following a four plus week jury trial, was convicted of five out of six counts which were substantially similar to those alleged in the Indictment. See Judgment, dated May 16, 2018, at 1–2. Atilla was found guilty of conspiracy to defraud the United States; conspiracy to violate the International Emergency Economic Powers Act ("IEEPA") and the Iranian Transactions and Sanctions Regulations; bank fraud; conspiracy to commit bank fraud; and conspiracy to commit money laundering. Id.  Evidence adduced at Atilla's trial indicated that other "senior level" officials of Halkbank (and the Turkish government), including Suleyman Aslan, Halkbank's General Manager, were involved in the alleged multi-billion dollar Iran sanctions avoidance scheme. See, e.g., Transcript, dated Nov. 29, 2017, at 364, ECF No. 404.

Halkbank funded Atilla's defense. See Transcript, dated June 12, 2017, at 5–6, ECF No. 269 (Court: "You are aware that your employer, Turkey Halk Bankasi, otherwise known as Halkbank, is paying for your legal fees and expenses in this matter? Do you understand that?" Atilla: "Yes, I know that."). Halkbank initially retained Messrs. Victor J. Rocco, Esq. and Thomas E. Thornhill, Esq. of the law firm Herrick, Feinstein LLP, along with Cathy Fleming, Esq. of Fleming Ruvoldt PLLC, to represent Atilla. See Transcript, dated May 18, 2017, at 3, ECF No. 256 (Court: "You have a retainer agreement between yourself and Mr. Atilla?" Mr. Rocco: "Yes, your Honor." Court: "And does [Atilla] pay your fees?" Mr. Rocco: "My fees are being paid by Halkbank."); Transcript, dated June 12, 2017, at 8–9, ECF No. 269 (Court: "The fact that Halkbank is paying your Fleming Ruvoldt legal fees and expenses as set forth in your

retainer agreement with Fleming Ruvoldt, and both you, Mr. Atilla, and Halkbank also signed

this retainer agreement; . . . [Y]ou realize that?" Atilla: "Your Honor, I first signed with Ms.

Fleming, and then after I decided to work with her, we signed the agreement, and after that, it

was sent to Halkbank, and Halkbank signed it."). Mr. Rocco and Herrick, Feinstein LLP have

also represented the Republic of Turkey in various business transactional deals in the United

States. See Transcript, dated April 13, 2017, at 7, ECF No. 220.

On the eve of Atilla's trial, Mr. Hruska, counsel to Halkbank, recruited two additional

lawyers to serve as co-counsel to Atilla, namely, Todd Harrison, Esq. and Joseph Evans, Esq., of

McDermott, Will & Emery, LLP. See Transcript, dated Nov. 21, 2017, at 13–14, 23–24, 28, ECF

No. 500 (Mr. Harrison: "So, as I understand it, Halkbank is currently represented by King &

Spalding and, in particular, a partner at King & Spalding named Andrew Hruska. . . . Mr. Hruska

asked me if I would be available to assist on a trial that was coming up very soon that was very

complicated. . . . [Hruska] indicated he had been in communication with the defense team . . . So,

he asked me if I would join the defense team and I told him I was willing to try and look into it. .

. . Court: "[A]re you [Mr. Atilla] aware that your employer, Halkbank, is paying for your legal

fees and expenses in this matter of Mr. Harrison and his firm?" Atilla: "Yes, I am aware of that. .

. . I would like to say that the suggestion about adding the firm of McDermott to my defense case

was suggested by Halkbank. . . . I agree with the strategy, but I would like to include that the

suggestions came from Halkbank.").

On May 16, 2018, Atilla was sentenced to 32 months' imprisonment. Judgment, dated

May 16, 2018, at 3. Upon Atilla's release from incarceration in the U.S. and his return to Turkey,

Turkish Finance Minister Berat Albayrak announced that Atilla had been appointed as the head

of Turkey's stock exchange, Borsa Istanbul. See Ayla Jean Yackley, Turkey Picks Former Jailed

4

<u>Banker to Head Istanbul Stock Exchange</u>, Financial Times (Oct. 21, 2019), https://www.ft.com/
content/31e25da8-f442-11e9-a79c-bc9acae3b654.

**Halkbank's Notice of the Indictment**

Immediately following the Indictment, the Court issued a summons ("First Summons")
directing Halkbank to appear on October 22, 2019 at 9:15 a.m. for arraignment. <u>See</u> First
Summons, dated Oct. 15, 2019, at 1. On October 16, 2019, the Government electronically
delivered the First Summons to King & Spalding, who had been representing Halkbank in
connection with the U.S. Government's investigation of Halkbank, including in negotiations with
the United States Government over a potential fine.  <u>See</u> Gov. Letter, dated Nov. 4, 2019, at 1–2,
ECF No. 571.  According to a letter from Mr. Hruska, dated October 21, 2019, King & Spalding
refused to accept service of the Indictment on behalf of Halkbank, stating that "[a]lthough King
& Spalding has represented Halkbank in connection with the Department of Justice's prior
investigation regarding Halkbank, at no point has King & Spalding been authorized to accept
service of a summons or other legal process on behalf of Halkbank, and we have so informed the
U.S. Attorney's office." Def. Letter, dated Oct. 21, 2019, at 1, ECF No. 564.

On the same day that the Government delivered the First Summons to King & Spalding,
Halkbank published an "Investor Relations Disclosure" on its website, among other things,
acknowledging the Indictment and its cooperation with U.S. officials. "This Bank has been
informed that the U.S. Attorney's Office for the Southern District of New York, under the U.S.
Department of Justice, has taken the decision to engage in due process to prosecute the Bank
based on an indictment related to the allegations made during the Atilla trial. . . .  Per our past
disclosures on numerous occasions, certain U.S. authorities have been asking Halkbank for
records and information pertaining to allegations made during the Atilla trial, which led the Bank

A134

to closely cooperate with these authorities and also initiate an independent investigation of its own on a voluntary basis." Gov. Letter, dated Oct. 22, 2019, at 8, ECF No. 565.

Notwithstanding Halkbank's extensive commercial dealings with the U.S. and its recent high level negotiations with the U.S., and coupled with Halkbank's involvement in the Atilla case and its notice of and acknowledgment of the Indictment, Halkbank failed to appear for the scheduled arraignment on October 22, 2019. See Transcript, dated Oct. 22, 2019, at 1, ECF No. 568.  On October 23, 2019, the Court issued a finding that "pursuant to Federal Rule of Criminal Procedure 4(c)(3)(D)(ii), which permits service of a summons on an entity not within a judicial district of the United States 'by any other means that gives notice,' the Government has properly served the First Summons and the Indictment on Halkbank." Order, dated Oct. 23, 2019, at 3, ECF No. 566 (citing Fed. R. Crim. P. 4(c)(3)(D)(ii)).  The Court also found that Halkbank had "willfully and knowingly disobeyed the Court's order in the First Summons," by failing to appear.  Id.

It should be noted that Federal Rule of Criminal Procedure 4 was amended in 2016 to enable the Government more easily to make service upon foreign corporations. See Memorandum from Hon. Reena Raggi, Chair, Advisory Committee on Criminal Rules to Hon. Jeffrey S. Sutton, Chair, Standing Committee on Rules of Practice and Procedure, Judicial Conference of the United States (May 6, 2015), https://www.uscourts.gov/sites/default/files/ 2015-05-criminal_rules_report_0.pdf, at 3 ("Given the increasing number of criminal prosecutions involving foreign entities, the Advisory Committee agreed that it would be appropriate for the Federal Rules of Criminal Procedure to provide a mechanism for foreign service on an organization.").  The amendments removed the requirement that a copy of the summons "be mailed to the organization's last known address within the district or to its

6

A135

principal place of business elsewhere in the United States." See Fed. R. Crim. P. 4(c)(3)(C)
(2011). The Rule as amended provides that a summons may be "served on an organization not
within a judicial district of the United States . . . by any other means that gives notice." Fed. R.
Crim. P. 4(c)(3)(D) (2016). This rule change was intended to "remove an unnecessary
impediment to the initiation of criminal proceedings against organizations that commit domestic
offenses but have no place of business or mailing address within the United States." Id. Advisory
Committee's Note to 2016 Amendment. The objective is that notice of pending criminal
proceedings is accomplished. Id.

The Court also provided Halkbank with an opportunity to cure its noncompliance by
issuing a second summons ("Second Summons") which directed Halkbank to appear on
November 5, 2019 at 11:00 a.m. See Order, dated Oct. 23, 2019, at 3, ECF No. 566 ("[T]o afford
Halkbank an opportunity to cure its noncompliance with the First Summons, the Court is issuing
a second summons. . . ."). On October 23, 2019, the Government, pursuant to Federal Rule of
Criminal Procedure 4, emailed electronic copies of the Second Summons and the Indictment to
King & Spalding. See Gov. Letter, dated Nov. 4, 2019, at 2. In addition, the U.S. Department of
Justice requested that the Turkish Ministry of Justice serve the Second Summons and related
documents on Halkbank. Id. at 2–3. The Government also emailed the Second Summons and the
Indictment to Halkbank at the email address listed on its website and in its 2018 Annual Report.
Id. at 2–3. And, the Government also sent an email with the Indictment and the Second
Summons to Tahsin Yazar, a member of the Turkish Ministry of Treasury and an advisor to the
Turkish Wealth Fund. Id. at 2. Mr. Yazar had "participated in meetings and conversations,
together with Halkbank executives and attorneys from King & Spalding, with U.S. Department
of Justice officials regarding the criminal investigation of Halkbank." Id.

