**Lockard, Michael (USANYS)**

| | |
|---|---|
| **From:** | Denton, David (USANYS) |
| **Sent:** | Wednesday, October 23, 2019 10:44 AM |
| **To:** | Hruska, Andrew |
| **Cc:** | Lockard, Michael (USANYS); Kamaraju, Sidhardha (USANYS); Denton, David (USANYS); Rebold, Jonathan (USANYS); Fletcher, Kiersten (USANYS) 1 |
| **Subject:** | United States v. Turkiye Halk Bankasi, S6 15 Cr. 867 (RMB) -- Order and Summons |
| **Attachments:** | halkbank order oct 23 2019.pdf; Halkbank summons.pdf; JAM7ZARC.pdf; S6 15 Cr 867 (RMB) US v Halkbank indictment (filed).pdf |

Drew,

Attached please find an order of the Court and a second summons in a criminal case, directing your client, Turkiye Halk Bankasi A.S., a/k/a "Halkbank," to appear for an arraignment in this matter on November 5, 2019, at 11 a.m., in Courtroom 17B of the United States Courthouse, 500 Pearl Street, New York, NY.  We have also enclosed again a copy of the Indictment, the First Summons, and the transcript of the October 22, 2019 conference in this matter referenced in the Court's order.

For your awareness, pursuant to the Court's order, the Government is also transmitting the Order, the Indictment, and both summonses (1) by mail to Halkbank's registered business address at Barbaros Mah. Şebboy Sok., No:4/1 Kat: 21, Batı Ataşehir P.K.34746, Ataşehir – Istanbul, Turkey; (2) by email to halkbank.ir@halkbank.com.tr; (3) by email to Mr. Tahsin Yazar, Turkish Ministry of Treasury and Finance; (4) to Deutsche Bank, Halkbank's registered agent for its ADRs traded in the United States; and (5) via diplomatic channels through the Office of International Affairs of the Department of Justice.

If you'd like to discuss, let us know and we can set up another call.

Thanks,

David W. Denton, Jr.
Assistant U.S. Attorney
U.S. Attorney's Office
Southern District of New York
(212) 637-2744

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA                    :          **ORDER**

          - v. -                            :          S6 15 Cr. 867 (RMB)

TÜRKİYE HALK BANKASI A.S.,                   :
   a/k/a "Halkbank,"
                                            :
                         Defendant.
                                            :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _10/23/19_

      WHEREAS a federal grand jury sitting in the Southern District of New York

returned a superseding indictment against TÜRKİYE HALK BANKASI A.S., a/k/a "Halkbank"

(referred to herein as "Halkbank"), which was filed on October 15, 2019 (the "Indictment");

      WHEREAS the Court issued a summons to Halkbank to appear before the Court

for an arraignment on October 22, 2019, at 9:15 a.m. (the "First Summons");

      WHEREAS the law firm of King & Spalding LLP ("King & Spalding") submitted

a letter to the Court dated October 18, 2019, in which King & Spalding indicated that it had

received the summons on October 16, 2019, and wrote that "[a]lthough King & Spalding has

represented Halkbank in connection with the Department of Justice's prior investigation

regarding Halkbank, at no point has King & Spalding been authorized to accept service of a

summons or other legal process on behalf of Halkbank" and "are not authorized to make an

appearance in this case;"

      WHEREAS the Court held a conference in this matter on October 22, 2019 (the

"First Conference"), at which Halkbank did not appear, through counsel or otherwise;

      WHEREAS, at the First Conference and in its letter dated October 22, 2019, the

Government proffered to the Court, among other things, that:

1. On October 15, 2019, King & Spalding requested that the Department of Justice transmit a copy of the Indictment to King & Spalding, which the Government did that day;

2. On October 16, 2019, the Government sent a copy of the First Summons to King & Spalding and asked King & Spalding to confirm that it would accept service;

3. On October 16, 2019, Halkbank issued an Investor Relations disclosure acknowledging that Halkbank "has been informed that the U.S. Attorney's Office for the Southern District of New York, under the U.S. Department of Justice, has taken the decision to engage in due process to prosecute the Bank based on an indictment," denying the charges, and specifically referencing that Halkbank "retained the prestigious U.S. law firm King & Spalding" in connection with the investigation of those charges. (Attached hereto as Exhibit A.)

4. On October 17, 2019, at King & Spalding's request, the Government spoke with attorneys from King & Spalding. During that call, King & Spalding represented that it was discussing the summons with its client, Halkbank, but was not authorized to accept service or make an appearance on behalf of Halkbank, and that it would seek to adjourn the arraignment. King & Spalding also indicated that it could not state whether Halkbank would stipulate to any particular form of service.

5. According to publicly-reported statements, Halkbank's majority shareholder, the Government of Turkey, has openly acknowledged the filing of the Indictment, including, among others, the following:

2

a. On or about October 16, 2019, Turkish President Recep Tayyip Erdogan commented that "It had seemed like this issue was closed," and that "Now, by opening it again, southern New York prosecutors have unfortunately taken an unlawful, ugly step." (Attached hereto as Exhibit B.)

b. On or about October 17, 2019, President Erdogan raised the subject of the Indictment with Vice President Michael Pence during meetings in Turkey. (Attached hereto as Exhibit C.)

c. On or about October 20, 2019, Turkish Foreign Minister Mevlut Cavusoglu commented to the media that nothing would result from the instant case "if the law in the United States works." (Attached hereto as Exhibit D.)

WHEREAS the Court finds, based on the foregoing, that, pursuant to Federal Rule of Criminal Procedure 4(c)(3)(D)(ii), which permits service of a summons on an organization not within a judicial district of the United States "by any other means that gives notice," that the Government has properly served the First Summons and the Indictment on Halkbank, and

WHEREAS the Court finds that Halkbank has willfully and knowingly disobeyed the Court's order in the First Summons to appear at the First Conference,

IT IS HEREBY ORDERED that, to afford Halkbank an opportunity to cure its noncompliance with the First Summons, the Court is issuing a second summons (the "Second Summons") with this Order, directing Halkbank to appear for an arraignment in this matter on November 5, 2019 at 11:00 a.m. (the "Second Conference");

IT IS FURTHER ORDERED that, the Government will serve this Order, the

4

Second Summons, and the Indictment on Halkbank as soon as practicable after the issuance of

this Order, by means specified under Federal Rule of Criminal Procedure 4, including without

limitation the following:

1.  Delivery by mail, parcel service, or other common carrier to Halkbank's

    principal published business address;

2.  Electronic transmission to King & Spalding;

3.  Delivery to any registered agent of Halkbank in the United States.

IT IS FURTHER ORDERED that the Government's execution of any of these

forms of service will constitute (additional) effective service of a summons and this Order.

Should Halkbank fail for a second time to appear pursuant to the Second Summons, the Court

will consider any appropriate sanctions for knowing and willful noncompliance.


SO ORDERED:

_RMB_

_October 23, 2019_

HONORABLE RICHARD M. BERMAN
UNITED STATES DISTRICT JUDGE

Date


4

 **HALKBANK**

GENEL MÜDÜRLÜK
FİNANSAL MUHASEBE DAİRE BAŞKANLIĞI

### İÇSEL BİLGİLERE İLİŞKİN ÖZEL DURUM AÇIKLAMA FORMU

Ortaklığın Unvanı/Ortakların Adı  : Türkiye Halk Bankası A.Ş.
Adresi  : Barbaros Mah. Şebboy Sok. No:4/1 Ataşehir/İstanbul
Telefon ve Fax No  : 0216 503 70 70 - 0212 340 93 99
E-posta adresi  : halkbank.ir@halkbank.com.tr
Ortaklığın Yatırımcı/Pay Sahipleri ile
İlişkiler Biriminin Telefon-Faks No  : 0216 503 54 50 – 0212 340 09 90
Tarih  : 16.10.2019
Konu  : ABD Adalet Bakanlığı New York Güney Bölge Savcılığı'nın
Bankamız Hakkında Düzenlediği İddianame

Açıklanacak Özel Durumlar: ABD Adalet Bakanlığı'na bağlı New York Güney Bölge Başsavcılığı tarafından Hakan Atilla davasında ileri sürülen iddialarla bağlantılı olarak bir iddianame hazırlanarak Bankamız hakkında dava açılmak üzere yargı sürecinin başlatıldığını öğrenmiş bulunuyoruz. Bu çerçevede, müşterilerimizin, yatırımcıların ve kamuoyunun doğru bilgilendirilmesi amacıyla aşağıdaki açıklamaların yapılması gerekli görülmüştür.

Bahse konu iddianamenin; yeni bir bilgi ve bulguya yer verilmeksizin, çoğunlukla Hakan Atilla davasında ileri sürülen iddiaları tekrarladığı ve bu davada ortaya konan girişimlerin Bankamız üzerinden tekrarlanmaya çalışıldığı görülmektedir. Söz konusu iddialara ilişkin Bankamız masumiyetini ortaya koyan bağımsız inceleme sonuçlarının, kanıtları ile birlikte ABD Adalet Bakanlığı ile paylaşılmasına rağmen iddianame hazırlanarak dava açılması manidardır.

Müteaddit defalar kamuoyuna yapılan açıklamalarımızda; Hakan Atilla davasında ileri sürülen iddialar ile bağlantılı olarak ABD'li yetkili kurumların Bankamızdan bilgi ve belge talebinde bulunduğu, Bankamızın da anılan kurumlar ile yakın iletişim ve işbirliği içerisinde olduğu, söz konusu bilgi ve belge taleplerinden ayrı olarak Bankamızın gönüllü bir bağımsız inceleme süreci başlattığı ifade edilmiştir.

ABD'nin saygın ve büyük hukuk firmalarından King & Spalding ile adli bilirkişi niteliğindeki veri analizi firması Exiger'a Bankamız tarafından gönüllü olarak yaptırılan bağımsız incelemede 6 milyondan fazla belge, 8 milyonun üstünde SWIFT mesajı, yaklaşık 36 GB işlem verisi, 140 bin işlem dosyası incelenmiştir. Bir yıllık süre zarfında yaklaşık 30 avukatın 25 bin saatin üzerinde mesai yaptığı bağımsız inceleme sonucunda Bankamızın ABD'nin İran'a yönelik birincil ve ikincil yaptırımları ihlal etmediği, dış ticaret işlemlerinde şeffaf olmayan uygulama ve metotlar kullanmadığı ve herhangi bir tertip ve kumpasın içerisinde bulunmadığı belgelenmiştir. Söz konusu firmalar, bu bulguları ABD Adalet Bakanlığı ile ABD Hazine Bakanlığına bağlı Yabancı Varlıkları Kontrol Ofisine (OFAC) bildirmiştir.

Bununla birlikte;

(1) Bankamız ABD'nin ikincil yaptırımlarını herhangi bir şekilde ihlal etmemiş olmakla birlikte, Bankamızın ABD'de herhangi bir şubesi ve çalışanı bulunmadığından, ABD Adalet Bakanlığı'nın ikincil yaptırım kararları hakkında yargılama yetkisi yoktur. Buna rağmen

iddianame düzenlenmesi, tarihte bir ilk olmak üzere emsali görülmemiş bir hukuki yetki aşımıdır.

(2) İddianamede, Hakan Atilla davasında da olduğu gibi, hukuk dışı yollarla elde edilen ve doğruluğu ispatlanmamış deliller kullanılmış, inanılırlığı hayli şüpheli olan tanıkların mahkemedeki sözlü beyanlarına itibar edilmiştir.

