**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> v. <br><br> TÜRKIYE HALK BANKASI A.Ş., <br><br> Defendant. | S6 15 Cr. 867 (RMB) |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION TO RECUSE THE ASSIGNED JUDGE

Robert M. Cary
Simon A. Latcovich
James W. Kirkpatrick
Damayanti Desai

WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC 20005

650 Fifth Avenue, Suite 1500
New York, NY 10019
(202) 434-5000

*Counsel for Türkiye Halk Bankası A.Ş.*

## <u>TABLE OF CONTENTS</u>

**FACTS** ................................................................................................................ **4**

  A. FETO has long attempted to subvert the Turkish Government. .................................. 4

  B. In 2013, FETO engaged in an improper and unscrupulous investigation which forms
     the basis of the prosecution's case against Halkbank. ................................................. 6

  C. The assigned judge took sides on factual issues that are core to this case at a May 2014
     symposium in Istanbul. ................................................................................................ 8

  D. Following the symposium, the assigned judge took sides on factual issues that are core
     to this case in statements to Turkish media. ............................................................... 10

  E. The assigned judge made negative comments about Halkbank's defense at the *Atilla*
     trial based on extrajudicial sources. ........................................................................... 11

  F. The assigned judge publicly commented on this case after the Atilla trial. ................. 13

  G. Since the indictment against Halkbank, the assigned judge has assumed Halkbank's
     guilt on the basis of extrajudicial sources. ................................................................. 14

**ARGUMENT**.................................................................................................... **18**

  I.  Recusal is Required Because the Assigned Judge's Continued Participation in this
     Case Would Create the Appearance of Partiality...................................................... 18

**CONCLUSION** ................................................................................................ **25**

## **TABLE OF AUTHORITIES**

### **CASES**

*Chase Manhattan Bank v. Affiliated FM Ins. Co.*, 343 F.3d 120 (2d Cir. 2003)...........................16

*In re Int'l Bus. Machs. Corp.*, 45 F.3d 641 (2d Cir. 1995) ............................................................18

*Ligon v. City of New York*, 736 F.3d 118 (2d Cir. 2013) ...................................................... passim

*Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847 (1988) .................................16, 21, 22

*United States v. Amico*, 486 F.3d 764 (2d Cir. 2007) .........................................................16, 17, 18

*United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001) (per curiam) .......................17, 22

### **OTHER AUTHORITIES**

28 U.S.C. § 455(a) ............................................................................................................15, 16, 17

Code of Conduct for United States Judges, Canon 3(A)(6)...........................................................17

The Second Circuit has held that where a reasonable person *might* question the assigned judge's impartiality, "for the judge's sake and the appearance of justice, an assignment to a different judge is salutary and in the public interest, especially as it minimizes even a suspicion of partiality."[1]  One of the nation's leading experts on judicial disqualification, Richard Flamm, has studied this case extensively and concluded that recusal is required.[2]  Put simply, the assigned judge in this case has made comments that contradict Halkbank's planned defense and prejudge the evidence in favor of the government.[3]  Moreover, the assigned judge made these statements based on information learned outside a courtroom.  This case, which threatens Halkbank's very existence, should not be decided by a judge whose impartiality could reasonably be questioned based on such public and problematic statements.  No one would perceive such a trial to be fair, and that is why this case must be assigned to a new judge.

To understand how this came to be and why the statements made by the assigned judge give rise to an appearance of partiality, it is necessary to understand Turkey's recent history.  In order to explain that history, we have attached a declaration from Dr. Michael A. Reynolds, Professor at Princeton University and the Director of Princeton's Program in Russian, East European, and Eurasian Studies, who has written extensively on Turkish history and politics.  As Professor Reynolds describes in his declaration, there was a great controversy in Turkey in December 2013 that relates directly to the subject matter of this case.  A group of investigators, prosecutors, and judges, working together on behalf of an organization known as Fethullahçı Terör Örgütü, arrested the former General Manager of Halkbank, among others.[4]  The charges

---

[1] *Ligon v. City of New York*, 736 F.3d 118, 123–24 (2d Cir. 2013) (internal quotation marks omitted), *vacated in part on other grounds*, 743 F.3d 362 (2d Cir. 2014).
[2] Declaration of Richard Flamm ("Flamm Decl.").
[3] *Id.* ¶¶ 47–75.
[4] Declaration of Michael A. Reynolds ("Reynolds Decl.") ¶ 12.

against the former General Manager of Halkbank were based on the same allegations as the charges made by prosecutors against Halkbank and its former General Manager in this case.[5] Following the December 2013 arrests, there was an immediate belief among most Turks that the charges were illegitimate and carried out for improper purposes.[6]  Turkish authorities responded by removing the investigators, prosecutors, and judges responsible for the controversial arrests.[7] Because these officials abused their positions to advance unlawful aims, most Turks viewed the removal of these corrupt investigators, prosecutors, and judges as entirely appropriate.[8]  The supporters of Fethullahçı Terör Örgütü, commonly known as FETO, on the other hand, voiced the view that the removal of the prosecutors and investigators was an attack on the rule of law. These events have deeply divided the Turkish population.[9]

In the middle of this polarizing debate, the assigned judge traveled to Istanbul and spoke at a symposium on "Justice and the Rule of Law" in Turkey.[10]  After listening to a number of other speakers who discussed Turkey's judicial system by using the December 2013 arrests as a barometer, the assigned judge characterized the removal of the FETO-affiliated investigators, prosecutors, and judges as an attack on the rule of law.[11]  The assigned judge then made similar comments to a Turkish newspaper.[12]  When viewed in their proper context, these comments could reasonably be understood as supporting the viewpoint of the FETO-affiliated investigators who arrested the former General Manager of Halkbank on allegations that are substantially

---

[5] *Id.* ¶ 12.
[6] *Id.* ¶ 13.
[7] *Id.* ¶ 14.
[8] *Id.*
[9] *Id.* ¶ 13.
[10] *Id.* ¶ 17.
[11] *Id.* Ex. 10 (May 2014 Symposium Brochure), at 168–69.
[12] *Id.* Ex. 13 (*Rule of Law and Freedom of Press Under Attack in Turkey*, Today's Zaman).

similar to what is alleged in this case.[13]  In other words, to those who understood the context, the assigned judge was speaking in favor of the case against Halkbank and the FETO-affiliated investigators who brought it.  That is essentially the same case that the U.S. Attorney's Office has brought against Halkbank in the Southern District of New York.

