UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

                                 :

UNITED STATES OF AMERICA

                                 :

         - v. -                         S6 15 Cr. 867 (RMB)

                                 :

TURKIYE HALK BANKASI, A.S.,
  a/k/a "Halkbank,"

                                 :

          Defendant.           :

                                 :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

 

**GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO
HALKBANK'S MOTION TO RECUSE**

 

                                                        AUDREY STRAUSS
                                                         Acting United States Attorney for the
                                                         Southern District of New York

Michael D. Lockard,
Sidhardha Kamaraju,
David W. Denton, Jr.,
Jonathan E. Rebold, and
Kiersten A. Fletcher,
Assistant United States Attorneys
     *Of Counsel*

## **Table of Contents**

PRELIMINARY STATEMENT ................................................................................. 1

BACKGROUND ................................................................................................... 2

    A.    The Indictment ........................................................................... 2

    B.    Proceedings Involving Co-Defendants ...................................... 3

    C.    Halkbank's Resistance to Service of the Summons and Motion
to Make a Special Appearance ................................................... 7

    D.    The 2014 Istanbul Symposium ................................................. 9

    E.    Halkbank's Co-Defendant's Motion to Recuse ...................... 11

    F.    The 2018 Courthouse News Article .......................................... 12

    G.    Halkbank's Motion to Recuse .................................................. 13

ARGUMENT ...................................................................................................... 15

    I.    Applicable Law ......................................................................... 15

    II.    Discussion ................................................................................. 19

        A.    The Court's Participation in the Symposium Does Not Support Recusal  19

        B.    The Court's Rulings During the *Atilla* Trial Do Not Support Recusal ..... 26

        C.    The Court's Comments During the 2018 Interview Do Not
Support Recusal ........................................................................ 28

        D.    The Court's Statements During the Pre-Arraignment Proceedings
Do Not Support Recusal ............................................................ 29

CONCLUSION .................................................................................................... 31

## Table of Authorities

**Cases**

*Cheney v. U.S. Dist. Court for D.C.*,
    541 U.S. 913 (2004) ............................................................................................... 16

*Da Silva Moore v. Publicis Groupe*,
    868 F.Supp.2d 137 (S.D.N.Y. 2012) ............................................................. 15, 18

*Hoffenberg v. United States*,
    333 F. Supp. 2d 166 (S.D.N.Y. 2004) .................................................................. 17

*Hygh v. Jacobs*,
    961 F.2d 359 (2d Cir. 1992) .................................................................................. 24

*In re Aguinda*,
    241 F.3d, 194 (2d Cir. 2001) ..................................................................... 16, 17, 24

*In re Drexel Burnham Lambert Inc.*,
    861 F.2d 1307 (2d Cir. 1988) ........................................................................ passim

*In re International Business Machine*,
    45 F.3d 641 (2d Cir. 1995) .................................................................................... 26

*In re Judicial Misconduct*,
    632 F.3d 1289 (9th Cir. 2011) ......................................................................... 17, 20

*Ligon v. City of New York*,
    736 F.3d 118 (2d Cir. 2013) .................................................................................. 25

*Ligon v. City of New York*,
    743 F.3d 362 (2d Cir. 2014) .................................................................................. 25

*Liteky v. United States*,
    510 U.S. 540 (1994) ....................................................................................... passim

*McMahon v. Hodges*,
    382 F.3d 284 (2d Cir. 2004) ............................................................................ 18, 28

*Metro. Opera Ass'n, Inc. v. Local 100, Hotel Emps. Int'l Union*,
    332 F.Supp.2d 667 (S.D.N.Y 2004) ..................................................................... 15

*Moore v. Publicis Groupe SA & MSL Grp.*,
    No. 11 Civ. 1279 (ALC), 2012 WL 12528637 (S.D.N.Y. Nov. 8, 2012) .............. 18

*Nat'l Auto Brokers Corp. v. Gen. Motors Corp.*,
    572 F.2d 953 (2d Cir. 1978) .................................................................................. 17

*Rosen v. Sugarman*,
    357 F.2d 794 (2d Cir. 1996)..................................................................................... 17

*Thorpe v. Zimmer, Inc.*,
    590 F. Supp. 2d 492 (S.D.N.Y. 2008)....................................................................... 17

*United States v. Atilla*,
    --- F.3d ----, 2020 WL 4045356 (2d Cir. July 20, 2020) ..................................... 7, 21

*United States v. Bernstein*,
    533 F.2d 775 (2d Cir. 1976)................................................................................ 18, 28

*United States v. Conte*,
    99 F.3d 60 (2d Cir. 1996) .......................................................................................... 18

*United States v. Curcio*,
    680 F.2d 881 (2d Cir. 1982)..................................................................................... 12

*United States v. Hamilton*,
    334 F.3d 170 (2d Cir. 2003)..................................................................................... 22

*United States v. Kerik*,
    419 Fed. Appx. 10 (2d Cir. 2011)............................................................................ 29

*United States v. Lovaglia*,
    954 F.2d 811 (2d Cir.1992)......................................................................... 16, 23, 25

*United States v. Pforzheimer*,
    826 F.2d 200 (2d Cir. 1987)..................................................................................... 21

*United States v. Pitera*,
    5 F.3d 624 (2d Cir. 1993) .................................................................................. 18, 20

*United States v. Prevezon Holdings Ltd.*,
    319 F.R.D. 459 (S.D.N.Y. 2015) .............................................................................. 22

*United States v. Santa*,
    180 F.3d 20 (2d Cir. 1999)........................................................................................ 21

*United States v. Sclafani*,
    487 F.2d 245 (2d Cir. 1973)................................................................................ 18, 28

*United States v. Tropeano*,
    252 F.3d 653 (2d Cir. 2001)..................................................................................... 22

**Statutes**

18 U.S.C. § 2.................................................................................................................... 2

18 U.S.C. § 371 ................................................................................................... 2

28 U.S.C. § 455 ................................................................................................. 15

18 U.S.C. § 1344 ................................................................................................. 2

18 U.S.C. § 1349 ................................................................................................. 2

18 U.S.C. § 1956 ................................................................................................. 2

50 U.S.C. §§ 1701-1706 ....................................................................................... 2

**Other Authorities**

*2019 Country Reports on Human Rights Practices: Turkey*;
   U.S. State Department, Bureau of Democracy, Human Rights, and Labor ............................ 15

Patrick Kingsley, *Turkey Investigating 17, Some Americans, Accused in Failed Coup*,
   N.Y. TIMES (Apr. 15, 2017) ............................................................................. 15

*World Press Freedom Index 2020: Turkey*, Reporters Without Borders ..................................... 15

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum of law in opposition to defendant Turkiye Halk Bankasi, A.S.'s ("Halkbank" or the "defendant") motion to recuse the Court due to a claimed appearance of partiality. ("Mot."). The Government respectfully submits that the defendant's motion is without merit and should be denied.

The defendant's motion is nothing but an attempt to manufacture the appearance of impropriety by injecting a Turkish political dispute into an American court of law. The Court has never taken sides in that political dispute, nor has the Court been called upon to do so. This prosecution is not about choosing sides in that Turkish controversy, but rather determining whether Halkbank violated U.S. law. Throughout the proceedings related to the defendant's co-conspirators, Reza Zarrab and Mehmet Hakan Atilla, and this proceeding, the Court has meticulously ensured that it not only conducts a fair inquiry into the defendants' guilt or innocence, but that that inquiry comports with the appearance of impartiality required in an American court of law.

Unable to point to any instance that could actually cause a reasonable observer to question the Court's impartiality, Halkbank grossly distorts the Court's prior statements and the record. Those distortions includ twisting the Court's words at a 2014 Turkish symposium into a referendum on this case even though, as the Court has explained already, the Court's comments had nothing to do with this prosecution; misconstruing the Court's comments during Atilla's trial to suggest that the Court improperly curtailed Atilla's defense, even though the Court actually allowed Atilla to pursue that defense; distorting the Court's statements to a reporter about Zarrab's case to make them appear as if those statements reflected the Court's view of the prosecution against Halkbank; and mischaracterizing the Court's well-reasoned denial of Halkbank's highly

unusual request for a "special appearance" as an improper determination of Halkbank's guilt based on extrajudicial sources. Halkbank's motion is not about curing the appearance of impropriety but rather the bank's "seeking to avoid the adverse consequences of [the Court's] presiding over [the bank's] case," *In re Drexel Burnham Lambert Inc.*, 861 F.2d 1307, 1312 (2d Cir. 1988), and thus, should be rejected as such.

