**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>TÜRKIYE HALK BANKASI A.Ş.,<br><br>Defendant. | S6 15 Cr. 867 (RMB) |

**REPLY MEMORANDUM IN SUPPORT OF DEFENDANT'S**
**MOTION TO RECUSE THE ASSIGNED JUDGE**

Robert M. Cary
Simon A. Latcovich
James W. Kirkpatrick
Damayanti Desai

WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC 20005

650 Fifth Avenue, Suite 1500
New York, NY 10019
(202) 434-5000

*Counsel for Türkiye Halk Bankası A.Ş.*

# **TABLE OF CONTENTS**

1. The Government Cites the Wrong Standard for Recusal. ............................................... 2

2. The Government Mischaracterizes *Liteky*. ..................................................................... 2

3. The Government Misconstrues the Relevance of Media Reports. .................................. 2

4. Media Reports are Relevent When They Report on the Judge's Statements. ............... 3

5. "Irrelevant" Media Reports Are Not at Issue. ................................................................. 3

6. Canon 4 Does Not Apply. ................................................................................................ 4

7. The Assigned Judge's Symposium Comments Concerned the FETO "Investigation." 4

8. The Assigned Judge's Decisions During the *Atilla* Trial are Irrelevant. ........................ 5

9. The Government is Incorrect that the Court Consistently Sided with Mr. Atilla. .......... 5

10. Questions of Admissibility of the FETO Evidence will be Central to this Case. ........ 6

11. Professor Reynolds's Opinions are Unrefuted. .............................................................. 6

12. Professor Reynolds's Opinions Do Not Amount to a "Straw Poll." ........................... 7

13. Mr. Flamm's Opinions are Unrefuted. ......................................................................... 7

14. The Government's Argument about the "Impending" Nature of the Charges Against Halkbank is Unsupported. ............................................................................................. 8

15. *Ligon* and *IBM* are on Point. ........................................................................................ 8

16. The Court's Statements During the *Atilla* Trial were Based on Extrajudicial Sources. ......................................................................................................................... 8

17. The Court Relied Upon Extrajudicial Sources in Forming Opinions on the *Zarrab* Jailhouse Call. ............................................................................................................... 9

18. The Assigned Judge Inappropriately Gave Media Statements about the Case. .......... 9

19. The Assigned Judge Relied on Media Articles in Deciding Preliminary Issues. ...... 10


# TABLE OF AUTHORITIES

## CASES

*Ginsberg v. Evergreen Sec. Ltd.*, 570 F.3d 1257 (11th Cir. 2009) ................................................... 7

*Hygh v. Jacobs*, 961 F.2d 359 (2d Cir. 1992) .................................................................................. 7

*In re Drexel Burnham Lambert Inc.*, 861 F.2d 1307 (2d Cir. 1988) ................................................ 3

*In re IBM*, 45 F.3d 641 (2d Cir. 1995) ............................................................................................ 8

*Ligon v. City of New York*, 736 F.3d 118 (2d Cir. 2013) .......................................................... 3, 8, 9

*Liteky v. United States*, 510 U.S. 540 (1994) ................................................................................. 2

*United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001) ..................................... 2, 3, 9, 10

*United States v. Zarrab*, 2017 WL 946334 (S.D.N.Y. Feb. 15, 2017) ............................................ 7

## OTHER AUTHORITIES

28 U.S.C. § 455 ................................................................................................................................ 2

Fed. R. Evid. 104 ............................................................................................................................. 6

Fed. R. Evid. 401 ............................................................................................................................. 6

Fed. R. Evid. 901 ............................................................................................................................. 6

Code of Conduct for United States Judges, Canon 3(A)(6) ............................................................ 9

Code of Conduct for United States Judges, Canon 4 ..................................................................... 4

Leading experts on recent Turkish history and judicial ethics have each provided evidence showing that the assigned judge's impartiality may reasonably be questioned. Rather than respond to this evidence, the government's opposition applies the wrong legal standard and struggles mightily but unsuccessfully to divorce the assigned judge's comments from their context. In so doing, the government's attempt to rewrite history trips over its own past representations about this very same matter.

