**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------x
UNITED STATES OF AMERICA,        :
        :
        :      15 Cr. 867 (RMB)
    - against -    :
        :      **DECISION & ORDER**
HALKBANK        :
        Defendants.    :
-----------------------------------------------------------------x

This decision denies defendant Halkbank's recusal motion, dated July 14, 2020, on waiver and estoppel grounds and because it has no substantive merit. No "objective and disinterested observer, knowing and understanding all of the facts and circumstances, could reasonably question the court's impartiality." *See S.E.C. v. Razmilovic*, 738 F.3d 14, 29 (2d Cir. 2013).

## I.  **Background**

Halkbank's co-defendant, Reza Zarrab, made a nearly identical motion over four years ago focusing upon the Court's discussion at an international symposium in Istanbul in 2014. The Symposium was devoted to the "rule of law." Zarrab's motion was also dismissed on both procedural and substantive grounds. This Court in Zarrab's case concluded that: (1) recusal could not be founded upon comments made by the Court at the Symposium which were properly devoted to civic and educational discussion of the rule of law and the importance of an independent and effective judiciary; (2) recusal was specifically waived by Zarrab's defense counsel, Benjamin Brafman;[1] (3) the Zarrab recusal motion was untimely; Id. at 13; and (4) the

---

[1] Mr. Brafman: "I was familiar with your Honor's remarks and appearance in Istanbul because, in our thoroughness, we try and follow everything that everyone does . . . My experience here has allowed me to conclude that you are indeed a fair and impartial judge . . . We have seen nothing to date which would suggest that you could not participate in any way." Apr. 27, 2016 Tr. at 4:17-5:3; See Sept. 29, 2016 Decision & Order at 1-3.

Zarrab recusal motion included incorrect and misleading statements by the defense. As the Government had pointed out: "the defendant's claims rely on a mischaracterization of the Court's remarks at the Istanbul conference, rank speculation, and impermissible consideration of press coverage. The comments about which the defendant complains were no more than noncontroversial opinions about fundamental principles of a fair and effective justice system, like judicial independence and impartiality." See Sept. 14, 2016 Gov't Opp. at 1; Sept. 29, 2016 Decision & Order at 4, 15-16. The Zarrab motion failed to overcome the presumption of impartiality; and it would have been objectively unreasonable to conclude from the Court's remarks that the Court was biased or partial. Id. at 17. The September 29, 2016 Decision & Order dismissing the Zarrab recusal motion was not appealed or challenged in any way.

Halkbank's recusal motion is a belated rerun of the Zarrab recusal motion, supplemented by 1,014 additional pages of exhibits and two purported expert declarations.[2] In addition to the Court's Symposium comments, Halkbank litigates comments at sidebar and in oral rulings made by the Court during co-defendant Mehmet Hakan Atilla's case; comments about Rudy Giuliani; and comments made in the pre-arraignment stage of Halkbank's case.

**2014 Rule of Law Symposium**

The Symposium was held in a large conference room at the Four Seasons Bosphorus Hotel in the heart of the City of Istanbul, Turkey. It was well-attended and seemingly well-received. The panelists were diverse, very well-qualified and well-informed men and women, many from Europe, Turkey, and the U.S., but including other countries as well. They included,

---

[2] The Halkbank recusal motion totals 1,091 pages in length and even includes 721 pages of exhibits in the Turkish language which are untranslated and, consequently, inadmissible. "The [Turkish]-language documents are inadmissible and will not be considered by the Court." *See Heredia v. Americare, Inc.*, 2020 WL 3961618, at *5 (S.D.N.Y. July 13, 2020); *Chen v. 2425 Broadway Chao Restaurant, LLC*, 2019 WL 1244291, at *15 n.10 ("Exhibits . . . to the affidavit are untranslated . . . documents which the Court does not accept as evidence").

among others, Lord Harry Woolf, former Lord Chief Justice of England and Wales; Charles

Hunter, then United States Consul General in Istanbul; Professor Sami Selçuk, former First

President of the Turkish Court of Cassation; Stefano Manservisi, the European Union's

Ambassador to Turkey; Thomas Guddat, Vice President of European Judges for Democracy and

Liberty and President of the Polish-German Judge's Association; and Marina Wes, Lead

Economist at the World Bank.

The panelists also included five Americans, namely professors of constitutional law

(Dean) Heather Gerken from Yale Law School, Richard Fallon from Harvard Law School, and

Richard Pildes from New York University School of Law; the then Vermont Attorney General,

William H. Sorrell, and myself.[3]

---

[3] An accomplished litigation partner at a top-tier New York City law firm (on his own initiative)
proposed the Court as a speaker at the Rule of Law Symposium. He was aware that I had made
comparable rule of law presentations (in and outside the U.S.) and he passed along my name and
credentials to one of the co-sponsors of the Symposium, which I believe was the Istanbul law
firm Yüksel Karkın Küçük ("Yuksel"). Yuksel was an affiliate of the international law firm DLA
Piper LLP. It was one of the largest - if not the largest - law firms in Istanbul and had been
awarded the "Chambers Europe Award for Excellence - Law Firm of the Year" for two
consecutive years in 2012 and 2013.

Before agreeing to participate in the Symposium, I reviewed the proposed agenda topics and the
29 person speakers list. I also determined that I had no conflicting cases on my docket. The main
topics for discussion at the Symposium were universal principles of the rule of law, including
separation of powers, independence of the judiciary, checks and balances, and accountability of
the government under the law. And, how those principles serve to promote transparency and
ensure stability in democratic nations.  The speakers list included some of the most prominent
rule of law authorities from all over the world, judges, law professors, European Union and
Council of Europe officials, legislators, and attorneys. The agenda and the list of speakers were
determinative of my decision to participate, along with the opportunity to visit Istanbul. The
Symposium sponsors made all travel and lodging arrangements, including reimbursement of
expenses.

The verbatim compendium of the Symposium in Turkish and English is incorporated in its
entirety by reference as "Exhibit A" to this Decision & Order. It may be found under Docket #81
(Ex. 2).

At the time of the Symposium, Turkey was an applicant for accession to the European Union. The EU-Turkey admission agreement had been signed "creating new momentum in EU-Turkey relations." President Recep Tayyip Erdoğan of Turkey had declared 2014 as the "Year of the European Union." See Ministry for EU Affairs - Republic of Turkey, *Turkey's New European Union Strategy*, at 15; European Commission, *October 2014 Turkey Progress Report*, at 1. And, panelists understood the issues surrounding Turkey's EU accession and endeavored diplomatically to impart ideas, ideals, and practices which might be expected of EU members.[4]

In his keynote address, Lord Harry Woolf helped set the stage as follows:

> The rule of law is international. It may not be precisely the same in all jurisdictions but it is international . . . It needs to be emphasized there is nothing western or eastern or northern or southern about the underlying principle of the rule of law. It has a global reach and dimension. Rule of law symbolizes the quest of civilized democratic societies, be they eastern or western, to combine that degree of liberty without which law is tyranny, with that degree of law without which liberty becomes license . . . The rule of law is the heritage of all mankind because of its underlying rationale, which is belief in the human rights and human dignity of all individuals everywhere in the world. Ex. A at 149.

Also on the first day of the Symposium, Dr. Yılmaz Argüden, Chairman of the United Nations Global Compact for Turkey, described the Symposium as follows:

> [We] attach utmost importance to this Symposium. Development takes its basis from trust, which is created by uninterrupted governance and a legal system that functions in a fair, impartial and rapid manner . . . Now that the main goal of the UN Global Compact is to make the development sustainable, you may now clearly understand why this Symposium is important for us. It will not be possible for us to increase our development and speed and improve our life quality without eliminating our deficiencies in this area in Turkey. … Well, we have deficiencies, but according to what criteria do we name them deficiencies? You need a benchmark. Our benchmark for this purpose is the EU and EU Council that hosts advanced practices in the field of universal legal norms and democracy, rights, law and freedoms. Ex. A at 18.

---

[4] While Turkey is still considered a "candidate country," accession negotiations are said to have become "effectively frozen" since June 2018. See European Commission, *European Neighborhood Policy and Enlargement Negotiations – Turkey*; European Commission, *Turkey 2019 Progress Report* (May 29, 2019) at 3.