The Government also sent the Second Summons and the Indictment by FedEx to Halkbank's legal department at Halkbank's headquarters in Istanbul. Id.  Halkbank refused to accept the FedEx delivery. Id. Instead, it provided FedEx with a handwritten note, written in both Turkish and English, stating: "Please be informed that this package . . . sent by the U.S. Attorney's Office for the Southern District of New York was . . . not accepted by this Bank, since the form of delivery is not in compliance with the legal service provisions of bilateral treaties between the Turkish Republic and the U.S." Id. The note was presumably signed by an employee of Halkbank. Id. A copy of the note is attached to this Decision & Order as Exhibit A.

There can be no doubt that Halkbank was notified of the charges against it.

**Unusual Contacts**

Following the arrests of Zarrab and Atilla in the U.S. and after their respective arraignments, an extraordinary, sustained series of Turkey-initiated state to state meetings, contacts, and involvements began—outside the courtroom—between and among Turkish and U.S. officials, lobbyists and attorneys.[3]  The objective of the campaign was, initially, to obtain the release and repatriation of Mr. Zarrab—even though he was in the middle of a U.S. Federal

---

[3]    This remarkable campaign involved, among others, Turkish President Recep Tayyip Erdoğan; Turkish Justice Minister Bekir Bozdag; former Turkish Deputy Prime Minister Mehmet Şimşek; Berat Albayrak, President Erdogan's son-in-law and Turkish Minister of Finance; and Turkish Minister of Foreign Affairs Mevlut Cavusoglu.

The Americans who appear for the most part to have been on the receiving end of these efforts include, among others, President Donald J. Trump; Joe Biden, former Vice President of the United States; Loretta Lynch, former United States Attorney General; Steven Mnuchin, United States Secretary of the Treasury; and Rex W. Tillerson, former United States Secretary of State.

Rudolph W. Giuliani, former New York City Mayor and former United States Attorney for the Southern District of New York and Michael B. Mukasey, former United States Attorney General & former Chief District Judge of the Southern District of New York participated on behalf of Defendant Reza Zarrab.  Mr. Hruska, of King & Spalding, participated as counsel to Halkbank.

criminal proceeding and heading for trial.  See, e.g., Letter from Benjamin Brafman, Defense

Counsel for Mr. Zarrab, to the Court, dated Mar. 30, 2017, at 1–2, ECF No. 205.  Mr. Brafman

advised that "[t]he engagement of Messrs. Giuliani and Mukasey relates to the [Zarrab]

prosecution."  "Messrs. Giuliani and Mukasey do not represent Mr. Zarrab before this Court, are

not involved in trial preparation or plea discussions with United States Attorney's Office for the

Southern District of New York, and they do not intend to appear . . . in any capacity in

connection with this case."  Id. at 1.  Mr. Brafman also advised that the "engagement of Messrs.

Giuliani and Mukasey relates to the prosecution; it may impact the prosecution, but it has not,

and whether it will is a matter of speculation."  Id. at 1. [4]

More recently, the objective of the campaign, following the conviction of Mr. Atilla on

January 3, 2018, appears to have been to avoid Halkbank being indicted and, relatedly, to avoid

Halkbank having to pay a potential fine.  This effort appears to have failed prior to the Halkbank

Indictment on October 15, 2019.  According to reporting by the New York Times:

> After repeated appeals to President Trump by Turkey's President to avoid charges
> against a state-owned Turkish bank . . . [t]he settlement push abruptly ended on
> Tuesday when prosecutors in New York filed bank fraud and money laundering
> charges against the institution, Halkbank . . . .  But the criminal charges were filed
> only after more than a year of interventions by President Recep Tayyip Erdogan
> of Turkey and other senior officials of his government, as well as lawyers and
> lobbyists working in New York and Washington on Turkey's behalf, to try to
> avoid a criminal prosecution of the bank.

---

[4]     By Decision & Order, dated April 5, 2017, the Court directed that a Curcio hearing be
held to examine whether there existed any actual or potential conflicts of interest regarding the
representation of Mr. Zarrab and other clients of Messrs. Giuliani and Mukasey or their firms,
and if so, whether Mr. Zarrab was aware of such actual or potential conflicts and knowingly and
voluntarily waived them. See Decision & Order, dated Apr. 5, 2017, ECF No. 209.
        The Curcio hearing was held on May 11, 2017.  Messrs. Giuliani and Mukasey submitted
written affidavits or declarations in connection with the hearing. See, e.g. Giuliani Affidavit,
dated May 4, 2017, ECF No. 238; Giuliani Affidavit, dated May 22, 2017, ECF No. 250;
Mukasey Affidavit, dated May 3, 2017, ECF No. 239; Mukasey Affidavit, dated May 19, 2017,
ECF No. 250.

Eric Lipton, <u>Settlement Talks for Bank Followed Pressure on Trump by Turkey's Leader</u>, N.Y.

Times (Oct. 16, 2019), https://www.nytimes.com/2019/10/16/us/politics/halkbank-trump-

turkey.html.

**Halkbank's Request to Make a Special Appearance**

On November 4, 2019, Mr. Hruska sent a letter to the Court stating that "Halkbank has

retained us to represent it in [this case] for a limited purpose, and we do not concede the

acceptance of service nor enter a general appearance on behalf of Halkbank by submitting this

request.  The Bank has refused to accept service and has not stipulated to service by any means. .

. . [C]ounsel for Halkbank respectfully requests leave to enter a limited and special appearance

for the purpose of filing a motion to dismiss for lack of personal jurisdiction and a motion

seeking this Court's recusal from this case."  Def. Letter, dated Nov. 4, 2019, at 1.

The Government opposed Mr. Hruska's application, arguing that it is an "empty delay

tactic"; that it "serves no legitimate purpose"; and that there is clearly "no established tradition of

special appearances in criminal cases." <u>See</u> Gov. Letters, dated Nov. 26, 2019, at 2, and Nov. 4,

2019, at 4, 5.  The Government also contends: "[t]he matters that Halkbank seeks to raise

through a limited appearance require no special appearance at all.  Halkbank's two proposed

motions can be raised after the defendant complies with the summonses and appears in this

matter." Gov. Letter, dated Nov. 4, 2019, at 5.

On November 5, 2019, the Court held oral argument.  <u>See</u> Transcript, dated Nov. 5, 2019,

ECF No. 575.  Mr. Hruska emphasized again that he wished to "make clear that we are **not**

requesting . . . to make a special appearance in order to challenge [the] summons. That's not our

intention. . . . [W]e have been authorized by the client to appear for th[e] limited purpose, and no

further, [of] challeng[ing] jurisdiction and also to file the recusal motion. . . ." <u>Id.</u>, at 4, 6

(emphasis added.)  Mr. Hruska also stated that "[w]e have seen examples where participation in aspects of court process beyond challenge of jurisdiction has led to courts concluding that there has been a waiver of jurisdiction. We are seeking to avoid that. . . ." Id. at 5.

The Government, in turn, contended that Halkbank's "refusal [to appear for arraignment] shows [] there is certainly an air of gamesmanship here with the bank's request to make a special appearance. . . .  Instead, it appears that what Halkbank is trying to do is to deny the jurisdiction of the Court to attempt to move to dismiss the indictment with no commitment whatsoever that it is going to remain in the case and answer the charges if it does not get its preferred ruling." Id. at 13, 14.

At the conclusion of oral argument, the Court directed the parties to submit additional letter briefs. Id. at 26–27.

On November 19, 2019, King & Spalding submitted a letter repeating (with some exceptions) arguments set forth in their November 4, 2019 letter and at oral argument. See Def. Letter, dated Nov. 19, 2019; see also Def. Letter, dated November 4, 2019, at 2 ("[T]he Bank's incidental contacts with the U.S. are insufficient to establish either general or specific personal jurisdiction over the Bank." (emphasis added)).  The November 19, 2019 letter also asserts— without citing any persuasive authority—that "[a]s a corporation, Halkbank cannot be a 'fugitive' since it has no physical body to present and can appear before the court in any case only through representatives such as its legal counsel."  Def. Letter, dated Nov. 19, 2019, at 6–7.

On November 26, 2019, the Government opposed Halkbank's application, arguing that "concepts of personal jurisdiction found in civil suits simply do not apply in criminal cases: the Court's jurisdiction is established by an indictment that sufficiently alleges violations of federal criminal law, and the application of the charges to a particular defendant complies with due

process so long as there is a sufficient nexus between the defendant and the United States, so that such application would not be arbitrary or fundamentally unfair." Gov. Letter, dated Nov. 26, 2019, at 1 (internal citations and quotation marks omitted).