(3) İddianamede ileri sürülen hususlar ile ilgili belge ve kanıtların önemli bir bölümü Halkbank tarafından kendilerine sunulduğu halde, Bankamızın masum olduğunu gösteren bu belge ve kanıtlar Savcılık tarafından yeterli düzeyde değerlendirmeye alınmamıştır. Ayrıca, müteaddit defalar tarafımızca talep edilmesine rağmen konu ile ilgili önemli tanıkların bilgisine de başvurulmamıştır.

(4) Hakan Atilla davasına ait temyiz süreci devam etmekte olup, bu sürecin sonuçlanması beklenmeksizin dava süreci başlatılmıştır.

(5) Bankamız ile ABD Adalet Bakanlığı arasında meselenin iddianame düzenlenmeden çözümlenmesi için yapılan görüşmeler sonuçlanmadığı halde, söz konusu suçlamalar, Kahraman Ordumuzun sınırlarımızın güvenliğini sağlamak ve bölgede barışı tesis etmek üzere başlattığı "Barış Pınarı Harekatı" sebebiyle, ABD hükümetince Ülkemize karşı başlatılan yaptırımların bir parçası olarak ortaya atılmıştır.

Bu haksız dava ile ilgili olarak uluslararası hukuktan kaynaklanan tüm yasal haklarımız kullanılacaktır. Ayrıca, dava süreci boyunca gerek yurtiçinde gerekse yurtdışında, Bankamızın güven ve itibarı ile finansal bünyesine zarar verecek nitelikte hareket edenler hakkında Bankacılık Kanunu ile uluslararası hukuktan kaynaklanan gerekli yasal süreçler başlatılarak maddi ve manevi tazminat haklarımız aranacaktır.

Bankamız, sermayesinin %51'i kamuya ait bir Banka olarak, kurumsal sorumluluklarının bilincinde bankacılık faaliyetlerini sürdürmekte olup, her türlü finansal yükümlülüğünü yerine getirecek güç ve kararlılıktadır. Bankamız, geçmiş dönemlerde karşılaştığı bütün güçlükleri nasıl aşıp, ülke kalkınmasına destek vermeye devam ettiyse, bundan böyle de aynı ruh ve inançla çalışmalarına devam edecektir. Müşterilerimizin de her zaman olduğu gibi, Bankamıza olan güvenini sürdüreceklerine ve Ülkemizin kalkınması ve gelişmesi için yürütmekte olduğumuz çalışmalara aynı inanç ve kararlılıkla destek olacaklarına inancımız tamdır.

Ülkemiz ekonomisine 81 yıldır hizmet sunan Bankamızın, faaliyetlerini geçmişte olduğu gibi bugün ve gelecekte de tüm ulusal ve uluslararası düzenlemelere uygun, güçlü, güvenilir ve kesintisiz bir şekilde sürdüreceğini kamuoyunun bilgisine sunarız.

Açıklamanın İngilizce versiyonuna aşağıda yer verilmektedir./ English version of the disclosure is stated below.

This Bank has been informed that the U.S. Attorney's Office for the Southern District of New York, under the U.S. Department of Justice, has taken the decision to engage in due process to prosecute the Bank based on an indictment related to the allegations made during the Atilla trial. The Bank has thus found it necessary to make the following explanations to furnish all clients, investors and general public with accurate information.

Absent any new findings, the indictment appears largely to repeat allegations used during the Atilla trial, retrying the same attacks against the Bank. It is rather significant that the U.S. Department of Justice's decision to indict comes despite the independent investigation findings demonstrating the Bank's innocence, which the Department received along with underlying evidence.

Per our past disclosures on numerous occasions, certain U.S. authorities have been asking Halkbank for records and information pertaining to allegations made during the Atilla trial, which led the

Bank to closely cooperate with these authorities and also initiate an independent investigation of its own on a voluntary basis.

The Bank had voluntarily retained the prestigious U.S. law firm King & Spalding, which then retained the forensic analysis firm Exiger, to conduct this independent internal investigation which encompassed 6+ million documents, 8+ million SWIFT messages, almost 36GB of transactional data and 140,000 underlying documents for review. Almost 30 lawyers put in around 25,000 hours over one year, and the review found that the Bank did not violate primary or secondary U.S. sanctions against Iran, and it did not employ non-transparent practices or methods in foreign trade transactions, nor was it involved in any scheme or conspiracy. These findings were reported by the two firms to the U.S. Department of Justice and the U.S. Department of Treasury's Office of Foreign Assets Control.

As such:

(1) The Bank was not engaged in any secondary U.S. sanctions violations. Furthermore, since the bank does not have any branches or employees based in the USA, it falls outside the Department of Justice's jurisdiction. Therefore the decision to indict is an unprecedented legal overreach.
(2) The indictment is based on illegally obtained, unauthenticated evidence previously presented in the Atilla case, and it relies heavily on unreliable testimony from witnesses who lack the necessary credibility.
(3) The U.S. Attorney's Office has failed to adequately consider the information Halkbank provided that Office which included a substantial amount of highly relevant evidence pertaining to the allegations, which demonstrates the Bank's innocence, and it has further refused to interview key witnesses as proposed on multiple occasions by the Bank.
(4) Hakan Atilla's appeal is still underway, and these charges have been filed before that appeal could come to a conclusion.
(5) Despite the fact that the Bank's ongoing discussions with the U.S. Department of Justice to resolve this matter without indictment has not yet come to a conclusion, these were filed as part of the sanctions introduced against our country by the U.S. government in response to Operation Peace Spring, heroically launched by the Turkish Army to secure our borders and establish peace in the region.

The Bank will exert all legitimate rights against this unwarranted case under international law. We will most certainly avail ourselves of our rights to both pecuniary and nonpecuniary damages granted by the Banking Law and relevant international regulations against all those who, in an attempt to discredit the Bank and damage its financial composition, try to abuse the situation during the course of this case.

With 51% state-owned capital, Halkbank is highly aware of its corporate responsibility and carries out all banking operations accordingly, capable and determined to fulfill all financial liabilities. The Bank will carry on with the same spirit and conviction which always helped us overcome the past challenges and contribute to national development. We are fully convinced that our clients will continue to stand by us, never wavering in their commitment to support our efforts for the growth and improvement of this country.

We would like to reaffirm our commitment to perform banking operations in a firm, reliable, unwavering fashion and in full compliance to national and international regulations, honoring our 81 years of history in the service of the Turkish economy.

In case of any contradiction between the Turkish and English versions of this public disclosure, the Turkish version shall prevail.

Yukarıdaki açıklamalarımızın, Sermaye Piyasası Kurulu'nun yürürlükteki Özel Durumlar Tebliğinde yer alan esaslara uygun olduğunu, bu konuda/konularda tarafımıza ulaşan bilgileri tam olarak yansıttığını, bilgilerin defter, kayıt ve belgelerimize uygun olduğunu, konuyla ilgili bilgileri tam ve doğru olarak elde etmek için gerekli tüm çabaları gösterdiğimizi ve yapılan bu açıklamalardan sorumlu olduğumuzu beyan ederiz.

Saygılarımızla,

TÜRKİYE HALK BANKASI A.Ş.
GENEL MÜDÜRLÜĞÜ

10/22/2019

Erdogan attacks 'ugly' US decision on Turkey's Halkbank | Financial Times

EXHIBIT B

**Turkish politics**

## Erdogan attacks 'ugly' US decision on Turkey's Halkbank

Tensions run high ahead of US vice-president Mike Pence's visit to Ankara



Recep Tayyip Erdogan addressing Turkey's parliament in Ankara on Wednesday © AP

Laura Pitel in Ankara OCTOBER 16 2019

Turkey's president Recep Tayyip Erdogan has attacked an "ugly" decision by US prosecutors to file criminal charges against a Turkish state-owned bank as he warned that he would not be cowed by threats over his contentious incursion into Syria.

Speaking ahead of the arrival of Mike Pence, the US vice-president, in Ankara for talks aimed at halting the military operation, Mr Erdogan questioned the timing of the announcement by New York prosecutors that Halkbank would face six counts of bank fraud and conspiracy to evade US sanctions. "It had seemed like this issue was closed," he told reporters. "Now, by opening it again, southern New York prosecutors have unfortunately taken an unlawful, ugly step."

Mr Pence's visit, due to begin on Thursday, comes amid mounting tensions between the two countries over the Turkish decision to launch an offensive against Kurdish militias in north-east Syria. Ankara views the group's terrorists but Washington sees them as key allies in the battle against Isis jihadis in the region.

Donald Trump, the US president, appeared to give the green light for the operation when he announced last week that he would pull US troops in the region out of harm's way. But, facing a harsh backlash at home and abroad, he has sought to limit the Turkish offensive.

On Monday, as the US imposed sanctions on Turkey, Mr Trump warned that he would "aggressively use economic sanctions to target those who enable, facilitate and finance . . . heinous acts in Syria".

Although the measures were milder than many had expected, Mr Trump said he was "fully prepared to swiftly destroy Turkey's economy" if the country's leaders continued on their "dangerous and destructive path" in Syria.

The Southern District of New York, which announced the prosecution against Halkbank, one of Turkey's biggest lenders, is known for its independence. But the timing of the charges against it will be viewed with deep suspicion in Ankara.

Halkbank said in a statement that the charges were filed as part of the Trump administration's sanctions package in response to Turkey's military incursion, which the bank said had been "heroically launched by the Turkish Army to secure our borders and establish peace in the region".

Members of Mr Pence's delegation — which includes Mike Pompeo, secretary of state, and Robert O'Brien, the new White House national security adviser — will use meetings with their Turkish counterparts to push for an agreement to halt the Turkish offensive, his office said before the visit.

But Mr Erdogan warned ahead of the meeting that he had no interest in negotiating with Kurdish "terrorists", adding that Turkey was "not looking for mediation for that".

In a speech to the Turkish parliament, he vowed that Turkey would push on with his goal to clear Kurdish forces from a 32km deep and 480km stretch of land that runs from the town of Manbij, west of the Euphrates river, to the Iraqi border.

He called on Kurdish militias to "lay down their arms, leave their equipment, destroy the traps they have created and leave the safe zone we as designated, as of tonight". He added: "If this is done, our Operation Peace Spring will end by itself."

He warned that economic threats against Turkey would not succeed, invoking the story of the Ottoman triumph against Allied powers at the battle of Gallipoli. "We are the grandchildren of those at Canakkale [Gallipoli] who were so poor that they shared one cup of soup. We are the grandchildren of those who wrote that legend."

Copyright The Financial Times Limited 2019. All rights reserved.

EXHIBIT C

CNN World   Africa   Americas   Asia   Australia   China   Europe   **Middle East**   India   UK         LIVE TV   Edition ∨   🔍   ☰

### What you need to know

- **The latest:** Vice President Mike Pence said Turkey has agreed to a ceasefire in Syria.

- **The terms:** The Syrian Kurds/Syrian Democratic Forces (SDF) must dismantle their defensive fortifications and pull troops from the border to appease Turkey.

- **What this means for the US:** Pence said today the US will "continue to engage" in Syria, but "not militarily."



2:13 p.m. ET, October 17, 2019

## Pence says Turkey raised Halkbank indictment after negotiations concluded

From CNN's Sarah Westwood

Vice President Mike Pence said the topic of Halkbank, the state-owned Turkish bank that was indicted Tuesday, came up during ceasefire talks with Turkish President Recep Tayyip Erdogan.



**"When we concluded the negotiations, the topic was raised," Pence said during a news conference in Ankara, Turkey. "We informed them that this was a matter for the Southern District of New York."**

CNN reported this week that Erdogan had previously urged President Trump in a phone call to drop a potential DOJ indictment into the state-owned Turkish bank Halkbank. Trump told Erdogan he would have his people look into it.