To be clear, Halkbank intends to argue that the FETO-affiliated investigators were corrupt and that the so-called evidence they gathered is utterly unreliable.  The assigned judge's comments therefore directly implicate core issues in the case.  Indeed, one of the government's star witnesses, Huseyin Korkmaz, is a former Turkish police officer who participated in the investigation that led to the disputed December 2013 arrests.  Halkbank believes—and will argue during this case—that Korkmaz is aligned with FETO, is legally corrupt and dishonest, and deserved to be removed from office.

In light of the assigned judge's public statements favorably prejudging those whom Halkbank alleges corruptly gathered so-called evidence against it, Halkbank does not believe that it can receive a fair trial before the assigned judge.  At a minimum, a reasonable person who understands the historical context of these comments could reasonably question whether Halkbank will receive a fair trial, because the assigned judge has voiced support for the disputed Turkish investigation and has condemned Korkmaz's removal as an attack on the rule of law.

Halkbank is also troubled by the assigned judge's comments since being assigned the case against Mehmet Hakan Atilla, a former Deputy General Manager of Halkbank.  In that case, the assigned judge repeatedly made comments demonstrating that he had formed views on the facts of the case based on extrajudicial sources.  For example, he derided a defense theory that called into question the veracity of prosecution evidence as a "farfetched conspiracy theory," an

---

[13] *Id.* ¶¶ 20–24.

opinion the assigned judge developed, by his own reasoning, "far outside any United States courtroom."[14]  As Professor Reynolds explains in his declaration, what the Court stated is a "farfetched conspiracy theory" is reality in Turkey.[15]

After the *Atilla* trial but while the case was still pending on appeal, the assigned judge gave another media interview about the subject matter of this case in which he stated that the prospect of not prosecuting the alleged conduct in this case made his "head . . . spin[]."[16]  And after the government handed down the indictment against Halkbank, the judge admittedly relied on extrajudicial sources to rule on a preliminary issue in this case.  In denying Halkbank's counsel's request to enter a special appearance, the assigned judge relied on *New York Times* articles to form views about the status of negotiations between Halkbank and the Department of Justice.  These articles mirrored the assigned judge's criticism of the Turkish authorities' response to the December 2013 Investigation.

\* \* \* \* \*

Every trial in an American courtroom must be administered by a judge who not only is, but also is perceived to be, fair.  The fair administration of justice requires nothing less, and this case should be assigned to a new judge.

## FACTS

**A.  FETO has long attempted to subvert the Turkish Government.**

FETO is a global organization with a major presence in Turkey dedicated to subverting the democratically elected Turkish government and gaining control.[17]  It promotes its activities,

---

[14] Atilla Trial Tr. at 1969:8–10, ECF No. 428.
[15] Reynolds Decl. ¶¶ 10, 30.
[16] *Id.* Ex. 15 (*In the Age of Trump, Judge Reflects on D'Souza and the 'New Rudy'*, Courthouse News).
[17] *Id.* ¶ 9.

which are designed to seem legitimate, through FETO-controlled education, media, and banking organizations (among others).[18]  To preserve its clandestine and subversive activities, FETO—until July 15, 2016—did not resort to conspicuous violence.  Instead, it undermined the Turkish state from within by gaining key positions in the government, including high-ranking positions in the judiciary, prosecutor's office, and the Turkish police force.  FETO did not obtain these positions through merit; instead, FETO members promoted other FETO members until they occupied some of the most important positions in the Turkish state.[19]

FETO has attempted to undermine the Turkish government since the 1980s.[20]  In 2007, a FETO-organized "investigation" led to the arrests of scores of high-ranking Turkish military officials on allegations of plotting a coup against the elected government.  Counter-investigations later revealed that FETO-affiliated officials presented documents as evidence at trial that were created years after their alleged dates of creation; for example, they were written in fonts that did not exist at the time the documents were allegedly prepared.[21]

In 2013, FETO-affiliated police officers, prosecutors, and judges made high-profile arrests on December 17 and December 25, ostensibly as part of a corruption investigation.[22] That operation, and its illegal fruits, form the basis for the charges in this case.  Part of this effort was coordinated by Korkmaz and Istanbul's Deputy Chief Prosecutor, who are known FETO affiliates.[23]

---

[18] *Id.* ¶¶ 8–9, Ex. 1 (Michael A. Reynolds, "*Woe to Him, for How He Schemed": Fetullah Gülen, the U.S., and the Damaging of Turkish Democracy*, *in* Turkey's July 15 Coup: What Happened and Why (M. Hakan Yavuz & Bayram Balci, eds.)).
[19] *Id.* ¶ 9.
[20] *Id.* ¶ 8.
[21] *Id.* ¶ 11.
[22] *Id.* ¶ 12, Ex. 3 (Istanbul Chief Prosecutor's Report re December 2013 Events).
[23] *Id.* ¶¶ 13–14, 16.