## BACKGROUND[1]

### A.      The Indictment

On October 15, 2019, the grand jury returned superseding indictment S6 15 Cr. 867 (RMB) (the "Indictment") (D.E. 562), charging Halkbank with obstructing the U.S. Department of the Treasury ("Treasury"), 18 U.S.C. § 371; conspiring to violate the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701-1706, and executive orders and regulations issued thereunder, 50 U.S.C. § 1705; bank fraud and conspiring to commit bank fraud, 18 U.S.C. §§ 1344, 1349, & 2; money laundering and conspiring to commit money laundering, 18 U.S.C. §§ 1956(a)(2)(A), (h) & 2.

As alleged in the Indictment, from approximately 2012 through 2016, Halkbank knowingly participated in a scheme to violate U.S. criminal laws in order to give the Government of Iran access to billions of dollars' worth of sanctions-restricted funds deposited with Halkbank. These sanctions were in response to the unusual and extraordinary threat the Government of Iran and its actions pose to the United States' national security, economy, and foreign policy: the Government

---

[1] In this memorandum, "D.E." refers to entries in the docket; "Tr." refers to the transcript against Mehmet Hakan Atilla; "GX" refers to a Government exhibit at the Atilla trial; "[date] Tr." refers to the transcript of proceedings held on the specified date; "PSR" refers to Atilla's Presentence Investigation Report; and "U.S.S.G" or "Guidelines" refers to the United States Sentencing Guidelines.

of Iran's sponsorship of international terrorism, pursuit of an illicit nuclear program and ballistic missiles program, and human rights abuses. (Tr. 163-65, 179-85, 195, 1081-82, 1409-12).

The purpose of Halkbank's scheme was to move the Government of Iran's money from accounts with Halkbank to intermediary accounts in the United Arab Emirates and Turkey, concealing the funds' Iranian nexus so the money could be disbursed throughout the world, including through the U.S. financial system. (Ind. ¶¶ 1-6). A sophisticated system of trade-based money laundering, falsified documents, front companies, and payment intermediaries induced U.S. financial institutions to unwittingly export funds and financial services for the Government of Iran in violation of both the banks' internal policies and sanctions laws. (*Id.* ¶¶ 25-35, 50-62, 64). Halkbank thus knowingly participated in a scheme to defraud U.S. banks, to launder money through the U.S. financial system, and to violate the sanctions against the Government of Iran. (*Id.* ¶¶ 69-81). Halkbank lied to the Treasury Department to conceal the scheme and to protect Halkbank's access to the U.S. financial system. (*Id.* ¶¶ 16-21, 42, 45, 63, 66-71).

### B.      Proceedings Involving Co-Defendants

Zarrab, Halkbank's client and co-defendant, pleaded guilty to an information, S5 15 Cr. 867 (RMB), charging him with crimes arising out of his participation in the scheme. (D.E. 364, 365, Oct. 26, 2017 minute entry).[2] Atilla, Halkbank's former Deputy General Manager for International Banking, was convicted following a jury trial of offenses charged in an underlying indictment, S4 15 Cr. 867 (RMB), arising out of his role in the scheme. (D.E. 293, 486, 518). Halkbank's former General Manager, Suleyman Aslan, and its former Head of Foreign Operations, Levent Balkan, are also charged and remain at large, along with other co-defendants. (D.E. 293).

---

[2] Halkbank's speculation that the original charges in this case were based on evidence obtained from the Turkish criminal investigation, (Mot. at 11), is false. (*See, e.g.*, Tr. at 1811-15 (Korkmaz first learned in approximately April 2016 that his attorney had spoken with U.S. law enforcement)).

Beginning November 27, 2017, the Court presided over the *Atilla* trial. Over several weeks of trial, the Government presented overwhelming evidence of Atilla's guilt, including: (1) testimony from Atilla's co-conspirator, Reza Zarrab; (2) emails from accounts used by Zarrab and his employees and business associates; (3) account records from U.S. financial institutions concerning Zarrab's companies and affiliated entities; (4) electronic records recovered from Zarrab's phone; (5) evidence from a Turkish criminal investigation of Atilla, Zarrab, other Halkbank officers, and Turkish government officials for corruption and money laundering offenses, including (i) wiretaps and transcripts of wiretaps of calls involving Zarrab, Atilla, and others; (ii) electronic records recovered from Zarrab's phones; (iii) records from electronic devices seized during searches of Zarrab's and his associates' offices and a Halkbank office; and (iv) photographs of documents seized during the office searches; and (6) documents and witness testimony from Treasury regarding its communications with Atilla and others at Halkbank.

During several days of testimony, Zarrab testified about the scheme, how it operated, and the roles of some of his co-conspirators. (*See, e.g.*, Tr. 319-35, 558-73). Among other things, Zarrab authenticated dozens of recordings of telephone calls in which he participated, and that were intercepted in the course of the Turkish criminal investigation, as genuine and accurate. (*See, e.g.*, Tr. 338-39, 346-49, 357, 359-63, 367-70, 388-92, 401-23, 425-40, 462-67, 476-79, 487-92, 496-501, 502-15, 550, 553-57, 577-88, 592-601, 615-16, 619-22, 655-59, 661-68, 671-78, 691-95, 743-46, 755-60, 1032). Zarrab also authenticated electronic records and documents seized in the course of the Turkish criminal investigation. (*See, e.g.*, Tr. 282-84, 480-81, 492-95, 501-02, 515-17, 548-50, 573-77, 606-07, 612-15, 649-55, 659-61, 668-71, 1033-34). This evidence corroborated evidence of the offenses obtained from other sources, such as, for example, emails obtained from searches of accounts controlled by Zarrab and his associates and employees, and

U.S. bank records. (*See, e.g.*, Tr. 284-87, 303-09, 312-19, 336-38, 353-57, 364-67, 397-401, 440-48, 449-53, 457-59, 461-62, 470-77, 607-12, 680-91, 706-34, 737-40, 761-77). Zarrab testified that he was arrested in December 2013 as a result of the Turkish criminal investigation and was released from prison after paying bribes. (Tr. 696, 1034-35). After Zarrab's cooperation became publicly known through his trial testimony, Turkish officials seized his assets in Turkey and those of his family members and associates and criminally investigated him for espionage. (Tr. 1046-47).

The supervisor of the Turkish criminal investigation, Huseyin Korkmaz, also testified, detailing how evidence in the investigation was collected. (Tr. 1392-98, 1578-81, 1587-88, 1749-51). After Korkmaz's unit conducted the arrests on December 17, 2013 of Zarrab, Suleyman Aslan and others, including many individuals with connections to politically powerful government officials, police supervisors were immediately reassigned. (Tr. 1374-75). Their replacements issued unlawful orders, including attempting to prevent the transmission of evidence to the prosecutor's office. (Tr. 1379-80). Korkmaz nonetheless delivered the evidence to the prosecutor and was promptly reassigned to a protection detail for the Bosporus Bridge, then moved to a remote eastern province, and, finally, arrested, along with others involved in the investigation. (Tr. 1380-83, 1561-64, 1793). Fearing the investigative evidence would be destroyed or tampered with, and as instructed by the prosecutor overseeing the case, Korkmaz made a copy of as much of the evidence as he was able to in order to preserve it. (Tr. 1385-87, 1788-92, 1801-02, 1834).

On cross-examination, counsel for Atilla sought to accuse Korkmaz, without any evidentiary basis,[3] of being involved in a July 15, 2016 coup attempt in Turkey (Tr. 1733-35, 1823-27), of shredding investigative materials (Tr. 1781-86), and of having a relationship to Fetullah

_____

[3] Counsel tried to establish certain allegations with unauthenticated documents of unknown origin.