For example, the government tries to explain away the assigned judge's comments during the 2014 Symposium and *Today's Zaman* interview by claiming they were only about "fundamental principles" and not "any particular case or circumstances." The complete comments themselves demonstrate the opposite. And the government previously told this Court the opposite. Here is what the government said: "*What the Court commented on* were the events in Turkey in 2013, which included a purge of law-enforcement agents, prosecutors and judges *involved in . . . the case charging Zarrab and other co-defendants . . . .*" Opp'n to Zarrab Mot. at 12, ECF No. 83 (emphasis added). Of course, one of the "other co-defendants" was the General Manager of Halkbank. Thus, by the government's own admission, *the assigned judge commented upon a case that targeted Halkbank.* It is Halkbank's position, supported not only by Turkish authorities, but also by a leading U.S. expert on Turkey, that the case upon which the assigned judge commented was an illegitimate attack on Halkbank orchestrated by a subversive group known as FETO. As it did in the *Atilla* trial, the government undoubtedly intends to rely on this illegitimate, FETO-led investigation in its case against Halkbank. Halkbank intends to argue that the FETO-led investigation was in fact illegitimate and that Turkish authorities were correct in finding it to be illegitimate and in removing the FETO investigators. Having voiced the opposite opinion at a FETO-sponsored symposium after listening to other speakers voicing

1

similar opinions—not to mention the assigned judge's comments to a FETO-affiliated newspaper—the assigned judge should not preside over this case.

There are many other flaws in the government's arguments.

1. The government cites 28 U.S.C. § 455(b)(1) for the proposition that a judge must recuse himself when he has "a personal bias or prejudice." Opp'n to Halkbank's Mot. ("Opp'n") at 15, ECF No. 642. That may be so, but Halkbank has not moved for recusal under § 455(b)(1). Halkbank moves under § 455(a), which requires recusal if the judge's "impartiality might reasonably be questioned." Thus, the government's attempt to show that rulings in another case were not subjectively biased has no bearing here. What matters is whether a reasonable person might question the judge's impartiality.

2. Similarly, the government's selective quotation from *Liteky* overlooks the Supreme Court's actual holding. *Liteky* makes clear that the "favoritism or antagonism standard" applies only to statements by a judge based on what he learned *inside the courtroom*. Statements based on extrajudicial sources need only create a question in the mind of a fully informed, reasonable person. *Liteky v. United States*, 510 U.S. 540, 555 (1994). *Liteky* similarly has no effect when a court submits statements to the media concerning a pending or impending case, even when there is a judicial basis for the statements. *See United States v. Microsoft Corp.*, 253 F.3d 34, 115 (D.C. Cir. 2001). Halkbank's motion is based on information the assigned judge learned outside the courtroom and statements made to the media about pending and impending cases.

3. The government's argument about the irrelevance of media reports rests on a contorted view of the case law. First, as the government acknowledges in defending the assigned judge's reliance on news articles, media reports may provide an appropriate basis for understanding background facts—though that does not make reliance on them appropriate in

2

judicial decisions.  The government provides no reason to question the opinions of Professor Reynolds—whose credentials and knowledge remain unchallenged—based on his occasional citation to media articles.  Nor does the government provide an alternative explanation of the facts, let alone rely on a source remotely comparable to Professor Reynolds, a professor at Princeton and one of the leading experts in the United States on Turkey.

    4.  Media reports are also highly relevant *when they report on what the judge said*.  A judge's comments in a media interview are frequently among the most relevant facts in deciding whether a question exists as to the judge's impartiality.  *Ligon v. City of New York*, 736 F.3d 118, 127 & n.23 (2d Cir. 2013), *vacated in part on other grounds*, 743 F.3d 362 (2d Cir. 2014).  The context of the interview is also important.  This is because "judges who affiliate themselves with news stories by participating in interviews run the risk that the resulting stories may contribute to the appearance of partiality," *Ligon*, 736 F.3d at 127, and because participating in an interview creates the impression that the judge shares the interviewer's viewpoint, *Microsoft*, 253 F.3d at 113.  Indeed, the Second Circuit has warned that judges who participate in media interviews concerning pending cases risk being perceived as coveting publicity, which would "*lead any objective observer to wonder whether their judgments are being influenced by the prospect of favorable coverage in the media*."  *Ligon*, 736 F.3d at 127 & n.23 (emphasis added) (quoting *Microsoft Corp.*, 253 F.3d at 115).