Charles Hunter, the United States Consul General in Istanbul at the time, added these

opening remarks:

> Thank you for inviting me to participate in this impressive gathering of dignitaries
> and experts from around the world to discuss the topic of profound importance: the
> rule of law and its role in a successful and democratic modern society. As we have
> seen in countries transitioning to democracy in this region and around the world,
> the overall health of any democratic society can be measured by the extent to which
> it is governed by its own laws . . . [W]hen we speak of the rule of law, we speak of
> an ideal. No country has ever had a perfect justice system, and all nations have
> ample room for improvement. So international conferences like this one provide an
> excellent venue for the sharing of experience. Ex. A at 29.

The relationship of the Symposium to Turkey's EU-accession efforts was highlighted by

Stefano Manservisi:

> It is a real pleasure and an honour to be here today in this very important event
> where I think the combination of civil society, academia, institutional, responsible
> people can help . . . in shedding light at and having a balanced debate on one of the
> most important and sensitive issues that [Turkey] is going through . . . Because the
> European Union accession perspective has, without any doubt, contributed to shape
> and drove the reforms that have transformed Turkey in the fifteen years since the
> country became a candidate for accession . . . The accession process has formed the
> backbone and has been one of the primary tools of Turkey's modernization. During
> this period, and this is worth underlining, Turkey and EU are working together with
> the close cooperation of the Council of Europe on judiciary reform. Ex. A at 40.

Panelists were aware (to varying degrees) of certain events which had transpired in

Turkey in December 2013 and the response to those events by Turkey. See Ex. A. Halkbank

describes the events in its recusal motion as follows: "In [December] 2013 . . . police officers,

prosecutors, and judges made high-profile arrests . . . ostensibly as part of a corruption

investigation." In response, "Turkish authorities . . . removed and reassigned several police

officers . . . [and] prosecutors because of their role in the same investigation." See Halkbank

Recusal Motion at 5-7; see also Emre Peker, "Under Mounting Pressure, Turkey Premier

Shuffles Cabinet," *Wall Street Journal* (Dec. 25, 2013) ("since December 17 [2013], prosecutors

unveiled a wide-ranging corruption investigation targeting dozens of [Turkish government] allies

in politics and business."). According to the *New York Times*: "The Turkish government

reshuffled the police . . . and sought to expand its power over the judiciary . . . [B]oth actions appeared calculated to fend off a widening corruption investigation that . . . centers on accusations that officials took bribes in return for bending zoning rules." See Dan Bilefsky and Sebnem Arsu, "Turkish Government, Shaking Up Police, Now Seeks More Power Over Judiciary," *New York Times* (Jan. 8, 2014). "Mr. Erdogan's government sent draft legislation . . . [that] would grant the justice minister greater authority over legal discipline, judicial investigations, and the appointment of judges and prosecutors, powers the minister does not now have." Id.

Panelists who expressed concern over the December 2013 events in Turkey included Marjete Schaake, member of the European Parliament: "While the world's and European eyes have been focused on the Ukranian crisis, the Turkey divisions that remained below the surface for a long time erupted at the end of last year . . . I want to focus on what the European Union can and should do. My fundamental premise in answering that question has been and will be that the EU needs to have the wellbeing of the Turkish population as a priority. That is why I have supported accession for years." See Ex. A at 34.

Two of my fellow panelists, Gabriela Knaul and Thomas Guddat, said the following:

Gabriela Knaul, United Nations Rapporteur on the Independence of Judges and Lawyers: We are all aware that recent developments in Turkey have raised serious concerns regarding the independence of the judiciary in the country. In this context, I would like to underline that judicial independence entails, among other things, clear, impartial and objective criteria for the appointment and nomination of judges and prosecutors, their security of tenure until a mandatory retirement age or the expiry of their term of office, fair and objective conditions for the promotion, transfer, suspension, protection, and cessation of their functions, and the actual independence from political interference by the Executive and Legislative. Any sort of interference or control of the Executive or Legislative over the Judiciary is contrary to the notion of an independent judicial system and gravely affects democracy and the rule of law. Ex. A at 172; see also Sept. 29, 2016 Decision & Order at 7.

Thomas Guddat, Vice President of European Judges for Democracy and Liberty ("MEDEL") and President of the Polish-German Judge's Association: Trusting the judicial system makes it, in my opinion, also easier for governments to accept

decisions. So I suppose the governments also should appreciate independent judiciary and not criticize too harshly the decisions but use legal remedies to correct a decision that is wrong in their opinion. I noticed in the reports about the recent events in Turkey in the deep mutual distrust between the judiciary on the one hand and the political branch shows the Turkish government on the other hand, this mistrust that seems to have increased in the last year is what makes MEDEL concerned . . . There is a huge problem, the relocation of judges . . . The High Judicial Council for Judges and Prosecutor has the authority to decide on the relocation of judges and prosecutor can lead to pressure of them and recently there made mention of use of this power. Ex. A at 178-179; see also Sept. 29, 2016 Decision & Order at 7.

**Panel on Independence of the Judiciary**

The Court was asked to moderate and discuss "Independent and Effective Judiciary" on Day 2 of the Symposium.[5]  Among other things, I outlined basic principles of an independent and effective judiciary, including: (1) separation of powers; (2) transparency; (3) judges must be highly qualified; (4) adherence to high ethical standards; and (5) deference to the rule of law, as opposed to the rule of man. See Ex. A at 168-169.[6]

As discussed in detail in Section IV below, none of the comments challenged by Halkbank support the extraordinary and untrue defense accusation that the Court endorses an organization called Fethullahçı Terör Örgütü [Fethullah Terrorist Organization] or FETO. The defense describes FETO as a global organization that "has long attempted to subvert the Turkish government." See Halkbank Recusal Motion at 1, 4. Indeed, one of the defense experts, Michael A. Reynolds, opines that "the assigned judge created the appearance that he is supportive of FETO's agenda . . . is partial to FETO's version of events . . . and has adopted the FETO viewpoint." Reynolds Decl. at 13. Reynolds also contends that "FETO, arguably, threatens the

---

[5] The panelists included: Professor Işıl Karakaş, Turkish judge on the European Court of Human Rights; Professor Lucian Mihai, former President of the Romanian Constitutional Court (the highest legal position in Romania); and, as noted, Thomas Guddat; Gabriela Knaul, and myself.

[6] My remarks were similar to the rule of law presentation I made to Albanian judges in Tirana, Albania in November 2013 under the auspices of the U.S. State Department.

integrity of the Turkish state and the health of Turkish democracy more insidiously than any terrorist group could hope," and that FETO "abused their positions and power . . . to destroy their enemies and any who would stand in their way." <u>Id.</u> at 4-5.

Richard E. Flamm, the second defense expert, criticizes the organizers of the Symposium including the law firm Yuksel: "In May 2014, a law firm that has been associated with FETO hosted an event in Istanbul called the 'Justice and Rule of Law Symposium' . . . a reasonable person would understand that, in making the comments it did in Istanbul, the Court had taken the side of the FETO supporters." <u>Flamm Decl.</u> at 20-21.[7]

Defense counsel's speculative, tenuous, and false allegations are "insufficient grounds for recusal." *See Hodgson v. Liquor Salesman's Union Local No. 2 of State of N.Y.*, 444 F.2d 1344, 1348 (2d Cir. 1971). As the Government correctly points out in its opposition brief: "The defendant's motion is nothing but an attempt to manufacture the appearance of impropriety by injecting a Turkish political dispute into an American court of law" and by "grossly distort[ing] the Court's prior statements and the record." <u>See</u> <u>Gov't Opp.</u> at 1.

## II.   **Legal Standards**

"The presumption of innocence [] attaches to every criminal defendant." *Herrera v. Collins*, 506 U.S. 390, 399 (1993).