**For the reasons that follow, the Court denies Halkbank's request to enter a "special appearance."** [5] **Following arraignment and consistent with this Decision & Order, Halkbank may file a motion for the Court's recusal and/or relating to the Court's jurisdiction.**

### II. Legal Standard

"'[F]eigning ignorance of a criminal summons of which the foreign organization does have notice (either by declining to appear, or by appearing and denying knowledge) is not a legitimate interest the criminal rules should protect.'" In re Pangang Grp. Co. LTD., 901 F.3d 1046, 1052 (9th Cir. 2018) (quoting Mem. from Jonathan J. Wroblewski, Director, Office of Policy and Legislation, Department of Justice to Judge David M. Lawson, Chair, Subcommittee on Rule 4, Advisory Committee on Rules of Criminal Procedure, Judicial Conference of the United States, at 3 (Feb. 20, 2015), https://www.uscourts.gov/sites/default/files/fr_import/ CR2015-05.pdf ("DOJ Memo")).  "A foreign organization acting lawfully in this situation has two reasonable choices: it can either appear in a U.S. court to raise any legitimate defenses or it can choose not to appear and face any attendant risks."  DOJ Memo at 3.

Federal Rule of Criminal Procedure 4 was amended in 2016 to permit service "on an organization not within a judicial district of the United States . . . by any other means that gives notice." Fed. R. Crim. P. 4(c)(3)(D).  The modification was intended to "remove an unnecessary

---

[5]     Any arguments or issues raised by the parties but not specifically addressed herein have been considered by the Court and rejected.

12

impediment to the initiation of criminal proceedings against organizations that commit domestic offenses but have no place of business or mailing address within the United States." Id. Advisory Committee's Note to 2016 Amendment.

There is no evidence of "a longstanding historical practice of allowing special appearances in criminal cases." In re Pangang Grp., 901 F.3d at 1057. And, following the enactment of Federal Rule of Criminal Procedure 12, a defendant is not "required at the door of the federal courthouse to intone that ancient abracadabra of the law, *de bene esse*, in order by its magic power to enable himself to remain outside even while he steps within. He may now enter openly in full confidence that he will not thereby be giving up any keys to the courthouse door which he possessed before he came in." Orange Theatre Corp. v. Rayherstz Amusement Corp., 139 F.2d 871, 874 (3d Cir. 1944); see also De Bene Esse, Black's Law Dictionary (11th ed. 2019) ("As conditionally allowed for the present; in anticipation of a future need.").

18 U.S.C. § 3231 provides that district courts of the United States shall have original jurisdiction . . . of all offenses against the laws of the United States. "In the criminal context, 18 U.S.C. § 3231 is all that is necessary to establish a court's power to hear a case involving a federal offense . . ." United States v. Yousef, 750 F.3d 254, 262 (2d Cir. 2014), abrogated on other grounds by Class v. United States, 138 S. Ct. 798 (2018). [6]

"[D]ue process of law is satisfied when one present in court is convicted of crime after having been fairly apprised of the charges against him and after a fair trial in accordance with

---

[6]     In its reply, Halkbank contends that "reliance on *Yousef*, 750 F.3d at 258–59, is misplaced since it is no longer good law in the Second Circuit." See Def. Letter, dated Dec. 2, 2019, at 4. Halkbank is not correct. Only a portion of Yousef was abrogated by Class, i.e. the portion dealing with whether a guilty plea "by itself bars a federal criminal defendant from challenging the constitutionality of the statute of conviction on direct appeal." See United States v. Van Der End, No. 17-2926, 2019 WL 5991546, at *4 (2d Cir. Nov. 14, 2019) (quoting Class, 138 S. Ct. at 803)). The remainder of Yousef remains good law.

13

constitutional procedural safeguards." United States v. Alvarez-Machain, 504 U.S. 655, 662

(1992) (quoting Frisbie v. Collins, 342 U.S. 519, 522 (1952)). "[I]n a criminal prosecution, '[i]t

is well settled that a district court has personal jurisdiction over any party who appears before it,

regardless of how his appearance was obtained.'" United States v. Maruyasu Indus. Co., 229 F.

Supp. 3d 659, 670 (S.D. Ohio 2017) (quoting United States v. Lussier, 929 F.2d 25, 27 (1st Cir.

1991)).

 "[T]he extent of [a] statute's extraterritorial reach is not an issue related to the court's

jurisdiction: '[T]o ask what conduct [a statute] reaches is to ask what conduct [the statute]

prohibits, which is a merits question.  Subject-matter jurisdiction, by contrast, refers to a

tribunal's power to hear a case.'"  United States v. Prado, 933 F.3d 121, 138 (2d Cir. 2019)

(quoting Morrison v. Nat'l Australia Bank, Ltd., 561 U.S. 247, 254 (2010)).

 The fugitive disentitlement doctrine "exists precisely to guard against defendants . . . that

'attempt to invoke from a safe distance only so much of a United States court's jurisdiction as

might secure him a dismissal while carefully shielding himself from the possibility of a penal

sanction.'" United States v. Hayes, 118 F. Supp. 3d 620, 626 (S.D.N.Y. 2015) (quoting Collazos

v. United States, 368 F.3d 190, 200 (2d Cir. 2004)).

 **III. Analysis**

 As discussed at pp 10-11 above, defense counsel emphasizes that Halkbank is **not**

challenging service of process.  See, e.g., Def. Letter, dated Nov. 19, 2019, at 11; Def. Letter,

dated Dec. 2, 2019 at 6; see also Transcript, dated Nov. 5, 2019, at 4 ("I do want to make clear

that we are not requesting a need to make a special appearance in order to challenge a summons.

That's not our intention."). This approach is surprising since the issue of service of process

(notice) is linked directly to the issue of personal jurisdiction. It may be that defense counsel

14

believes that such a challenge would be futile because the Government has complied with Federal Criminal Rule of Procedure 4 which permits service "by any means that gives notice." Fed. R. Crim. P. 4(c)(3)(D)(ii); see also discussion at pp. 5-7 above.

The defense's disparate jurisdictional arguments include the following: (i) "the Bank's incidental contacts with the U.S. are insufficient to establish either general or specific personal jurisdiction over the Bank;" (ii) "Halkbank is a Turkish corporation headquartered in Istanbul with no U.S. offices or physical operations in the United States;" and (iii) Halkbank's "conduct alleged in the indictment has no connection to the U.S. sufficient to create jurisdiction." Def. Letter, dated Nov. 4, 2019, at 2. Construed in the light most favorable to Halkbank, the defense appears to challenge extraterritoriality and/or the lack of a connection or nexus between Halkbank and the U.S. sufficient to satisfy the constitutional requirement of fairness. "In order to apply extraterritorially a federal criminal statute to a defendant consistently with due process, there must be a sufficient nexus between the defendant and the United States, so that such application would not be arbitrary or fundamentally unfair." Gov. Letter, dated Nov. 26, 2019, at 9 (quoting United States v. Yousef, 327 F.3d 56, 111 (2d Cir. 2003)). Halkbank may seek recusal and/or make its extraterritorial or jurisdictional challenge by motion following arraignment. See e.g. Fed. R. Crim. P. 12(b); see also Morrison, 561 U.S. at 254; Yousef, 750 F.3d at 260.

The Court has found no instance where a special appearance was required to seek recusal. Recusal motions are generally made after the parties appear, and are resolved swiftly by the court because "a prompt application affords the district judge an opportunity to assess the merits of the application before taking any further steps. . . ." See In re Int'l Bus. Mach. Corp., 45 F.3d 641, 643 (2d Cir. 1995); see also United States v. LaMorte, 940 F. Supp. 572, 575 (S.D.N.Y. 1996).

**(1) Special Appearances to Challenge "Minimum Contacts" Are Not Properly Entertained in Criminal Cases**

Defense counsel in his submissions refers to the idea that this is a "high profile" case and is "widely publicized", perhaps suggesting somehow that high profile qualifies his client, Halkbank, for a special appearance.  See, e.g., Def. Letter, dated Nov. 4, 2019, at 3, ECF No. 570; Def. Letter, dated Nov. 19, 2019, at 7, ECF No. 577.  The Court fails to perceive a correlation between accounts of political leaders and others who have taken a keen interest in these court proceedings and the more mundane and easily resolved question whether a special appearance is appropriate here.  It is not.

Halkbank's proposal to make a "limited and special appearance" to challenge the Court's personal jurisdiction is denied.  As the Ninth Circuit has recently pointed out, there is no "evidence of a longstanding historical practice of allowing special appearances in criminal cases."  See In re Pangang Grp., 901 F.3d at 1057.  Similarly, the court in Maruyasu Industries could "not recall encountering a 'Special Appearance' in a criminal case" - - and was "not satisfied that it may make a distinction between a general appearance and a 'Special Appearance'" in the criminal context.  See Maruyasu Industries, 229 F. Supp. 3d at 671.