The US indicted Halkbank on Tuesday on charges related to evading sanctions on Iran.

2:30 p.m. ET, October 17, 2019

## Pence: The US will "continue to engage" in Syria, but "not militarily"

From CNN's Nikki Carvajal, Sarah Westwood and Matthew Hoye

EXHIBIT D

 **REUTERS**

BUSINESS NEWS

OCTOBER 20, 2019 / 4:40 AM

# Turkey says nothing will come of Halkbank case if law in U.S. works

ANKARA (Reuters) - Nothing will come of a case against Turkey's state-owned lender Halkbank "if the law in the United States works", Turkish Foreign Minister Mevlut Cavusoglu said on Sunday, adding that the case was politically motivated.

U.S. prosecutors on Tuesday charged Halkbank with taking part in a multi-billion-dollar scheme to evade U.S. sanctions on Iran.

Halkbank said the U.S. charges against it amounted to an escalation of Washington's sanctions on Ankara over its military incursion in Syria, while President Tayyip Erdogan called them an "unlawful, ugly" step.

Reporting by Tuvan Gumrukcu; Editing by Dale Hudson
*Our Standards:The Thomson Reuters Trust Principles.*

https://www.reuters.com/article/us-usa-turkey-halkbank/turkey-says-nothing-will-come-of-halkbank-case-if-law-in-u-s-works-idUSKBN1WZ072

AO 83 (Rev. 06/09) Summons in a Criminal Case

# UNITED STATES DISTRICT COURT
### for the
Southern District of New York

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| Türkiye Halk Bankasi, A.Ş.,<br>a/k/a "Halkbank" | ) | Case No.   S6 15 Cr. 867 (RMB) |
| | ) | |
| _____ | ) | |
| Defendant | ) | |

## SUMMONS IN A CRIMINAL CASE

**YOU ARE SUMMONED** to appear before the United States district court at the time, date, and place set forth below to answer to one or more offenses or violations based on the following document filed with the court:

☐ Indictment     ☑ Superseding Indictment     ☐ Information     ☐ Superseding Information     ☐ Complaint
☐ Probation Violation Petition     ☐ Supervised Release Violation Petition     ☐ Violation Notice     ☐ Order of Court

| Place: | Daniel Patrick Moynihan U.S. Courthouse<br>500 Pearl Street<br>New York, New York 10007 | Courtroom No.:   17B |
|---|---|---|
| | | Date and Time: November 5, 2019<br>at 11 A.M. |

This offense is briefly described as follows:

(1) conspiring to obstruct the U.S. Department of the Treasury's administration of U.S. economic sanctions against the Islamic Republic of Iran, in violation of 18 U.S.C. § 371;
(2) conspiring to violate the International Emergency Economic Powers Act , in violation of 50 U.S.C. § I705(c);
(3) bank fraud, in violation of 18 U.S.C. § 1344;
(4) conspiring to commit bank fraud, in violation of 18 U.S.C. § 1349;
(5) money laundering, in violation of 18 U.S.C. § 1956(a)(2)(A); and
(6) conspiring to commit money laundering, in violation of 18 U.S.C. § 1956(h)

Date:   October 23, 2019

_____
*Issuing officer's signature*

Richard M. Berman, United States District Judge
*Printed name and title*

I declare under penalty of perjury that I have:

☐ Executed and returned this summons          ☐ Returned this summons unexecuted

Date:   _____          _____
*Server's signature*

_____
*Printed name and title*

AO 83 (Rev. 06/09) Summons in a Criminal Case (Page 2)

Case No.  S6 15 Cr. 867 (RMB)

**This second page contains personal identifiers and therefore should
not be filed in court with the summons unless under seal.**
*(Not for Public Disclosure)*

### INFORMATION FOR SERVICE

Name of defendant/offender:    Türkiye Halk Bankasi, A.Ş., a/k/a "Halkbank"

Last known residence: _____

_____

Usual place of abode *(if different from residence address):* _____

_____

If the defendant is an organization, name(s) and address(es) of officer(s) or agent(s) legally authorized to receive service of

process: _____

_____

If the defendant is an organization, last known address within the district or principal place of business elsewhere in the

United States: _____

_____

### PROOF OF SERVICE

This summons was received by me on *(date)* _____ .

□ I personally served the summons on this defendant _____ at

*(place)* _____ on *(date)* _____ ; or

□ On *(date)* _____ I left the summons at the individual's residence or usual place of abode

with *(name)* _____ , a person of suitable age and discretion who resides

there, and I mailed a copy to the individual's last known address; or

□ I delivered a copy of the summons to *(name of individual)* _____ ,

who is authorized to receive service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ and I mailed a copy to

the organizations's last known address within the district or to its principal place of business elsewhere in the

United States; or

□ The summons was returned unexecuted because: _____

_____ .

I declare under penalty of perjury that this information is true.


Date returned: _____      _____

*Server's signature*

_____

*Printed name and title*


Remarks:

AO 83 (Rev. 06/09) Summons in a Criminal Case

# UNITED STATES DISTRICT COURT
for the
Southern District of New York

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| Türkiye Halk Bankasi, A.Ş., | ) | Case No.   S6 15 Cr. 867 (RMB) |
| a/k/a "Halkbank" | ) | |
| | ) | |
| *Defendant* | ) | |

## SUMMONS IN A CRIMINAL CASE

**YOU ARE SUMMONED** to appear before the United States district court at the time, date, and place set forth below to answer to one or more offenses or violations based on the following document filed with the court:

☐ Indictment   ☑ Superseding Indictment   ☐ Information   ☐ Superseding Information   ☐ Complaint
☐ Probation Violation Petition   ☐ Supervised Release Violation Petition   ☐ Violation Notice   ☐ Order of Court

| | |
|---|---|
| Place: Daniel Patrick Moynihan U.S. Courthouse 500 Pearl Street New York, New York 10007 | Courtroom No.:   17B |
| | Date and Time: 10/22/19 @ 9:15 am |

This offense is briefly described as follows:

(1) conspiring to obstruct the U.S. Department of the Treasury's administration of U.S. economic sanctions against the Islamic Republic of Iran, in violation of 18 U.S.C. § 371;
(2) conspiring to violate the International Emergency Economic Powers Act , in violation of 50 U.S.C. § I705(c);
(3) bank fraud, in violation of 18 U.S.C. § 1344;
(4) conspiring to commit bank fraud, in violation of 18 U.S.C. § 1349;
(5) money laundering, in violation of 18 U.S.C. § 1956(a)(2)(A); and
(6) conspiring to commit money laundering, in violation of 18 U.S.C. § 1956(h)

Date:  10/15/19

*RMB*

*Issuing officer's signature*

Richard M. Berman, United States District Judge

*Printed name and title*

I declare under penalty of perjury that I have:

☐ Executed and returned this summons          ☐ Returned this summons unexecuted

Date: _____          _____

*Server's signature*

_____

*Printed name and title*

AO 83 (Rev. 06/09) Summons in a Criminal Case (Page 2)

Case No.  S6 15 Cr. 867 (RMB)

**This second page contains personal identifiers and therefore should
not be filed in court with the summons unless under seal.**
*(Not for Public Disclosure)*

### INFORMATION FOR SERVICE

Name of defendant/offender:   Türkiye Halk Bankasi, A.Ş., a/k/a "Halkbank"

Last known residence:

Usual place of abode *(if different from residence address):*

If the defendant is an organization, name(s) and address(es) of officer(s) or agent(s) legally authorized to receive service of process:   Andrew Hruska, Esq., King & Spalding LLP, 1185 Avenue of the Americas 34th Floor New York, NY 10036

If the defendant is an organization, last known address within the district or principal place of business elsewhere in the United States:

### PROOF OF SERVICE

This summons was received by me on *(date)* _____ .

❏ I personally served the summons on this defendant _____ at
*(place)* _____ on *(date)* _____ ; or

❏ On *(date)* _____ I left the summons at the individual's residence or usual place of abode
with *(name)* _____ , a person of suitable age and discretion who resides
there, and I mailed a copy to the individual's last known address; or

❏ I delivered a copy of the summons to *(name of individual)* _____ ,
who is authorized to receive service of process on behalf of *(name of organization)* _____
_____ on *(date)* _____ and I mailed a copy to
the organizations's last known address within the district or to its principal place of business elsewhere in the
United States; or

❏ The summons was returned unexecuted because: _____
_____ .

I declare under penalty of perjury that this information is true.

Date returned: _____

_____
*Server's signature*

_____
*Printed name and title*

Remarks:

JAM7ZARC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

           v.                           15 Cr. 867 (RMB)

REZA ZARRAB, et al.,

          Defendants.

------------------------------x

                              New York, N.Y.
                              October 22, 2019
                              9:15 a.m.

Before:

                  HON. RICHARD M. BERMAN
                            District Judge

                    APPEARANCES

GEOFFREY S. BERMAN
     United States Attorney for the
     Southern District of New York
BY:  MICHAEL LOCKARD
     SID KAMARAJU
     DAVID DENTON
     JONATHAN REBOLD
     KIERSTEN FLETCHER
     Assistant United States Attorneys

JAM7ZARC

1           (In open court)

2           THE COURT:  Please be seated.  I note from the press

3      this morning that Mr. Atilla has been appointed to head the

4      Istanbul Stock Exchange.  I'm just passing that along in case

5      you haven't seen it.

6           MR. LOCKARD:  That's known to be the case, your Honor,

7      yes.

8           THE COURT:  I suppose that's one way of integrating

9      back into society a person who has been convicted of a

10     financial wrongdoing.

11          But to the case at hand, I have received a copy from

12     the government of the letter from King & Spalding indicating

13     that -- well, I will read the first paragraph.  It says, "Dear

14     Judge Berman, I am a partner of King & Spalding and an attorney

15     admitted to practice in this district.  The U.S. attorney's

16     office has informed me that the Court has issued a summons in

17     this case" -- our case -- "for an initial appearance on October

18     22 at 9:15 a.m.  Neither I nor my firm are authorized to accept

19     service on behalf of Halk Bank and are not authorized to make

20     an appearance in this case."  And it's signed by Andrew Hruska.

21          Is that your understanding as well?

22          MR. LOCKARD:  Yes, your Honor, we also received a copy

23     of the letter Friday.

24          THE COURT:  I was somewhat -- I don't know if taken

25     aback is the correct expression -- but I was surprised somewhat

by the letter because it was my understanding that for over a
period of years -- or a year anyway -- that there were some
discussions on behalf of Halk Bank with respect to a potential
fine, I guess it would be, in connection with the Iran
sanctions evasion scheme, but more particularly I thought that
King & Spalding had been involved in those discussions.  Is
that fair, or is that accurate?

MR. LOCKARD:  Your Honor, it is accurate that King &
Spalding has represented Halk Bank with respect to the criminal
investigation of the bank since at least October of 2017, and
we think that King & Spalding's letter, along with additional
circumstances, shows that while Halk Bank has declined to
authorize King & Spalding to formally accept service, that
service has in fact been accomplished under Rule 4, and that
Halk Bank is actually aware of the summons, is aware of the
court appearance this morning, and has intentionally failed to
appear at the conference in violation of the summons.

THE COURT:  Before we get to what next, I suppose it
wouldn't hurt to send a set of the papers by FedEx or some
other form to Halk Bank.  Does Halk Bank have a branch or a arm
here in New York?