**B.     In 2013, FETO engaged in an improper and unscrupulous investigation which forms the basis of the prosecution's case against Halkbank.**

In connection with its December 2013 "investigation," these FETO-affiliated individuals arrested a number of public figures, including the former General Manager of Halkbank.  Most Turkish citizens believe that the FETO-affiliated investigators used unscrupulous investigatory tactics and, in some cases, manipulated evidence.[24]  The FETO-affiliated investigators alleged that the former General Manager of Halkbank participated in a corruption scheme with Reza Zarrab—another star witness for the prosecution in this case—in order to facilitate illegal transactions.[25]  Many of the allegations were substantively identical to those that form the basis of the prosecution's theory in this case, so much so that the defense expects the bulk of the prosecution's evidence in this case to be the same evidence used by the FETO-affiliated investigators to justify the December 2013 arrests.[26]  In fact, the discovery provided by the government to date appears to consist only of the evidence stolen from the Turkish investigation and exhibits from the *Atilla* trial.

There was immediate, widespread skepticism in Turkey (and in particular among those supportive of the Turkish majority government) as to the legitimacy of the December 2013 arrests, which prompted Turkish authorities to launch an independent investigation.[27]  On December 23, 2013, Turkish Police removed and reassigned several police officers, including Korkmaz, based on their roles in the December 2013 Investigation.[28]  Korkmaz was later arrested

---

[24] *Id.* ¶¶ 9, 12, Ex. 3.
[25] Reynolds Decl. ¶ 12. Halkbank's former General Manager is currently under indictment in this matter.  Superseding Indictment, ECF No. 293.
[26] Atilla Trial Tr. at 1277–1398 (ECF No. 420), 1560–1687 (ECF No. 422), 1725–62 (ECF No. 424), 1775–1846 (ECF No. 426).
[27] Reynolds Decl. ¶¶ 14–15.
[28] *Id.* ¶¶ 14, 16.

and charged for his role in the events.[29]  Similarly, on January 7, 2014, Turkey's High Council of

Judges and Prosecutors removed and reassigned several prosecutors because of their role in the

same investigation, including Istanbul's Deputy Chief Prosecutor.[30]  On January 29, 2014,

Istanbul's Chief Prosecutor assigned a new prosecutor to the corruption investigation and in

October 2014 he issued a decision that included the following findings:

- The electronic surveillance used to justify the December 2013 arrests was illegal.[31]
- The electronic evidence used to justify the December 2013 arrests was collected unreliably and may have been manipulated.[32]
- Even if the electronic evidence had been collected legally and reliably, the evidence did not justify the arrests.[33]

These events are central to the case that is pending before the assigned judge.  *After all,*

*Korkmaz is certain to be a star witness for the prosecution and "evidence" he admittedly stole*

*from the Turkish authorities will play a key role in the government's case.*[34]  Halkbank intends to

argue, consistently with the findings of Turkish authorities, that Korkmaz engaged in illegal acts

and is utterly unreliable.  Halkbank also intends to argue that his reassignment was justified,

necessary, and appropriate.

FETO and its wide web of sympathizers, on the other hand, voiced the view that the

removal of the prosecutors and investigators who carried out the December 2013 arrests was an

attack on the rule of law in Turkey.[35]  In other words, those who spoke of an attack on the rule of

law can reasonably be perceived as taking the side of FETO's narrative and against the

---

[29] *Id.* Ex. 4 (Indictment of Huseyin Korkmaz).
[30] *Id.* ¶¶ 14–15.
[31] *Id.* Ex. 3 at 31–33, 37–40.
[32] *Id*. Ex. 3 at 34–35.
[33] *Id.* Ex. 3 at 45–48.
[34] Atilla Trial Tr. at 1277–1398 (ECF No. 420), 1560–1687 (ECF No. 422), 1725–62 (ECF No. 424), 1775–1846 (ECF No. 426).
[35] Reynolds Decl. ¶ 21.

legitimate Turkish authorities including the Turkish Police and the High Council of Judges and Prosecutors.

## C.   The assigned judge took sides on factual issues that are core to this case at a May 2014 symposium in Istanbul.

It is against this backdrop that the FETO-affiliated law firm Yuksel Karkin Kucuk (YKK)[36] organized a May 2014 conference in Istanbul called the "Justice and Rule of Law Symposium."  The December 2013 arrests and the subsequent removal of the prosecutors and investigators were front and center at this symposium.  Speakers, including the assigned judge, spoke about the authorities' response to the December 2013 arrests and almost unanimously criticized it.[37]

For example, European Parliament MP Marietje Schaake stated that "divisions that remained below the surface for a long time erupted at the end of [2013]," creating a "crisis" that harmed "the rule of law."[38]  She also characterized the official Turkish account of the crisis as rooted in "conspiracy theories."[39]

Following these remarks, the assigned judge—the only American judge who spoke at the event—chaired a panel on "the Rule of Law in Turkey."[40]  In his opening remarks, the assigned judge called the response to the December 2013 arrests an "attack" on the "rule of law" that caused Turkey to "erupt[]"—apparently echoing the characterization of Ms. Schaake.  At the risk of stating the obvious, discharging government officials who engaged in misconduct is not an "attack" on the rule of law—it is an entirely appropriate response and preserves the rule of law.

---

[36] *Id.* ¶ 17.
[37] *See, e.g.*, *id.* Ex. 10, at 34–35.
[38] *Id.* Ex. 10, at 34.
[39] *Id.* Ex. 10, at 34.
[40] *Id.* at 167.

Accordingly, a perfectly fair inference—perhaps the only fair inference from the assigned judge's statement—is that he believed that the evidence against those arrested in December 2013 including Halkbank's former General Manager was legitimate; that those who caused the December 2013 arrests were acting appropriately despite the majority Turkish view that they were not; and that the Turkish authorities who removed those who caused the December 2013 arrests were acting inappropriately. *Halkbank intends to argue just the opposite.*

Making clear that he was referring to the removal of those who caused the December 2013 arrests, the assigned judge added that politicians should not be encouraged to "diminish judicial independence, or to introduce new rules and/or to change the rules of the game much less to *change the participants in the game while the very game is in progress*." He went on to make clear that he was commenting on recent Turkish history in particular, by saying that his remarks were made in the context of "reflect[ing] upon judicial independence and effectiveness[,] *particularly during this period of flux for Turkey*," and that "the rule of law is what prevents the state from *unilaterally and arbitrarily relocating, firing judges and prosecutors who are actively pursuing an investigation, [or] removing police officers*." One of Halkbank's primary theories in this case is that the "participants in the game"—the judges and prosecutors to whom the judge referred at the Symposium—were not "unilaterally and arbitrarily relocated," but rather were appropriately disciplined for participating in an illegitimate and pretextual investigation. In other words, Halkbank intends to take precisely the opposite position that the assigned judge took at the May 2014 Symposium and continues to take.