Gulen[4] (Tr. 1827-30), among other things. The Court did not limit or curtail counsel's ability to pursue this cross-examination. Atilla moved for a mistrial based on Korkmaz's testimony (D.E. 376, 377), which the Court denied. (Tr. 1957-71). Among other things, the Court noted that it "permitted the defense great leeway in its cross-examination of Mr. Korkmaz, as it usually does, and as most of my colleagues also do to defense counsel in criminal cases. But at the same time, I note that the defense's at best illogical foreign conspiracy theory has no foundation in the record, and is, in reality, unpersuasive and borderline unprofessional, as a diversion from the issues to be decided in this case." (Tr. 1970).

Atilla's defense case consisted of testimony from an airline employee and Atilla's own testimony, which was riddled with false statements. (May 16, 2018 Tr. at 12-19). No witnesses challenged the authenticity or accuracy of evidence from the Turkish criminal investigation or attempted to establish that the Turkish criminal investigation was illegitimate. In closing, Atilla's counsel conceded that the criminal scheme existed and that Mr. Zarrab was involved. (Tr. 2285, 2287). He conceded the authenticity of the investigative evidence, and the fact that individuals (other than Atilla) were paid substantial bribes in connection with the scheme. (Tr. 2287, 2291-97, 2303-06, 2317-18). Atilla's principal defense was that he did not know about the scheme and did not participate in it. (Tr. 2288-89, 2298-2300).

On January 3, 2018, the jury unanimously found Atilla guilty of conspiring to obstruct the U.S. Department of the Treasury, conspiring to violate the IEEPA, bank fraud, conspiring to commit bank fraud, and conspiring to commit money laundering. (D.E. 486). Before sentencing, the Government argued that "Atilla's offenses simultaneously opened a multi-billion-dollar

---

[4] There was no evidence concerning Gulen or the so-called "FETÖ" organization, except Korkmaz's uncontradicted testimony that he was not affiliated with that group. (Tr. 1753-54, 1831).

channel of illicit funding for the Government of Iran and relieved crucial financial pressure on Iran during negotiations to limit its nuclear program." (D.E. 505 at 1; *see also id*. at 5, 11, 17-18, 20-21). The parties provided the Court with various potential sentencing comparisons, noting the unprecedented scale of the sanctions evasion at issue in this case. (D.E. 498 at 45-58 & Exs. B, D; D.E. 505 at 50-62; *see also id*. at 57 ("the crimes that Atilla committed are without ready comparison"); May 16, 2018 Tr. at 72 ("[T]o our knowledge, there has not been a bigger criminal sanctions evasion prosecution in a U.S. court than this case. This is the biggest sanctions evasion case prosecuted in the United States that we are aware of. The scope and scale is massive.")). On May 16, 2018, the Court sentenced Atilla principally to a term of imprisonment of 32 months. (May 16, 2018 Tr. at 81).

Atilla appealed his conviction and sentence, and the Second Circuit affirmed. *United States v. Atilla*, --- F.3d ----, 2020 WL 4045356 (2d Cir. July 20, 2020).

C.    **Halkbank's Resistance to Service of the Summons and Motion to Make a Special Appearance**

A summons was issued on October 15, 2019, the day that the Indictment was returned, directing Halkbank's appearance on October 22, 2019. (D.E. 563; *see also* D.E. 565, 566). That same day, the defendant issued a press release stating, among other things, that: "certain U.S. authorities have been asking Halkbank for records and information pertaining to allegations made during the *Atilla* trial, which led the Bank to closely cooperate with these authorities[5] and also initiate an independent investigation of its own on a voluntary basis. The Bank had voluntarily retained the prestigious U.S. law firm King & Spalding, which then retained the forensic analysis firm Exiger, to conduct this independent internal investigation . . . These findings were reported

---

[5] The Government does not agree that the defendant cooperated in the investigation.

by the two firms to the U.S. Department of Justice and the U.S. Department of Treasury's Office of Foreign Assets Control." (D.E. 565 Ex. B). According to public reports filed with the Court, Turkey's President Erdogan raised the bank's indictment during a meeting with Vice President Pence and Secretary of State Pompeo, and the Turkish Foreign Minister attacked the charges as "politically motivated." (*Id.* Exs. C, D, E). On October 18, 2019, prior counsel delivered a letter to the Court acknowledging that: "King & Spalding has represented Halkbank in connection with the Department of Justice's prior investigation regarding Halkbank," but advising that it was not authorized to accept service on behalf of the defendant or appear in the case. (D.E. 564).

Halkbank failed to appear as required on October 22, 2019. (D.E. 566). At the conference, the Court noted it was "surprised somewhat" by prior counsel's letter, "because it was my understanding that for over a period of years—or a year anyway—that there were some discussions on behalf of Halk Bank with respect to a potential fine, I guess it would be, in connection with the Iran sanctions evasion scheme, but more particularly I thought that King & Spalding had been involved in those discussions. Is that fair, or is that accurate?" (Oct. 22, 2019 Tr. at 2). The Government confirmed the Court's understanding: "King & Spalding has represented Halk Bank with respect to the criminal investigation of the bank since at least October of 2017. . ." (*Id.* at 2-3). The Court issued a second summons directing Halkbank to appear on November 5, 2019 to give the defendant the chance to cure its noncompliance, (*id.*), which was served. (D.E.571, 572).

On November 5, 2019, prior counsel requested permission to enter a special appearance for purposes of filing a motion to recuse the Court and to dismiss the Indictment for lack of personal jurisdiction. Halkbank would not commit to appear if the motions were denied. (Nov. 5, 2019 Tr. at 15-16; D.E. 577). The Court set an "expeditious" schedule to resolve these preliminary issues, in light of the extensive length of time that, as the Government and Halkbank's counsel had

described to the Court, the defendant had been engaged in responding to the criminal investigation prior to the filing of the Indictment. (Nov. 5, 2019 Tr. at 19-22).

The Court denied the bank's motion for a special appearance, finding that Halkbank's theory of personal jurisdiction was incorrect and that Halkbank would not, in any event, waive its ability to challenge personal jurisdiction by appearing. (D.E. 581). Halkbank filed a petition for mandamus, which the Court of Appeals denied, holding that Halkbank could challenge personal jurisdiction after appearing and on direct appeal. (D.E.596). Only then did prior counsel enter an appearance and advise that counsel was authorized to participate in an arraignment and enter a plea of not guilty on behalf of the defendant. (*See generally* Feb. 25, 2020 Tr.).

### D.      The 2014 Istanbul Symposium

The Symposium was held on May 8 and 9, 2014, in Istanbul, Turkey. The Court was joined at the Symposium by a number of well-respected participants, including diplomats, members of law enforcement, current and former jurists, legal scholars, and practicing attorneys. (D.E. 640 (Reynolds Decl.) Ex. 10 at 1, 15, 25, 31, 37, 91, 143, 167, 195). The Court chaired one panel, entitled "Independent and Effective Judiciary," which included the U.N. Special Rapporteur on the Independence of Judges and Lawyers; a judge on the European Court of Human Rights; a representative of the European Commission for Democracy Through Law; and a German judge and vice-president of the Magistrats Européens pour la Démocratie et les Libertés. (*Id.* at 167-68).

According to a Symposium program, in its opening remarks to the panel, the Court emphasized the importance of judicial independence and impartiality and described fundamental principles of separation of powers, transparency, ensuring the qualifications of the judiciary, and ethical standards. (*Id.* at 168-69). "These are critical questions for every democracy, not just Turkey." (*Id.* at 168). Without identifying any specific case or circumstance, the Court noted that "it is no secret that the rule of law as contrasted with the rule of man is under some attack in

Turkey," referring to earlier comments by European Union representatives about "how concerned they were about certain developments here, in Turkey. One of them said that Turkey erupted last year. . . And to be sure, this is a complex nuanced and multidimensional issue. It's also a dynamic one which changes almost every day." (*Id*.). The Court also described remarks by the President of the Turkish Constitutional Court in April 2014 about a Turkish government Twitter ban as "impressive." (*Id*.). Later in its remarks, the Court reportedly noted that:

> [C]ourts do not exist in a vacuum. And there is therefore an obvious political context in which all of our respective judiciaries operate. And in that connection [the word] politics is not used negatively or pejoratively. . . And so to understand this debate and to participate in this debate we need to understand the Turkish politics as well. But what we should not be doing in the political realm is encouraging politics, or politicians to diminish judicial independence, or to introduce new rules and/or to change the rules of the game[,] much less to change the participants in the game while the very game is in progress. That in my opinion will be surely to substitute the rule of man for the rule of law.