    5.  Some media reports might not be relevant to ascertaining the beliefs of a reasonable person, but not those at issue here.  The cases cited by the government stand for the irrelevant proposition that media accusations of bias alone do not, *per se*, demonstrate an appearance of bias, because that would allow "litigants fortunate enough to have easy access to the media . . . effectively [to] veto the assignment of judges."  *See In re Drexel Burnham Lambert Inc.*, 861

3

F.2d 1307, 1309 (2d Cir. 1988); Flamm Decl. ¶¶ 57–60, ECF No. 641.  Halkbank does not cite any such articles, and had no effect on what was published in *Today's Zaman* or *Courthouse News*, something that is particularly clear given that the cited news articles do not criticize the assigned judge and simply reflect what he said.

6.  The government turns Canon 4 on its head by suggesting it somehow shields judges from recusal.  Canon 4 expressly contemplates that extrajudicial activities may lead to disqualification, notwithstanding their permissibility under the judicial ethics rules.  CODE OF CONDUCT FOR UNITED STATES JUDGES, CANON 4 (2019).  Regardless, the 2014 Symposium did not qualify under Canon 4; the assigned judge was neither a citizen of Turkey nor "particularly knowledgeable" about the issues discussed at the Symposium.  Flamm Decl. ¶ 68; Order Den. Zarrab Recusal Mot. at 16, ECF No. 87.  Moreover, speaking at an event hosted by a FETO affiliate with a specific agenda that included supporting an investigation attacking Halkbank, and giving an interview to an overtly biased media outlet, do not constitute the kind of "law-related pursuits" or civic activities contemplated by Canon 4.

7.  The government's argument that the assigned judge's comments during the 2014 Symposium and *Today's Zaman* interview concerned only "fundamental principles" and not "any particular case or circumstances" is belied not just by the comments themselves and the unrefuted expert evidence in the record, but by the government's own admission when it opposed Zarrab's recusal motion.  ECF No. 83, at 12.  It simply cannot be seriously disputed (and the government makes no serious attempt to dispute) that the 2014 Symposium addressed issues that are central to this case—a FETO-sponsored investigation of the very same allegations that are at issue in this case.

4

8. The government's argument that the assigned judge's decisions during the *Atilla* trial somehow bear on recusal in this case has no basis in law or fact. The standard for recusal is not whether the assigned judge has been fair in prior cases—that is not for Halkbank to raise. Halkbank is entitled to its own trial and will present its own defense; the legal decisions related to FETO made under the specific circumstances of the *Atilla* trial are irrelevant. Furthermore, Mr. Atilla's lawyers did not "vigorously" attempt to demonstrate the connection between the Turkish "investigation" and FETO, opting instead to argue that he knew nothing about the alleged transactions. The only apparent effort they made was during the examination of Korkmaz, which the Court said it allowed because of a practice in the Southern District to afford "great leeway" to defense counsel during cross-examination. Atilla Tr. at 1970, ECF No. 428. The Court proceeded to assert—without any record basis—that the theory was "farfetched," "illogical," "unpersuasive," and "borderline unprofessional." *Id.* The Court made no indication that it would have allowed the defense to pursue such a theory during its case-in-chief, as Halkbank intends to do in this case.

9. Regardless, the government is incorrect in its suggestion that the Court consistently sided with the defense on issues related to Korkmaz's testimony. In fact, the Court sustained an objection to a question directed at Korkmaz about FETO's practices of secretly promoting fellow FETO members in the police, Atilla Tr. at 1754, and overruled *all* substantive defense objections to the government's examination. *Id.* at 1277–1398, 1560–1687, 1725–62, 1775–1846. Based on the government's argument, the parties would need to litigate the specific judicial decisions made during the *Atilla* trial to determine whether a reasonable person might question the assigned judge's impartiality. Requiring that cannot be the law.