"To establish a basis for recusal, movants must overcome a presumption of impartiality, and the burden for doing so is substantial." *Da Silva Moore v. Publicis Groupe*, 868 F.Supp.2d 137, 150 (S.D.N.Y. 2012) (internal citations and quotations omitted). "The question is whether

---

[7] The attorney who filed Zarrab's recusal motion, Christine Chung, then of Quinn Emmanuel LLP, lodged similarly wild accusations: "[t]he name partners of the YKK firm were charged in Turkey, after the recent coup attempt, as 'terrorist' followers of the Gülenist movement . . . A disinterested observer reasonably would perceive from these facts that the Court is sympathetic to the YKK sponsors and the view advanced at the Symposium funded by YKK." <u>See</u> <u>Sept. 27, 2016 Ltr. from C. Chung</u> at 2.

an objective and disinterested observer, knowing and understanding all of the facts and circumstances, could reasonably question the court's impartiality." *See S.E.C. v. Razmilovic*, 738 F.3d 14, 29 (2d Cir. 2013). "Recusal determinations are within the sound discretion of the court . . . and there is a substantial burden on the party seeking recusal to show the appearance of impropriety." *United States v. Wilson*, 2001 WL 121943, at *1 (S.D.N.Y. Feb. 13, 2001). "The decision whether a judge's impartiality can reasonably be questioned is to be made in light of the facts as they existed, and not as they were surmised or reported." *Cheney v. United States Dist. Court for D.C.*, 541 U.S. 913, 914 (2004) (internal quotations omitted); *see Estate of Ginor v. Landsberg*, 1997 WL 414114, at *2 (S.D.N.Y. July 24, 1997) ("Where the basis for recusal is not direct, but is remote, contingent, or speculative, recusal is not warranted.").

"It is well-settled that a party must raise its claim of a district court's disqualification at the earliest possible moment after obtaining knowledge of facts demonstrating the basis for such a claim." *Apple v. Jewish Hosp. & Mec. Ctr.*, 829 F.2d 326, 333 (2d Cir. 1987). "Recusal motions are often denied on the basis of untimeliness when there has been only a short delay." *Raghavendra v. Trustees of Columbia Univ.*, 2012 WL 2878123, at *5 (S.D.N.Y. July 13, 2012) (collecting cases). "Untimeliness in [the recusal] context can constitute a basis for finding an implied waiver." *United States v. Burke*, 756 F. App'x 93, 94 (2d Cir. 2019). "Timeliness [of a recusal motion] is to be strictly enforced as a safeguard against use of the procedure as a delaying tactic." *United States v. Int'l Bus. Machines Corp.*, 539 F.Supp. 473, 477 (S.D.N.Y. 1982).

"The law of the case doctrine forecloses reconsideration of issues that were decided – or that could have been decided – during prior proceedings." *See United States v. King*, 2020 WL 2703682, at *2 (2d Cir. May 16, 2020). "The law of the case doctrine . . . holds that when a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case, unless 'cogent' and 'compelling' reasons militate otherwise." *United*

*States v. Quintieri*, 306 F.3d 1217, 1225 (2d Cir. 2002). "The court has discretion to apply the law of the case doctrine, notwithstanding a 'difference in parties,' provided that doing so would be consistent with the court's 'good sense.'" *See S.E.C. v. Penn*, 2020 WL 1272285, at *3 (S.D.N.Y. Mar. 17, 2020) (citing *Zdanok v. Glidden Co.*, 327 F.2d 944, 953 (2d Cir. 1964)).

"This circuit is in accord with other circuits in *requiring* exclusion of expert testimony that expresses a legal conclusion." *In re Initial Public Offering Sec. Litig.*, 174 F.Supp.2d 61, 63 (S.D.N.Y. 2001) (citing *Hygh v. Jacobs*, 961 F.2d 359, 363 (2d Cir. 1992)) (emphasis in original). "The question presented on the recusal motion is whether 28 U.S.C. § 455 requires this Court to disqualify itself. This decision involves nothing more than interpreting the statute given certain undisputed facts; it is solely a question of law." *Id.* at 65. "It is well-established that the trial judge has broad discretion in the matter of the admission or exclusion of expert evidence." *Id.* at 62.

"A judge may engage in extrajudicial activities, including law-related pursuits and civic, charitable, educational, religious, social, financial, fiduciary, and governmental activities, and may speak, write, lecture, and teach on both law-related and nonlegal subjects." CODE OF CONDUCT FOR UNITED STATES JUDGES CANON 4. "As a judicial officer and a person specially learned in the law, a judge is in a unique position to contribute to the law, the legal system, and the administration of justice." CODE OF CONDUCT FOR UNITED STATES JUDGES CANON 4, COMMENTARY.

"The Court has an affirmative duty not to disqualify itself unnecessarily." *Thorpe v. Zimmer, Inc.*, 590 F.Supp.2d 492,494 (S.D.N.Y. 2008) (citing *Rosen v. Sugarman*, 357 F.2d 794,797 (2d Cir. 1966)). "[W]here the standards governing disqualification have not been met, disqualification is not optional; rather, it is prohibited." *In re Aguinda*, 241 F.3d 194, 201 (2d Cir. 2001). "A judge should not recuse himself on unsupported, irrational, or highly tenuous speculation." *Lamborn v. Dittmer*, 726 F.Supp. 510, 514 (S.D.N.Y. 1989); "[R]ecusal motions

should not be allowed to be used as strategic devices to judge shop." *Hoffenberg v. United States*, 333 F.Supp.2d 166, 173 (S.D.N.Y. 2004).

"Recusal is not warranted where the [] challenged conduct consists of judicial rulings, routine trial administration efforts, and ordinary admonishments to counsel." *See Balkany v. United States*, 2017 WL 5897441, at *1 (S.D.N.Y. Nov. 29, 2017), *aff'd*, 751 F. App'x 104 (2d Cir. 2018).

"[R]eference in legal proceedings to [newspaper] articles . . . cannot, standing alone, provide a basis for demonstrating actual or apparent bias or prejudice." *In re Ad Hoc Committee of Tort Victims*, 327 B.R. 138, 142 (S.D.N.Y. 2005). "As the Second Circuit has recognized, requiring judges to shelter themselves from information and opinions in periodicals in order to avoid accusations of bias or prejudice would lead to absurd results." *Id.* (citing *In re Aguinda*, 241 F.3d 194, 205 (2d Cir. 2001)). "Judges need access to this information in order to evaluate competing views and arguments." *Id.*

## III.  Halkbank's Experts Have Overstepped and their Declarations are Excluded

The Halkbank recusal motion, as noted, includes the declarations of Richard E. Flamm, who is described as a "Legal Ethics Expert" affiliated with the University of California at Berkeley and Golden Gate University in San Francisco, and Michael A. Reynolds, Associate Professor of Near Eastern Studies at Princeton University. Their declarations are being excluded by the Court because they each improperly opine as to the ultimate legal issues presented here, particularly whether the Court is required to recuse. Throughout their declarations, the refrain is the same: In their expert opinion, section 455 requires recusal. *See In re Initial Pub. Offering Sec. Litig.*, 174 F.Supp.2d 61, 65-66 (S.D.N.Y. 2001); see also Flamm Decl. at 3, 13, 19-32; Reynolds Decl. at 12-16.

"[G]iven that expert opinion may not address issues of law, it follows that expert opinion on a recusal motion cannot be admitted." *In re Initial Pub. Offering Sec. Litig.*, 174 F.Supp. 2d at

62. In *Hygh v. Jacobs*, the Court of Appeals stated: "This circuit is in accord with other circuits in requiring exclusion of expert testimony that expresses a legal conclusion." 961 F.2d 359, 363 (2d Cir. 1992); *Sacerdote v. New York University*, 2019 WL 2763922, at *4 (S.D.N.Y. July 1, 2019); *Doe v. Cabrera*, 134 F.Supp.3d 439, 447 n.12 (D.D.C. 2015); *United States v. Eyerman*, 660 F.Supp. 775, 781 (S.D.N.Y. 1987).