There is a good reason for the paucity of cases supporting Halkbank's application.  Simply stated, it is improper to make a personal jurisdiction motion based upon the absence of minimum U.S. contacts in a criminal case. While minimum contacts challenges may be appropriate in civil cases, such challenges do not apply to criminal matters. See id. at 668; see also United States v. Ali, 718 F.3d 929, 944 (D.C. Cir. 2013) ("It is true courts have periodically borrowed the language of personal jurisdiction in discussing the due process constraints on extraterritoriality. But . . . flawed analogies do not establish actual standards for judicial inquiry; the law of personal jurisdiction [in civil cases] is simply inapposite.")  Further, **"the issue of**

16

'**minimum contacts' does not arise in criminal cases.**" <u>United States v. Bodmer</u>, 342 F. Supp.
2d 176, 188 (S.D.N.Y. 2004) (emphasis added).

Halkbank's reliance upon minimum contacts jurisprudence is simply misplaced.  "A
federal district court has personal jurisdiction to try any defendant brought before it on a federal
indictment charging a violation of federal law."  <u>United States v. Rendon</u>, 354 F.3d 1320, 1326
(11th Cir. 2003) (citing <u>United States v. Alvarez-Machain</u>, 504 U.S. 655, 659–70 (1992)).

A recent (2017) decision which is on point is <u>Maruyasu Industries,</u> where the Southern
District of Ohio described as a "novel argument" the contention that "minimum contacts applies
in [a] criminal prosecution," <u>i.e.</u> the same position being advanced here by Halkbank.  229 F.
Supp. 3d at 666-67.  In <u>Maruyasu Industries</u>, a Japanese corporation defendant was indicted for
engaging in a price-fixing conspiracy. <u>Id.</u> at 663. The foreign corporation moved to dismiss the
indictment for lack of personal jurisdiction arguing that "before exercising personal jurisdiction
over a non-resident defendant like itself, a district court must find that the defendant has
minimum contacts with the forum state so as not to offend notions of fair play and substantial
justice—the jurisdictional test typically applied in *civil* cases." <u>Id.</u> at 666–67 (emphasis in
original). The Government opposed the defendant's motion, arguing persuasively that "the Due
Process Clause does not impose identical requirements in the civil and criminal contexts. Rather,
in a criminal prosecution, due process of law is satisfied when one present in court is convicted
of [a] crime after having been fairly apprised of the charges against him and after a fair trial in
accordance with constitutional safeguards. . . . Nothing more, including meeting the minimum
contacts test, is required." <u>Id.</u> at 668 (internal citations and quotations omitted).

A146

The Ohio court examined the (few) criminal cases which assessed minimum contacts and it concluded that each of those cases was either "distinguishable" or an "outlier." Id. at 669. It reasoned as follows:

> [T]he Court finds compelling the Government's position that due process in the civil and criminal contexts simply is *different.* . . . This Court, therefore, will apply the long-held standard that due process 'is satisfied when one present in court is convicted of [a] crime after having been fairly apprised of the charges against him and after a fair trial in accordance with constitutional safeguards.' A 'federal district court has personal jurisdiction to try any defendant brought before it on [a] federal indictment charging violation of federal law.'

Id. at 670 (internal citations omitted) (quoting Lussier, 929 F.2d at 27 Alvarez–Machain, 504 U.S. at 670, Frisbie, 342 U.S. at 522, and Rendon, 354 F.3d at 1326).

Halkbank "has two reasonable choices: it can either appear in a U.S. court to raise any legitimate defense or it can choose not to appear and face any attendant risks." See DOJ Memo at 3.  If Halkbank wishes the district court to decide its jurisdictional motion, this international bank holds the key to unlock its dilemma: travel to New York and answer the charges or have its legal counsel do so.  "That is all the district court ask[s] of [it]." Martirossian, 917 F.3d at 887–88; see also DOJ Memo at 3.

**Halkbank's Authorities Are Not At All Compelling**

The cases which Halkbank relies upon are not persuasive. They do not include any case from the Second Circuit where a special appearance was entertained to address minimum contacts or recusal in a criminal matter. The three cases which appear most germane do not support Halkbank's cause and are discussed immediately below.  (Halkbank's other authorities are distinguished in Exhibit B attached hereto.)  None of Halkbank's cases involves a special appearance to move for recusal.

Here is the Court's assessment of the three principal cases put forward by Halkbank in its opening brief.

(i) **United States v. Kassian Maritime Navigation Agency, Ltd.**, No. 2:13-cr-00070 (E.D. Va. June 24, 2013), ECF No. 38

In <u>Kassian</u>, a Greek corporate defendant sought to enter a special appearance in order to challenge personal jurisdiction on the grounds that it did not have "sufficient minimum contacts with the United States."  <u>See</u> Def. Mem. of Law in Support of Mot. to Dismiss, at 7, <u>id.</u> (June 10, 2013), ECF No. 25.  The defendant also asserted that it "does not have an office, employees, and/or property within the judicial district, or anywhere else within the United States of America," and argued that it "conducts its business exclusively out of its office in Greece."  <u>Id.</u> at 3.  While the Government did not oppose the special appearance, it argued that the minimum contacts test was irrelevant because "[w]hen a defendant enters a jurisdiction and commits a crime, jurisdiction immediately attaches to that defendant regardless of his 'minimum contacts' with the jurisdiction."  <u>See</u> Gov. Mem. of Law in Oppn. to Mot. to Dismiss, at 6, <u>id.</u> (June 6, 2013), ECF No. 28.

The district court in <u>Kassian</u> denied the foreign corporate defendant's motion to dismiss. It determined that "a Rule 12 motion is not an appropriate method of raising such a factual defense," and that "the Government's proof with respect to jurisdictional elements is subject to evaluation by the trial court solely in connection with a motion for judgment of acquittal made after the evidence on either side is closed."  <u>See</u> Order, at 3-4, <u>id.</u> (June 24, 2013) ECF No. 38. The Court stated that defendant's motion was in essence a challenge to the Government's factual assertions "and how such facts impact the elements of the offenses."  <u>Id.</u> at 5.  The defendant's argument that it "does not 'do business' and/or have sufficient minimum contacts with the

United States"—which is comparable to Halkbank's contention —did not, according to the Virginia district court, implicate personal jurisdiction.  Id. at 5.

**(ii)  United States v. Nippon Paper Industries Co., No. 1:95-cr-10388, 944 F. Supp. 55 (D. Mass. 1996)**

In the Nippon Paper case, a Japanese corporate defendant filed a "NOTICE of special appearance of counsel," without first requesting permission from the court.  See id. (Jan. 23, 1996), ECF No. 17.  However, the Government did not raise an objection.  Thereafter, the defendant filed a motion to dismiss for lack of personal jurisdiction because Nippon did not have "sufficient contacts with the United States to fall within the Court's general or specific jurisdiction."  See 944 F. Supp. at 62.  The Government opposed the motion on the merits and contended that service on Nippon's office in Seattle "standing alone" was sufficient to assert jurisdiction over Nippon and, alternatively, that "because Nippon has sufficient contacts with the United States, service pursuant to Rule 4 [also] gives this Court jurisdiction over Nippon."  Id. at 59-60.

The Massachusetts District Court held that "the mere service of process on an agent or officer of an alien corporation within the United States does not without more establish the jurisdiction of a federal court over an alien corporation.  Rather, as this Court has previously decided in the context of a civil matter, service of such process is only effective to create in personam jurisdiction where a defendant has sufficient contacts with the United States."  Id. at 61.  The Massachusetts court did not explain why it believed that the minimum contacts test employed in civil cases should also apply to criminal prosecutions.  It ultimately determined that the defendant engaged in continuous and systematic activity in the United States and "[a]ccordingly, the Court possess[ed] general personal jurisdiction over Nippon."  Id. at 62.

This Court agrees with the <u>Maruyasu Industries</u> decision discussed above at pp. 18–19 which concluded that <u>Nippon Paper</u> is "not . . . particularly persuasive" in part because it did not "adequately address . . . *why* and *whether* the minimum contacts test is properly applied to determine whether personal jurisdiction exists over a criminal defendant." 229 F. Supp. 3d at 669. <u>Nippon Paper</u> is an "outlier[] . . . and the court here is not persuaded to follow [it]." <u>Id.</u>

### (iii) <u>United States v. Chitron Electronics Co. Ltd., No. 1:08-cr-10386, 668 F. Supp. 2d 298 (D. Mass. 2009)</u>

In <u>Chitron</u>, a Chinese corporate defendant filed a "NOTICE OF SPECIAL APPEARANCE . . . for the limited purpose of seeking dismissal for lack of personal jurisdiction and insufficiency of service of process." <u>See</u> Notice of Attorney Appearance, at 1, <u>Id.</u> (June 5, 2009), ECF No. 46. The defendant did not request permission to appear specially, however the Government did not raise an objection. Thereafter, the Defendant filed a motion to "dismiss for insufficiency of service of process and lack of personal jurisdiction" because it "does not do business, in any state of the United States, . . . does not own any real or tangible property in the United States, and it has no offices, bank accounts or employees in the United States." <u>See</u> Def. Mem. in Support of Mot. to Dismiss, at 1, 3, <u>id.</u> (June 22, 2009), ECF No. 57. The Government countered that notice of the charges against Chitron through service of process "was adequately provided" and that the issue "is not whether [the Defendant] conducted business in the United States but rather whether it committed a crime in the United States." <u>See</u> Gov. Mem. in Oppn. to Mot. to Dismiss, at 3, 9, <u>id.</u> (July 9, 2009), ECF No. 60. The Government also argued that "the civil concepts of personal jurisdiction under *International Shoe* and its progeny are not applicable to a criminal case." <u>See Id.</u> at 15-16.