MR. LOCKARD:  Halk Bank does not have any employees or
offices in the United States.  Halk Bank does have ADRs that
are listed in the United States, and Halk Bank does have a
corresponding account in the United States, so it does business

1    in the U.S., but it does not have any employees or offices in

2    the United States.

3            So, I think with the Court's permission, I think we

4    also would like to discuss next steps, but before that I think

5    it would be helpful to outline sort of the timeline of the

6    prior service efforts and the facts that demonstrate that the

7    bank is in fact aware of the summons and has declined to

8    appear, and in fact why we think the record demonstrates that

9    Halk Bank as of this morning is now a fugitive from the charges

10   in the indictment.

11           THE COURT:  Sure.

12           MR. LOCKARD:  So, as I mentioned earlier, King &

13   Spalding has represented the bank since at least the last two

14   years with respect to the investigation of the bank, and that

15   is I think referenced in King & Spalding's letter where they

16   note that the firm has represented the bank in connection with

17   the Department of Justice's investigation regarding the bank.

18   I think that is also confirmed in a release that the bank

19   itself put out on Wednesday after the indictment was returned,

20   denying that there was jurisdiction over the bank and noting

21   that King & Spalding had represented the bank in the

22   investigation.

23           So, the timeline briefly with respect to the

24   indictment and the summons -- oh, I would also note that in

25   addition to the press release there are also a number of press

JAM7ZARC

reports indicating that the bank's majority shareholder --
which is the government of Turkey -- also clearly is aware of
the charges against the bank.

As the Court knows, the indictment was filed on
Tuesday, October 15.  After the indictment was filed, King &
Spalding requested a copy of the indictment from the Department
of Justice, and the government e-mailed a copy of it to the
firm.

On Wednesday the Court issued the summons.  We again
e-mailed the summons to King & Spalding and requested
confirmation that it had been received.  In response to that,
King & Spalding asked to have a phone call with the government
which was scheduled for Thursday, October 17.  In the meantime,
Halk Bank issued an investor disclosure regarding the
indictment, claimed that the charges were false and politically
motivated, claimed that the United States doesn't have
jurisdiction over the bank.  And there are press reports about
government officials in Turkey calling the indictment ugly and
unlawful, so clearly the bank and its shareholder were aware of
the indictment.

THE COURT:  Excuse me.  Go ahead.

MR. LOCKARD:  On Thursday, October 17, the government
spoke with King & Spalding about the summons.  King & Spalding
indicated that it was not authorized to accept service of the
summons but was discussing it with its client.  King & Spalding

asked if the government would consent to an adjournment of the

appearance, which we declined to consent to.  We asked if the

bank would stipulate to an alternate form of service if the

firm was not authorized to accept service, and we were told

that the bank would not stipulate to an alternative form of

service.  And at that time we understood that the firm King &

Spalding intended to contact the Court to request an

adjournment of today's appearance, and note that we did not

consent to that request.  Also note that later that day on

October 17 according to press reports President Erdogan raised

the Halk Bank indictment with U.S. government officials in

Turkey.

          The summons was electronically filed on the docket

also on Thursday.  Then on Friday King & Spalding sent the

letter to the Court that's been docketed as docket entry number

564.

          The press has also reported that on Saturday, October

19, the Turkish Minister of Foreign Affairs commented on the

indictment to the Turkish press and said that if the law in the

United States works nothing would come of the case.

          So, I think what that timeline shows is that the bank

is clearly aware of the summons, is aware of the charges, has

denied that there is jurisdiction over the bank, and Turkish

government officials have exercised efforts to exercise

political influence over the proceedings.

JAM7ZARC

1          THE COURT:  When you say that -- did you say that

2     President Erdogan had raised the subject with U.S. officials in

3     Turkey?

4          MR. LOCKARD:  Yes, that was reported in the media

5     during the meetings on October 17.

6          THE COURT:  Would those be at the embassy level, those

7     U.S. officials?

8          MR. LOCKARD:  Those would be between President

9     Erdogan, Vice President Pence and Secretary of State Pompeo.

10         THE COURT:  Thank you.  Go ahead.

11         MR. LOCKARD:  And of course those efforts are

12    consistent with other press reports of persistent government of

13    Turkey's efforts to exercise political influence over the

14    course of the investigation and the prosecutions, which I think

15    the Court is aware of dating back to approximately 2016.

16         So, we think service has been accomplished under Rule

17    4(c), which provides that a summons is served on an

18    organization that is not within a judicial district of the

19    United States by any means that gives notice, and the rule

20    provides for a number of mechanisms that would satisfy that

21    notice, but these are not exclusive means of providing notice.

22    And in a recent case from last year in the Ninth Circuit the

23    Court of Appeals held that delivery of a summons to U.S.

24    counsel of a foreign corporation that resulted in actual notice

25    to the defendant company satisfied the service requirements of

1    Rule 4.  That case is Pangang, and the cite is 901 F.3d 1046.

2              THE COURT:  Mr. Lockard, what I'm going to do is ask

3    you for a draft order in this matter essentially summarizing

4    the points you've made today -- you can reference the

5    transcript of these proceedings -- and I will take a look at it

6    and expeditiously sign off if I think that's appropriate, as it

7    does seem appropriate based on your comments and my

8    understanding of the law as well.

9              MR. LOCKARD:  So, your Honor, what we would propose,

10   if the Court agrees with the proposal, is given that Halk Bank

11   has intentionally failed to appear for today's conference, and

12   as a result is now a fugitive from charges and is in contempt

13   of the summons, we have proposed giving the bank an opportunity

14   to cure that contempt by re-issuing the summons, by setting a

15   further conference date some date next week.  The government

16   will undertake efforts to serve the re-issued summons by all

17   available means, including by delivering it to King & Spalding

18   and any other method that is approved under 4(c), so that the

19   bank has an opportunity to cure; and if the bank does not

20   appear at the rescheduled conference, at that time the

21   government would contemplate requesting contempt sanctions

22   against the bank.

23             THE COURT:  And I would suggest you include that

24   process in the draft order as well.  It sounds like a viable

25   way to go forward.

JAM7ZARC

1            Does anybody else want to be heard on this matter?  Of

2    course the record reflects that no one has appeared today on

3    behalf of Halk Bank, no attorneys in particular from King &

4    Spalding, as set forth in their letter saying that they were

5    not authorized to appear on behalf of Halk Bank.  So, I think

6    that's it.

7            Let me take a look at your order.  And if you leave

8    the date blank, maybe two weeks might be more to give Halk Bank

9    to review and perhaps reconsider, but something of that nature,

10   a week to two weeks, I would say.

11           MR. LOCKARD:  Yes, your Honor.

12           THE COURT:  Great.  So, I think that's it for today.

13   Just looking ahead somewhat, you all looked into the contempt

14   process and how it might apply to Halk Bank?

15           MR. LOCKARD:  We have reviewed those issues, and what

16   we would expect is to outline the Court's authority to issue

17   contempt sanctions in advance of the appearance.

18           THE COURT:  Great.  OK.  I think that's it for today

19   then.  Nice to see you all, and I look forward to receiving

20   that draft.

21           MR. LOCKARD:  Thank you, your Honor.

22           THE COURT:  You bet.

23           (Adjourned)

24

25

ORIGINAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - x
                                    :
UNITED STATES OF AMERICA            :      **SUPERSEDING INDICTMENT**
                                    :
          - v. -                    :      S6 15 Cr. 867 (RMB)
                                    :
TÜRKİYE HALK BANKASI A.S.,          :
     a/k/a "Halkbank,"              :
                                    :
               Defendant.           :
                                    :
- - - - - - - - - - - - - - - - - - x

> USDC SDNY
> DOCUMENT
> ELECTRONICALLY FILED
> DOC #: _____
> DATE FILED:   OCT 1 5 2019

### BACKGROUND

1.    The charges in this Indictment arise out of a
multi-year scheme by TÜRKİYE HALK BANKASI A.S., a/k/a
"Halkbank," the defendant (hereinafter, "HALKBANK"), a Turkish
bank majority-owned by the Government of Turkey, to violate and
evade U.S. national security controls against the Government of
Iran.  HALKBANK and its officers, agents, and co-conspirators
directly and indirectly used money service businesses and front
companies in Iran, Turkey, the United Arab Emirates, and
elsewhere to violate and to evade and avoid prohibitions against
Iran's access to the U.S. financial system, restrictions on the
use of proceeds of Iranian oil and gas sales, and restrictions
on the supply of gold to the Government of Iran and to Iranian
entities and persons.  HALKBANK knowingly facilitated the
scheme, participated in the design of fraudulent transactions

intended to deceive U.S. regulators and foreign banks, and lied to U.S. regulators about HALKBANK's involvement.

2.    High-ranking government officials in Iran and Turkey participated in and protected this scheme.  Some officials received bribes worth tens of millions of dollars paid from the proceeds of the scheme so that they would promote the scheme, protect the participants, and help to shield the scheme from the scrutiny of U.S. regulators.

3.    The proceeds of Iran's sale of oil and gas to Turkey's national oil company and gas company, among others, were deposited at HALKBANK, the defendant, in accounts in the names of the Central Bank of Iran, the National Iranian Oil Company ("NIOC"), and the National Iranian Gas Company.  Because of U.S. sanctions against Iran and the anti-money laundering policies of U.S. banks, it was difficult for Iran to access these funds in order to transfer them back to Iran or to use them for international financial transfers for the benefit of Iranian government agencies and banks.

4.    HALKBANK, the defendant, participated in several types of illicit transactions for the benefit of Iran that, if discovered, would have exposed HALKBANK to sanctions under U.S. law, including (a) allowing the proceeds of sales of Iranian oil and gas deposited at HALKBANK to be used to buy gold for the

2

benefit of the Government of Iran; (b) allowing the proceeds of
sales of Iranian oil and gas deposited at HALKBANK to be used to
buy gold that was not exported to Iran, in violation of the so-
called "bilateral trade" rule; and (c) facilitating transactions
fraudulently designed to appear to be purchases of food and
medicine by Iranian customers, in order to appear to fall within
the so-called "humanitarian exception" to certain sanctions
against the Government of Iran, when in fact no purchases of
food or medicine actually occurred.  Through these methods,
HALKBANK illicitly transferred approximately $20 billion worth
of otherwise restricted Iranian funds.

     5.   Senior officers of HALKBANK, the defendant,
acting within the scope of their employment and for the benefit
of HALKBANK, concealed the true nature of these transactions
from officials with the U.S. Department of the Treasury
("Treasury") so that HALKBANK could supply billions of dollars'
worth of services to the Government of Iran without risking
being sanctioned by the United States and losing its ability to
hold correspondent accounts with U.S. financial institutions.

     6.   The purpose and effect of the scheme in which
HALKBANK, the defendant, participated was to create a pool of
Iranian oil funds in Turkey and the United Arab Emirates held in
the names of front companies, which concealed the funds' Iranian

nexus. From there, the funds were used to make international payments on behalf of the Government of Iran and Iranian banks, including transfers in U.S. dollars that passed through the U.S. financial system in violation of U.S. sanctions laws.