**D.    Following the symposium, the assigned judge took sides on factual issues that are core to this case in statements to Turkish media.**

On the same day as the panel, the assigned judge contributed to an article in a Turkish newspaper called *Today's Zaman.*[41]   The article is entitled "Rule of Law and Freedom of Press Under Attack in Turkey," and refers to the assigned judge.[42]   According to the article, "US District Judge Richard Berman told *Today's Zaman* that the rule of law is under attack in Turkey because the independence of the judiciary has been challenged.  *Referring to the corruption probe that started on Dec. 17, 2013*, Berman said that the legal proceedings have been interrupted."[43]   The only fair reading of this statement is that the assigned judge was supportive of the charges against Halkbank's former General Manager and disapproved of the removal of the prosecutors and the investigating police officers by the Turkish authorities.  To be clear, it is Halkbank's position that the prosecutors and his investigators were removed appropriately because *they* were breaking the law.  That will be a central tenet of Halkbank's defense.

After months of independent investigation and a formal judicial process, the new Turkish prosecutor found no merit to the relevant accusations against the Halkbank General Manager and dropped the substantive charges against him,[44] a decision that effectively cleared Halkbank of any wrongdoing in the matter.  Halkbank's position will be that those decisions were justified.  Before being assigned to this case, the assigned judge twice publicly said they were not.

---

[41] Reynolds Decl. ¶ 26, Ex. 13.

[42] *Id.* Ex. 13.

[43] *Id.* (emphasis added).

[44] *Id.* ¶ 15, Ex. 3.

**E.    The assigned judge made negative comments about Halkbank's defense at the *Atilla* trial based on extrajudicial sources.**

In 2015, the U.S. Attorney's Office for the Southern District of New York handed down an indictment against several individuals that was based upon the same nucleus of facts as those alleged by the rogue Turkish law enforcement officials in December 2013.[45]   Unbeknownst to the assigned judge or parties at the time, the government's case was based largely upon the testimony of Korkmaz.[46]   After being released from jail, Korkmaz fled Turkey in violation of his bail conditions with the help of a smuggler, and brought with him the evidence on which U.S. prosecutors would eventually rely.[47]   Korkmaz admits that he "stole" this "evidence."[48]   In addition to the approval of his asylum request, the U.S. Government paid Korkmaz $50,000.00 and covered his housing expenses.[49]

The assigned judge drew the case from the wheel.   One of the individual defendants, Reza Zarrab, moved for recusal, because of the assigned judge's earlier comments related to the subject matter of this case.   However, Zarrab did not timely object, and as a result waived his argument.[50]   The assigned judge also noted that the Symposium did not concern Zarrab, and that Zarrab's arguments were largely based on news reports.[51]   At that time, it could not have been apparent to the assigned judge that the prosecution would be relying on "evidence" stolen by one of the Turkish police officers who participated in the December 2013 Investigation, the termination of which he publicly criticized as an attack on the rule of law.[52]   However, it should

---

[45] *See generally* Superseding Indictment, ECF No. 7; Reynolds Decl. ¶ 12.
[46] Atilla Trial Tr. at 1829–31, ECF No. 426.
[47] Atilla Trial Tr. at 1385, 1389, 1391–92, ECF No. 420; *id.* at 1823, ECF No. 426.
[48] Atilla Trial Tr. at 1846:17–14, ECF No. 426.
[49] Atilla Trial Tr. at 1564–65, ECF No. 422.
[50] *See* Order Denying Mot. Recusal at 12–14, ECF No. 87.
[51] *Id.* at 14–18.
[52] *Cf. id.* at 22 (reasoning that the Symposium did not concern any "key merits issues").

have been apparent that if individuals had been convicted in Turkey, the United States would seek to prosecute them as well.  A reasonable person would know, therefore, that the matter about which the assigned judge commented at the Symposium was not only "pending" in Turkey, but "impending" here, as confirmed by the indictments.  Zarrab eventually pled guilty under a plea agreement and has not been sentenced.

In April 2017, Halkbank's then-Deputy General Manager Mehmet Hakan Atilla was indicted on charges of bank fraud and conspiracy to violate the International Emergency Economic Powers Act (IEEPA).  Broadly, the prosecution alleged that Atilla participated in the alleged illegal activity that led to the December 2013 arrests in Turkey.

Later that year, Atilla went to trial.  Though not identified as a witness until the last minute, the prosecution relied heavily on documents and other materials provided by Korkmaz.[53] Korkmaz admitted that he had no personal knowledge of the facts purportedly demonstrated by the documents, and that he stole them before leaving Turkey.  After Atilla's counsel attempted to elicit testimony about Korkmaz's bias and improper motive during the original investigation, the assigned judge derided the defense argument as an "unpersuasive," "farfetched conspiracy theory."[54]  There was no evidence in the record to support the assigned judge's dismissive attitude, which by his own reasoning was based on extrajudicial information "constructed and developed far outside any United States courtroom."[55]  To be clear, to those familiar with recent Turkish history it is anything but a "conspiracy theory" that the December 2013 charges were brought by affiliates of FETO for improper purposes.[56]

---

[53] Atilla Trial Tr. at 1801–08, ECF No. 426.
[54] Atilla Trial Tr. at 1969:8–10, ECF No. 428.
[55] *Id.*
[56] Reynolds Decl. ¶¶ 18, 30, 33.