(*Id*. at 168-69). The Court's remarks did not refer to any particular case or circumstances.

The Court then addressed several generally applicable principles of judicial independence: separation of powers, transparency, highly qualified judges, adherence to high ethical standard, and adherence to the rule of law rather than the rule of man. (*Id*. at 169). Describing the principle of upholding the rule of law, the Court is reported to have said:

> So, clearly this principle overlaps with others that I have mentioned[,] particularly separation of powers[,] but the rule of law is what prevents the state from unilaterally and arbitrarily relocating, firing judges and prosecutors who are actively pursuing an investigation, removing police officers, crashing investigations, disrespecting court decisions, closing down the means of communications, and otherwise attempting to dominate the judiciary. It means not granting preferential treatment to some and punishment to others on the basis of rules that do not apply generally. . . .

(*Id*. at 169). As with the Court's discussion of the other fundamental principles of judicial independence, this description of the rule of law was not in reference to any particular case, circumstances, or jurisdiction. Indeed, the Court noted that it had attended a program in Albania

the previous year, and that similar issues were discussed at that event. (*See id.* at 180). At no point during the panel, or the entire Symposium, were Halkbank or Zarrab mentioned.

On the last day of the Symposium, an English-language article published in the Turkish newspaper, Today's Zaman (the "*Zaman* Article), attributed to the Court the statement that "[i]t is inappropriate to change the rules of the game while the game is taking place," reportedly made in reference to a Turkish corruption probe that began on December 17, 2013. The Court is further reported to have said that there is "complete separation of powers between the executive and the judiciary" in the United States and that it is inappropriate for a minister to have a supervisory role over judges, to have commended a speech by the Constitutional Court President, and to have said that senior officials should not disparage decisions by their courts. (Reynolds Decl. Ex. 13).

### E. Halkbank's Co-Defendant's Motion to Recuse

On August 30, 2016, Zarrab filed a motion to recuse the Court based on the Court's participation in the 2014 Symposium, arguing that it had created an appearance of partiality because (1) the Symposium purportedly focused on Zarrab's criminal case in Turkey, and (2) one of the Symposium's sponsors, a Turkish law firm (the "Turkish Law Firm"), was later accused by the Government of Turkey of being a member of an "Armed Terrorist Organization" led by Fetullah Gulen.[6] (D.E. 79 & 85). The Court denied the motion in an order dated September 26, 2016. (D.E. 87 (the "Recusal Order"), finding the motion both untimely and ungrounded on the merits.

---

[6] At the time of the Symposium, this firm "was an affiliate of DLA Piper and was regarded as one of the preeminent (and largest) law firms in Istanbul." It was "awarded the 'Chambers Europe Award for Excellence - Law Firm of the Year' for two consecutive years in 2012 and 2013." (*Id.* at 6 & n.8).

As the Court observed in its order, "[a]t the time of the 2014 Symposium, the Court had never heard of Defendant Reza Zarrab. The Court first learned of Zarrab two years after the Symposium, on March 21, 2016, when Zarrab was arrested by U.S. officials in Miami, Florida and his criminal case alleging, among other things, conspiracy to violate U.S. sanctions against Iran, was randomly assigned." (*Id*. at 2). The Court found that "an objective and informed observer could not reasonably question the Court's impartiality." (*Id*. at 14). "[I]t would be objectively unreasonable to conclude from these remarks [at the Symposium] that the Court was biased or partial against Mr. Zarrab." (*Id*. at 17).

F.     **The 2018 Courthouse News Article**

The Court held several proceedings pursuant to *United States v. Curcio*, 680 F.2d 881 (2d Cir. 1982), regarding Zarrab and Atilla's knowing and voluntary waiver of conflicts or potential conflicts of interest of certain counsel. Among these were proceedings relating to Zarrab's representation by Rudy Giuliani of Greenberg Traurig LLP and Michael B. Mukasey of Debevoise & Plimpton LLP. (D.E. 209, 225, 233, 236, 238, 239, 244, 258, 259). Messers. Giuliani and Mukasey reportedly were retained in order to determine whether the prosecution could be resolved as part of a political agreement between the United States and Turkey; as part of that effort, these attorneys met with senior officials of the governments of the United States and Turkey, including the President of Turkey. (D.E. 225). The two firms also represented the Government of Turkey and the various victim-banks of the bank fraud offenses in other matters. (*Id*.). After *Curcio* proceedings, Zarrab waived any conflict created by these joint representations, and the Court accepted the waiver. (D.E. 259).

According to an article published on June 22, 2018 in Courthouse News, the Court was interviewed by a journalist for that publication. With respect to Mr. Giuliani's representation of

Zarrab (who, by this time, had pleaded guilty and testified extensively at the *Atilla* trial), the Court reportedly observed:

> [Mr. Giuliani] was hired to be – and he very actively pursued – being the 'go between' between President Trump and Turkey's President Erdogan in an unprecedented effort to terminate this federal criminal case in the middle of the case. . . Had Rudy succeeded, he and the two presidents I mentioned, would have helped very significantly the country of Iran – which was the beneficiary of the conspiracies to avoid USA sanctions against Iran, i.e. the very heart of the allegations in this case. My head still spins when I consider that.

The Court reportedly noted that Mr. Giuliani, as described by the article's author, "had previously staked his political reputation as an anti-Iran hawk who forged his anti-terrorism bona fides in the fires of the fallen Twin Towers after the Sept. 11, 2001 attacks." The Court reportedly found Mr. Giuliani's role in this case, accordingly, stunning and ironic. There was no discussion of Halkbank.

## G.   Halkbank's Motion to Recuse

On July 14, 2020, the defendant filed its motion to recuse the Court. (D.E. 637, 638, 340, 341). In its motion, Halkbank argues that the Court's impartiality could be questioned based on (1) the Court's participation in the 2014 Symposium, (2) certain rulings the Court made during the trial of co-defendant Atilla, and (3) the 2018 Courthouse News interview. In support of its motion, Halkbank attaches two proposed expert declarations, one concerning the law of judicial recusal (D.E. 641 (Flamm Decl.) and one concerning Turkish political events. (Reynolds Decl.).

The proposed expert declaration about Turkish politics opines repeatedly about what "most Turks" believe to be true: "[m]ost Turkish citizens believe that Gülen and his vast network have used these institutions to recruit others to join the FETÖ movement and expand its resources and influence." (Reynolds Aff. at 4; *see also id*. at 7 ("Most Turks believed. . . ."), 10 ("the view among supporters of the government (and indeed, most Turks) . . ."), 14 ("It is likely that most Turks believe . . ."), 15 ("what most Turks believe to be true . . .")).

13

The proposed expert opines that, in 2013, "FETÖ struck back hard" against proposed Turkish legislation purportedly adverse to Gulenist interests, "by opening 'investigations' into its opponents and seeking to put them in jail. On December 17, 2013, FETÖ-affiliated prosecutors, judges, and police officers carried out the arrests of 24 individuals." (*Id.* at 6). To support this claim, the author cites a chapter he contributed to a book published in March 2018. (*Id.* and Ex. 1).[7] In that chapter, the author asserted that, "no one doubted that Gulenists were again behind the corruption investigations" resulting in the arrests on December 17, 2013 (*id.* at 12-13), citing two Turkish news articles published on December 19, 2013 and January 8, 2014. (*Id.* & n. 46, 47).