10. The government's argument that the Court would never have an opportunity to be biased against Halkbank because "extrajudicial sources" are irrelevant to questions of admissibility misses the point. The question is not whether the assigned judge can put aside what he learned at the FETO-affiliated symposium and the opinions he expressed at that symposium and in comments to the media. The question is whether a reasonable person might question whether the assigned judge's opinion about the nature of the December 2013 "investigation" could color his view of the case. For example, the Court will be asked to decide preliminary questions about the relevance and authenticity of the FETO evidence. Fed. R. Evid. 104(a), 401, 901. A reasonable person might question whether the assigned judge would subconsciously be inclined to view that evidence as legitimate based on extrajudicial information—a position he essentially publicly supported when he claimed that the Turkish authorities' response to the FETO-led investigations was an attack on the rule of law. As for the government's argument that the evidence is so "overwhelming" that no questions about admissibility will arise during Halkbank's trial, the government's hubris stems from a trial *in which Halkbank had no opportunity to challenge the evidence*, and where the primary defense theory concerned *mens rea*, not evidence related to the alleged conspiracy.

11. The government makes essentially no effort to refute Professor Reynolds's credentials or opinions. Instead, it takes petty swipes at his reasoning while offering no evidence of its own. For example, the government complains that Professor Reynolds's book chapter failed to take into consideration the factual record in the *Atilla* trial. Opp'n at 12–13. There is no reason Professor Reynolds should have consulted the trial record before authoring his book chapter, which pertained broadly to FETO and its decades-long attempts to subvert the Turkish government. Moreover, almost all of the "evidence" introduced during the *Atilla* trial was

6

unchallenged.  Mr. Atilla—whose counsel's strategy was not to challenge the conspiracy allegations but rather to refute his involvement—did not attempt to conduct an in-depth examination of the origins or inner-workings of the December 2013 "investigation."

12.  The government once again misses the point in dismissing Professor Reynolds's opinions about what "most Turks believe" as "a straw poll of the only partly informed man-on-the-street" not based on "record facts."  Opp'n at 23.  As an initial matter, Professor Reynolds's opinions are the most relevant evidence in the record.  Moreover, Professor Reynolds is far from a "partly informed man," and does not attempt to opine that a majority of Turks would question the assigned judge's impartiality.  Rather, Professor Reynolds's opinions refute the assigned judge's comments that the defense theory of the case is nothing more than a "far-fetched," "illogical" "conspiracy theory," when in fact it is none of those things for a fully informed, reasonable person.

13.  The government also makes virtually no effort to undermine the credentials or opinions of Richard Flamm.  In addition to repeating arguments addressed above, the government argues that "the opinion simply states legal conclusions."  Opp'n at 24.  In the case cited by the government, the expert testified as to whether a police officer's conduct was "justified under the circumstances," which effectively supplanted the role of the jury.  *Hygh v. Jacobs*, 961 F.2d 359, 364 (2d Cir. 1992) (internal quotation marks omitted).  Mr. Flamm, in comparison, offers expertise on the standard for recusal and the misleading nature of published recusal decisions in the United States.  This is the appropriate subject of expert testimony.  *See, e.g.*, *Ginsberg v. Evergreen Sec. Ltd.*, 570 F.3d 1257, 1265, 1270 (11th Cir. 2009); *United States v. Zarrab*, 2017 WL 946334, at *2 & n.5 (S.D.N.Y. Feb. 15, 2017).  Moreover, Mr. Flamm, one of our nation's leading experts on judicial ethics, has extensively studied the "reasonable

7

person." And he has concluded, after an extensive review of the record, that a reasonable person might question the judge's impartiality. Recusal, therefore, is required.

14. The government's argument related to the impending nature of the charges against Halkbank when the assigned judge made his comments is devoid of any legal citation or reasoning. There is nothing "absurd" about the idea that it is foreseeable that a case involving a supposed conspiracy to evade U.S. sanctions and the international banking system would be prosecuted in the Southern District of New York.