As noted, Messrs. Flamm and Reynolds overstep repeatedly by opining and drawing impermissible legal conclusions, particularly as to whether the Court should ("must") recuse under 28 U.S.C. § 455. See e.g. Flamm Decl. at 3, 19, 31, 32; Reynolds Decl. at 12-16. But, in addition, the asserted bases of support for their declarations and their legal conclusions are convoluted and totally speculative. For example, Flamm speculates that: **(1)** "by the time the judge made his comments [in May 2014] . . . it was certainly foreseeable . . . that the targets of the [2013 Turkish] investigation would be tried in the United States – and if so, very likely in the Southern District of New York – for their alleged crimes." And, presumably, he speculates that this Court would be assigned to the case.[8] See Flamm Decl. at 29-30. It must be underscored that the Zarrab case was not filed in the S.D.N.Y. until December 2015; the Atilla case was not filed until March 2017; and the Halkbank case was not filed until October 2019; **(2)** "a reasonable person would . . . be apt to suspect that the Symposium was not a well-planned attempt to conduct an 'educational activity' focusing on . . . 'fundamental principles of law' . . . but, rather, an attempt to bring together a group of prominent scholars, shortly before a Turkish national election, to legitimize FETO's version of the December 2013 events." Id. at 28; and **(3)** "An objective observer would understand that the Court was invited by individuals critical of Halkbank's defense to participate in a Symposium which many believe was organized for the

---

[8] Apart from its other weaknesses, Flamm's declaration does not account for the S.D.N.Y.'s random assignment of new cases among dozens of S.D.N.Y. judges.

purpose of promoting a FETO agenda; that, at the Symposium, the Court did not confine itself to making 'noncontroversial' statements about 'fundamental principles of law' . . . but went far beyond that by espousing opinions about 'current events' and 'legal developments' in Turkey that were consistent with FETO's views and antithetical to those of Halkbank." Id. at 31-32. These are absurd prognostications.

Reynolds presents an unabashedly one-sided (seemingly biased) viewpoint. He speculates ("conjures up") that: (1) "FETO and its affiliates launched a public-relations campaign to make their [December 2013] 'investigation' appear apolitical and legitimate. One example of this campaign was the symposium entitled 'Justice and the Rule of Law.'" Reynolds Decl. at 8; (2) "by participating in an interview with the leading newspaper for FETO, the assigned judge created the appearance that he is supportive of FETO's agenda . . . [and] is partial to FETO's version of events." Id. at 13; and (3) "Comments that the assigned judge made during and after the trial of Mehmet Hakan Atilla further demonstrate that the assigned judge has adopted the FETO viewpoint of the 17–25 December 2013 events." Id.

The Court adopts the reasoning of the *Eyerman* case with respect to the defense expert declarations: "supplying such affidavits under these circumstances seems rather presumptuous, considering that the affiants have not been asked by the Court for their views on the law and how the motion should be decided. What makes their gratuitous sworn legal opinions even more inappropriate is their apparent obliviousness to the self-evident utter absence of any factual basis in the record for a cognizable opinion from them." *In re Eyerman*, 660 F.Supp. at 781; *see also Sacerdote*, 2019 WL 2763922, at \*4; *Cabrera*, 134 F.Supp.3d at 447 n.12.

**IV.** **The Twelve (12) Comments Challenged by Halkbank – Individually or Collectively – Do Not Begin to Overcome the Presumption of Impartiality and Cannot Support Recusal**

Because Defense counsel so often misleadingly takes the Court's comments out of context, the Court re-states (below) the comments and also provides the context in which each comment

was made. The Government is correct to say: "Halkbank selectively edits, rearranges, and strings together various statements (excising the bulk of the Court's comments); implies connections between statements (which do not exist in the Court's unedited statements), and attributes Halkbank's spin on comments by other speakers at the Symposium to the Court . . . in an effort to manufacture an appearance that the Court's comments spoke to the legitimacy of the Turkish criminal investigation and the viability of Halkbank's putative defenses." See Gov't Opp. at 20-21.

**Comments (1-5) from the 2014 Istanbul Rule of Law Conference**

Comment #1: "**[I]t is no secret that the rule of law as contrasted with the rule of man is under some attack in Turkey**."

Context in which Comment #1 was made:

> Our topic is "Independence and Effectiveness of the Judiciary." These are critical questions for every democracy, not just Turkey. For without a fearless, strong, well-qualified, fair and independent judiciary, there can be no real democracy. And even that is not enough, there also needs to be, as Judge [Harry] Woolf [former Lord Chief Justice of England & Wales] pointed out, constant vigilance by the bar, the judges, the law schools, the media and of course the citizenry to maintain and foster judicial independence. As we heard yesterday and we have seen here, **it is no secret that the rule of law as contrasted with the rule of man is under some attack in Turkey.** We heard for example, particularly from the European Union representatives yesterday how concerned they were about certain developments here in Turkey. One of them said that Turkey erupted last year. But that's part of the debate, those same officials also said and pointed out that Turkey is a much needed and much sought after as a member of the European Union. Ex. A 168-169 (emphasis added).

Comment #2: "**This panel, in my opinion, is uniquely qualified to reflect upon judicial independence and effectiveness, particularly during this period of flux for Turkey.**"

Context in which Comment #2 was made:

> Our panelists include Gabriela Knaul who is U.N. special reporter on the independence of judges and lawyers. She, herself, is an experienced judge from Brazil and an expert in criminal justice. And she worked on the very subject at issue, independence and the effectiveness of the Brazilian Judiciary. We have also Prof. Işıl Karakaş. She is the Turkish Judge on the European Court of Human Rights, visiting professor at the universities of Aix-Marseille, Montpellier and Strasbourg and has been vice dean of the Faculty of Law the Galatasaray University and she's also been associate professor on the Faculty of Political Science of

Istanbul University. And we have Prof. Lucian Mihai who was a member of the Venice Commission of the Council of Europe. His job is to provide legal advice to member states to help bring their legal systems up to the European standards. He is the former president of the constitutional court of Romania, also an arbitrator among his many other accomplishments. And Thomas Guddat, is the vice president of MEDEL European Judges for Democracy and Liberty and also the president of the German-Polish Judges Association. And, he has been a judge in various courts among his many accomplishments. **This panel, in my opinion is uniquely qualified to reflect upon judicial independence and effectiveness particularly during this period of flux for Turkey**. Ex. A at 168 (emphasis added).

Comment #3: **"[W]hat we should not be doing in the political realm is encouraging politics, or politicians to diminish judicial independence, or to introduce new rules and/or to change the rules of the game much less to change the participants in the game while the very game is in progress."**

Context in which Comment #3 was made:

I certainly appreciate that courts do not exist in a vacuum. And there is therefore an obvious political context in which all of our respective judiciaries operate. And in that connection by the way politics is not used negatively or pejoratively, it is not a dirty word. In fact it is a reality and it is unavoidable. And so to understand this debate and to participate in this debate we need to understand the Turkish politics as well. But **what we should not be doing in the political realm is encouraging politics, or politicians to diminish judicial independence, or to introduce new rules and/or to change the rules of the game much less to change the participants in the game while the very game is in progress**. That in my opinion will be surely to substitute the rule of man for the rule of law. Ex. A at 168-169 (emphasis added).

Comment #4: **"[T]he rule of law is what prevents the state from unilaterally and arbitrarily relocating, firing judges and prosecutors who are actively pursuing an investigation, removing police officers."**

Context in which Comment #4 was made:

[J]ust a word about number 5 [on the Court's list of rule of law principles]. The rule of law prevails in a democracy and not the rule of man. And then I'll turn to our panel. So, clearly this principle overlaps with others that I have mentioned particularly separation of powers but **the rule of law is what prevents the state from unilaterally and arbitrarily relocating, firing judges and prosecutors who are actively pursuing an investigation, removing police officers**, quashing investigations, disrespecting court decisions, closing down the means of communications, and otherwise attempting to dominate the judiciary. It means not granting preferential treatment to some and punishment to others on the basis of rules that do not apply generally. Ex. A at 169 (emphasis added to reflect the comment Halkbank complains of).

<u>Comment #5</u>: **"It is inappropriate to change the rules of the game while the game is taking place."**

<u>Context in which Comment #5 was made</u>:

Note that: The Court's comment consisted of the remarks in bold and in quotes in the paragraph below and is very similar to Comment #3.

> US District Judge Richard Berman told *Today's Zaman* that the rule of law is under attack in Turkey because the independence of the judiciary has been challenged. Referring to the corruption probe that started on Dec. 17, 2013, Berman said that the legal proceedings have been interrupted. "**It is inappropriate to change the rules of the game while the game is taking place**," he said, calling attention to the changes that the Turkish government made to laws regulating the judicial system after the corruption investigations went public. <u>See</u> <u>Halkbank Recusal Motion</u> <u>Ex. 13</u> at 2 (emphasis added).