In its <u>Chitron</u> decision, the Massachusetts District Court concluded, without explanation, that "to establish personal jurisdiction over a foreign corporation charged with a crime, the

A150

Government has the burden of demonstrating (via the indictment or affidavits) . . . 'minimum contacts' between the corporation (or its agent) and the United States."  See 668 F. Supp. 2d at 302.  The two cases relied upon by the Chitron court concern a court's power to enforce a subpoena to testify or provide documents, and they do not involve jurisdiction over a criminal defendant—such as Halkbank—which has been indicted.  See In re Sealed Case, 832 F.2d 1268 (D.C. Cir. 198), abrogated on other grounds by Braswell v. United States, 487 U.S. 99 (1968); Matter of Marc Rich & CO., A.G., 707 F.2d 663 (2d Cir. 1983).  They "are distinguishable on that basis alone." See Maruyasu Industries, 229 F. Supp. 3d at 669.  Ultimately, the Chitron court determined that the defendant "engaged in activities in the United States sufficient to meet the 'minimum contacts' and 'effects' test."  See 688 F. Supp. 2d at 304.  Chitron like Nippon Paper has been considered an "outlier."  The Court is respectfully not persuaded to follow it.  See Maruyasu Industries, 229 F. Supp. 3d at 669.

### (2) Halkbank will Not be Prejudiced by Seeking Recusal and/or Dismissal on Jurisdictional Grounds Following Arraignment

Even though the Court rejects Halkbank's request to make a special appearance, Halkbank faces no prejudice because it is entitled to litigate recusal and jurisdiction following arraignment.

It is a court's obligation to deal with a recusal request expeditiously.  This was the approach the Court followed in the Zarrab case.  At the outset of that case, the Court disclosed to counsel and to Mr. Zarrab the following: "I personally have been in Istanbul on one occasion. . . . The occasion was May of 2014, and I was one of five Americans, including three prominent constitutional law professors, the Vermont Attorney General, and myself, among 20 speakers in total to participate in an international legal symposium for lawyers, law students, academics, and judges about the Rule of Law. . . . My participation in this panel does not impact my ability to

22

preside over this case fairly and impartially, and to ensure that Mr. Zarrab, who is presumed to

be innocent . . . receives a fair and impartial hearing and eventual trial." See Transcript, dated

Apr. 27, 2016, at 3-4, ECF No. 14.

Defense counsel Brafman responded: "Might I add, your Honor, that with all modesty,

you have proven me correct. I was familiar with your Honor's remarks and appearance in

Istanbul because, in our thoroughness, we try and follow everything that everyone does. And . . .

so I said that the first thing the judge is going to do is raise the fact that he participated in the

panel, so I'm glad that you proved me correct. . . . [M]y experience here has allowed me to

conclude that you are indeed a fair and impartial judge. . . ." Id. at 4-5.  Notwithstanding Mr.

Brafman's positive (and kind) comments, his co-counsel filed a recusal motion on August 30,

2016. It was resolved on September 29, 2016.  See Def. Mot. for Recusal, United States v.

Zarrab, No. 15-CR-867-RMB-1 (S.D.N.Y. Aug. 30, 2016), ECF No. 79; Decision & Order, Id.

(Sept. 29, 2016), ECF No. 87.

Similarly, there is no prejudice to Halkbank as a result of the Court's rejection of

Halkbank's personal jurisdiction claim based upon minimum contacts.  Halkbank is free to argue

absence of U.S. contacts or conduct following arraignment. See Morrison, 561 U.S. at 254.

("[T]o ask what conduct [a statute] reaches is to ask what conduct [the statute] prohibits, which

is a merits question. . . . [J]urisdiction, by contrast, refers to a tribunal's power to hear a case."

(internal citations and quotation marks omitted)).  Extraterritoriality and/or subject matter

jurisdiction may well be what Halkbank is contesting by arguing that "[t]he Bank's conduct

alleged in the indictment has no connection to the U.S." See Def. Letter, dated Nov. 4, 2019, at

2. This issue also can be raised after Halkbank has appeared, as also happened in the Atilla case.

See Def. Mot. to Dismiss, at 14-18, United States v. Atilla, No. 15-CR-867-RMB-5 (S.D.N.Y. July 31, 2017), ECF No. 281; see also Decision & Order, Id., (Feb. 7, 2018), ECF No. 493.

In United States v. Prado, 933 F.3d 121, 138 (2d Cir. 2019), the Court of Appeals explained "that the extent of [a] statute's extraterritorial reach is not an issue related to the court's jurisdiction: . . . 'to ask what conduct [a statute] prohibits . . . is a merits question.'" (quoting Morrison, 561 U.S. at 254); see also Yousef, 750 F.3d at 258 ("[I]n order to apply extraterritorially a federal criminal statute to a defendant consistently with due process, there must be a sufficient nexus between the defendant and the United States, so that such application would not be arbitrary or fundamentally unfair." (internal quotation marks omitted)).

**(3) As a Fugitive, Halkbank Would Not Be Entitled to Invoke the Court's Processes**

It is not necessary to reach the fugitive disentitlement issue because the Court has already denied (in Sections III (1) and (2) above) Halkbank's motion to make a special appearance. If the Court were to reach this issue, it would almost certainly conclude that the fugitive disentitlement doctrine applies and that the doctrine's principles would render Halkbank a fugitive.

"[T]he fugitive disentitlement doctrine 'disentitles [a] defendant to call upon the resources of the Court for determination of [its] claims' while [it] remains a fugitive." See United States v. Miller, 166 F. Supp. 3d 346, 348 (W.D.N.Y. 2016) (quoting Molinaro v. New Jersey, 396 U.S. 365, 366 (1970)). A defendant who fails to appear in the first instance or absconds during the course of ongoing criminal proceedings flouts the authority of the court. "By imposing the sanction of disentitlement, that court can both protect the dignity of its proceedings and deter similarly situated parties. . . ." See United States v. Awadalla, 357 F.3d 243, 246 (2d Cir. 2004). "Federal courts do not play 'catch me if you can.' If a defendant

24

refuses to show up to answer an indictment . . . the court may decline to resolve any objections

to the indictment in [its] absence." United States v. Martirossian, 917 F.3d 883, 885 (6th Cir.

2019).

Halkbank unpersuasively asserts that "[a]s a corporation, Halkbank cannot be a 'fugitive'

since it has no physical body to present and can appear before the court in any case only through

representatives such as its legal counsel." See Def. Letter, dated Nov. 19, 2019, at 6–7.

Halkbank cites one unpublished out-of-circuit case that stated little more than: "a motions panel

of this court held that Four Pillars, as a corporate defendant, is not subject to dismissal under the

fugitive disentitlement doctrine." See United States v. Yang, 144 F. App'x 521, 522 (6th Cir.

2005). No explanation or reasoning was offered for the statement, but it should be noted that the

corporate defendant, Four Pillars, had in fact appeared in the case through counsel even after the

individual defendant owners of the corporation fled the United States. See Defs. Oppn. to Gov.

Mot. to Dismiss Appeal Under the Fugitive Disentitlement Rule, at 3, United States v. Yang, No.

03-4093 (6th Cir. Dec. 8, 2003).

The Court agrees with the Government that "[t]he principles underlying the

disentitlement doctrine apply equally to a corporate defendant as to an individual defendant."

Gov. Letter, dated Nov. 26, 2019, at 8. "There is no reason . . . why a corporate defendant like

Halkbank, which has been served with two summonses and intentionally refused to comply with

[two] lawful orders, should be permitted to simultaneously ignore and invoke the court's

authority." Id.

Moreover, Congress has explicitly authorized the applicability of the fugitive

disentitlement doctrine to corporations. 28 U.S.C. § 2466 permits a court to "disallow a person

from using the resources of the courts of the United States in furtherance of a claim in any

related civil forfeiture action or a claim in third party proceedings in any related criminal

forfeiture action" if the person in order to avoid criminal prosecution purposefully leaves or

declines to enter or re-enter the jurisdiction of the United States or otherwise evades the

jurisdiction of the court in which a criminal case is pending. <u>See</u> 28 U.S.C. § 2466(a).  And, in

2001, Congress amended this statute to permit a court to apply the fugitive disentitlement

doctrine to "a claim filed by a corporation if any majority shareholder, or individual filing the

claim on behalf of the corporation" is a fugitive.  28 U.S.C. § 2466(b). In <u>United States v.</u>

<u>$6,976,934.65 Plus Interest</u>, 478 F. Supp. 3d 30, 43 (D.D.C. Mar. 21, 2007), the court

specifically determined that: **Subsection (b) was "intended to clarify the fact that fugitive**

**disentitlement could apply to a corporate entity."** (emphasis added).

      Halkbank's argument that the fugitive disentitlement doctrine does not apply because

Halkbank is "not present in the United States [and] did not flee the jurisdiction" is also

unavailing – and unsupported.  <u>See</u> Def. Letter, dated Nov. 19, 2019, at 6–7.  The Second Circuit

recognizes that a defendant may become a fugitive when, "having learned of charges while

legally outside the jurisdiction, [the defendant] 'constructively flees' by deciding not to return."