**The Defendant**

7. At all times relevant to this Indictment, HALKBANK, the defendant, was a foreign financial institution organized under the laws of and headquartered in Turkey. The majority of HALKBANK's shares are owned by the Government of Turkey. From approximately 2011 until 2014, Suleyman Aslan, a co-conspirator not charged as a defendant herein, was HALKBANK's General Manager (i.e., the chief executive). From approximately 2011 until 2017, Mehmet Hakan Atilla, a co-conspirator not charged as a defendant herein, was HALKBANK's Deputy General Manager for International Banking, and was responsible for maintaining the bank's correspondent banking relationships, including its U.S. correspondent accounts, and for the bank's relationships with Iranian banks, including the Central Bank of Iran. During their tenures, Aslan and Atilla were the executives principally responsible for communicating with Treasury's Under Secretary for Terrorism and Financial Intelligence and its Director of the Office of Foreign Assets Control ("OFAC") about HALKBANK's compliance with U.S. sanctions

4

against Iran. From approximately 2011 until 2013, Levent Balkan, a co-conspirator not charged as a defendant herein, headed HALKBANK's Foreign Operations Department, which was responsible for processing international banking transactions. In undertaking the actions and agreements described below, Aslan, Atilla, Balkan, and other officers and employees of HALKBANK were acting within the scope of their employment and for the benefit of HALKBANK.

8. At all times relevant to this Indictment, HALKBANK, the defendant, was the sole repository of proceeds from the sale of Iranian oil by NIOC to Turkey. Principally as a result of U.S. sanctions restricting the use of Iranian oil proceeds, as of in or about 2012, billions of dollars' worth of funds had accumulated in NIOC's and the Central Bank of Iran's accounts at HALKBANK.

### The International Emergency Economic Powers Act

9. The International Emergency Economic Powers Act ("IEEPA"), codified at Title 50, United States Code, Sections 1701 to 1706, confers upon the President authority to deal with unusual and extraordinary threats to the national security and foreign policy of the United States. Section 1705 provides, in part, that "[i]t shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of

5

any license, order, regulation, or prohibition issued under this title." 50 U.S.C. § 1705(a).

10. Beginning with Executive Order No. 12170, issued on November 14, 1979, the President has found that "the situation in Iran constitutes an unusual and extraordinary threat to the national security, foreign policy and economy of the United States" and declared "a national emergency to deal with that threat."

## The Iranian Transactions and Sanctions Regulations

11. On March 15 and May 6, 1995, the President issued Executive Orders Nos. 12957 and 12959, prohibiting, among other things, the exportation, reexportation, sale, or supply, directly or indirectly, to Iran of any goods, technology, or services from the United States or by a United States person, and on August 19, 1997, issued Executive Order No. 13059 clarifying the previous orders (collectively, the "Executive Orders"). The Executive Orders authorized the United States Secretary of the Treasury to promulgate rules and regulations necessary to carry out the Executive Orders. Pursuant to this authority, the Secretary of the Treasury promulgated the Iranian Transactions Regulations (renamed in 2013 the Iranian Transactions and Sanctions Regulations, or "ITSR"), implementing the sanctions imposed by the Executive Orders.

6

12. Title 31, Code of Federal Regulations, Section 560.204 of the ITSR prohibits, among other things, the exportation, reexportation, sale, or supply, directly or indirectly, from the United States, or by a United States person, of goods, technology, or services to Iran or the Government of Iran (with certain limited exceptions), including the exportation, reexportation, sale, or supply of goods, technology, or services to a third country knowing that such goods, technology, or services are intended for Iran or the Government of Iran, without a license from OFAC.

13. The ITSR provide that the transfer of funds, directly or indirectly, from the United States or by a U.S. person to Iran or the Government of Iran is a prohibited export, reexport, sale, or supply of services to Iran or the Government of Iran. See 31 C.F.R. § 560.427(a).

14. The ITSR further prohibit transactions that evade or avoid, have the purpose of evading or avoiding, cause a violation of, or attempt to violate the ITSR. See 31 C.F.R. § 560.203.

### Sanctions Concerning Proceeds of Iranian Oil Sales and the Supply of Gold to Iran

15. On December 11, 2011, the National Defense Authorization Act for Fiscal Year 2012 was enacted (the "2012 NDAA"), requiring the imposition of sanctions on foreign

7

financial institutions—including banks and money service business, among others—following a determination by the President that a foreign financial institution violated certain prohibitions with respect to the Central Bank of Iran or another Iranian financial institution designated under the IEEPA. These prohibitions applied to government-owned foreign financial institutions with respect to transactions for the sale or purchase of petroleum or petroleum products to or from Iran conducted or facilitated on or after 180 days from the enactment of the 2012 NDAA, unless the foreign country significantly reduced its volume of petroleum and petroleum products purchased from Iran. These prohibitions included an exception for transactions for the sale of food, medicine, or medical devices to Iran.

16. On July 30, 2012, the President issued Executive Order 13622 to take additional steps with respect to the national emergency declared in Executive Order 12957. The President, among other things, imposed additional restrictions with respect to the sale of Iranian petroleum and petroleum products, authorizing the Secretary of the Treasury to impose sanctions on a foreign financial institution that knowingly conducted or facilitated any significant financial transaction with NIOC, the Naftiran Intertrade Company Ltd. ("NICO"), or the

8

Central Bank of Iran, or for the purchase or acquisition of petroleum or petroleum products from Iran, unless the President determined the foreign country had significantly reduced its volume of petroleum and petroleum products purchased from Iran pursuant to the 2012 NDAA. The available sanctions included prohibitions and conditions on opening or maintaining U.S. correspondent and payable-through accounts of the foreign financial institution. Exec. Order 13622, 77 Fed. Reg. 45897 (Jul. 30, 2012).

17. Executive Order 13622 also authorized the Secretary of the Treasury to block property and property interests in the United States of any person who "materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services in support of, NIOC, NICO, or the Central Bank of Iran, or the purchase or acquisition of U.S. bank notes or precious metals by the Government of Iran." Exec. Order 13622, 77 Fed. Reg. 45897 (Jul. 30, 2012). Executive Order 13622 prohibited any transaction that evaded or avoided, had the purpose of evading or avoiding, caused a violation of, or attempted to violate any of the prohibitions set forth in that order.

18. On August 10, 2012, the Iran Threat Reduction and Syria Human Rights Act of 2012, codified at 22 U.S.C. §§ 8711 et

9

seq. (the "Iran Threat Reduction Act" or "ITRA"), extended the
sanctions against Iranian oil sales.  The ITRA amended the 2012
NDAA by imposing a "bilateral trade" restriction on Iranian oil
proceeds:  Financial transactions by foreign financial
institutions with respect to the sale or purchase of petroleum
or petroleum products to or from Iran were permitted only for
trade between the foreign country and Iran, with any funds owed
to Iran deposited in an account within that foreign country.
See 22 U.S.C. § 8513a(d)(4)(D).  In other words, the proceeds of
Iranian oil sales to Turkey had to be deposited into accounts in
Turkey and could be used only for trade between Turkey and Iran;
otherwise, any foreign financial institution facilitating non-
compliant transactions faced U.S. sanctions.  These requirements
went into effect on or about February 6, 2013.

19.  On January 2, 2013, the Iranian Freedom and
Counterproliferation Act (the "IFCA"), imposed additional
restrictions on supplying gold to Iran.  The IFCA broadened the
prohibition in Executive Order 13622 on supplying precious
metals to the Government of Iran to prohibit the sale, supply,
or transfer of precious metals, directly or indirectly, to the
country of Iran, including non-Government entities.  See 22
U.S.C. § 8804(a)(1)(A).  The available sanctions included
prohibitions and conditions on opening or maintaining U.S.

10

correspondent and payable-through accounts of the foreign financial institution. The IFCA also extended the ITRA's bilateral trade restriction to the proceeds of Iranian natural gas sales. The IFCA's restrictions went into effect on or about July 1, 2013.

20. On June 3, 2013, the President implemented, among other things, the IFCA's prohibition on dealings in precious metals on behalf of Iran pursuant to his authorities under the IFCA, the IEEPA, and other statutes, as well as the ITRA's "bilateral trade" and other restrictions on transactions relating to petroleum and petroleum productions from Iran. Exec. Order 13645, 78 Fed. Reg. 33945 (June 3, 2013). Executive Order 13645 prohibited any transaction that evaded or avoided, had the purpose of evading or avoiding, caused a violation of, or attempted to violate any of the prohibitions set forth in that order.

21. The Secretary of the Treasury promulgated the Iranian Financial Sanctions Regulations (the "IFSR") implementing the sanctions imposed by the Executive Orders 13622 and 13645, the 2012 NDA, the IFCA, and the ITRA, among others. See 31 C.F.R. §§ 561.203, 204, 205. The IFSR prohibited, among other things, transactions that evaded or avoided, had the purpose of evading or avoiding, caused a violation of, or

11

attempted to violate any of the provisions of the IFSR.  See 31
C.F.R. § 561.205.

### Designated or Identified Entities and Individuals

22.  Appendix A to the ITSR contained a list of
persons determined to be the Government of Iran.  At all times
relevant to this Indictment, NIOC was an Iranian Oil Company on
the list in Appendix A.  At all times relevant to this
Indictment, NICO and Naftiran Intertrade Company Sarl ("NICO
Sarl") were on the list in Appendix A.

23.  At all times relevant to this Indictment, Bank
Sarmayeh, Bank Parsian, Bank Pasargad, Bank Saman, Credit
Institution for Development, and Eghtesad Novin Bank were
Iranian financial institutions and, beginning on July 12, 2012,
were identified as Iranian financial institutions by OFAC.  At
all times relevant to this Indictment, Sarmayeh Exchange was a
money services business in Iran owned and controlled by Bank
Sarmayeh.  At all times relevant to this Indictment, Bank
Keshavarzi was an Iranian financial institution owned or
controlled by the Government of Iran and listed in Appendix A to
the ITSR.

24.  On or about July 12, 2012, OFAC designated Hong
Kong Intertrade Company ("HKICO") as a "Specially Designated
National" ("SDN") pursuant to the ITSR.  OFAC further identified

12

NIOC as an agent or affiliate of Iran's Islamic Revolutionary

Guard Corp ("IRGC") pursuant to Executive Order 13599 on or

about September 24, 2012.  On or about May 23, 2013, OFAC

designated Seifollah Jashnsaz, chairman of NICO, NICO Sarl, and

HKICO; Ahmad Ghalebani, managing director of NIOC and a director

of both Petro Suisse Intertrade Company SA and HKICO; Farzad

Bazargan, managing director of HKICO; Hashem Pouransari, NICO

official and managing director of Asia Energy General Trading

LLC; and Mahmoud Nikousokhan, NIOC finance director and a

director of Petro Suisse Intertrade Company SA as SDNs under

Executive Order 13382 and the Weapons of Mass Destruction Non-

Proliferation Sanctions Regulations, 31 C.F.R. Part 544.  At all

times relevant to this Indictment after on or about July 12,

2012, HKICO was an SDN. At all times relevant to this Indictment

after May 23, 2013, Jashnsaz, Ghalebani, Bazargan, Pouransari,

and Nikousokhan were each an SDN.  At all times relevant to this

Indictment after September 24, 2012, NIOC was identified as an

agent or affiliate of the IRGC.

### The Gold Export Scheme

25.  As alleged above, in 2012 the U.S. sanctions

relating to the sale of Iranian oil and the supply of currency

and precious metals to Iran and the Government of Iran grew more

restrictive.  In response, HALKBANK, the defendant, and others

13

devised a scheme to use exports of Turkish gold to allow Iran access to the proceeds of Iranian oil sales to Turkey, to evade those restrictions, and to deceive foreign banks and U.S. regulators.