During cross-examination of the prosecution's other star witness, Reza Zarrab, the assigned judge further relied on information constructed outside of the courtroom.[57]  Defense counsel attempted to impeach Zarrab with a statement he made over the phone to his uncle, wherein he said that "to make it out of prison you need to admit to something you haven't committed."[58]  Because the recording was not in English, defense counsel attempted to use the government's translation.[59]  As defense counsel read the translation to the assigned judge, he said "[w]e all read about it in the *New York Times* and 90 other places, and each time it was a different version of it, including your time," seemingly finding that the translation was inaccurate based on what was said in the *New York Times*.[60]  Atilla was found guilty in December 2017.

**F.     The assigned judge publicly commented on this case after the Atilla trial.**

After sentencing Atilla to 32 months' imprisonment, the assigned judge gave a public media interview where he ruled out plans for a return visit to Turkey, saying "[t]here's no way [he] would go" because of what happened after his first trip to Turkey.[61]  The article's author stated that the current Turkish administration and Turkish media had "tarred" the assigned judge by association after his participation in the 2014 Symposium and the *Atilla* trial.[62]

The assigned judge also opined on attempts by Zarrab's attorney, Rudy Giuliani, to advocate for the dismissal of the case.  The assigned judge called the effort "unprecedented," and said that the implications of the Justice Department discontinuing its prosecution of Halkbank's co-defendants made his "head . . . spin[]" because it "would have helped very significantly the

---

[57] Atilla Trial Tr. at 1009:21–1012:5, ECF No. 416.
[58] *Id.* at 1010:1–3.
[59] *Id.* at 1012:6–7.
[60] *Id.* at 1012:3–5.
[61] Reynolds Decl. Ex. 15.
[62] *Id.* Ex. 15.

country of Iran—which was the beneficiary of the conspiracies to avoid USA sanctions."[63]  In

other words, the assigned judge prematurely credited the government's charges.

### G.      Since the indictment against Halkbank, the assigned judge has assumed Halkbank's guilt on the basis of extrajudicial sources.

On October 15, 2019, the prosecution obtained an indictment against Halkbank.  At an

October 22 hearing, the assigned judge asserted—apparently relying on media reports—that

Halkbank was in discussions with the government about a potential resolution.[64]  The assigned

judge repeated this reference on November 5, 2019, this time expressly acknowledging that the

source for his information was the *New York Times*.[65]  The assigned judge went on to say based

on what he had read in the *New York Times* that Halkbank did not need to enter a special

appearance, because doing so would, in the assigned judge's view, constitute "preliminary

fencing or shadow boxing."[66]

The written opinion denying Halkbank's request for a special appearance repeatedly

referenced purported negotiations between Halkbank and the United States Government over a

potential fine, even though there was no judicial source for his assertions.[67]  The assigned judge

even described—without citation to the record—what he characterized as a "campaign," to

"avoid Halkbank being indicted and, relatedly, to avoid Halkbank having to pay a potential

---

[63] *Id.*

[64] October 22, 2019 Hearing Tr. at 2:24–3:7, ECF No. 568.

[65] November 5, 2019 Hearing Tr. at 21:18–25, ECF No. 575.

[66] *Id.* at 20:21–23.

[67] Dec. 5, 2019 Order at 5, ECF No. 581 ("King & Spalding . . . had been representing Halkbank in connection with . . . negotiations with the United States Government over a potential fine."); *id.* at 6 ("Notwithstanding Halkbank's extensive commercial dealings with the U.S. and its recent high level negotiations with the U.S. . . . Halkbank failed to appear[.]"); *id.* at 9 ("[A]ccording to reporting by the New York Times: 'After repeated appeals . . . to avoid charges . . . prosecutors in New York filed . . . charges against . . . Halkbank.'").

fine."[68]  There was no evidence whatsoever of any such "campaign" that the judge could have

obtained from judicial sources.  The only possible source of such an alleged campaign was what

the media had reported.  The assigned judge openly cited the *New York Times* for other

extraneous, prejudicial commentary, including for the proposition that the alleged conspiracy is

the "largest Iran sanctions violation in United States history."[69]

## LEGAL STANDARD

A District Judge is required to recuse from "any proceeding in which his impartiality

might reasonably be questioned."[70]  In the vast majority of cases where judges recuse, no opinion

is published.[71]  Thus while a review of published opinions on the subject might suggest that

recusal is reserved for rare cases with egregious facts, the actual standard is low, and requires

"close" cases to be resolved in favor of recusal.[72]  Recusal is required whenever one *might*

reasonably question the judge's impartiality.[73]  A "reasonable person" in this context is not the

judge himself, but an individual outside of the judicial system fully informed of the context

surrounding the judge's comments.[74]

The goal of section 455(a) is to avoid not only partiality but also the appearance of

partiality.[75]  Section 455(a) accordingly establishes an "objective standard designed to promote

public confidence in the impartiality of the judicial process."[76]  A judge's subjective intent—for

---

[68] *See id.* at 9.

[69] *See id.* at 2.

[70] 28 U.S.C. § 455(a).

[71] Flamm Decl. ¶¶ 39–40.

[72] Flamm Decl. ¶ 32; *Ligon*, 736 F.3d at 124.

[73] Flamm Decl. ¶¶ 25, 38.

[74] Flamm Decl. ¶¶ 35–37.

[75] *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 860 (1988).