Prior to the book's publication, (1) Zarrab had pleaded guilty to the offenses in the superseding information; (2) Zarrab had testified extensively at the *Atilla* trial concerning his role in those offenses, including the payment of massive bribes to Suleyman Aslan, Mehmet Zafer Caglayan, and others; (3) Zarrab had authenticated evidence gathered during the Turkish criminal investigation and admitted he bribed his way out of prison in Turkey; (4) Korkmaz, the supervisor of the Turkish criminal investigation, had also testified extensively about how the investigation originated and was conducted, how the evidence was gathered and preserved, and convincingly illustrated that the investigation was not politically motivated and the evidence was genuine; and (5) a large volume of evidence derived from the Turkish criminal investigation, and a large volume of other evidence and witness testimony corroborative of that evidence, had been made public as trial exhibits. (*See supra* at 4-5). The declaration does not acknowledge or address these facts in any way. The declaration, though relying on Turkish press reports, also does not acknowledge or address reports by the U.S. State Department and humanitarian organizations concerning

---

[7] The proposed expert affidavit also relies on various Turkish documents, whose source is unidentified and which are not translated into English. (*Id.* Ex. 3, 4, 6).

widespread political prosecutions and arbitrary detentions in Turkey, including of United States citizens and employees;[8] and severe limits on press freedom that render reliance on Turkish press reports of limited objective value. *See, e.g.*, *2019 Country Reports on Human Rights Practices: Turkey*; U.S. State Department, Bureau of Democracy, Human Rights, and Labor (*available at* https://www.state.gov/reports/2019-country-reports-on-human-rights-practices/turkey/); Report of the Special Rapporteur on the promotion and protection of the right to freedom of opinion and expression on his mission to Turkey (June 21, 2017) (*available at* https://documents-dds-ny.un.org/doc/UNDOC/GEN/G17/170/40/PDF/G1717040.pdf); *World Press Freedom Index 2020: Turkey*, Reporters Without Borders (*available at* https://rsf.org/en/taxonomy/term/145).

## ARGUMENT

### I.     Applicable Law

Title 28, United States Code, Section 455(a) requires a district judge to "disqualify himself in any proceeding in which his impartiality might reasonably be questioned." 28 U.S.C. § 455(a). Further, a judge must recuse himself when he has "a personal bias or prejudice concerning a party." 28 U.S.C. § 455(b)(1). The movant must "overcome a presumption of impartiality, and the burden for doing so is substantial." *Da Silva Moore v. Publicis Groupe*, 868 F.Supp.2d 137, 150 (S.D.N.Y. 2012) (quoting *Metro. Opera Ass'n, Inc. v. Local 100, Hotel Emps. Int'l Union*, 332 F.Supp.2d 667, 670 (S.D.N.Y 2004)). Recusal under § 455(a) is only required when "an objective, disinterested observer fully informed of the underlying facts, [would] entertain significant doubt

---

[8] *See also, e.g.*, Patrick Kingsley, *Turkey Investigating 17, Some Americans, Accused in Failed Coup*, N.Y. TIMES (Apr. 15, 2017) (*available at* https://www.nytimes.com/2017/04/15/world/europe/turkey-failed-coup-investigation-americans.html) (Turkish prosecutors opened an investigation of former CIA director John O. Brennan, Senator Chuck Schumer, former U.S. Attorney Preet Bharara, former CIA deputy director and former Undersecretary for Terrorism and Financial Intelligence David Cohen, among several others, for fomenting the 2016 coup attempt).

that justice would be done absent recusal." *United States v. Lovaglia*, 954 F.2d 811, 815 (2d Cir.1992). In order to show a substantial doubt about the Court's impartiality warranting recusal, the defendant must show that the Court has demonstrated "such a high degree of favoritism or antagonism as to make fair judgment impossible." *Liteky v. United States*, 510 U.S. 540, 555 (1994). Recusal is not appropriate where the circumstances giving rise to the purported appearance of impropriety are "remote, contingent, indirect or speculative." *Lovaglia*, 954 F.2d at 815.

"Section 455(a) does not require that [the district court] accept all allegations by the moving party as true." *Lamborn v. Dittmer*, 726 F. Supp. at 517. On the contrary, "the grounds asserted in a recusal motion must be scrutinized with care." *In re Aguinda*, 241 F.3d, 194, 201 (2d Cir. 2001). "The trial judge must carefully weigh the policy of promoting public confidence in the judiciary against the possibility that those questioning his impartiality might be seeking to avoid the adverse consequences of his presiding over their case." *In re Drexel Burnham Lambert, Inc.*, 861 F.2d 1307, 1312 (2d Cir. 1988). The Court must make its determination, "not by considering what a straw poll of the only partly informed man-in-the-street would show[,] but by examining the record facts and the law." *Drexel*, 861 F.2d at 1313. The "[j]udicial inquiry may not . . . be defined by what appears in the press. If such were the case, those litigants fortunate enough to have easy access to the media could make charges against a judge's impartiality that would effectively veto the assignment of judges." *Id.* at 1309. "The decision whether a judge's impartiality can 'reasonably be questioned' is to be made in light of the facts as they existed, and not as they were surmised or reported." *Cheney v. U.S. Dist. Court for D.C.*, 541 U.S. 913, 914 (2004). Accordingly, "the appearance of partiality must have an objective basis beyond the fact that claims of partiality have been well publicized." *Aguinda*, 241 F.3d at 201.

16

A motion for recusal is committed to the sound discretion of the district court. *In re Drexel Burnham Lambert Inc.*, 861 F.2d 1307, 1312 (2d Cir. 1988). But the Court has no discretion to recuse itself unless the defendant has satisfied his heavy burden. *See Thorpe v. Zimmer, Inc.*, 590 F. Supp. 2d 492, 494 (S.D.N.Y. 2008) (citing *Rosen v. Sugarman*, 357 F.2d 794, 797 (2d Cir. 1996); *see also Aguinda*, 241 F.3d at 201 ("Where the standards governing disqualification are not met, disqualification is not optional; rather, it is prohibited.") (citing *Drexel*, 861 F.2d at 1312 ("A judge is as much obliged not to recuse himself when it is not called for as he is obliged to when it is."))); *Nat'l Auto Brokers Corp. v. Gen. Motors Corp.*, 572 F.2d 953, 958 (2d Cir. 1978) ("[A] judge has an affirmative duty . . . not to disqualify himself unnecessarily, particularly where the request for disqualification was not made at the threshold of the litigation and the judge has acquired a valuable background of experience.") (internal citations, quotation marks omitted). Recusal motions may not be used as strategic devices to judge shop. *Hoffenberg v. United States*, 333 F. Supp. 2d 166, 173 (S.D.N.Y. 2004).

A judge "may engage in extrajudicial activities, including law-related pursuits and civic, charitable, educational, religious, social, financial, fiduciary, and government activities, and may speak, write, lecture, and teach on both law-related and nonlegal subjects." Canon 4, CODE OF CONDUCT FOR UNITED STATES JUDGES. "[T]he presumption is that a judge will put personal beliefs aside and rule according to the laws as enacted, as required by his or her oath," and no appearance of impropriety is "created by the fact that every judge inevitably has opinions on the controversies of the day." *Aguinda*, 241 F.3d at 204; *see also In re Judicial Misconduct*, 632 F.3d 1289, 1289 (9th Cir. 2011) ("Engaging in such law-related activities—including speeches that comment on current events and legal developments—is permitted not only because judges are citizens, but because they are particularly knowledgeable on such topics."); *United States v. Pitera*, 5 F.3d 624,

626 (2d Cir. 1993) (affirming denial of recusal motion where district judge had given speeches to law enforcement agents and prosecutors about "steps they might take to increase the prospects for conviction in narcotics cases," and noting that the judge often lectured at trial seminars); *Da Silva Moore*, 868 F. Supp. 2d at 163, *objections overruled sub nom. Moore v. Publicis Groupe SA & MSL Grp.*, No. 11 Civ. 1279 (ALC), 2012 WL 12528637 (S.D.N.Y. Nov. 8, 2012) (denying recusal motion where magistrate judge had spoken and written publicly about the benefits of computer-assisted review in the context of civil discovery, an issue of dispute in the pending case).