15. The government's attempts to distinguish the cases cited in Halkbank's motion come up short. As an initial matter, looking to the precise facts of judicial recusal opinions paints a misleading picture of § 455(a). Flamm Aff. ¶ 39. Regardless, the reasoning in *Ligon* and *IBM* is directly on point. In *Ligon*, the Second Circuit found that, in addition to comments the judge made on the bench, interviews given by the judge "might [have led] a reasonable observer to question [her] impartiality." *Ligon*, 736 F.3d at 126–27. The court did not suggest that the media interviews created a questionable appearance of partiality only because of comments the judge made from the bench. And in *IBM*, where the court found it "manifestly clear . . . and indisputable" that a reasonable observer would question the assigned judge's impartiality, the court focused primarily on newspaper interviews given by the judge. *In re IBM*, 45 F.3d 641, 642–44 (2d Cir. 1995). As both *Ligon* and *IBM* held, giving newspaper interviews might cause a reasonable person to question the judge's impartiality. So it is here.

16. The government misunderstands the relevance of the assigned judge's comments during the *Atilla* trial. Halkbank takes no issue with the Court's observation that Mr. Atilla had not developed his defense theory in the record. But it was inappropriate for the assigned judge to characterize that theory—*which by his own reasoning was undeveloped in the record*—as an

8

"illogical" and "farfetched conspiracy theory." Atilla Trial Tr. at 1969–70, ECF No. 428. There was simply no basis in the record for the assigned judge to conclude that the majority-Turkish viewpoint of the nature of the 2013 "investigation" was a "farfetched conspiracy theory." As Professor Reynolds has explained, this "conspiracy theory" rhetoric is the very language FETO uses to keep its operations hidden. Reynolds Decl. ¶¶ 10, 18, ECF No. 640. No criminal defendant should have to stand trial before a judge who has derided his defense—a defense which has been credited by Princeton's leading expert on Turkish history—as a "farfetched conspiracy theory."

17. As for the government's argument related to Zarrab's jailhouse statements, Halkbank does not contend that the Court's ruling on the admissibility of the transcript created a questionable appearance of partiality. Rather, Halkbank takes issue with the assigned judge using translations of the tape he saw "in the *New York Times* and 90 other places" to support his assertion that the translation was inaccurate. Atilla Trial Tr. at 1009:21–1012:5, ECF No. 416.

18. The government does not dispute that the assigned judge agreed to a media interview in 2018, and that the interview touched on cases that were pending and impending at the time. Nor does the government dispute that courts have found recusal warranted based on even modest comments under similar circumstances. *Microsoft Corp.*, 253 F.3d at 112–13; *see also Ligon*, 736 F.3d at 125–27. Instead, the government argues that the comments were based on information learned in the judicial context of the *Atilla* trial. The government, again, misses the point. First, Halkbank was not a party to the *Atilla* trial, had no opportunity to defend itself, and is entitled to its own, fair trial. But even more to the point, it was improper for the assigned judge to make media comments about cases that were pending and impending before him. CODE OF CONDUCT FOR UNITED STATES JUDGES, CANON 3(A)(6) (2019); *Microsoft Corp.*, 253 F.3d at

9

115.  This is true regardless of whether those statements were made based on opinions he formed in his judicial capacity.  *Microsoft Corp.*, 253 F.3d at 115.  During his *Courthouse News* interview, "referring to [the] recent criminal proceedings," the assigned judge "took care" to criticize the conduct of Zarrab's counsel—a criticism he made while Zarrab was still waiting to be sentenced.  Reynolds Decl. Ex. 15.  He also commented on the *Atilla* case while it was pending on appeal.  *Id.*  More generally, the Court opined that the prospect of dismissing this case made his "head . . . spin[]."  *Id.*  These comments require recusal.

19.  The government attempts to rewrite the record of how the assigned judge has used newspaper articles in his rulings to date.  He did not merely signal his "awareness" of them, but rather *relied on them* in deciding issues in this case.  If the Court actually had relied on judicial sources for the propositions cited by the government, as the government now suggests, the Court certainly would have cited those sources, rather than the *New York Times*.

Dated:  August 4, 2020

Respectfully submitted,

WILLIAMS & CONNOLLY LLP

/S *Robert M. Cary*

Robert M. Cary
Simon A. Latcovich
James W. Kirkpatrick
Damayanti Desai
725 Twelfth Street, N.W.
Washington, DC 20005

650 Fifth Avenue, Suite 1500
New York, NY 10019
Phone: (202) 434-5000
Fax:    (202) 434-5029
Email:  rcary@wc.com
            slatcovich@wc.com
            jkirkpatrick@wc.com
            ddesai@wc.com