Comments 1-5 are identical to comments which have already been litigated by Halkbank's co-defendant Reza Zarrab. Indeed, defense counsel's legal arguments are also the same. <u>See</u> <u>Sept. 29, 2016 Decision & Order</u> at 2-7, 14-23. The doctrine of law of the case precludes Halkbank from re-litigating the Court's comments made over six years ago at the 2014 Rule of Law Symposium, including the comment in *Today's Zaman*. The doctrine is intended to "foreclose[] reconsideration of issues that were decided – or that could have been decided – during prior proceedings." *See United States v. King*, -- Fed. App'x --, 2020 WL 2703682, at *2 (2d Cir. May 16, 2020); *Pearlstein v. BlackBerry Ltd.*, 2019 WL 6831554, at *9 (S.D.N.Y. Aug. 2, 2019) ("[under] the law of the case doctrine . . . a district court generally has the obligation to adhere to its own decision at an earlier stage of the litigation"); *see also Flibotte v. Pa. Truck Lines, Inc.*, 131 F.3d 21, 25 (1st Cir. 1997) ("the law of the case doctrine . . . states [] that . . . a legal decision made at one stage of a criminal or civil case constitutes the law of the case throughout the pendency of the litigation"); *King*, 2020 WL 2703682, at *2.

Law of the case binds Halkbank to the Court's Decision & Order, dated September 29, 2016, denying recusal. Following a thorough review of Comments 1-5, this Court in deciding Zarrab's motion held that "an objective and informed observer could not reasonably question the

Court's impartiality." See Sept. 29, 2016 Decision & Order at 14. The Court found, among other things, that: the "remarks at the Symposium focused upon universal principles of the Rule of Law and Justice and, particularly, the importance of an independent and effective judiciary;" that "[e]ngaging in law related activities [such as the Symposium] – including speeches that comment on current events and legal developments – is permitted;" and that the Court's comments "made no mention of Zarrab or the [2013] Turkish charges brought against him." Id. at 15-16. The Court made these determinations based upon the transcript of the Symposium, the briefs, the canons of judicial ethics, and applicable case law. Id. at 15-17.

It is both appropriate and fair that Halkbank be bound by the September 29, 2016 Decision & Order even though Halkbank was not at the time a party to the case (and was indicted in October 2019). In a recent decision in *S.E.C. v. Penn*, S.D.N.Y. District Judge Valerie Caproni concluded that: "The court has discretion to apply the law of the case doctrine, notwithstanding a 'difference in parties,' provided that doing so would be consistent with the court's 'good sense.'" *S.E.C. v. Penn*, 2020 WL 1272285, at *3 (S.D.N.Y. Mar. 17, 2020) (citing *Zdanok v. Glidden Co., Durkee Famous Foods Division*, 327 F.2d 944, 953 (2d Cir. 1964) ("Since the doctrine of the law of the case is addressed to the court's 'good sense,' we see no reason why it should be peremptorily excluded because of the presence of new parties . . .")); *see also United States v. Harden*, 2013 WL 12419410, at *1 (E.D. Tex. Dec. 18, 2013) ("[W]hen a rule of law has been decided adversely to one or more co-defendants, the law of the case doctrine precludes all other co-defendants from relitigating the issue"); 18B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 4478.5 (2d ed.).

The law of the case doctrine is driven by considerations of fairness to the parties, judicial economy, and the societal interest in finality. *Cty. of Suffolk v. Stone & Webster Eng'g Corp.*, 106 F.3d 1112, 1117 (2d Cir. 1997); *Penn*, 2020 WL 1272285, at *3. All three of those considerations favor barring Halkbank's new challenges to Comments 1-5. How unfair it would

be nearly 3 years after the Zarrab plea, over 2 years after the Atilla conviction and sentence and appeal, and nine months after the Halkbank Indictment was rendered, to relitigate what was said at the 2014 Symposium. And how wasteful. For the last four years, the Court and the parties have been actively engaged in shepherding these proceedings to conclusion while ensuring that all parties, particularly the defendants, are treated fairly. The Court's September 29, 2016 Decision & Order was never appealed or challenged and should be accorded finality.

As stated at page 1 above, defense counsel acknowledged at the outset of Zarrab's case in 2016, that he had investigated the Court's role in the 2014 Symposium and found nothing amiss. "**I was familiar with your Honor's remarks and appearance in Istanbul because, in our thoroughness, we try and follow everything that everyone does . . . My experience here has allowed me to conclude that you are indeed a fair and impartial judge . . . We have seen nothing to date which would suggest that you could not participate in any way**." Apr. 27, 2016 Tr. at 4:17-5:3; *see also New York ex. rel. Boardman v. Nat'l R.R. Passenger Corp.*, 2007 WL 655607, at *14 (N.D.N.Y. Feb. 23, 2007) ("[the Court] rejected the very same arguments renewed in this Motion and clearly found that this Court acted appropriately within the law. For the sake of judicial economy, law of the case is applicable and the Motion to Recuse will be denied on this account"); *United States v. Hill*, 2004 WL 2064622, at *2 (N.D. Ill. Sept. 13, 2004) ("The motions to recuse . . . are at bottom regurgitations of motions that have already been raised, considered and decided. The doctrine of the law of the case provides that a court's decision upon a rule of law governs the same issues [even] if they arise at subsequent stages of a case absent a strong reason to depart from the prior decision. [Defendant] has not advanced any reason to replow the ground covered by this court").

But, even assuming, arguendo, that the Court were to examine Comments 1-5 anew, the Court would reject Halbank's challenge based upon the sound reasoning of the September 29, 2016 Decision & Order. That is: (i) the Court's remarks at the Symposium focused upon

18

universal principles of the Rule of Law and Justice and, particularly, the importance of an independent and effective judiciary; (ii) engaging in law related activities such as the Symposium is permitted and appropriate; and (iii) the Court's remarks contained no mention of defendants Zarrab, Atilla or Halkbank or of any of the charges in the 2013 Turkish proceedings - - or the merits of any charges or the viability of any defendant's defenses. Nor, of course, was there any mention of any charges in this S.D.N.Y. case which had not been filed in 2014. It would be objectively unreasonable, based upon all of the facts and circumstances, to conclude that the Court is biased against Halkbank or has made any decision detrimental to or in any way diminishing the legal presumption of Halkbank's innocence. *See Razmilovic*, 738 F.3d at 29.

**Comments (6&7) were made at sidebar or in an oral ruling during the Atilla proceedings**

Comment #6: "[T]he defense overall appears quite willing to join a rather **farfetched conspiracy theory bandwagon which has been constructed and developed far outside any United States courtroom. And was not . . . part of the trial record . . . the defense at best illogical foreign conspiracy theory . . . is . . . unpersuasive."**

Context in which Comment #6 was made:

> THE COURT: So what I'd like to do, before we get the jury, is deal with two motions that have been filed by the defense, one is a motion for a mistrial . . . that motion is, respectfully, denied . . . [T]he reasons for denying the mistrial motion include, among others: First and foremost . . . Mr. Atilla has received and is receiving a thoroughly fair and transparent trial . . . Second, Huseyin Korkmaz, whose testimony is objected to in this motion by the defense . . . is clearly relevant to the Atilla case . . . The third reason for rejecting the defense motion is that . . . Mr. Korkmaz's testimony . . . corroborated the testimony of other witnesses . . . Fourth, Kormaz's testimony was, in the Court's view, not prejudicial to defendant Atilla. Indeed, his testimony may be viewed as anything but prejudicial to Mr. Atilla, which is reason enough to deny a mistrial application . . .

> While some of the defense team appear not to appreciate fully aspects of Mr. Korkmaz's testimony as I've just described, the defense overall appears quite willing to join a rather **farfetched conspiracy theory bandwagon which has been constructed and developed far outside any United States courtroom**. **And was not**, at least until defense counsel Harrison cross-examined Mr. Korkmaz, **part of the trial record** . . .