<u>See United States v. Catino</u>, 735 F.2d 718, 722 (2d Cir. 1984); <u>see also United States v. Blanco</u>,

861 F.2d 773, 779 (2d Cir. 1988) ("A person can be said to be a fugitive when, while abroad,

they learn that they are under indictment and make no effort to return to the United States to face

charges.").  It appears to the Court that this is what Halkbank – which is an important institution

in Turkey – has done so far in this case.  "The primary purpose of the fugitive disentitlement

doctrine—promoting mutuality of litigation—is served both when a defendant flees the United

States and when he chooses to remain outside the United States."  <u>Miller</u>, 166 F. Supp. 3d at 348;

<u>see also Martirossian</u>, 917 F.3d at 890 (where the Court confirmed that "a defendant need not be

26

A155

present in and leave a jurisdiction to become a fugitive; the mere refusal to report for prosecution can constitute constructive flight").

Halkbank has failed to appear following the service of two summonses, with full knowledge and notice of the charges in the Indictment and of the related <u>Atilla</u> and <u>Zarrab</u> cases. <u>See</u> pp. 3–5 above.  Halkbank has also been represented by U.S. legal counsel, Mr. Hruska of King & Spaulding LLP, for at least two years in connection with the U.S. criminal investigation of Halkbank's alleged Iran sanctions evasion.  <u>See</u> Gov. Letter, dated Nov. 4, 2019, at 1.  And, this Court has found that "Halkbank has willfully and knowingly disobeyed the Court's order in the First Summons to appear at the First Conference."  Order, dated Oct. 23, 2019, at 3.  The fugitive disentitlement doctrine exists to encourage compliance with the law and to protect against entities that "'attempt to invoke from a safe distance only so much of a United States court's jurisdiction as might secure . . .  a dismissal while carefully shielding [itself] from the possibility of a penal sanction.'"  <u>Hayes</u>, 118 F. Supp. 3d at 625–26 (brackets omitted) (quoting <u>Collazos v. United States</u>, 368 F.3d 190, 200 (2d Cir. 2004)); <u>see also</u> <u>Niemi v. Lasshofer</u>, 728 F.3d 1252, 1255 (10th Cir. 2013).

## IV. Conclusion & Order

For the reasons stated above, the Court denies Halkbank's application, dated November 19, 2019, to make a special appearance.

Dated:  December 5, 2019
        New York, New York

*Richard M. Berman*

**RICHARD M. BERMAN**
**U.S.D.J.**

27

A156

**Exhibit A**



**VIA EMAIL:** ██████ @usdoj.gov

November 5, 2019

██████
USDOJ/U.S. Atty. Office
1 Saint Andrews Plaza
New York, NY 10007

Dear ██████:

I am writing in regard to your October 23, 2019 shipment, under package tracking number 856351660142.

Thank you for bringing this matter to our attention. According to our records, this shipment was tendered to FedEx on Wednesday, October 23, for delivery by 8:00 p.m. on Friday, October 25, provided there were no Customs or otherwise unforeseen delays. Our records show that this shipment was addressed to: ATTN: LEGAL DEPT, TURKIYE HALK BANKASI A.S, BARBAROS MAH SEBBOY SOK, NO:4/1 KAT:21 BATI ATAZEHIR P., ISTANBUL, 34746, TR. Unfortunately, the recipient has refused delivery of this shipment.

On October 25, the recipient sent the following communication to FedEx in Turkey:



**Exhibit B**

**Halkbank's Authorities Do Not Support Its Application for a Special Appearance to Challenge Personal Jurisdiction Based Upon Minimum Contacts or to Move for Recusal, as follows:**

| Case | Distinguishing Factors |
|---|---|
| Ford v. United States, 273 U.S. 593 (1927) | • Foreign defendants (individuals) appealed from a judgment of conviction, alleging lack of personal jurisdiction because they were arrested through an "illegal seizure."  In 1927, the Supreme Court affirmed the convictions, concluding that the defendants "waive[d] the question of the jurisdiction of the persons of defendants" by failing to raise the issue through "a plea to the jurisdiction," which "must precede th[e] plea of not guilty." Id. at 606.  The Supreme Court also ruled that the lower court had personal jurisdiction "because [defendants] were actually in its custody." Id. at 606–07.<br>• Defendants challenged the court's jurisdiction after appearing.<br>• Defendants were individuals, not a corporation.<br>• No special appearance was sought.<br>• Federal Rule of Criminal Procedure 12 subsequently "abolish[ed] pleas to the jurisdiction." See Fed. R. Crim. P. 12, Advisory Committee's Note to 1944 Enactment.<br>• There was no motion to dismiss for lack of minimum contacts nor a recusal motion. |
| United States v. Beadon, 49 F.2d 164 (2d Cir. 1931) | • Defendant corporations appealed from a judgment of conviction, alleging lack of personal jurisdiction because "[t]he court erred in holding that defendant[-corporations] were in court and were bound to plead to the indictment." Id. at 166. The Second Circuit affirmed the convictions, finding that there was "no merit in the contention of the corporate defendants that they were not in court" because "the record showed that they had appeared by attorneys." Id.<br>• Defendants challenged the court's jurisdiction after appearing.<br>• No special appearance was sought.<br>• There was no motion to dismiss for lack of minimum contacts nor a recusal motion. |
| United States v. Kolon Ind., 926 F. Supp. 2d 794 (E.D. Va. 2013) | • Defendant foreign corporation sought to make a special appearance to dismiss indictment for lack of personal jurisdiction because the foreign corporation defendant did not have an address in the United States.  The district court entertained the application because the Government did not oppose it.  But, the district court denied the motion to dismiss, concluding that the Federal Rule of Criminal Procedure 4 mailing requirement was not "a necessary prerequisite to the exercise of jurisdiction over a foreign corporation."  "It is |

i

| | |
|---|---|
| | doubtful that Congress would stamp with approval a procedural rule permitting a foreign corporate defendant to intentionally violate the laws of this country thereby causing harm to its citizens, yet evade the jurisdiction of United States' courts by purposefully failing to establish an address here." Id. at 802.<br>• Special appearance was not opposed.<br>• Case is outside the Second Circuit.<br>• Pre-2016 amendment to Rule 4.<br>• Criticized by the Ninth Circuit in In re Pangang Grp. Co., because the court, "without explanation or critical examination, permitted [a] criminal defendant[] to enter [a] special appearance[] to raise threshold objections." 901 F.3d at 1057–58.<br>• There was no motion to dismiss for lack of minimum contacts nor a recusal motion. |
| United States v. Dotcom, No. 1:12-cr-00003, 2012 WL 4788433 (E.D. Va. Oct. 5, 2012) | • Defendant foreign corporation sought to make a special appearance to dismiss indictment for lack of personal jurisdiction because the foreign corporation defendant did not have an address in the United States. The district court entertained the application without explanation. But, the district court denied the motion to dismiss, concluding that "so long as the government could prove that an individual defendant is an alter ego of the corporate defendant, the government could satisfy Rule 4's mailing requirement by mailing a copy of the summons to one of the individual defendants" following extradition to the U.S. Id., at *2.<br>• The defendant foreign corporation also sought to make additional special appearances related to storage of the defendant's electronic data and the return of data stored on the defendant's servers. The district court allowed the defendant "to appear . . . for the purpose of [each] hearing . . . on a limited basis," without explaining its reasoning. Id., ECF No. 84, at 27; id., ECF No. 148, at 1.<br>• Case is outside the Second Circuit.<br>• Pre-2016 amendment to Rule 4.<br>• There was no motion to dismiss for lack of minimum contacts nor a recusal motion. |