26. First, HALKBANK, the defendant, conspired with Reza Zarrab, a co-conspirator not named as a defendant herein, and others to transfer Iranian oil proceeds at HALKBANK to exchange houses and front companies controlled by Zarrab in order for those exchange houses and front companies to buy gold for export from Turkey. After being exported from Turkey, the gold could be converted into cash or currency and remitted to Iran or used to conduct international financial transfers on behalf of Iranian persons and entities. Although these gold purchases were made by or on behalf of the Government of Iran -- including NIOC, the Central Bank of Iran, and Iranian banks owned or controlled by the Government of Iran -- in violation of Executive Order 13622, Aslan and Atilla represented to Treasury officials that the gold purchases were permissible transactions by private Iranian companies and individuals.

27. Second, HALKBANK, the defendant, conspired with Zarrab and others to use false documentation and misrepresentations to make it appear that, after gold had been purchased in Turkey with the proceeds of Iranian oil sales

14

deposited at HALKBANK, the gold was then exported to Iran when, in fact, the gold was exported to Dubai and sold there, in violation of the ITRA, 22 U.S.C. § 8513a(d)(4)(D), in order to obtain U.S. dollars, Euros, and other currencies that could be used to fund the activities of the Government of Iran and Iranian companies and persons.  This continued after the IFCA broadened the gold prohibitions to include supply to private Iranian companies and individuals.

### HALKBANK Agrees with the Government of Iran and Zarrab to Execute the Gold Export Scheme

28.  Reza Zarrab, an Iranian-Turkish businessman, operated, among other things, money services businesses and trading companies in the United Arab Emirates and Turkey. Zarrab had a contract with Sarmayeh Exchange, a money services business owned and controlled by Bank Sarmayeh, to conduct currency exchange and wire transfers for that entity.  In or about early 2012, Zarrab learned from a representative of Sarmayeh Exchange that NIOC and the Central Bank of Iran held billions of dollars' worth of proceeds of sales of Iranian petroleum in accounts maintained at HALKBANK, the defendant.

29.  Accordingly, in or about March 2012, Zarrab approached Aslan about opening business accounts at HALKBANK, the defendant, in order to extract the Iranian oil proceeds to Dubai through gold exports, using Sarmayeh Exchange and Bank

15

Sarmayeh as intermediaries between Zarrab's companies and the Government of Iran accounts. Aslan, however, was concerned that Zarrab's high public profile in Turkey would draw attention creating a risk that the scheme would be detected.

30. Zarrab then met with Turkey's then-Minister of Economy, Mehmet Zafer Cağlayan, a co-conspirator not charged herein, about Aslan's concern. Zarrab explained the scheme to Cağlayan and enlisted his help. Cağlayan agreed to help Zarrab execute the gold export scheme through HALKBANK, the defendant, but demanded that Zarrab give Cağlayan half of Zarrab's profits. Zarrab agreed. Over the course of 2012 and 2013, Zarrab paid Cağlayan bribes totaling at least approximately $70 million in U.S. dollars, Euro, and Turkish lira, as well as luxury watches and other items, in exchange for Cağlayan's support of the gold export scheme's execution.

31. In addition to benefiting the Government of Iran by evading restrictions on the use of oil proceeds, the gold scheme would also benefit the Government of Turkey: By converting the otherwise-restricted Iranian oil proceeds at HALKBANK, the defendant, into gold and exporting that gold, the scheme would artificially inflate Turkey's export statistics, making its economy appear stronger than it in fact was. For example, in 2011, the year before the scheme began, Turkey

16

reported exporting approximately $55 million in gold to Iran. In 2012, after, as discussed below, the gold scheme was implemented, Turkey reported exporting approximately $6.5 billion in gold to Iran. Similarly, Turkey's reported exports of gold to the U.A.E. rose from approximately $280 million in 2011 to approximately $4.6 billion in 2012. The funds laundered from HALKBANK, the defendant, through Zarrab and his companies were responsible for the vast majority of this increase.

32. After obtaining Cağlayan's agreement to use his influence to help the scheme, Zarrab met again with Aslan. After Cağlayan conveyed his support of the gold export scheme to Aslan, Aslan agreed that Zarrab could participate in the gold scheme through HALKBANK, the defendant.

33. During the summer of 2012, executives with HALKBANK, the defendant, discussed the gold scheme and its operation. For example, Balkan sent emails to Aslan and other bank officers tracking Zarrab's and others' gold export volumes and confirming the bank's understanding of the scheme. In one such email, sent on or about June 20, 2012, Balkan summarized the scheme, writing:

> It is understood that this gold, which is
> left in Dubai, can be used in all kinds of
> foreign payments of Iran, either in gold or
> in foreign currency. The fact that these
> gold deposits are collected in the various
> fiduciary accounts and used for

17

international payments of the forbidden
Iranian banks in Dubai (such as Bank Melli,
Bank Sedarat) or Bank Mellat in Turkey. The
gold transaction volume has reached
remarkable dimensions in terms of
international Iran sanctions.

34.   In October 2012, Zarrab arranged meetings
between, among others, Iranian government officials and Iranian
bank executives at the Istanbul offices of HALKBANK, the
defendant, to discuss ways to increase the amount of Iranian oil
proceeds that could be laundered through the scheme.

35.   In particular, on or about October 4, 2012,
Aslan, Atilla, Zarrab, and a representative of Sarmayeh Exchange
met with Mahmoud Nikousokhan, then the finance director of NIOC,
and other Iranian oil officials.  The participants discussed,
among other things, the following:

a.   NIOC sought to transfer its oil revenues
held in banks in other countries to HALKBANK, the defendant, so
that these funds could also be laundered through the gold system
in place at HALKBANK.

b.   NIOC officials also asked that HALKBANK make
international financial payments on behalf of NIOC using its oil
proceeds directly, rather than laundering them through Zarrab's
front companies.  Aslan and Atilla declined the request, telling
NIOC that those payments should continue to be made through "the
existing system" -- meaning the laundering of Iranian oil funds

18

through the gold system with Zarrab, which concealed HALKBANK's participation in the scheme.

### HALKBANK's General Manager Accepts Bribes to Support the Gold Export Scheme

36. On October 6, 2012, Aslan and Zarrab met in Alsan's office at HALKBANK, the defendant. At this meeting, Aslan told Zarrab that he was under scrutiny by U.S. officials relating to HALKBANK's Iran-related business, and that while Cağlayan directed that the gold export scheme should be conducted through HALKBANK, it was Aslan who bore the risks.

37. After this meeting, Zarrab sought and obtained Cağlayan's permission to bribe Aslan. Cağlayan agreed. In an intercepted telephone conversation on October 6, 2012, Zarrab told Abdullah Happani, a co-conspirator not named as a defendant herein and an employee of Zarrab, that Cağlayan knew Zarrab would pay bribes to Aslan, and described how Aslan's bribes would be structured using the "same system" as Cağlayan's bribe payments.

38. On October 8, 2012, officers of HALKBANK, the defendant, held another meeting with Iranian and Turkish government officials. In an intercepted telephone call, Aslan described the meeting to Zarrab, stating that the Iranian officials had again asked HALKBANK to allow the government of Iran to conduct transfers of their funds out of the bank. Aslan

19

told Zarrab that: "I [Aslan] defended the matter just like we had talked about yesterday," and that he had told the Iranians that HALKBANK would continue to move their money "through the existing system" with Zarrab. The next day, Reza Zarrab directed Happani to arrange to pay a €2 million bribe to Suleyman Aslan. A few days later, one of Zarrab's employees delivered the bribe. Over the course of the following year, Zarrab arranged for regular deliveries of cash, packaged in shoe boxes, to Aslan at Aslan's residence. These bribes totaled at least approximately $8.5 million in U.S. dollars, Euro, and Turkish lira.

39. Zarrab arranged additional meetings in Turkey between Caǧlayan, Aslan, others at HALKBANK, the defendant, and Iranian government banking and oil officials. In May 2013, these meetings included the then-Iranian Minister of Oil; Ahmad Ghalebani, the then-managing director of NIOC; Mahmoud Nikousokhan; and Seifollah Jashnsaz, the then-chairman of NICO. At these meetings the participants discussed, among other things, arranging for the Turkish national oil company to make its payments to NIOC for Iranian oil at an account held by Bank Sarmayeh at HALKBANK. Because of Zarrab's contract with Sarmayeh Exchange, he would have preferential access to these Iranian oil revenues.

## HALKBANK Protects the Gold Export Scheme
## from Detection by OFAC

40. Throughout the scheme, senior executives from HALKBANK, the defendant, took steps to prevent U.S. authorities, particularly OFAC, from detecting the illicit nature of the transfers being conducted through Zarrab's companies.

41. On or about October 24, 2012, Zarrab and Balkan spoke in an intercepted telephone call. During that conversation, Zarrab and Balkan discussed a transfer of U.S. dollars between Zarrab's account at HALKBANK, the defendant, and another account held by Zarrab's gold trading company, Safir Altin. Balkan warned Zarrab about the transfer because it was conducted by a U.S. financial institution through its correspondent account in the United States ("U.S. Bank-1"). Balkan expressed his concern about drawing attention to HALKBANK's involvement in Zarrab's illicit gold-trading business as a result of the direct transfer from HALKBANK to the United States, stating: "I mean I'm talking about, one, an American Bank. Two, dollars. Three, Safir. I mean, many factors are all bundled up here." Zarrab asked if the transfer would cause an issue, and Balkan replied: "I just wanted to share it with you. When I mentioned strategic thinking, I meant we should assess this together briefly. . . . The balance, the balance is not important. What's more important is security."

21

42.  On or about February 12, 2013, Treasury representatives met in Turkey with Atilla and other officials of HALKBANK, the defendant.  During this meeting, among other things, Treasury representatives, including the then-Director of OFAC, specifically warned Atilla about HALKBANK's involvement in Iranian attempts to evade sanctions.  The OFAC Director specifically cautioned Atilla about (a) the use of false invoices concealing the true purchaser or destination of goods as a means of allowing Iran to launder oil proceeds through phony purchases, and (b) the requirement that trade between Turkey and Iran financed with Iranian oil proceeds be "bilateral," that is, restricted Iranian funds at HALKBANK could be used only to buy Turkish goods for shipment to Iran.  The Director pulled Atilla aside for a private meeting to warn Atilla that HALKBANK was in a "category unto themselves," reflecting OFAC's particular concern about the magnitude of the bank's potential involvement in Iranian sanctions evasion.

43.  Shortly after the meeting with OFAC, Atilla, HALKBANK's Deputy General Manager for International Banking, instructed Zarrab to alter the way the gold transactions were reflected in the customs paperwork submitted to the bank, changing the purported destination of the gold from the United Arab Emirates to Iran.  In August 2012, Atilla had directed

22

Zarrab to change the documents to reflect that the gold was being exported to Dubai rather than Iran, to reduce the risk that HALKBANK, the defendant, would be sanctioned under the regulations against supplying gold to the Government of Iran. Now, Atilla wanted the documentation to be changed again because of the tightened restrictions on the use of oil proceeds for bilateral trade. In an intercepted telephone call between Zarrab and Happani on February 21, 2013, Zarrab relayed that he "talked to Mr. Hakan," referring to Atilla. Zarrab stated that Atilla had informed him that "there was a problem but it has been resolved . . . for the exports, write 'transit to Iran through Dubai' on the declarations again . . . . That is what the regulations indicate" -- referring to the requirement described in the February 12, 2013 meeting between Atilla and OFAC. The change directed by Atilla made it appear as if the shipments of gold purchased with Iranian oil proceeds complied with the regulations, though the gold in fact continued to be sent to Dubai in order to make NIOC oil proceeds available for Iran's international financial payments there.