[76] *Ligon*, 736 F.3d at 123 (internal citation and quotation marks omitted).

example, as to "how [he] intended his remarks to be understood"—is thus irrelevant.[77]  The context surrounding a judge's comments inform whether there exists an "appearance of partiality," regardless of the judge's intent at the time he made the comments.[78]  As a result, "judges who affiliate themselves with news stories by participating in interviews run the risk that the resulting stories may contribute to the appearance of partiality."[79]

Whether there exists an "appearance of partiality" is determined based on a totality of the circumstances, including judicial and extrajudicial conduct.[80]  Public statements on the subject matter of a case strongly indicate partiality, especially when the outcome of the case is pending or "public interest in the outcome of the litigation [is] high."[81]  This is because "[j]udges who covet publicity, or convey the appearance that they do, lead any objective observer to wonder whether their judgments are being influenced by the prospect of favorable coverage in the media."[82]  Media interviews present unique and thorny issues related to the appearance of impartiality.[83]  For example, readers tend to attribute the viewpoints of the interviewer to the judge, even if the judge was unaware of the final contents of the article in which the interview appears.[84]  Moreover, participating in an interview can create the impression that the judge has absorbed extrajudicial commentary from the interviewer.[85]

---

[77] *Id.* at 126–27; Flamm Decl. ¶¶ 35, 55.

[78] *Liljeberg*, 486 U.S. at 860; *see also Chase Manhattan Bank v. Affiliated FM Ins. Co.*, 343 F.3d 120, 130 (2d Cir. 2003) (holding that "the district judge's stated ignorance" was insufficient to overcome an objective appearance of a conflict of interest); Flamm Decl. ¶¶ 35, 55.

[79] *Ligon*, 736 F.3d at 127.

[80] *See United States v. Amico*, 486 F.3d 764, 775–76 (2d Cir. 2007); Flamm Decl. ¶ 38.

[81] *Ligon*, 736 F.3d at 124, 127 n.23.

[82] *Id.* at 127 n.23 (quoting *United States v. Microsoft Corp.*, 253 F.3d 34, 115 (D.C. Cir. 2001) (per curiam)).

[83] *See Microsoft Corp.*, 253 F.3d at 115.

[84] *See Ligon*, 736 F.3d at 127; Flamm Decl. ¶ 55.

[85] *Microsoft Corp.*, 253 F.3d at 113 ("We do not know whether he spent even more time in untaped conversations with the same reporter, nor do we know how much time he spent with

A media interview about a pending or impending case even further exacerbates the appearance of partiality.[86]  Canon 3(A)(6) of the Code of Judicial Conduct says that "[a] judge should not make public comment on the merits of a matter pending or impending in any court."[87] The Commentary to the Code also counsels that a judge take particular care if a judge's own court is involved, so that the comment "does not denigrate public confidence in the judiciary's integrity and impartiality."[88]  Federal judges have been disqualified under section 455(a) for making even limited public comments about cases pending before them.[89]

Even if comments by a judge might have been reasonable or defensible considered in isolation, if in the aggregate they might lead a disinterested observer to question his impartiality, then recusal is required.[90]  Similarly, even if recusal may not have been warranted at the outset of a case or related cases, events and commentary surrounding a matter, as well as prior dealings with the parties involved, may develop to the point where recusal becomes necessary to avoid the appearance of bias.[91]  In *In re IBM*, the Second Circuit found that the cumulative effect of the *growing* appearance of bias was sufficient to warrant recusal,[92] granting mandamus and ordering recusal based on both judicial and extrajudicial actions by the district judge (including newspaper interviews).[93]

---

others.  But we think it safe to assume that these interviews were not monologues.  Interviews often become conversations.").

[86] *See Ligon*, 736 F.3d at 127 (citing *In re Boston's Children First*, 244 F.3d 164, 170 (1st Cir. 2001)).

[87] CODE OF CONDUCT FOR UNITED STATES JUDGES, CANON 3(A)(6) (2019).

[88] CODE OF CONDUCT FOR UNITED STATES JUDGES, COMMENTARY TO CANON 3(A)(6) (2019).

[89] *Microsoft Corp.*, 253 F.3d at 112–13; s*ee also Ligon*, 736 F.3d at 125–27.

[90] *Amico*, 486 F.3d at 776; Flamm Decl. ¶¶ 38, 75.

[91] *Amico*, 486 F.3d at 775–76 ("[T]his test deals exclusively with appearances.  Its purpose is the protection of the public's confidence in the impartiality of the judiciary.").

[92] *In re Int'l Bus. Machs. Corp.*, 45 F.3d 641, 644–45 (2d Cir. 1995).

[93] *Id.* at 644.

**ARGUMENT**

The assigned judge's repeated endorsements of the FETO-affiliated Turkish prosecutors and investigators, his condemnation of their removal, his endorsements of the prosecution's theories, his apparent proclivity toward media even when it involves cases that are pending or impending, and his reliance on extrajudicial sources might cause a reasonable person to question his impartiality.  Regardless of the assigned judge's subjective view of his ability to preside over this case—and even if he is impartial in fact—his comments created a reasonable question as to his partiality in favor of the prosecution, and against Halkbank.  To preserve public confidence in the administration of justice, the assigned judge must be recused.

**I.    Recusal is Required Because the Assigned Judge's Continued Participation in this Case Would Create the Appearance of Partiality.**

The assigned judge's impartiality might reasonably be questioned.  The common theme, tone, and pattern of the assigned judge's comments—which have extrajudicial roots in a 2014 visit to Turkey—reveal a growing appearance of partiality with respect to Halkbank and the evidence that the government will seek to introduce in this case.  A reasonable person might question whether the assigned judge's comments were an extrajudicial endorsement of the December 2013 arrests, relevant directly to the Turkish charges brought against Halkbank's former General Manager, and a rejection of the Turkish findings that those who caused the arrests were corrupt and acted pretextually.[94]  Because the allegations leading to the 2013 arrests arise from the same nucleus of allegations and even the same evidence underlying the prosecution's case against Halkbank, these comments created a basis on which a reasonable person might question whether the assigned judge is partial to the prosecution's theory.[95]  In

---

[94] Flamm Decl. ¶¶ 47–75; Reynolds Decl. ¶¶ 20–33.
[95] Reynolds Decl. ¶¶ 49, 53–55.

addition to questioning the assigned judge's ability to preside over the case generally, a reasonable person might also question the assigned judge's ability to fairly decide specific evidentiary questions.[96]  As previewed in the *Atilla* trial, Korkmaz's testimony is central to the government's case.  In addition to testifying about his "investigation" into Halkbank officers, Korkmaz will be the conduit for crucial government exhibits that he admittedly stole from Turkey.  Whether Korkmaz's investigation had ulterior motives, whether his testimony is biased, and whether the evidence he purports to offer was fabricated, will be central issues in this case.