"[O]pinions formed by [a] judge on the basis of facts introduced or events occurring during current or prior proceedings are not grounds for a recusal motion" absent a showing of deep-seated favoritism or antagonism that renders fair judgement impossible. *Liteky*, 510 U.S. at 555; *see also United States v. Conte*, 99 F.3d 60, 65 (2d Cir. 1996) ("Events occurring in the course of judicial proceedings generally do not constitute a basis for recusal" absent indications that the judge's decision-making was so prejudiced that it called into question the fairness of the proceedings). As such, recusal is not warranted when a judge "undoubtedly form[s] opinions about [a defendant's] likely guilt" based on information learned while presiding over a coconspirator's trial. *McMahon v. Hodges*, 382 F.3d 284, 290 (2d Cir. 2004) (holding that judge's statement that defendant would likely be convicted given evidence at co-defendant's trial did not require recusal); *see also United States v. Bernstein*, 533 F.2d 775, 785 (2d Cir. 1976) ("The rule of law . . . is that what a judge learns in his judicial capacity whether by way of guilty pleas of codefendants or alleged coconspirators, or by way of pretrial proceedings, or both is a proper basis for judicial observations, and the use of such information is not the kind of matter that results in disqualification."); *United States v. Sclafani*, 487 F.2d 245, 255 (2d Cir. 1973) (affirming denial of recusal motion despite

judge's reference at sentencing of codefendant to remaining defendants as "people who have poisoned your existence and placed you on the road of delinquency").

## II.    Discussion

The defendant's motion for recusal largely accuses the Court of creating the appearance that it has formed and expressed views on the merits of Halkbank's anticipated defense based on out-of-court information and evidence. But the motion itself is based on out-of-court speculation, combined with mischaracterizations of the prior proceedings and the Court's comments. Halkbank's proposed defense theory—that the Government's case against Halkbank relies on manipulated evidence from a politically motivated and illegitimate Turkish criminal investigation—has never been supported by any shred of evidence before the Court, and even in Halkbank's motion the theory is based on speculation, rumor, and unreliable foreign press reports. That theory has been soundly refuted in these proceedings by first-hand witness testimony and voluminous documentary and recorded evidence. Nonetheless, the Court never precluded Halkbank's co-defendants from attempting to argue or cross-examine based on this unfounded theory, and has never acted in a manner that could cause a reasonable, disinterested, and informed observer to question the Court's impartiality.

### A.    The Court's Participation in the Symposium Does Not Support Recusal

As the Court already concluded in rejecting the same argument raised by Zarrab, nothing in the Court's comments at the Symposium or in the *Zaman* Article creates an appearance of impropriety. To the contrary, the Court's remarks "focused upon universal principles of the Rule of Law and Justice and, particularly, the importance of an independent and effective judiciary" and "made no mention of Zarrab or the Turkish charges against him." Recusal Order at 15-16. The Symposium as a whole was devoted to general and salutary principles, not the Turkish criminal investigation of Zarrab and his co-conspirators. *Id.* at 14-15; *see also supra* at 9-11. Similarly, the

Court found that its purported comments reported in the *Zaman* Article also did not refer to Zarrab or the December 2013 case. Recusal Order at 16-17. Accordingly, the Court concluded that a reasonable observer would have no basis to question the Court's impartiality in presiding over Zarrab's case and that, as a result, recusal was not warranted. *See id*. pp. 16-18.

The Court appropriately rejected Zarrab's contention—repeated in the instant motion—that the involvement of the Turkish Law Firm in the Symposium compromises the appearance of impartiality because that firm has subsequently been accused of being aligned with FETÖ. In particular, the Court found that that Turkish Law Firm's sponsorship of the Symposium was irrelevant because, among other reasons (i) the Court had not been assigned to Zarrab's case until nearly two years after the Symposium; (ii) the Court had not commented on any of the merits of the case against Zarrab during the Symposium; and (iii) the Court had not been exposed to any "pre-screening" of the Government's case. *See id*. pp. 21-22.

The same reasoning applies to the defendant's instant motion. The Court's comments at the Symposium and the excerpted commentary in the *Zaman* Article deal with general principles about the need for judicial independence, which are of universal application. There is nothing in those comments that pertain to Halkbank's guilt with respect to the charges in the Indictment. Indeed, the Court's comments addressed neither the sanctions-evasion conduct described in the Indictment, nor, for that matter, the conduct that was at the heart the December 2013 case. The Court's comments were commentary on "current events and legal developments," which is entirely permissible, and not a basis for recusal. *See In re Judicial Misconduct*, 632 F.3d at 1289; *Pitera*, 5 F.3d at 626.

In the face of the Court's prior ruling, Halkbank selectively edits, rearranges, and strings together various statements (excising the bulk of the Court's comments); implies connections

between statements (which do not exist in the Court's unedited statements), and attributes Halkbank's spin on comments by other speakers at the Symposium to the Court, (Mot. at 8-9; *compare supra* at 9-11), in an effort to manufacture an appearance that the Court's comments spoke to the legitimacy of the Turkish criminal investigation and the viability of Halkbank's putative defenses. In this manner, Halkbank attempts to transform the Court's comments about the importance of judicial independence, separation of powers, transparency, qualified judges, adherence to high ethical standards, and deference to the rule of law rather than the rule of man in any judicial system, into an expression of views about the merits of a case that had not been filed.

Halkbank's argument, moreover, fundamentally misstates the issues that are before the Court. Simply put, this case is not about a Turkish political controversy, it is about a massive scheme to violate U.S. sanctions. The Turkish criminal investigation is relevant to the sanctions evasion scheme in one specific manner: evidence collected during that case, along with other evidence, "overwhelming[ly]" shows that Halkbank executives facilitated that scheme. *See Atilla*, 2020 WL 4045356 at 3 (describing evidence of Atilla's guilt as "overwhelming"). Thus, the issue before this Court with respect to that evidence is whether it is admissible at trial, not whether it was obtained in violation of another sovereign's law or for some politically-motivated reason. *See*, *e.g.*, *United States v. Pforzheimer*, 826 F.2d 200, 203-04 (2d Cir. 1987) (evidence seized in violation of state law admissible in federal proceeding where seizure of evidence did not violate any federal Constitutional protections); *see also United States v. Santa*, 180 F.3d 20, 30-31 (2d Cir. 1999) (Newman, J., concurring) (federal law controlled federal prosecution even though evidence would have been suppressed under state law). The Court must therefore determine whether there is "evidence sufficient to support a finding that the [evidence from the December 2013 investigation] is what [the Government] claims." *United States v. Tropeano*, 252 F.3d 653,

661 (2d Cir. 2001). "Extrajudicial sources" are not relevant to that question, and the Court did not

rely on any extrajudicial sources in ruling on the evidence's admissibility during the *Atilla* trial.

Rather, the Court considered the testimony of trial witnesses: from Zarrab, a participant in the

communications, and from Korkmaz, the supervisory investigator responsible for the collection

and seizure of the evidence. *See United States v. Hamilton*, 334 F.3d 170, 186-87 (2d Cir. 2003)

(audio recordings are "adequately authenticated" by "parties to the conversations" reflected in

them); *United States v. Prevezon Holdings Ltd.*, 319 F.R.D. 459, 462-63 (S.D.N.Y. 2015) (attorney

could authenticate photographs taken of documents in Russian criminal file). Thus, that the Court

will address the admissibility of the Turkish evidence (as it did at Atilla's trial) is not a basis for

recusal. *See Liteky*, 510 U.S. at 540-541 (absent "deep-seated favoritism or antagonism," court

rulings "alone almost never constitute valid basis for a bias or partiality recusal motion" because

they "cannot possibly show reliance on an extrajudicial source").