> For example, Mr. Harrison clearly seemed on his cross-examination to be arguing, without stating any basis for his own claim or insinuation, that Korkmaz's job and promotion as a young police investigator, who . . . appears to have graduated third

in his class from Turkish police academy, was attributable less to Korkmaz's own merits, than to support of alleged Gülenist backing . . . And during the cross-examination, again by Mr. Harrison, defense counsel produced, seemingly out of the blue and without any explanation or any foundation, documents written in Turkish that only Mr. Harrison said could be construed to show . . . that Mr. Korkmaz's release from prison was as a result of Gülenist intervention.

The Court permitted the defense great leeway in its cross-examination of Mr. Korkmaz, as it usually does, and as most of my colleagues also do with defense counsel in criminal cases. But at the same time, I note that **the defense's at best illogical foreign conspiracy theory** has no foundation in the record, and **is**, in reality, **unpersuasive** and borderline unprofessional, as a diversion from the issues to be decided in this case." See Dec. 15, 2017 Tr. at 1967:14-1970:22 (emphasis added).

<u>Comment #7</u>: **"[W]e all read about it in the *New York Times* and 90 other places, and each time it was a different version of it, including your time."**

<u>Context in which Comment #7 was made</u>:

MS. FLEMING (defense counsel): There's a recorded phone call that we got the other night. This is the English translation of it. It was in Azeri. It was hard to get a translator. I want to play it to impeach him . . .

THE COURT: It's a call from him [Zarrab]?

MS. FLEMING: From his uncle over the jail system. It's recorded.

AUSA KAMARAJU: The federal rules of evidence do not allow the use of extrinsic evidence to impeach a witness on credibility.

MS. FLEMING: It's not to impeach him. I'm going to play the recording.

COURT: You just said on the record that you were going to impeach him . . .

MS. FLEMING: I can't speak Azeri. I can barely say a word of it. I can't impeach him in Azeri.

COURT: You know, as we said at the last break . . . I think you're just flailing around a little bit. You said we were getting to the end. I think you should get to the goal post.

MS. FLEMING: This is what I'm getting at. I'd like to show it to you. It's a . . . statement: 'Once you admit your guilt, you become free. Look, there is no rule . . .'

**COURT: We all read about it in the *New York Times* and 90 other places, and each time it was a different version of it, including your time.**

20

MS. FLEMING: Well, we used what the prosecutors gave us as a summary.

COURT: Why don't you just ask him, as best you can phrase the question, whether that happened or not.

MS. FLEMING: I just did. He denied it. I have to be able to impeach him with his own statement.

COURT: Ask him whether he spoke to his uncle and what did he say. See Dec. 7, 2017 Tr. at 1011:2-1012:13 (emphasis added).

The Atilla case was intensely litigated and included extensive motion practice, a three-and-a-half week jury trial, and appeal of Atilla's conviction to the Second Circuit. Throughout those proceedings, the defense team – which consisted of four separate sets of defense counsel – raised not a whisper of partiality or bias attributable to the Court. Halkbank, which had signed Atilla's retainer agreements, paid Atilla's legal fees, and selected new defense trial counsel (Todd Harrison, McDermott Will & Emery LLP) on the eve of trial, had considerable influence over Atilla's defense. Compare *Alpert's Newspaper Delivery Inc. v. The New York Times Co.*, 876 F.2d 266, 270 (2d Cir. 1989); *Capitol Records, LLC v. ReDigi Inc.*, 2015 WL 5076457, at *6 (S.D.N.Y. Aug. 27, 2015); *Imagineering, Inc. v. Lukingbeal*, 1997 WL 363591, at *4 (S.D.N.Y. June 30, 1997); *In re Apollo Air Passenger Computer Reservation Sys.*, 720 F.Supp. 1061, 1067 (S.D.N.Y. 1989).

Halkbank unquestionably influenced the Atilla defense by virtue of the facts that, among other things: **(i)** Halkbank was a signatory to the retainer agreements of defense counsel Victor Rocco of Herrick Feinstein LLP, and Cathy Fleming of Fleming Ruvoldt PLLC, and Todd Harrison of McDermott Will & Emery LLP.[9] See e.g. June 12, 2017 Tr. at 6:20-22; Nov. 21, 2017 Tr. at 9:15-10:15 (Court: "Mr. Harrison . . . a retainer agreement which I have, it is dated November 14, 2017, and it's on the letterhead of McDermott Will & Emery and it is addressed to

---

[9] Defense counsel Josh Dratel was compensated under the Criminal Justice Act.

Mr. Atilla, and it appears to have been signed on page 2 by yourself, by Mr. Atilla . . . [and a] signatory, at least one, on behalf of Halkbank . . ." Mr. Harrison: "The signed on 'behalf of Halkbank' by the current [Halkbank] CEO Osman Arslan . . . and this is the [] official signature of the Bank and the CEO."); **(ii)** Halkbank also paid the legal fees of these attorneys. See e.g. June 12, 2017 Tr. at 6:15-7:7; and **(iii)** Halkbank exercised its power to retain new defense trial counsel, Todd Harrison of McDermott Will & Emery LLP, on the eve of trial. See Nov. 21, 2017 Tr. at 13:5-14:20 (Harrison: "Halkbank is currently represented by King & Spalding and, in particular, a partner at King & Spalding named Andrew Hruska . . . Mr. Hruska and I were colleagues at the U.S. Attorney's office in the Eastern District of New York. Relatively recently, less than two weeks ago, Judge, Mr. Hruska asked me if I would be available to assist on a trial that was coming up very soon that was very complicated . . . he also indicated to me that it was his understanding that, from speaking to people at the Bank [Halkbank] and relatives, apparently, of Mr. Atilla, that he was also interested in having another lawyer join the team."); Id. at 28:18-20 (Atilla: "I would like to say that the suggestion about adding the firm of McDermott [Will & Emery] to my defense case was suggested by Halkbank.").

Surely, Halkbank could have raised -- or caused to be raised -- any claim of bias with the Court or with the Second Circuit if, in fact, there were such a claim to be raised. Halkbank did not do so because there was no bias or partiality. And, Halkbank is barred at this late hour from raising Atilla case claims. *See Apple*, 829 F.2d at 334; *United States v. Brinkworth*, 68 F.3d 633, 639 (2d Cir. 1995); *United States v. Yu-Leung*, 51 F.3d 1116, 1120 (2d Cir. 1995); *Polizzi v. United States*, 926 F.2d 1311, 1321 (2d Cir. 1991).

Additionally, Comments 6 and 7 were made (outside the presence of the Atilla jury) at side bar or during the Court's oral ruling on the defense motion for a mistrial. Even if they were timely challenged (which they are not), such comments are not a proper basis for recusal. "Recusal is not warranted where the [] challenged conduct consists of judicial rulings, routine

trial administration efforts, and ordinary admonishments to counsel." *Balkany v. United States*, 2017 WL 5897441, at *1 (S.D.N.Y. Nov. 29, 2017), *aff'd*, 751 Fed. App'x 104 (2d Cir. 2018).

And, reference in legal proceedings to news articles "cannot . . . provide a basis for demonstrating actual or apparent bias or prejudice." *In re Ad Hoc Committee of Tort Victims*, 327 B.R. 138, 142 (S.D.N.Y. 2005); *United States v. Kerik*, 419 Fed. App'x 10, at*3-4 (2d Cir. 2011); *In re Aguinda*, 241 F.3d 194, 205 (2d Cir. 2001).

**Comment (8) was included in an article, dated June 22, 2018, in *Courthouse News* entitled "In the Age of Trump, Judge Reflects on D'Souza and the 'New Rudy'"**

Comment #8: **"I am still stunned by the fact that Rudy [Giuliani] was hired to be – and he very actively pursued – being the 'go between' between President Trump and Turkey's President Erdogan in an unprecedented effort to terminate this federal criminal case in the middle of the case . . . Had Rudy succeeded, he and the two presidents I mentioned, would have helped very significantly the country of Iran – which was the beneficiary of the conspiracies to avoid USA sanctions against Iran, i.e. the very heart of the allegations in this case . . . My head still spins when I consider that."**

Context in which Comment #8 was made:

A reporter from *Courthouse News Service* asked me for a comment about Rudy Giuliani and his involvement in the Zarrab case. The Court agreed to comment after Zarrab had pled guilty and after Atilla had been found guilty and had been sentenced. The Court did not discuss the merits of the case.