ii

| United States v. Yousef, 327 F.3d 56 (2d Cir. 2003) | • Defendant (individual) appealed from judgment of conviction, alleging violation of the "doctrine of specialty" which "prohibits prosecution of a defendant for a crime other than the crime for which he has been extradited." Id. at 115. The Second Circuit affirmed the conviction, concluding that the defendant "forfeited any argument on the doctrine of specialty when he failed to assert it in his initial appellate brief." Id. at 115–16.<br>• Defendant challenged the court's jurisdiction after appearing.<br>• Defendant was an individual, not a corporation.<br>• No special appearance was sought.<br>• There was no motion to dismiss for lack of minimum contacts nor a recusal motion. |
|---|---|
| United States v. Noriega, 683 F. Supp. 1373 (S.D. Fla. 1988) and 746 F. Supp. 1506 (S.D. Fla. 1990) | • Defendant (General Manuel Antonio Noriega, the de facto head of state of Panama) sought to make a special appearance to dismiss indictment, alleging improper extraterritorial application of U.S. law and asserting sovereign immunity. The district court entertained the special appearance. See 683 F. Supp. at 1374. But, the district court denied the motion to dismiss, concluding that "[j]urisiction over Defendant's extraterritorial conduct [was] appropriate both as a matter of international law and statutory construction," and the defendant was not entitled to immunity. 746 F. Supp at 1519–26.<br>• The district court granted the request for a special appearance because the indictment of "the *de facto* head of a foreign government" was "surrounded with special circumstances." 683 F. Supp. at 1374. It was "not stating that as a matter of law any fugitive criminal defendant may contest the validity of his indictment. The precedential value of such a discretionary ruling will, necessarily, be minimal." Id.<br>• Defendant was an individual, not a corporation.<br>• Case is outside the Second Circuit.<br>• The district court's reasoning for granting a special appearance was rejected by its Circuit Court of Appeals in United States v. Shalhoub, 855 F.3d 1255, 1265 (11th Cir. 2017) (if the defendant "wants to challenge the indictment, he need only submit himself to the jurisdiction of the district court").<br>• There was no motion to dismiss for lack of minimum contacts nor a recusal motion. |
| United States v. Siriwan, No. 2:09-cr-00081, 2011 WL 13057709 (C.D. Cal. July 28, 2011) | • Defendants (individuals) sought to make a special appearance to dismiss indictment, alleging improper extraterritorial application of U.S. law and the Government's failure to state an offense. The district court entertained the application for a special appearance—which was unopposed—without explanation. But, the district court never ruled on the motion to dismiss, and the Government eventually dismissed the |

iii

| | indictment after the defendants were convicted in their home country. |
| | • Defendants were individuals, not a corporation. |
| | • Special appearance was not opposed. |
| | • Case is outside the Second Circuit. |
| | • Unique circumstances: defendants were indicted and convicted in their home country. |
| | • There was no motion to dismiss for lack of minimum contacts nor a recusal motion. |
| In re Hijazi, 589 F.3d 401 (7th Cir. 2009) | • Defendant (individual) sought to dismiss indictment, alleging improper extraterritorial application of U.S. law, lack of subject-matter jurisdiction, and violations of the Sixth Amendment and the Speedy Trial Act.  The district court refused to consider the motion to dismiss until the defendant appeared and was arraigned.  Instead of appearing for arraignment, the defendant sought a writ of mandamus from the Seventh Circuit directing the district court to consider his motion to dismiss.  The Seventh Circuit directed the district court to decide the motion to dismiss, reasoning that because the defendant "is under no obligation to travel to the United States, and as long as he does not enter the country, he cannot forcibly be brought before the Central District of Illinois for his arraignment . . . resolution of Hijazi's claims—and for that matter, resolution of the government's right to proceed with this case—will not be forthcoming through the usual procedures." 589 F.3d at 407. |
| | • Defendant was an individual, not a corporation. |
| | • No special appearance was sought. |
| | • Case is outside the Second Circuit. |
| | • The ruling was subsequently limited by the Seventh Circuit. See In re Kashamu, 769 F.3d 490, 494 (7th Cir. 2014) (where the Seventh Circuit refused to direct the district court to rule on a fugitive's motion to dismiss the indictment for lack of personal jurisdiction and violation of the Speedy Trial Clause of Sixth Amendment, concluding that "[i]f he wants to fight the charges, he has only to fly from Lagos to Chicago; there are loads of reasonably priced flights"). |
| | • The determination to allow a fugitive to file a motion to dismiss without appearing has also been rejected by two other Circuit courts.  In United States v. Martirossian, 917 F.3d 883 (6th Cir. 2019), the Sixth Circuit held that the fugitive defendant "ha[d] a readily available means of obtaining a ruling on his motion to dismiss the indictment."  He could "show up in the Southern District of Ohio, and the court as promised [would] decide his motion."  Id. at 889.  In United States v. Shalhoub, 855 F.3d 1255 (11th Cir. 2017), the Eleventh Circuit similarly concluded: |

| | |
|---|---|
| | "[n]otwithstanding what the Seventh Circuit has stated on this issue [in <u>Hijazi</u>] . . . we submit that Shalhoub has an adequate remedy: appearance in the district court." <u>Id.</u> at 1265.<br>• There was no motion to dismiss for lack of minimum contacts nor a recusal motion. |
| <u>United States v. Tucor Int'l. Inc.</u>, 35 F. Supp. 2d 1172 (N.D. Cal. 1998) | • Defendant corporation sought to make a special appearance to dismiss indictment, asserting immunity under the Shipping Act of 1984, 46 U.S.C. § 40307.  The district court entertained the application without explanation and granted the motion to dismiss, concluding that "the indictment allege[d] conduct for which defendants are immune from criminal liability."  <u>Id.</u> at 1185.<br>• Case is outside the Second Circuit.<br>• Criticized by the Ninth Circuit in <u>In re Pangang Grp. Co.</u>, because the court, "without explanation or critical examination, permitted [a] criminal defendant[] to enter [a] special appearance[] to raise threshold objections."  901 F.3d at 1057–58.<br>• There was no motion to dismiss for lack of minimum contacts nor a recusal motion. |
| <u>United States v. Sinovel Wind Grp. Co.</u>, No. 3:13-cr-00084 (W.D. Wis. Oct. 20, 2017), ECF No. 348 | • Defendant foreign corporation sought to make a special appearance to quash service of indictment, alleging that service of process on counsel for the defendant was insufficient.  The district court entertained the application for a special appearance—which was unopposed—without explanation.  But, the district court denied the motion to quash, concluding that "sending the summons to Sinovel's counsel and filing it on ECF provided the actual notice to Sinovel," and "that nothing more is required under Rule 4(c)(3)(D)."  <u>Id.</u> at 18.<br>• Special appearance was not opposed.<br>• Case is outside the Second Circuit.<br>• Criticized by the Ninth Circuit in <u>In re Pangang Grp. Co.</u>, because the court, "without explanation or critical examination, permitted [a] criminal defendant[] to enter [a] special appearance[] to raise threshold objections."  901 F.3d at 1057–58.<br>• There was no motion to dismiss for lack of minimum contacts nor a recusal motion. |
| <u>United States v. Pangang Grp. Co.</u>, 2017 WL 3034063 (N.D. Cal. July 18, 2017) | • Defendant foreign corporation sought to make a special appearance to quash service of indictment, alleging that service on counsel for the defendant was insufficient.  The district court entertained the application for a special appearance—which was unopposed—without explanation.  But, the district court denied the motion to quash, concluding that "the Government served the [foreign corporate] defendants using a 'means that gives notice,'" as required by Rule 4.  <u>Id.</u> at *3. |

| | |
|---|---|
| | • Special appearance was not opposed.<br>• Case is outside the Second Circuit.<br>• Special appearance was rejected by the Ninth Circuit in <u>In re Pangang Grp. Co.</u>, 901 F.3d 1046, 1057 (9th Cir. 2018) (finding no "evidence of a longstanding historical practice of allowing special appearances in criminal cases").<br>• There was no motion to dismiss for lack of minimum contacts nor a recusal motion. |
| <u>United States v. Alfred L. Wolff GmbH</u>, No. 1:08-cr-00417, 2011 WL 4471383 (N.D. Ill. Sept. 26, 2011) | • Defendant foreign corporation sought to make a special appearance to quash service of indictment because foreign corporation defendant did not have an address in the United States.  The district court entertained the application without explanation and granted the motion to quash because, "given the facts before the Court, the government ha[d] not met its heavy burden under a veil piercing analysis" to show that the domestic subsidiaries were alter egos of the foreign corporate defendant.  <u>Id.</u> at *4.<br>• The foreign corporate defendants later ceased operations and "sold" their assets to other corporations, and the Government dismissed the indictments against them.<br>• Case is outside the Second Circuit.<br>• Pre-2016 amendment to Rule 4.<br>• There was no motion to dismiss for lack of minimum contacts nor a recusal motion. |
| <u>United States v. Johnson Matthey Plc.</u>, 2:06-cr-00169, 2007 WL 634269 (D. Utah Feb. 26, 2007) and 2007 WL 2254676 (D. Utah Aug. 2, 2007) | • Defendant foreign corporation entered a special appearance on the docket without requesting permission in advance.  Defendant sought to quash service of indictment because it did not have an address in the United States.  The district court granted the motion to quash, concluding that "service upon the subsidiary is not sufficient service on the parent company." 2007 WL 2254676, at * 2.<br>• Special appearance was not opposed.<br>• Case is outside the Second Circuit.<br>• Pre-2016 amendment to Rule 4.<br>• There was no motion to dismiss for lack of minimum contacts nor a recusal motion. |
| <u>United States v. Pub. Warehousing Co.</u>, No. 1:09-cr-00490 (N.D. Ga. Nov. 19, 2009), ECF No. 165 | • Defendant foreign corporation entered a special appearance on the docket without requesting permission in advance.  Defendant sought to quash service of indictment because foreign corporation defendant did not have an address in the United States.  The district court denied the motion to quash, concluding that "enough evidence ha[d] been presented to indicate that Agility Holdings[, a domestic subsidiary,] was the alter ego or conduit of PWC," the foreign corporate defendant.  <u>Id.</u> at 18. |