44. On or about May 6, 2013, Zarrab and Aslan spoke in an intercepted telephone call. During this conversation, Aslan told Zarrab that Atilla had reported that NIOC transferred 70 million Turkish lira directly to an account controlled by

Zarrab at HALKBANK, the defendant.  This transfer contradicted the agreement among HALKBANK, NIOC, and Zarrab that NIOC's oil proceeds would be transferred to Zarrab indirectly through another Iranian bank account held at HALKBANK.  Zarrab complained, "No, not direct.  No.  They made a mistake.  It will go to . . . Bank Shahr.  You stop it, and I will get it corrected.  They are stupid.  They are retarded . . . .  Please process this as a null transaction, as if it never happened."  Aslan agreed to void the transaction, and told Zarrab that HALKBANK would not report the violation.  Because reporting the transaction would have revealed that the money Zarrab and his companies were laundering through the gold scheme belonged to NIOC, Zarrab and Aslan's agreement to nullify and not report this transaction protected the scheme from detection.

### HALKBANK Continued the Gold Export Scheme While Lying to OFAC

45.  On or about July 1, 2013, the day IFCA's restrictions on the supply of precious metals to Iran went into effect, see supra ¶ 19, Atilla sent an email to the then-Director of OFAC, purporting to inform him that HALKBANK, the defendant, had stopped allowing Iranian gold transactions as of June 10, 2013.

46.  In fact, however, HALKBANK, the defendant, continued to allow Zarrab to use proceeds of Iranian oil and gas

24

sales at HALKBANK to buy gold for export from Turkey in order to give the Government of Iran and Iranian banks access to these funds after July 1, 2013.  On or about November 11, 2013, for example, a HALKBANK representative emailed Zarrab's employees spreadsheets of transactions relating to exports of gold from Turkey to the United Arab Emirates and Iran that purported to show tens of millions of Euros' worth of gold being exported by Zarrab's companies, Royal Denizcilik and Safir Altin Ticaret, to Iran as recently as October 2013, including to Iranian financial institutions.

47.  On or about September 16, 2013, Zarrab and Aslan spoke in an intercepted telephone conversation.  Aslan reported on a meeting that he recently had with the then-Prime Minister of Turkey, Çağlayan, and other Turkish government officials. Aslan was asked to increase Turkey's gold exports.  Aslan reported, "That's their request, um, last year they exported $11 billion in gold."  Zarrab responded, "They are asking for the same to be done again, aren't they?"  Aslan replied, "I mean, they're saying, 'do something, whatever the method is, but help us out, take care of this job,' you know."  Aslan also stated, "I said, 'Iran -- it would not be through Iran, but we, um, we will find a way, don't you worry. They said, 'if you can find a

way, do it.'" Zarrab responded in part, "We have a method, we will do it. We need to sit down and talk about that in person."

48. Zarrab and others caused gold purchased with the proceeds of Iranian oil and gas sales and exported from Turkey to be sold in Dubai rather than reexported to Iran, and further caused the proceeds to be transferred back to companies owned and controlled by Zarrab in Turkey, where they could be further transferred secretly on behalf of and for the benefit of the Government of Iran and Iranian companies and persons. On other occasions, Zarrab and others would cause the gold to be repurchased by companies owned and controlled by Zarrab in Turkey and imported back to Turkey, where it could be sold. These transactions to sell gold in Dubai or to repurchase and reimport the gold to Turkey on behalf of and for the benefit of the Government of Iran and Iranian companies and persons were often conducted in U.S. dollars. Between at least approximately December 2012 and October 2013, more than $900 million in such transactions were conducted by U.S. financial institutions through correspondent accounts held in the United States.

49. At all times relevant to the gold export scheme, Aslan, Atilla, Balkan, and other officers and employees of HALKBANK, the defendant, were acting within the scope of their employment at HALKBANK and for the benefit of HALKBANK.

### The Fraudulent Food and Medicine Trade Scheme

50.  In response to the broadened prohibition against the supply of gold to include private Iranian companies and individuals and heightened restrictions limiting the use of Iranian oil proceeds for bilateral trade, HALKBANK, the defendant, and others also conspired to transfer Iranian oil revenues held at HALKBANK outside Turkey by falsely pretending that these transfers were in connection with the sale of food and medicine to Iran from Dubai, which would qualify for humanitarian exceptions to the sanctions restrictions.

51.  Aslan, Atilla, and others at HALKBANK, the defendant, designed the fraudulent food and medicine scheme with Zarrab, Happani, and others.  In addition to helping design the scheme, Aslan and Atilla concealed the scheme from Treasury officials in order to avoid potential sanctions against HALKBANK pursuant to the 2012 NDAA, the ITSR, the IFCA, and the IFSR. Cağlayan and other Turkish government officials both approved of and directed that the fraudulent food and medicine scheme be adopted and implemented.

52.  On or about March 26, 2013, Zarrab met with Aslan again.  At this meeting, Aslan told Zarrab that HALKBANK, the defendant, would stop processing the fraudulent gold transactions in the next month-and-a-half, but that Aslan could

extend that deadline by another month or two. Aslan instructed Zarrab instead to begin conducting food transactions, even though Zarrab had no history conducting such transactions with HALKBANK. When Zarrab asked how it would be possible for him to start food trade with the bank now, Aslan also told Zarrab during the meeting that Zarrab should provide HALKBANK with whatever documentation Zarrab could for these food transactions, even if that involved submitting fraudulent documents. In other words, as the deadline for IFCA's tightened regulations on gold trade approached, Aslan instructed Zarrab that Zarrab should instead pursue a fraudulent food trade.

53. Zarrab arranged meetings in Turkey between approximately April 9 and 10, 2013, among Cağlayan, Aslan, and others, and Iranian government banking and oil officials, including Mahmoud Nikousokhan and Seifollah Jashnsaz. At these meetings the participants discussed, among other things, designing fraudulent transactions with the proceeds of Iranian oil sales held at HALKBANK, the defendant, to make them appear to be for the purpose of importing food into Iran, when in reality they were a vehicle for further evasion of U.S. sanctions.

54. Aslan and Atilla devised methods to mask the true purpose of the purported food trade so as to avoid detection,

and to create a compliance record to protect HALKBANK, the
defendant, while excusing Zarrab from records he could not
provide because the transactions were not genuine.  For example,
in or about April 2013, Zarrab met with Atilla and Aslan in
Aslan's office at HALKBANK's headquarters.  During that meeting,
the participants discussed documentation Zarrab would provide in
connection with the fraudulent food transactions.  When Zarrab
stated that he could provide bills of lading, Atilla informed
Zarrab that bills of lading were traceable.  Zarrab then
retracted his representation, and the participants agreed that
Zarrab would not be required to provide such documents.  Zarrab
later purported to use small, wooden vessels that would not
provide traceable bills of lading to cover for this deficiency
in his documentation.

      55.  On or about July 2, 2013, Zarrab and Atilla spoke
in an intercepted telephone call.  During that conversation,
Atilla cautioned Zarrab about errors made by Zarrab's employees
in falsifying the documents submitted to HALKBANK, the
defendant, that could result in the scheme's detection by
regulators.  For example, Atilla instructed Zarrab that the
quantities of the purported shipments were unrealistic in light
of the small size of the vessels Zarrab purported to use because
of his inability to provide bills of lading:  "I'm thinking that

it is a little difficult to move a shipment of 140, 150 thousand tons, on things with five-thousand ton capacity." Zarrab apologized for the error and promised to correct it.

56. On or about July 9, 2013, Zarrab and Atilla spoke again during an intercepted telephone call. Zarrab and Atilla discussed, among other things, more errors in the false supporting documents submitted in connection with Zarrab's transfers of Iranian oil proceeds at HALKBANK, the defendant. Atilla explained that the falsified documents now either (a) still claimed to load quantities of goods on the vessels larger than the purported capacities of the ships, or (b) purported to use vessels that were large enough to be able to provide the bills of lading that Zarrab could not, in fact, provide. Atilla explained: "Now, these vessels, um, some of them are very large vessels . . . . I mean, there is one that is 50,000 tons. There are those that are 80,000, 90,000 tons . . . . These are not small vessels . . . . I would kindly ask that the guys take a look at compliance between the loads and the tonnages." ZARRAB acceded: "Of course. Do you mean that they should look at the ones involving large vessels?" Atilla warned of the even greater risks of documents identifying smaller ships:

> They should look at the opposite, the small
> ones, as well. Now, for example, the bill

of lading may be somewhat doable, you know,
with the large vessels, since the vessel is
large.  As for the small ones, the
relatively smaller ones, such as vessels
with capacities between 13,000 and 14,000
tons, when their loads are 20,000, then that
becomes different and odd.  You get that
reviewed . . . .  There are those large
loads on small tonnage [vessels].

Zarrab asked:  "Is there anything I need to do about them?"

Atilla instructed:  "They need to keep an eye on this . . . .

The load should match up."

57.  In electronic communications on or about July 1,
2013, Zarrab explained to Aslan the underlying reason for the
errors in the forged documents:  Zarrab had tried to move too
much Iranian oil money at once through the fake food scheme at
HALKBANK, the defendant, resulting in unrealistic purported food
quantities that made the documents' falsity obvious.  Zarrab
told Aslan, "Mr. minister [Cağlayan] told me to step on the gas
and I think I over did it."  Zarrab and Aslan agreed that Zarrab
would limit the amount of money he would move each time going
forward.

58.  On or about September 16, 2013, Zarrab and Aslan
spoke in a recorded telephone conversation, as described in
paragraph 47 above.  During this conversation, Zarrab and Aslan
discussed, among other things, the fact that HALKBANK, the
defendant, intended to preclude non-Turkish companies, including

two specifically identified American companies, from selling
food to Iran in exchange for the proceeds of Iranian oil and gas
sales held at HALKBANK, in order to increase the amount of funds
available to Zarrab.

## HALKBANK Continues the Scheme After the Arrests of Zarrab and Aslan

59.  In or about December 2013, Zarrab, Aslan, and
others were arrested by Turkish law enforcement officials in
connection with a Turkish public corruption investigation into,
among other things, the bribe payments Zarrab made to Aslan,
Cağlayan, and others in furtherance of the scheme to launder
Iranian funds through HALKBANK, the defendant. See supra ¶¶ 30,
36-38.  At the time of the arrests, Turkish law enforcement
officers conducted searches of Zarrab's and Aslan's homes and
offices, among other places, during which they recovered, among
other things:

a.   millions of dollars' worth of cash, in
multiple currencies, including U.S. dollars, stored in shoeboxes
in Aslan's home.

b.   documents in Aslan's home and his office at
HALKBANK reflecting exceptions from documentation ordinarily
required by HALKBANK that Zarrab's companies had received in
connection with falsified food trade transactions; and

32

c.   a diagram of the transactions associated with the food scheme found in Aslan's office at HALKBANK.

60.   Zarrab paid bribes, through his attorney, to secure his release and the release of his co-defendants from prison in February 2014 and, ultimately, the dismissal of the case in October 2014.

61.   In mid-2014, after Zarrab was released from prison but before the case was dismissed as a result of bribe payments, Zarrab approached HALKBANK, the defendant, including its new general manager, a co-conspirator not named as a defendant herein ("Halkbank General Manager-1"), and Atilla, among other HALKBANK employees, to restart the sanctions-evasion scheme.

62.   Though some at HALKBANK, the defendant, supported continuing the scheme, Halkbank General Manager-1 initially was reluctant to do so because of concern that Zarrab's arrest and notoriety would draw unnecessary attention to the scheme.  At Zarrab's request, however, the then-Prime Minister of Turkey and his associates, including a relative of the then-Prime Minister who later held multiple Turkish cabinet positions, instructed HALKBANK to resume the scheme, and HALKBANK agreed.  The only change to the scheme was the addition of one new forged document:  Zarrab would provide forged inspection certificates

33

as part of the fake food scheme. HALKBANK continued executing the evasion and money-laundering scheme until at least in or about March 2016, when Zarrab was arrested in the United States.