These questions arise from the assigned judge's: (1) comments during a 2014 Symposium that directly addressed issues of fact and law in this case; (2) similar comments during an interview with a media outlet that endorsed the prosecution's theory of the case; (3) statements during the *Atilla* trial tending to show that the assigned judge adopted an opinion on a key defense theory based on extrajudicial sources; (4) comments made during an American media interview praising a specific prosecutorial decision related to Halkbank's co-defendant; and (5) reliance on information outside of the record during the pre-arraignment proceedings in this matter.

***Comments during the 2014 Symposium.***  In May 2014—less than five months after the Turkish investigators were disciplined for their role in the controversial arrests based on factual assertions that are virtually identical to those advanced by the prosecution against Halkbank—the assigned judge attended a symposium in Istanbul hosted by the FETO-affiliated law firm YKK.[97]  The assigned judge's trip was apparently paid for, at least in part, by the host organization.[98]  At the symposium, speakers explicitly took sides against the Turkish authorities, characterizing the

---

[96] *See, e.g.*, *id.* ¶¶ 29–31.
[97] *Id.* Ex. 10, at 167.
[98] *Id.* ¶ 20 n.4.

reassignment and dismissal of the FETO-affiliated investigators as an attack on the rule of law.[99] When it came time for the assigned judge to speak, he asserted—necessarily based on an understanding from previous speakers or other extrajudicial sources—that "it is no secret that the rule of law as contrasted with the rule of man is under some attack in Turkey."[100]  The assigned judge characterized Turkey's actions as impinging upon the independence of the judiciary and as "chang[ing] the participants in the game while the very game is in progress."[101]  He further suggested that Turkey's response to the December 2013 arrests was "unilateral[] and arbitrar[y]," when, at least as most Turks and Halkbank believe, it was neither.[102]  In characterizing the response to the December 2013 arrests as an attack on a rule of law—when most Turks and Halkbank believe it *preserved* the rule of law—the assigned judge created the appearance that he believes the December 2013 arrests were proper and based on legitimate evidence.[103]  Stated differently, a reasonable person might question whether the assigned judge formed an opinion on guilt or innocence and key evidence in this case from extrajudicial sources.  This is buttressed by the assigned judge's participation in a conference with a group that openly disagreed with the Turkish authorities' response to the Turkish investigation.[104]  And even if the assigned judge did not appreciate the nature of his association, the 2014 Symposium, or that his commentary would relate to a case over which he would later preside, the *appearance* that he prejudged the legitimacy of the original Turkish investigation requires recusal.[105]

To be clear, it is irrelevant whether the assigned judge appreciated the nature of his

---

[99] *E.g.*, *id.* Ex. 10, at 40, 98.
[100] *Id.* Ex. 10, at 168.
[101] *Id.* Ex. 10, at 169.
[102] *Id.* Ex. 10, at 169.
[103] Flamm Decl. ¶ 50.
[104] Reynolds Decl. ¶ 17–19.
[105] *Liljeberg*, 486 U.S. at 859; Flamm Decl. ¶ 63.

association with the 2014 Symposium or that his commentary would relate to a case over which

he would later preside.  What matters is the *appearance* that he prejudged the legitimacy of the

original Turkish investigation.  If reasonable observers fully informed of the facts could infer

that appearance, the assigned judge should recuse.

  ***Comments to Today's Zaman.***  The assigned judge's post-Symposium interview with the

FETO-affiliated newspaper *Today's Zaman* also provided reasons to question his impartiality.[106]

According to the article—entitled "Rule of Law and Freedom of Press Under Attack in

Turkey"—the assigned judge "told *Today's Zaman* that rule of law is under attack in Turkey

because the independence of the judiciary has been questioned," and, "[r]eferring to the

corruption probe that started on Dec. 17, 2013," that it was "inappropriate to change the rules of

the game while the game is taking place."[107]  These comments raise further questions about the

assigned judge's attitude toward the December 2013 arrests and the Turkish authorities'

response, and suggest that his views have long been decided based on extrajudicial sources.[108]

  But even putting aside the contents of the assigned judge's comments, his participation in

an interview for such an article creates *the appearance* that (1) he shares the author's views, and

(2) he has been exposed to the author's viewpoint.[109]  Sharing the viewpoint of many speakers at

the Symposium, the *Today's Zaman* author plainly wrote this article to criticize the Turkish

authorities' response to the December 2013 arrests.[110]  And as with the 2014 Symposium, it does

not matter whether the assigned judge appreciated the nature of *Today's Zaman* or the article in

---

[106] Reynolds Decl. ¶¶ 25–27.
[107] *Id.* Ex. 13.
[108] *Id.* ¶¶ 25–27.
[109] *See Liljeberg*, 486 U.S. at 859; *Microsoft Corp.*, 253 F.3d at 108–13.
[110] Reynolds Decl. ¶ 26.

which his comments would appear. [111]  After reading the article, especially in conjunction with his participation at the Symposium where he voiced the same views, a reasonable person could well question whether the assigned judge is biased against Halkbank's view of the case.[112]  This questionable appearance of impropriety is exacerbated by the fact that a case was pending in Turkey and impending in the United States.[113]