Halkbank further argues that the Court's allegedly FETÖ-sympathetic views create the

appearance that it will prevent Halkbank from pursuing a defense that the December 2013 evidence

is tainted by alleged FETÖ control of that investigation. (Mot. at 8-10). This claim is belied by the

fact the Court *allowed Atilla to pursue that very defense* (which the jury rejected). In opening

statements, Atilla's counsel argued, among other things, that "[t]he recordings come from a

controversial Turkish investigation, something that's been described as a judicial coup d'etat;"

"[t]he people who ran this [Turkish] investigation are partisan;" that "[the investigators] broke

Turkish law;" and that "who knows what's been destroyed or mislaid as a result of the very

unorthodox way that crucial evidence has been handled. How can you trust partisans or how can

you trust anything they've touched." (Tr. 59-60). The Court also afforded defense counsel great

leeway during cross-examination of Korkmaz to pursue this theory of defense. Among other

things, Atilla's counsel questioned Korkmaz regarding charges against him in Turkey related to a purported attempted coup, illegal wiretapping, and participation in a terrorist organization, *i.e.*, FETÖ; whether Turkish parliament found violations of law by Turkish police in connection with the investigation; potential violations of Turkish law by retaining a copy of the evidence; whether metadata for some files reflected alterations; and whether Korkmaz had any relationship to the July 2016 coup attempt. (Tr. 1729-33, 1753, 1777-79, 1792, 1811, 1824-25). During closing, Atilla's defense counsel argued that Korkmaz was "removed from his job for zealotry" and stole evidence from Turkey. (Tr. 2285-86). The Court already permitted a vigorous defense based on an alleged FETÖ conspiracy in the *Atilla* trial, and it is implausible that a reasonable observer who is "fully informed of the underlying facts" would conclude that the Court would improperly curtail the bank's ability to mount the same challenge. *Lovaglia*, 954 F.2d at 815.

Halkbank turns to Prof. Reynolds and Flam's declarations to argue that there is nonetheless an appearance of partiality because of how "most Turks" view the Turkish corruption investigation and the Turkish government's retaliation against the participants. Halkbank's reliance on these declarations fails as a matter of law and fact. Even if the Court were to credit Professor Reynolds' opinions about what "most Turks believe,"[9] those opinions are irrelevant. Recusal is determined, "not by considering what a straw poll of the only partly informed man-in-the-street would show[,] but by examining the record facts and the law." *Drexel*, 861 F.2d at 1313. In this case, the "record facts"—which Prof. Reynolds does not address—include, among others, that the Court permitted Atilla to advance Halbank's proposed defense; Zarrab, one of the purported victims of this "political vendetta," authenticated the evidence from the Turkish criminal investigation; and Zarrab testified that he in fact engaged in the conduct alleged in the Turkish criminal case and paid

---

[9] These opinions appear to have a limited and unreliable basis. (*Supra* at 13-15).

bribes to secure his release from Turkish prison. (*See supra* at 4-5). Professor Reynolds' opinions about the Turkish public's alleged perception of these proceedings does not support deviating from the Court's original conclusion that recusal is not warranted.

That this case has received media attention does not undermine the Court's conclusion. "Judicial inquiry may not . . . be defined by what appears in the press. If such were the case, those litigants fortunate enough to have easy access to the media could make charges against a judge's impartiality that would effectively veto the assignment of judges." *Drexel*, 861 F.2d at 1309. That is particularly true in this case, where the bank and its majority shareholder, the Turkish government, have ready access to the press and are able to amplify unwarranted allegations against the Court to "effectively veto [the Court's assignment]." (*See supra* at 14-15, D.E. 594 at 7-8, 12-17). There is no objective basis for recusal, and "a judge should not grant a recusal motion simply because a claim of partiality has been given widespread publicity." *Aguinda*, 241 F.3d at 201, 206.

Halkbank's reliance on Prof. Flamm is similarly unavailing. As an initial matter, the opinion simply states legal conclusions and, as such, should be disregarded. *See Hygh v. Jacobs*, 961 F.2d 359, 363 (2d Cir. 1992) ("This circuit is in accord with other circuits in requiring exclusion of expert testimony that expresses a legal conclusion."). But even if the Court were to consider it, Prof. Flamm's conclusion is of no value because it, like Prof. Reynolds' declaration, ignores the trial record. (*See* Flamm Decl. ¶ 9 (describing sources)). Professor Flamm's opinion that Halkbank would not have a fair opportunity to challenge the "authenticity, veracity, and reliability" of the Turkish evidence (*see id.* ¶ 73), is fatally contradicted by the Court's actual rulings in the *Atilla* trial, which demonstrates that Atilla was able to, and did, advance the same FETÖ-themed defenses that Halkbank advances now. (*See supra* p. 5-6 and *infra* at 26).

Professor Flamm also contends that even though there was no U.S. prosecution pending at the time of the Symposium and the *Zaman* Article, the reasonable observer would be troubled by the Court's comments because "it was certainly foreseeable at the time the Court made its comments that the targets of the investigation would be tried in the United States – and if so, very likely in the Southern District of New York – for their alleged crimes." (*See* Flamm Decl. ¶ 70).[10] The notion that it was "certainly foreseeable" that Halkbank or its officers would be charged with violations of U.S. criminal laws in this District some three years after the Symposium was held because Halkbank was implicated in potential violations of Turkish corruption and anti-money-laundering offenses is simply absurd. Professor Flamm's opinion is not merely speculative, it is facially implausible. *See Lovaglia*, 954 F.2d at 815.

Finally, the cases upon which Halkbank principally relies are easily distinguishable. The defendant relies heavily on *Ligon v. City of New York*, 736 F.3d 118 (2d Cir. 2013) *vacated in part on other grounds*, 743 F.3d 362 (2d Cir. 2014). In *Ligon*, the Second Circuit deemed recusal appropriate after finding that the district judge encouraged plaintiffs to bring a separate action, outlined the basis for that potential action, provided her view of its merit, stated how she would rule on a document request in that action, told plaintiffs she would take the action as related to the already-ongoing litigation, and provided multiple interviews with local and national media outlets during which she "described herself as a jurist who is skeptical of law enforcement." This Court has done nothing of the sort. The Court has never made any suggestions to the Government about whether or how to charge the case, encouraged motions by intimating how it would rule, or described itself as antagonistic to any of the parties. Similarly, in *In re International Business*

---

[10] Professor Flamm concludes that, when Zarrab filed his recusal motion two years later, the same facts "likely would *not* have been known to a reasonable person." (*Compare id.* ¶¶ 71-73 *with* ¶ 74) (emphasis supplied).

*Machine*, 45 F.3d 641, 644-45 (2d Cir. 1995), the Second Circuit found recusal appropriate when the district judge refused to dismiss a case that both parties sought to terminate and made statements to the media specifically criticizing the conduct of the parties to the action. *Id.* at 644-45. No comparable circumstances exist here: the Court has not improperly denied relief on consent or criticized any party to the media. Halkbank's attempts to distort the Court's appropriate conduct into a basis for recusal are without merit.

### B.    The Court's Rulings During the *Atilla* Trial Do Not Support Recusal

Halkbank argues that recusal is warranted because the Court made comments allegedly based on extrajudicial sources during the *Atilla* trial. This argument is simply wrong.

*First*, Halkbank complains that the Court purportedly found the "official Turkish account" of the December 2013 case to be a "far-fetched conspiracy theory" based on information the Court "constructed and developed far outside any United States courtroom." (Mot. at 22). This is an extraordinary distortion of the Court's statements and the record. After the conclusion of Korkmaz's testimony, Atilla moved for a mistrial, which the Court denied. The Court noted that it had granted Atilla considerable leeway to cross-examine Korkmaz about FETÖ and the July 2016 coup attempt, despite the fact that *Atilla's defense theory* had no basis in the evidence at trial and *the defense theory* was "constructed and developed far outside any United States courtroom." (Tr. 1969; *see also* Tr. 1970 ("I note that the defense's at best illogical foreign conspiracy theory has no foundation in the record. . ."). Far from basing its views on extrajudicial sources, the Court's comments were explicitly based on the trial record. The overwhelming evidence contradicting Atilla's defense theory (*see supra* at 4-5) further belies any claim that the Court's ruling was motivated by "deep-seated antagonism," and reinforces why "judicial rulings alone almost never constitute valid basis for a bias or partiality recusal motion" because such rulings "cannot possibly show reliance on an extrajudicial source." *Liteky*, 510 U.S. at 541.