Rudy Giuliani's widely publicized involvement in the Zarrab case was the subject of both written submissions requested by the Court and a series of *Curcio* hearings held by the Court, among other things, to assess potential conflicts of interest and to protect the integrity of the proceedings. Giuliani was retained by Zarrab to work outside the courtroom but the work he was doing had the potential to impact the court proceedings and required vigilance.

During the course of the Zarrab proceedings, the Government advised the Court that: "Mr. Giuliani and Mr. Mukasey traveled to Turkey some time shortly after February 24, 2017 . . . [and] met with Turkey's president, Recep Tayyip Erdoğan, to discuss potential ways to facilitate a resolution of the charges against the defendant in this case;" and that "Mr. Giuliani and Mr. Mukasey had sought to meet other officials in the U.S. government outside of this [U.S.

Attorney's] Office to discuss a potential disposition of this case." See Mar. 31, 2017 Ltr. from Gov't at 1-2. The Government also advised the Court that Giuliani's firm, Greenberg Traurig, "appears to be a registered agent of the Republic of Turkey." Id. at 3. The Government "request[ed] that the Court hold a hearing pursuant to *Curcio* with respect to the potential conflicts of interest of the defendant's counsel." Id. at 4; see also Christian Berthelsen and Tom Schoenberg, "Giuliani Sought Top-Level Meetings to End Iran Sanction Case," *Bloomberg News* (Mar. 31, 2017); Benjamin Weiser and Patrick Kingsley, "Why Giuliani Held a Secret Meeting with Turkey's Leader," *New York Times* (Apr. 20, 2017).

This was a unique experience and the Court was determined to ensure that the defendant's rights were not infringed and that the in-court proceedings continued apace. A series of *Curcio* hearings were held by the Court on April 4, 2017, April 13, 2017, April 24, 2017, May 2, 2017, May 11, 2017, and May 25, 2017. The Court also required written declarations from Rudy Giuliani and Michael B. Mukasey, which were submitted on April 14, 2017, May 3, 2017, May 4, 2017, and May 22, 2017. During these proceedings, it was confirmed that Giuliani was not retained to appear in court (he never did) but rather was "retained to provide advice and to consult . . . with respect to Mr. Zarrab's defense of the charges in this case . . .  principally . . . to determine whether this case can be resolved as part of some agreement between the United States and Turkey . . . Those services have included and are anticipated to include further meetings or conversations with senior officials of the United States and Turkey . . . The meetings and conversations with Turkish officials have included a meeting with the President of Turkey." See April 14, 2017 Giuliani Affidavit at 2. It was also confirmed that Greenberg Traurig was a registered agent of the Republic of Turkey. See May 11, 2017 Tr. at 10:15-16.

Following the hearings, the Court wrote a written decision in which it concluded, among other things, that Zarrab "voluntarily and knowingly waived [] potential conflicts" arising from

the retention of Giuliani and also that "these conflict situations must continue to be closely monitored." See June 1, 2017 Decision & Order at 4, 6.

The Court discussed its past association with Giuliani with the reporter, including the fact that the Court had worked on Giuliani's campaigns for mayor and had been appointed to the New York State Family Court by Giuliani. The Court expressed admiration for Giuliani's work as Mayor, including after 9/11. It made no mention of Halkbank or of any charges against Halkbank or the merits of any charges against Halkbank. Nor did the Court discuss the charges against co-defendants Atilla or Zarrab, or the merits of those charges. The conversation with the reporter, as noted, took place after Zarrab had pled guilty and after Atilla had been sentenced – and also some sixteen months before Halkbank would be indicted.

The Court did not "prematurely credit the government's charges" or "signal [an] opinion that the allegations are true," as alleged by Halkbank. See Halkbank Recusal Motion at 14, 23. Comment #8 reflected the Court's surprise that Rudy Giuliani was engaged in the role outlined above.

As the court in *In re Marshall* determined, an interview does not, as here, reflect bias or partiality. *In re Marshall*, 403 B.R. 668, 682 (C.D. Ca. 2009).  In the *Marshall* case, the Court found that an interview does not "call the judge's impartiality into question in the mind of a reasonable observer [a]s . . . the judge made no representation on the merits of the case." *Id.* Similarly, in *LoCascio v. United States*, the Court of Appeals concluded that the District Court's "comment to an interviewer following the criminal trial . . . [did not] raise any doubt in the mind of a reasonable person as to his ability to decide the present case fairly." 473 F.3d 493, 496 (2d Cir. 2007); *see also United States v. Yonkers Bd. of Educ.*, 946 F.2d 180, 184-85 (2d Cir. 1991).

**Comments 9-12 were made in the course of the Court's efforts to schedule Halkbank's arraignment and motion practice**

Comment #9 (October 22, 2019): **I was somewhat – I don't know if taken aback is the correct expression – but I was surprised somewhat by the letter [from King & Spalding] because it was my understanding that for over a period of years – or a year anyway – that there were some discussions on behalf of Halkbank with respect to a potential fine, I guess it would be, in connection with the Iran sanctions evasion scheme, but more particularly I thought that King & Spalding had been involved in those discussions.**

Comment #10 (November 5, 2019): **They are well past this preliminary fencing or shadow boxing . . . I'm referring to what I read in the newspapers including the *New York Times* . . . there have been negotiations between Turkey and the United States, I suspect although I don't particularly know, between the U.S. Department of Treasury and Halkbank as to whether there was involvement in the conspiracies that were just referred to such that they are culpable and, if so, whether there is a penalty to be applied and how much it is.**

Comment #11 in the Court's December 5, 2019 Decision & Order: **This alleged conspiracy has been described as the largest Iran sanctions violation in United States history.**

Comment #12 in the Court's December 5, 2019 Decision & Order : **"[T]he objective of the campaign, following the conviction of Mr. Atilla on January 3, 2018, appears to have been to avoid Halkbank being indicted and, relatedly, to avoid Halkbank having to pay a potential fine . . . [a]ccording to the *New York Times*."** [10]

The litigation posture of Halkbank conveyed by defense counsel, Andrew Hruska, appeared at the outset to be one of delay. Immediately following Halkbank's Indictment in October 2019, Halkbank refused to accept service of process and would, according to Hruska, not allow counsel to accept service on its behalf or to conduct an arraignment. See Oct. 18, 2019 Ltr. from A. Hruska at 1 ("Neither I nor my firm are authorized to accept service on behalf of Halkbank and are not authorized to make an appearance in this case."); Nov. 4, 2019 Ltr. from A. Hruska at 1 ("Halkbank has retained [King & Spalding] to represent it in the above-referenced matter . . . and we do not concede the acceptance of service . . . The Bank has refused to accept service and has not stipulated to service by any means."). On November 5, 2019, the

---

[10] *See e.g.* Kenneth P. Vogel, "Targets of U.S. Sanctions Hire Lobbyists With Trump Ties to Seek Relief," *New York Times* (Dec. 10, 2018); Eric Lipton, "U.S. Indicts Turkish Bank on Charges of Evading Iran Sanctions," *New York Times* (Oct. 15, 2019).

Government filed a letter update regarding its efforts to serve written notice of the charges on Halkbank. The letter included a handwritten note, presumably from Halkbank, which stated: "Please be informed that this package . . . sent by the U.S. Attorney's Office for the Southern District of New York was . . . not accepted by this Bank, since the form of delivery is not in compliance with the legal service provisions of bilateral treaties between the Turkish Republic and the U.S." See Nov. 5, 2019 Gov't Ltr. at 1. Authorizing counsel to accept service and to appear is not unusual in criminal matters where the defendant is a corporation.

Instead, Hruska pressed for a "special appearance" and a motion challenging the Court's jurisdiction based on a "lack of contacts" by Halkbank with the U.S., and seeking recusal. This too was unusual, as it is common practice to arraign the corporation (without prejudice to motion practice) and then to schedule a motion(s), e.g. to dismiss based on jurisdiction, seeking recusal, and/or other grounds. The Court assured the defense that Halkbank would not waive its right to seek relief. Surprisingly, defense counsel would not say whether Halkbank would appear and be arraigned if it lost the motion submitted via special appearance. See Nov. 5, 2019 Tr. at 15:5-11; 22:4-10.