vi

| | |
|---|---|
| | • Special appearance was not opposed.<br>• Case is outside the Second Circuit.<br>• Pre-2016 amendment to Rule 4.<br>• There was no motion to dismiss for lack of minimum contacts nor a recusal motion. |
| United States v. Swank Corp., 797 F. Supp. 497 (E.D. Va. 1992) | • Defendant (individual) sought to make a special appearance to modify a restraining order to release assets so the defendant could fund his legal defense. The district court entertained the special appearance without explanation. But, the district court substantially denied the request to modify because "[a]ssets that have been targeted and restrained as potentially forfeitable cannot be used to pay legal fees." Id. at 504.<br>• Defendant was an individual, not a corporation.<br>• Case is outside the Second Circuit.<br>• There was no motion to dismiss for lack of minimum contacts nor a recusal motion. |
| United States v. Rafiekian, No. 1:18-cr-457 (E.D. Va. Sept. 24, 2019), ECF. No. 213 | • Defendant (individual) sought to make a special appearance to oppose Government's request for application of the crime-fraud exception. The Government opposed the request for a special appearance because the defendant "has chosen to remain a fugitive and [] forfeit[ed] this opportunity." The district court allowed the defendant "to appear solely for the purposes of the government's motion on the crime-fraud exemption," but did not explain its reasoning. Id. at 3.<br>• Defendant was an individual, not a corporation.<br>• Case is outside the Second Circuit.<br>• There was no motion to dismiss for lack of minimum contacts nor a recusal motion. |
| United States v. Mitchell, 377 F. Supp. 1326 (D.D.C. 1974) | • Former President Richard M. Nixon sought to make a special appearance to quash a subpoena, arguing, among other things, that "court[s] are without authority to rule on the scope or applicability of executive privilege when asserted by the President." Id. at 1329. The district court entertained the application for a special appearance—which was unopposed—without explanation. But, the district court denied Nixon's motion to quash, concluding that the President's contention that the court does not have jurisdiction "is without legal force in this Circuit." Id. The Supreme Court affirmed.<br>• Defendant was an individual, not a corporation.<br>• Special appearance was not opposed.<br>• Case is outside the Second Circuit.<br>• Unique circumstance: the movant was President Richard M. Nixon who sought to quash subpoena seeking production of the Watergate tapes which the special prosecutor sought to use in |

A164

| | |
|---|---|
| | the criminal trial of John Mitchell, the former U.S. Attorney General.<br>• There was no motion to dismiss for lack of minimum contacts nor a recusal motion. |
| <u>United States v. Stein</u>, 435 F. Supp. 2d 330 (S.D.N.Y. 2006) | • Defendant-employees (individuals) sought an order requiring their employer to advance legal defense fees for their criminal prosecution.  The employer objected on the ground that the district court did not have personal jurisdiction over the employer as a non-party to the criminal proceedings.  The district court stated that it "is arguable that [the employer's] actions before the Court constituted a general appearance," because the employer "has long been well aware of these proceedings" and "attended the hearing and submitted papers." <u>Id.</u> at 378.  The district court directed the defendant-employees to file a civil suit against the employer to secure their legal defense fees.  It did not adjudicate the motion in the criminal proceeding.<br>• No special appearance was sought.<br>• The employer was not a defendant in the criminal action.<br>• There was no motion to dismiss for lack of minimum contacts nor a recusal motion. |
| <u>Schleifer v. Lexus of Manhattan</u>, 2019 WL 4640055 (S.D.N.Y. 2019) | • Defendant corporation sought to dismiss complaint for lack of personal jurisdiction, alleging that the defendant corporation had been dissolved.  In fact, another corporation with a very similar name had been formed to take over the operations of the dissolved entity.  The district court denied the motion to dismiss, concluding that the use of "an incorrect variation on a name in a summons and complaint is merely a technical defect" and "is not grounds to dismiss Plaintiff's claims." <u>Id.</u> at *2.<br>• Defendant challenged the court's jurisdiction after appearing.<br>• No special appearance was sought.<br>• Civil case, not a criminal prosecution.<br>• There was no motion to dismiss for lack of minimum contacts nor a recusal motion. |

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 12/9/19

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA　　　　　　:　　**ORDER**

　　　- v. -　　　　　　　　　　　　　　:　　S6 15 Cr. 867 (RMB)

TÜRKİYE HALK BANKASI A.S.,　　　　　:
　　a/k/a "Halkbank,"
　　　　　　　　　　　　　　　　　　:

　　　　　　Defendant.　　　　　　　:

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

WHEREAS a federal grand jury sitting in the Southern District of New York returned a superseding indictment against TÜRKİYE HALK BANKASI A.S., a/k/a "Halkbank" (referred to herein as "Halkbank"), which was filed on October 15, 2019 (the "Indictment");

WHEREAS the Court issued a summons to Halkbank to appear before the Court for an arraignment on October 22, 2019, at 9:15 a.m. (the "First Summons");

WHEREAS the law firm of King & Spalding LLP ("King & Spalding") submitted a letter to the Court dated October 18, 2019, in which King & Spalding indicated that it had received the summons on October 16, 2019, and wrote that "[a]lthough King & Spalding has represented Halkbank in connection with the Department of Justice's prior investigation regarding Halkbank, at no point has King & Spalding been authorized to accept service of a summons or other legal process on behalf of Halkbank" and "are not authorized to make an appearance in this case;"

WHEREAS the Court held a conference in this matter on October 22, 2019 (the "First Conference"), at which Halkbank did not appear, through counsel or otherwise;

WHEREAS, the Court issued an order dated October 23, 2019 (the "Order"), finding that the Government has properly served the First Summons and the Indictment on

A166

Halkbank and that Halkbank has willfully and knowingly disobeyed the Court's order in the First Summons to appear at the First Conference;

WHEREAS, on October 23, 2019, the Court issued a summons (the "Second Summons") directing Halkbank to appear for an arraignment on November 5, 2019;

WHEREAS, the Government served the Second Summons and Indictment on Halkbank by electronic delivery to Halkbank, King & Spalding, and a representative of the Turkish Ministry of Treasury and Finance; and attempted to deliver the Second Summons and Indictment by commercial carrier to Halkbank's Legal Department at its principal place of business in Istanbul, Turkey but delivery was refused;

WHEREAS, King & Spalding delivered a letter to the Court dated November 4, 2019, requesting permission to make a special and limited appearance on behalf of Halkbank;

WHEREAS, Andrew Hruska, Esq., William Johnson, Esq., Richard Walker, Esq., and Jacob Gerber, Esq., attorneys with King & Spalding, attended the court appearance on November 5, 2019 (the "Second Conference"), denied that they were entering an appearance on behalf of Halkbank, and requested permission to make a special and limited appearance on behalf of Halkbank;

WHEREAS, the Court finds, based on the foregoing, that, pursuant to Federal Rule of Criminal Procedure 4(c)(3)(D)(ii), that the Second Summons and Indictment have been served on Halkbank and that Halkbank had actual knowledge of the Second Conference;

WHEREAS, that Halkbank's request for counsel to make a special and limited appearance was denied on December 5, 2019 (by Decision & Order, dated December 5, 2019, incorporated here by reference);

IT IS HEREBY ORDERED that a hearing will be held in this matter on

2

A167

February 10, 2020, at 10:00 a.m. at which Halkbank shall show cause why it should not be held in contempt of the First Summons and the Second Summons and contempt sanctions imposed;

IT IS FURTHER ORDERED that, should counsel of record enter an appearance on behalf of Halkbank prior to the date of the hearing, Halkbank shall be arraigned on the Indictment forthwith, i.e. as soon as practicable following such appearance;

IT IS FURTHER ORDERED that the Government shall submit briefing regarding a contempt finding and contempt sanctions on or before noon on January 3, 2020; Halkbank, if appearing through counsel of record, shall submit briefing regarding a contempt finding and contempt sanctions on or before noon on January 21, 2020; and the Government may submit a reply on or before 5:00 p.m. on January 23, 2020;

IT IS FURTHER ORDERED that the direct testimony of any witness(es) to be called at the hearing shall be submitted by affidavit (10 pages, double spaced) 10 days prior to the hearing. Cross examination and re-direct shall be "live";

IT IS FURTHER ORDERED that the Government will serve this Order on Halkbank forthwith following the issuance of this Order by any means specified in the Federal Rules of Criminal Procedure, including the same way the first or second summons was served; and

IT IS FURTHER ORDERED that, the Government will serve this Order, the Second Summons, and the Indictment on Halkbank forthwith following of the issuance of this Order, by any means specified under Federal Rule of Criminal Procedure 4.

SO ORDERED:

_____
HONORABLE RICHARD M. BERMAN
UNITED STATES DISTRICT JUDGE

12/9/2019
_____
Date

3

A168