63. After the continuation of the scheme following Zarrab's arrest, officials at HALKBANK, the defendant, continued to deceive Treasury officials about the bank's relationship with Zarrab. For example, on or about October 10, 2014, Treasury representatives met with Atilla, Halkbank General Manager-1, and other HALKBANK officials. During this meeting, the Treasury representatives asked about HALKBANK's dealings with Zarrab. Atilla lied about the scope of Zarrab's business: he failed to disclose Zarrab's gold export business for the Government of Iran or Zarrab's fraudulent food trade for the Government of Iran, and instead described Zarrab as the recipient of certain bank loans and someone involved in unspecified foreign trade.

64. As a result of the gold export and fake food schemes, at least approximately $1 billion was laundered through unwitting U.S. financial institutions on behalf of NIOC, the Central Bank of Iran, and other Iranian entities.

65. At all times relevant to the fraudulent food and medicine scheme, Aslan, Halkbank General Manager-1, Atilla, Balkan, and other officers and employees of HALKBANK, the

defendant, were acting within the scope of their employment at HALKBANK and for the benefit of HALKBANK.

### STATUTORY ALLEGATIONS

### COUNT ONE

### (Conspiracy to Defraud the United States)

The Grand Jury charges:

66. The allegations contained in paragraphs 1 through 65 of this Indictment are repeated and realleged as if fully set forth herein.

67. From at least in or about 2012, up to and including in or about 2016, in the Southern District of New York, Turkey, the United Arab Emirates, and elsewhere, TÜRKİYE HALK BANKASI A.S., a/k/a "Halkbank," the defendant, and others known and unknown, knowingly and willfully combined, conspired, confederated, and agreed together and with each other to defraud the United States and an agency thereof, to wit, to impair, impede, and obstruct the lawful and legitimate governmental functions and operations of the U.S. Department of the Treasury in the enforcement of economic sanctions laws and regulations administered by that agency.

### Overt Acts

68. In furtherance of the conspiracy and to effect the illegal object thereof, TÜRKİYE HALK BANKASI A.S., a/k/a

"Halkbank," the defendant, and its coconspirators committed the overt acts set forth in paragraphs 25 to 64 of this Indictment, among others, which are fully incorporated by reference herein.

(Title 18, United States Code, Section 371.)

## COUNT TWO

### (Conspiracy to Violate the International Emergency Economic Powers Act)

The Grand Jury further charges:

69. The allegations contained in paragraphs 1 through 65 of this Indictment are repeated and realleged as if fully set forth herein.

70. From at least in or about 2012, up to and including in or about 2016, in the Southern District of New York, Turkey, the United Arab Emirates, and elsewhere, TÜRKİYE HALK BANKASI A.S., a/k/a "Halkbank," the defendant, and others known and unknown, knowingly and willfully combined, conspired, confederated, and agreed together and with each other to violate, and to cause a violation of, licenses, orders, regulations, and prohibitions issued under the International Emergency Economic Powers Act.

71. It was a part and an object of the conspiracy that TÜRKİYE HALK BANKASI A.S., a/k/a "Halkbank," the defendant, and others known and unknown, would and did provide and cause others to provide financial services to Iran and to the

36

Government of Iran prohibited by U.S. law, without first
obtaining the required approval of OFAC, and to evade and avoid
the requirements of U.S. law with respect to the provision of
financial services to Iran and to the Government of Iran, in
violation of Executive Orders 12959, 13059, 13224, 13599, 13622,
and 13645 and Part 31 of the Code of Federal Regulations,
Sections 560.203, 560.204, 560.205, 561.203, 561.204, and
561.205.

(Title 50, United States Code, Section 1705;
Executive Orders 12959, 13059, 13224, 13599, 13622, & 13645;
Title 31, Code of Federal Regulations, Sections 560.203,
560.204, 560.205, 561.203, 561.204, & 561.205.)

### COUNT THREE

### (Bank Fraud)

The Grand Jury further charges:

72.  The allegations contained in paragraphs 1 through
65 of this Indictment are repeated and realleged as if fully set
forth herein.

73.  From at least in or about 2012, up to and
including in or about 2016, in the Southern District of New
York, Turkey, the United Arab Emirates, and elsewhere, TÜRKİYE
HALK BANKASI A.S., a/k/a "Halkbank," the defendant, and others
known and unknown, did knowingly execute and attempt to execute
a scheme or artifice to defraud a financial institution, the
deposits of which were then insured by the Federal Deposit

Insurance Corporation (the "FDIC"), and to obtain moneys, funds, credits, assets, securities, and other property owned by and under the custody and control of such financial institution, by means of false and fraudulent pretenses, representations, and promises, and aided and abetted the same, to wit, inducing U.S. financial institutions to conduct financial transactions on behalf of and for the benefit of the Government of Iran and Iranian entities and persons using money and property owned by and under the custody and control of such financial institutions, by deceptive means.

(Title 18, United States Code, Sections 1344 & 2.)

### COUNT FOUR

### (Conspiracy to Commit Bank Fraud)

The Grand Jury further charges:

74.   The allegations contained in paragraphs 1 through 65 of this Indictment are repeated and realleged as if fully set forth herein.

75.   From at least in or about 2012, up to and including in or about 2016, in the Southern District of New York, Turkey, the United Arab Emirates, and elsewhere, TÜRKİYE HALK BANKASI A.S., a/k/a "Halkbank," the defendant, and others known and unknown, knowingly and willfully combined, conspired, confederated, and agreed together and with each other to commit

38

bank fraud, in violation of Title 18, United States Code, Section 1344.

76. It was a part and an object of the conspiracy that TÜRKİYE HALK BANKASI A.S., a/k/a "Halkbank," the defendant, and others known and unknown, would and did knowingly execute and attempt to execute a scheme or artifice to defraud a financial institution, the deposits of which were then insured by the FDIC, and to obtain moneys, funds, credits, assets, securities, and other property owned by and under the custody and control of a financial institution, by means of false and fraudulent pretenses, representations, and promises, in violation of Title 18, United States Code, Section 1344.

(Title 18, United States Code, Section 1349.)

## COUNT FIVE

### (Money Laundering)

The Grand Jury further charges:

77. The allegations contained in paragraphs 1 through 65 of this Indictment are repeated and realleged as if fully set forth herein.

78. From at least in or about 2012, up to and including in or about 2016, in the Southern District of New York, Turkey, the United Arab Emirates, and elsewhere, TÜRKİYE HALK BANKASI A.S., a/k/a "Halkbank," the defendant, and others

known and unknown, in an offense involving and affecting
interstate and foreign commerce, did knowingly transport,
transmit, and transfer, and attempt to transport, transmit, and
transfer, monetary instruments and funds to places in the United
States from and through places outside the United States, in
amounts exceeding $10,000, and aided and abetted the same, with
the intent to promote the carrying on of specified unlawful
activity, to wit, (i) the illegal export of services to Iran as
charged in Count Two of this Indictment, (ii) bank fraud as
charged in Counts Three and Four of this Indictment, and
(iii) an offense against a foreign nation involving bribery of a
public official.

(Title 18, United States Code, Sections 1956(a)(2)(A) & 2.)

## COUNT SIX

### (Conspiracy to Commit Money Laundering)

The Grand Jury further charges:

79. The allegations contained in paragraphs 1 through
65 of this Indictment are repeated and realleged as if fully set
forth herein.

80. From at least in or about 2012, up to and
including in or about 2016, in the Southern District of New
York, Turkey, the United Arab Emirates, and elsewhere, TÜRKİYE
HALK BANKASI A.S., a/k/a "Halkbank," the defendant, and others

40

known and unknown, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to violate Title 18, United States Code, Section 1956(a)(2)(A).

81.  It was a part and an object of the conspiracy that TÜRKİYE HALK BANKASI A.S., a/k/a "Halkbank," the defendant, and others known and unknown, in an offense involving and affecting interstate and foreign commerce, would and did transport, transmit, and transfer, and attempt to transport, transmit, and transfer, monetary instruments and funds to places in the United States from and through places outside the United States, in amounts exceeding $10,000, with the intent to promote the carrying on of specified unlawful activity, to wit, (a) the illegal export of services to Iran as charged in Count Two of this Indictment, (ii) bank fraud as charged in Counts Three and Four of this Indictment, in violation of Title 18, United States Code, Sections 1344 and 1349, and (iii) an offense against a foreign nation involving bribery of a public official, in violation of Title 18, United States Code, Section 1956(a)(2)(A).

(Title 18, United States Code, Section 1956(h).)

41

## FORFEITURE ALLEGATION

### (Counts Two, Three, and Four)

82. As a result of committing the offenses alleged in Counts Two, Three, and Four of this Indictment, TÜRKİYE HALK BANKASI A.S., a/k/a "Halkbank," the defendant, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461, all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of the offenses alleged in Counts Two, Three, and Four of this Indictment, including but not limited to a sum of money representing the amount of proceeds obtained as a result of the offenses.

### Substitute Assets Provision

83. If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

  a) cannot be located upon the exercise of due diligence;

  b) has been transferred or sold to, or deposited with, a third person;

  c) has been placed beyond the jurisdiction of the court;

  d) has been substantially diminished in value; or

e)  has been commingled with other property
    which cannot be subdivided without
    difficulty;

it is the intent of the United States, pursuant to Title 21,

United States Code, Section 853(p), to seek forfeiture of any

other property of said defendant up to the value of the above

forfeitable property.

### FORFEITURE ALLEGATION

### (Counts Five and Six)

84.  As a result of committing the money laundering

offenses alleged in Counts Five and Six of this Indictment,

TÜRKİYE HALK BANKASI A.S., a/k/a "Halkbank," the defendant,

shall forfeit to the United States, pursuant to Title 18, United

States Code, Section 982, all property, real and personal,

involved in the money laundering offenses and all property

traceable to such property, including but not limited to, a sum

of money representing the amount of property that was involved

in the money laundering offenses or is traceable to such

property.

### Substitute Assets Provision

85.  If any of the above-described forfeitable

property, as a result of any act or omission of the defendant:

a)  cannot be located upon the exercise of due
    diligence;

b) has been transferred or sold to, or deposited with, a third person;

c) has been placed beyond the jurisdiction of the court;

d) has been substantially diminished in value; or

e) has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of said defendant up to the value of the above forfeitable property.

(Title 18, United States Code, Sections 981, 982;
Title 21, United States Code, Section 853;
Title 28, United States Code, Section 2461.)


_____
Foreperson


_____
GEOFFREY S. BERMAN
United States Attorney


44

Form No. USA-33s-274 (Ed. 9-25-58)

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

### UNITED STATES OF AMERICA

v.

### TÜRKİYE HALK BANKASI A.S.,
### a/k/a "Halkbank,"

**Defendant.**

### SUPERSEDING INDICTMENT

S6 15 Cr. 867 (RMB)

(18 U.S.C. § 371, 1344, 1349, 1956, &
2; 50 U.S.C. § 1705; 31 C.F.R.
§§ 560.203, 560.204, 560.205, 561.203,
561.204, & 561.205.)

GEOFFREY S. BERMAN
United States Attorney.

A TRUE BILL

Foreperson.

KL
10/15/19

Filed Superseding Indictment

Stewart D. Aaron
USMJ