    ***Comments During the Atilla Trial.***  The appearance that the assigned judge has formed an opinion on the legitimacy of the December 2013 arrests was made even starker by the assigned judge's characterization of the official Turkish account as a "far-fetched conspiracy theory" during the *Atilla* trial. [114]  As noted above, the view that the Turkish investigation into Halkbank harbored ulterior motives and farcical is anything but a conspiracy theory.[115]  Indeed, it is supported by the Turkish authorities including Istanbul's Chief Prosecutor and the Turkish High Council of Judges and Prosecutors.[116]  Moreover, by the assigned judge's own reasoning, his views on the nature of the charges against Halkbank were formed "far outside any United States courtroom."[117]  The same is true for the assigned judge's comments about Zarrab's jailhouse statements.  The Court cited the *New York Times*, among "90 other" extrajudicial sources, to suggest that the prosecution's transcript was inaccurate.[118]

    ***Post-Atilla Trial Comments.***  The assigned judge's interview following the *Atilla* trial further contributed to the appearance of partiality.[119]  The assigned judge again participated in an

---

[111] *Liljeberg*, 486 U.S. at 859; Flamm Decl. ¶ 63.
[112] Reynolds Decl. ¶¶ 25–27.
[113] Flamm Decl. ¶¶ 69–72.
[114] Atilla Trial Tr. at 1969:8, ECF No. 428.
[115] Reynolds Decl. ¶¶ 10, 30.
[116] *Id.* ¶¶ 14–15, Ex. 3.
[117] Atilla Trial Tr. at 1969:9–10, ECF No. 428.
[118] Atilla Trial Tr. at 1012:3–5, ECF No. 416.
[119] Reynolds Decl. Ex. 15.

interview with an author of an article that was outwardly negative toward the Turkish

government, stating in his article that it "tarred" the assigned judge for his participation in the

2014 Symposium.  The assigned judge also opined on the possibility of the government

discontinuing its prosecution, stating that the prospect makes the assigned judge's "head . . .

spin."  By weighing in on the government's prosecution decision, the assigned judge appeared to

signal his opinion that the allegations are true and the charges against Halkbank are legitimate.[120]

This appearance is made starker by the fact that the interview was given while the *Atilla* appeal

and indictments against several of Halkbank's co-defendants were pending before him and the

indictment against Halkbank was impending.[121]  But even putting aside the appearances created

by the assigned judge's statements, his apparent proclivity for media and willingness to discuss a

pending case would "lead any objective observer to wonder whether [the assigned judge's]

judgments are being influenced by the prospect of favorable coverage in the media."[122]

   ***Comments Made During Pre-Arraignment Proceedings.***  The assigned judge's

statements since the government's indictment of Halkbank further contribute to the appearance

that he has been influenced by extrajudicial sources.  The assigned judge has repeatedly

referenced media articles and based his decisions on them.  For example, on November 5, 2019,

when the parties were litigating whether Halkbank could enter a special appearance for purposes

of contesting jurisdiction, the assigned judge asserted, based on a *New York Times* article, that

Halkbank did not need to enter a special appearance, because doing so would constitute

---

[120] The assigned judge reinforced his position, without any record basis and based wholly on
extrajudicial sources, in referring to what he characterized as a "campaign," involving not only
Halkbank and the Turkish government but Halkbank's counsel, which the Court identified by
name, to "avoid Halkbank being indicted and, relatedly, to avoid Halkbank having to pay a
potential fine."  Dec. 5, 2019 Order at 9, ECF No. 581.

[121] Flamm Decl. ¶¶ 69–72.

[122] *Ligon*, 736 F.3d at 127 n.23 (internal quotation marks omitted).

"preliminary fencing or shadow boxing" when the parties were already in settlement negotiations.[123]

* * * * *

The assigned judge's attendance and comments at the 2014 Symposium in Istanbul created an appearance of bias.  The assigned judge waded into a hyper-polarized controversy and staked out his position, a position which touches upon the exact events at issue in this case and in direct opposition to the defenses that Halkbank will make.  Whether in preparation for his comments or at the Symposium itself, the assigned judge formed a view on these events based on extrajudicial sources.  He then publicly articulated his views not just at the Symposium, but also in media interviews.  After being assigned to this case, the assigned judge continued to rely on extrajudicial accounts of these events and others related to the case—something that the jurors in this case will be admonished not to do.  Based on these extrajudicial sources, the assigned judge has made it clear that he has already rejected Halkbank's defenses.  Under these conditions, a reasonable person might question whether Halkbank will receive a fair trial.

Halkbank and its 17,000 employees were targeted in Turkey in 2013 when a FETO-affiliated group of investigators and prosecutors wrongfully arrested its former General Manager. Professor Michael Reynolds, one of America's leading experts on Turkey, tells us that FETO is a menace to democratic interests and is not a conspiracy theory.  The removal of FETO-affiliated prosecutors for illegally arresting Halkbank's former general manager on the same charges as this case was entirely appropriate.  There is abundant evidence of that, and Halkbank intends to prove at trial that the FETO-affiliated investigators were corrupt.  That is a key issue in this case and no judge who has publicly supported the FETO-affiliated investigators and dismissed

---

[123] November 5, 2019 Hearing Tr. 20:21–23, ECF No. 575.

Halkbank's defense as an unfounded conspiracy theory should preside over this case.

Individually and taken together, the assigned judge's actions have provided many reasonable bases on which an objective observer might question his ability to impartially decide central issues in this case. Even if the assigned judge subjectively believes he is capable of impartially deciding this case, the promotion of public confidence in the fair administration of justice requires recusal.

## CONCLUSION

For these reasons, Halkbank respectfully requests that the assigned judge recuse himself from further proceedings in this case and that the matter be randomly reassigned to another United States District Judge.

Dated: July 14, 2020

Respectfully submitted,

WILLIAMS & CONNOLLY LLP

/S *Robert M. Cary*

Robert M. Cary
Simon A. Latcovich
James W. Kirkpatrick
Damayanti Desai
725 Twelfth Street, N.W.
Washington, D.C. 20005

650 Fifth Avenue, Suite 1500
New York, NY 10019
Phone: (202) 434-5000
Fax:    (202) 434-5029
Email: rcary@wc.com
        slatcovich@wc.com
        jkirkpatrick@wc.com
        ddesai@wc.com