*Second*, Halkbank argues that "the assigned judge's comments about Zarrab's jailhouse statements" were also formed outside the courtroom because "[t]he Court cited the New York Times, among '90 other' extrajudicial sources, to suggest that the prosecution's transcript was inaccurate." (Mot. 22). Again, the defendant mischaracterizes the trial record. Atilla's counsel cross-examined Zarrab about a phone call he participated in from prison, and counsel attempted to play the foreign-language audio for supposed impeachment purposes. (Tr. 1010-12; D.E. 384, 385). The Government objected to playing the foreign-language recording because it was offered as extrinsic evidence to impeach a witness. (Tr. 1010-12). In a sidebar colloquy, defense counsel gave inconsistent descriptions of the translation and reaffirmed that counsel sought to impeach Zarrab with the audio recording, not the transcript.  (Tr. at 1011 & 1012; D.E. 384). Rather than admitting and playing a foreign language audio recording, the Court suggested that defense counsel attempt to establish whether there was a genuine inconsistency: "Ask him whether he spoke to his uncle and what did he say." (*Id*.). Defense counsel asked Zarrab two more questions about the call and abandoned the line of cross-examination. (Tr. 1013).

At sidebar, the Court noted, as Halkbank emphasizes, that "we all read about it in the New York Times and 90 other places, and each time it was a different version of it, including your time." (*Id*.). But the record is clear that the Court did not rely on extrajudicial sources to make any rulings on the admissibility of the defense's transcript. At the time of the sidebar, Atilla did not even offer the transcript; defense counsel sought to play the audio recording. When, after the conclusion of Zarrab's testimony, Atilla sought to introduce an uncertified transcript of the call, the Court found that the proffered transcript was in violation of Federal Rule of Evidence 608(b) and denied the motion. (D.E. 383). Thus, the Court made no rulings based on media reports, and later excluded the transcript of the call based on the parties' arguments and the rules of evidence.

Halkbank's suggestion that recusal is warranted based on an offhand comment at sidebar relating to the reliability of a transcript, in light of defense counsel's own inconsistent arguments about it and where the admissibility of the transcript was not at issue during the colloquy, is meritless.

### C.     The Court's Comments During the 2018 Interview Do Not Support Recusal

Halkbank's claim that the Court's 2018 interview supports recusal fails for similar reasons. The defendant argues that the Court "appeared to signal his opinion that the allegations are true and the charges against Halkbank are legitimate." (Mot. p. 23). The bank claims that the Court's comments show that it "prematurely credited the government's allegations." (*Id*. p. 13). This contention distorts both the chronology of events and the Court's comments.

The Court's comments addressed the inconsistency between Mr. Giuliani's efforts to arrange a political termination of Zarrab's prosecution and Mr. Giuliani's historical positions on anti-terrorism and the Iran sanctions. The Court's comments were about Mr. Giuliani's role in Zarrab's case, about Halkbank, any of Halkbank's potential putative defenses, or any potential charges against it. Moreover, even if the Court's comments reflected a belief that *Zarrab* committed the crimes for which he was charged, that belief incontrovertibly would be based on Zarrab's guilty plea and extensive testimony, among other trial evidence. (*See supra* at 4-5).

Finally, even if presiding over these proceedings led the Court to develop an opinion about evidence of Halkbank's likely complicity—and nothing in the article so indicates—that would not support recusal.  "'[O]pinions formed by [a] judge on the basis of facts introduced or events occurring in the course of . . . prior proceedings[ ] do not constitute a basis for a bias or partiality motion'."  *McMahon,* 382 F.3d at 290 (quoting *Liteky*, 510 U.S. at 555); *Bernstein*, 533 F.2d at 785; *Sclafani*, 487 F.2d at 255. Thus, even if one could construe the Court's statement that Mr. Giuliani's efforts would have helped Iran as a view about Halkbank's role, opinions about a

defendant's likely guilt based on information learned while presiding over a coconspirator's trial is not a basis for recusal.

### D.     The Court's Statements During the Pre-Arraignment Proceedings Do Not Support Recusal

Halkbank argues that the Court relied on extrajudicial sources in connection with the special-appearance application. (Mot. at 14, 15, 23-24). This argument similarly misconstrues the record. Halkbank seizes on the Court's references to media reports about collateral matters to argue that the Court's decision on the defendant's special appearance motion was based on press reports. As with its other arguments, the bank is simply wrong.

As an initial matter, a court's awareness of news articles, and even reference to news articles as background, does not justify recusal. *See, e.g.*, *United States v. Kerik*, 419 Fed. Appx. 10, at *3-4 (2d Cir. 2011) (district court's discussion of news articles as background to imposition of sentence did not demonstrate the sentencing judge's partiality). But here, the Court's awareness of Halkbank's pre-indictment discussions with the U.S. government was based on the record. These discussions, which lasted for approximately two years before the Indictment was filed, were addressed in letters to the Court and discussions at court conferences. The Government provided the Court with, among other things, Halkbank's own press release responding to the Indictment, stating that the bank had retained King & Spalding and was purportedly cooperating with the U.S. authorities and supplying documents to Treasury and the Department of Justice. Halkbank's counsel also acknowledged that it had been representing the bank in connection with the investigation. (*See supra* at 7-8; *see also, e.g.*, D.E. 565, 566 & Ex. B; Oct. 22, 2019 Tr. at 2-3).

At the November 5, 2019, conference, the Court noted this record evidence as well as media reports about such discussions. Halkbank argues that this comment was the basis of judicial fact-finding, but it clearly was the basis of judicial *questioning*: the Court sought to ascertain the

purpose of requesting a special appearance in order to challenge personal jurisdiction in light of lengthy pre-indictment discussions with the Government, and whether Halkbank intended to appear and defend the charges if its special-appearance request were denied. (Nov. 5, 2019 Tr. 18-22). The only decision the Court reached, based in part on the fact and length of pre-indictment discussions—and not on the possible content of those discussions (*see id.* at 20 ("I wasn't there, so I have no idea."))—was that Halkbank's request for a special appearance should be resolved expeditiously. (*Id.* at 21).

Lastly, Halkbank argues that the Court's order denying Halkbank's request for a special appearance relied on extrajudicial sources by referring to a "campaign" by the Turkish government against the prosecution and to the scale of the charged scheme. (Mot. at 14-15). The Turkish government's "campaign" against the prosecution was addressed, among other places, in the Government's filing regarding service of the summons (D.E. 565 & Exs. B, C, D) its letter in support of the Court's contempt authority (D.E. 571), and sources cited therein, which noted the Turkish government's publicly reported attacks on the charges and requests to senior U.S. government officials to intervene. The Court's description of the scale of the offense also was based on the proceedings, including, but not limited to, the *Atilla* trial and sentencing, the Indictment, and the Government's submissions in support of the Court's contempt authority and in opposition to the defendant's special-appearance request. (*See supra* at 4-9; D.E. 571 at 3). And the Court's ruling denying Halkbank's request for a special appearance was not based on either of these facts, but on the parties' arguments and the law: namely, that Halkbank's theories of personal jurisdiction in criminal cases and waiver were unavailing. (D.E. 581 at 14-24).

## <u>CONCLUSION</u>

Accordingly, the Government respectfully requests that the Court deny the defendant's

motion for the Court to recuse itself.[11]

Dated: New York, New York
   July 28, 2020

         Respectfully submitted,

         AUDREY STRAUSS
         Acting United States Attorney


       by: _____/s/_____
         Michael D. Lockard / Sidhardha Kamaraju /
         David W. Denton, Jr. / Jonathan E. Rebold /
         Kiersten A. Fletcher
         Assistant United States Attorneys
         (212) 637-2193/-6523/-2744/-2512/-2238

cc:  Counsel of record (by ECF)

---

[11] The Government respectfully requests that the Court accept this memorandum in excess of the page limits in the Court's Individual Rules of Practice in light of, among other things, the two declarations totaling approximately 50 pages with exhibits totaling approximately 1,000 pages filed in support of the defendant's motion.