The Court scheduled briefing on whether there should be a special appearance and motion practice prior to arraignment. On December 5, 2019, the Court ruled that "[s]pecial appearances to challenge 'minimum contacts' are not properly entertained in criminal cases;" "[t]he cases which Halkbank relies upon are not persuasive [and] do not include any case from the Second Circuit where a special appearance was entertained to address minimum contacts or recusal in a criminal matter;" "Halkbank will not be prejudiced by seeking recusal and/or dismissal on jurisdictional grounds following arraignment;" and "[a]s a 'fugitive,' Halkbank would not be entitled to invoke the Court's processes" because "[a] defendant who fails to appear in the first instance or absconds during the course of ongoing criminal proceedings flouts the authority of the court." See Dec. 5, 2019 Decision & Order at 16, 18, 22, 24.

But that was not the end of the story. Halkbank then moved for a stay of the Court's proceedings in both the District Court and the Court of Appeals and simultaneously sought to have the Court of Appeals issue a writ of mandamus compelling the Court "to allow Halkbank to enter a special appearance." See Dec. 17, 2019 Ltr. from A. Hruska at 1. The Second Circuit affirmed the District Court's rulings. But the whole episode consumed five months. The arraignment was held on March 31, 2020 and the Court quickly turned to motion practice.

Prior to Halkbank's arraignment, Mr. Hruska withdrew as counsel and was succeeded by Robert Cary of Williams & Connolly LLP. The very first words from Mr. Cary to the Court were: "I was hired to turn over a new leaf in this case and get a fresh start." Counsel then requested a three month adjournment. See Mar. 31, 2020 Tr. at 9:23-10:4, 10:10-11:7 (Mr. Cary: "Our request, and the government is not agreeing with this request, would be that we have a status conference in 90 days from today . . . 90 days is a good time to see where we are and hopefully by then we'll be able to travel to Turkey and discuss these important issues with them."). The Court granted a 90-day extension. Mr. Cary filed the instant recusal motion on July 14, 2020.[11]

**Analysis of Comments 9-12**

Halkbank contends that "[i]n denying Halkbank's counsel's request to enter a special appearance, the assigned judge relied on *New York Times* articles to form views about the status of negotiations between Halkbank and the Department of Justice." See Halkbank Recusal Motion at 4. And that "[s]ince the indictment against Halkbank, the assigned judge has assumed Halkbank's guilt on the basis of [such] extrajudicial sources." Id. at 14.

---

[11] On August 10, 2020, Halkbank also filed a motion to dismiss the Indictment principally based upon alleged lack of personal jurisdiction and immunity under the Foreign Sovereign Immunities Act.

The Government counters persuasively that: "the Court's awareness of Halkbank's pre-indictment discussions with the U.S. Government was based on the record . . . in letters to the Court and discussions at court conferences." See e.g. Oct. 18, 2019 Ltr. from A. Hruska; Oct. 22, 2019 Tr.; Oct. 22, 2019 Gov't Ltr. Ex. B; Gov't Opp. at 29-30. And, according to the Government, "[any] 'campaign' by the Turkish government against the prosecution and [] the scale of the charged scheme . . . [were] addressed, among other places, in the Government's filing[s]." Id. at 7, 29-30; see May 16, 2018 Sentencing Hearing Tr. at 72:12-16 (AUSA Lockard: "[T]o our knowledge, there has not been a bigger criminal sanctions evasion prosecution in a U.S. court than this case. This is the biggest sanctions evasion case prosecuted in the United States that we are aware of. The scope and scale is massive."); Oct. 22, 2019 Gov't Ltr. Ex. B Halkbank Press Release dated Oct. 16, 2019 at 3: "Despite the fact that the Bank's ongoing discussions with the U.S. Department of Justice to resolve this matter without indictment has not yet come to a conclusion, these [charges] were filed as part of the sanctions introduced against our country by the U.S. government."

Halkbank, as the Government contends, "misconstrues the record [and] seizes on the Court's reference to media reports about collateral matters to argue that the Court's decision on the defendant's special appearance motion was based on press reports." See Gov't Opp. at 29. In fact, the Court's Decision & Order, dated December 5, 2019, denying Halkbank's request for a special appearance was based on very clear case law and the parties' arguments in their briefing. Halkbank's theory of special appearances and personal jurisdiction in criminal cases, as presented by the defense to the Court, was incorrect. Id. at 30.

Halkbank's argument that the Court's comments during the pre-arraignment proceedings show that the Court "has assumed Halkbank's guilt," see Halkbank Recusal Motion at 14, is unpersuasive and simply not true. See also Lamborn, 726 F.Supp. at 514; Landsberg, 1997 WL 414114, at *2. The Court takes seriously the presumption of innocence of all criminal

defendants, including Halkbank, and has worked diligently (over the four plus years of presiding over these proceedings) to ensure fair and impartial treatment of all parties. This was true during Zarrab's guilty plea, and Atilla's conviction after trial and his sentencing, and has been true throughout Halkbank's arraignment and motion practice.

All of the Court's conferences, rulings, decisions, hearings, trials, and comments are grounded in the record (including letters, briefs, arguments of counsel) and applicable law. The record of these proceedings is not only voluminous, it is thoroughly sourced and annotated. See e.g. Dec. 15, 2017 Tr.; May 16, 2018 Tr.; Dec. 5, 2019 Decision & Order; Dec. 26, 2019 Decision & Order. Unfortunately, Halkbank takes Comments 9-12 out of context and stretches their meaning beyond reason, apparently in an attempt to suggest the appearance of bias or partiality. *See Da Silva Moore v. Publicis Groupe*, 868 F.Supp.2d 137, 168-172 (S.D.N.Y. 2012). The approach is not successful. The challenged comments "consist entirely of judicial rulings, routine trial administration efforts, and ordinary admonishments to counsel" and do not support recusal. *See Balkany v. United States*, 2017 WL 5897441, at *1 (S.D.N.Y. Nov. 29, 2017), *aff'd*, 751 F. App'x 104 (2d Cir. 2018). "The Court's rulings and comments . . . do not even remotely approach the level warranting recusal, as a review of the transcripts and opinions show." *See Universal City Studios v. Reimerdes*, 104 F.Supp.2d 334, 359 (S.D.N.Y. 2000).

And, any occasional reference by the Court to a media source has been intended to provide background. "[R]eference in legal proceedings to . . . newspaper . . . articles . . . cannot, standing alone, provide a basis for demonstrating actual or apparent bias or prejudice." *See In re Ad Hoc Committee of Tort Victims*, 327 B.R. 138, 142 (S.D.N.Y. 2005). Such references can be helpful to enhance questioning of the parties, e.g. during the scheduled October 22, 2019 and November 5, 2019 arraignment hearings. See Gov't Opp. at 29 ("the Court noted this record evidence as well as media reports about such discussions . . . it clearly was the basis of judicial *questioning*: the Court sought to ascertain the purpose of requesting a special appearance in order

to challenge personal jurisdiction in light of lengthy pre-indictment discussions with the Government, and whether Halkbank intended to appear and defend the charges if its special-appearance request were denied."); *In re Ad Hoc Committee of Tort Victims*, 327 B.R. at 142 ("Judges need access to this information in order to evaluate competing views and arguments.").

The Second Circuit has recognized that "requiring judges to shelter themselves from information and opinions in periodicals in order to avoid accusations of bias or prejudice would lead to absurd results." *In re Ad Hoc Committee of Tort Victims*, 327 B.R. at 142 (citing *In re Aguinda*, 241 F.3d 194, 205 (2d Cir. 2001)). The proposition that the Court must avoid reading or referencing sources such as the *Wall Street Journal* or *New York Times* is rejected. *Id.*

## V.   Conclusion & Order

For the reasons stated above, Halkbank's motion to recuse [Dck. #637] is respectfully denied.[12]

Dated: New York, New York
       August 24, 2020

*Richard M. Berman*

**RICHARD M. BERMAN, U.S.D.J.**

---

[12] **Any issues or arguments raised by the parties but not specifically addressed in this Decision and Order have been considered by the Court and rejected.**