K9IPHALO

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                            15 CR 867 (RMB)
                                             Oral Argument
5                                            Teleconference
     HALKBANK, ET AL.,
6
                    Defendants.
7
     ------------------------------x
8
                                             New York, N.Y.
9                                            September 18, 2020
                                             9:30 a.m.
10
     Before:
11
                        HON. RICHARD M. BERMAN,
12
                                             District Judge
13

14                    APPEARANCES VIA TELEPHONE

15   AUDREY STRAUSS,
          Acting United States Attorney for the
16        Southern District of New York
     BY:  SIDHARDHA KAMARAJU
17        MICHAEL LOCKARD
          DAVID W. DENTON, JR.
18        JONATHAN REBOLD
          KIERSTEN A. FLETCHER
19        Assistant United States Attorneys

20   WILLIAMS & CONNOLLY, LLP
          Attorneys for Defendant Halkbank
21   BY:  ROBERT M. CARY
          SIMON A. LATCOVICH
22        DAMAYANTI DESAI
          JAMES KIRKPATRICK

23

24

25

K9IPHALO

1          (The Court and all parties appearing telephonically)

2          THE COURT:  This is Judge Berman.  I think we're ready

3     to begin, and I would ask everybody who is not speaking or is

4     not speaking at the particular time, if you can, to mute your

5     phone so we don't have background noise.

6          Second, I would ask everybody to introduce themself

7     when they are about to speak.  So, for example, this is Richard

8     Berman, and I'm introducing the oral argument on Defendant

9     Halkbank's motion to dismiss the indictment.

10          We are proceeding today in light of the fact that the

11    Court of Appeals yesterday evening denied the defense

12    application to stay the proceedings and the District Court,

13    that is to say myself, by decision and order had denied the

14    application made to the District Court for stay of these

15    proceedings.

16          So with that in mind, we will proceed pursuant to an

17    earlier order that I had issued indicating that each side would

18    have 20 minutes and may reserve time for rebuttal, if you wish.

19          So we'll start with the defense.  Mr. Cary, would you

20    introduce your team and who will be making the presentation

21    today?

22          MR. CARY:  Yes, your Honor.  It's Rob Cary for the

23    defense.  With me is Simon Latcovich, Damayanti Desai and James

24    Kirkpatrick on the phone in different places.  And

25    Mr. Latcovich will be making the argument today, your Honor.

K9IPHALO

1          THE COURT:  Okay.  Does the court reporter have the

2    spelling of each of the names?

3          THE REPORTER:  I have Mr. Latcovich's name.  I do not

4    have the other names.

5          THE COURT:  If you could provide, just so that the

6    record is clear, the spellings?

7          MR. CARY:  Yes, your Honor.  James Kirkpatrick is

8    spelled J-a-m-e-s, Kirkpatrick is K-i-r-k-p-a-t-r-i-c-k, and

9    Damayanti, D-a-m-a-y-a-n-t-i, is the first name, and the

10   surname is D-e-s-a-i.

11         THE COURT:  That's great.

12         Okay.  Mr. Latcovich, I think you have the floor.

13         MR. LATCOVICH:  Thank you, your Honor.  Good morning.

14   Simon Latcovich on behalf of Halkbank.

15         Your Honor, given the limited time, I plan today to

16   focus my efforts on sovereign immunity, but I will have

17   something brief to say about all of our arguments to dismiss

18   this indictment, and I'm going to try to reserve approximately

19   five minutes for rebuttal, but we'll see how that goes.

20         THE COURT:  Okay.

21         MR. LATCOVICH:  Starting with --

22         THE COURT:  I just wanted you to know, I do have I

23   think enough time.  I'm not going to cut anybody off, you know,

24   in the middle of an idea.  So you will certainly have five

25   minutes or ten minutes, if you need it, for rebuttal, no matter

K9IPHALO

1  how much time of the 20 minutes you use during your

2  presentation.

3          MR. LATCOVICH:  Understood, your Honor.  Thank you.

4          So let's just jump right into sovereign immunity, your

5  Honor.  This doctrine creates an unusual posture for a criminal

6  case.  It's the government that has to meet certain burdens,

7  not the defense, and we don't believe the government can meet

8  the multiple burdens it needs to continue this prosecution.

9          So starting with subject matter jurisdiction, your

10  Honor, I think that I can even get the government to agree that

11  this Court cannot proceed without subject matter jurisdiction.

12  And as various courts have analyzed the issue, sovereign

13  immunity is really a question of subject matter jurisdiction.

14  Although the parties disagree on which is applicable, there are

15  two potential bases for subject matter jurisdiction over

16  Halkbank; the first is the Foreign Sovereign Immunity Act, and

17  the second is 18 U.S.C. 3231, the general criminal

18  jurisdictional statute.

19          Now, let's start with the Foreign Sovereign Immunities

20  Act.  If this is the source of subject matter jurisdiction for

21  this case, then Halkbank is immune and the case must be

22  dismissed.  28 U.S.C. 1330(a), by its plain terms, limits

23  Federal Court jurisdiction to "non-jury civil actions" against

24  foreign states.  The argument is simple.  The SSIA does not

25  provide jurisdiction for either jury actions in civil matters

K9IPHALO

1   or in criminal matters.  And as the Supreme Court said in the

2   *Amerada Hess* matter, the SSIA provides "the sole basis for

3   obtaining jurisdiction over a foreign state."  If that plain

4   language means what it says, then that's the end of this

5   argument.

6          Now, in response, your Honor, the government argues

7   that Congress could not have limited criminal matters against

8   foreign states without saying more in the SSIA.  Well, your

9   Honor, we submit that the plain language says more than enough

10  and it means what it says.  But no matter because the

11  government hasn't identified any pre-SSIA criminal cases

12  against foreign sovereigns.

13         Against that background, Congress wasn't limiting

14  anything when it passed the Foreign Sovereign Immunities Act.

15  Instead, it was ratifying 200 years of status quo.  If the

16  executive branch wants to indict foreign states, it should ask

17  Congress to change the law, not ask this Court to ignore the

18  plain language of the statute.

19         Now, I'd like to turn to the other potential basis for

20  subject matter jurisdiction, and that is the general criminal

21  jurisdictional statute, 18 U.S.C. 3231.  I think the

22  government's argument can be boiled down to this, because that

23  statute gives jurisdiction over "all offenses against the

24  United States," this must include foreign sovereigns.

25         Your Honor, I think this argument is clever but it's

K9IPHALO

too clever by half because it proves too much.  First, such an

interpretation runs the risk of gutting the SSIA.  For example,

and as we noted in our reply papers, federal question

jurisdiction is set forth in 28 U.S.C. 1331.  And similar to

the criminal jurisdictional statute, it gives federal courts

jurisdiction over "all civil actions" arising under federal law

or the Constitution.

          If the government interprets this statute like it does

the criminal jurisdictional statute, then the Foreign Sovereign

Immunities Act does not apply to federal question matters.  And

I think an example is probably best helpful here, your Honor.

If I, for some reason, sued a foreign state instrumentality for

10(b)(5) securities fraud, the subject matter jurisdiction

would be decided by the Foreign Sovereign Immunities Act, not

the federal question jurisdictional statute.

          The same should be true in this criminal matter, and I

think, your Honor -- I mean, the government's attempt to rely

on this general criminal jurisdictional statute conflicts with

a basic statutory canon of construction, the general specific

canon.  If there's a conflict between a general provision and a

specific provision, the specific provision prevails.  In a case

that actually involves foreign sovereigns, the statute that

actually addresses jurisdiction for foreign sovereigns should

prevail.

          So to recap, your Honor, we think the government

K9IPHALO

1    cannot clear its initial hurdle here of the basis for subject

2    matter jurisdiction.  The SSIA's language is plain, should not

3    be read to do violence to other statutes, and we think it means

4    that there is no subject matter jurisdiction here.

5          THE COURT:  Thank you.  Mr. Latcovich, if I can

6    interrupt for one moment.

7          I underscore, for those who are participating or

8    listening in to today's oral argument, it is public, to mute

9    your telephone if you are not a speaker.  It is distracting to

10   have the background noise effecting the oral argument, and I

11   would ask everybody again, who is not speaking, to please mute

12   your phone to cut out the background noise.

13         Mr. Latcovich, I know it's implicit in everything

14   you're saying, but we should just make clear on the record that

15   the arguments are premised upon the fact that the defendant,

16   Halkbank, is a state-owned bank; isn't that correct?

17         MR. LATCOVICH:  That's absolutely correct, your Honor.

18   The indictment alleges that, and the indictments -- the

19   allegations in the indictments set forth the sufficient facts

20   to establish that Halkbank is an instrumentality of a foreign

21   state, as defined under 28 U.S.C. 1603.  And I did not read the

22   government's opposition to dispute that; so I chose not to

23   address that argument here, but that is correct, your Honor.

24         THE COURT:  I got it.  I just wanted to clarify.

25   Okay.  Please continue.

K9IPHALO

1          MR. LATCOVICH:  Thank you, your Honor.

2          So even if, for some reason, this general criminal

3     jurisdiction statute trumps the more specific Foreign Sovereign

4     Immunities Act, that doesn't end the discussion.  The Foreign

5     Sovereign Immunities Act still applies.  Indeed, the

6     government's favorite case, or at least it's favorite case in

7     its papers, the *In Re:  Grand Jury Subpoena* case from the DC

8     Circuit, assumed as much in it's reading.  Although, frankly,

9     it was tough to discern that from the government's description

10    of the case.

11         So let's turn to potential application of the SSIA,

12    which I think boils down to whether any of the statutes listed

13    exceptions to immunity apply here.  Now, we briefed the issue

14    of whether section 1605's exceptions apply at all in criminal

15    matters, and I don't intend to address that argument here.

16         But assuming for the sake of argument that they do

17    apply, the commercial activities exception, which is the only

18    basis cited by the government, doesn't apply in this particular

19    matter for a few reasons, your Honor.  First, the actions at

20    issue here are inherently sovereign and not commercial.

21    Although the definition of commercial is not a model of

22    clarity, your Honor, courts have held that an activity is

23    "commercial" only if those same powers can be exercised by

24    private citizens.

25         Here, we're talking about processing Iranian oil and

K9IPHALO

natural gas transactions.  The Republic of Turkey designated

Halkbank, under the National Defense Authorization Act, to

process these transactions.  By definition, this is the type of

activity that cannot be exercised by private citizens, making

it sovereign and not commercial.

But, your Honor, even if the government somehow clears

that hurdle and this could be deemed some sort of commercial

activity, the commercial activity exception itself states that

this case, our litigation, must be "based upon" one of the

three listed commercial activities.  Again, the government

can't meet that burden.  The Supreme Court in *OBB*

*Personenverkehr AG v. Sachs* -- and I'll spell Personenverkeher,

P-e-r-s-o-n-v-e-r-k-e-h-r -- the Supreme Court held that for a

claim to be based upon particular conduct, it must be the focus

or as it described it, the "gravamen of the suit."  And that,

your Honor, is where the government's indictment starts to take

on water.

But to fully understand the government's problem,

we've got to go back to the time when the government sought

this indictment.  In the fall of 2019, the government believed,

as it told this Court and the Second Circuit, that attempts to

evade secondary sanctions were a crime.

Halkbank's indictment reflects this focus, alleging

that the point of Halkbank's participation in the alleged

conspiracy was to create some sort of pool of Iranian oil funds

K9IPHALO

1    in Turkey and the United Arab Emirates.  And those allegations,

2    for example, are contained in indictment paragraph 6.  Indeed,

3    the indictment even purports to total this alleged amount,

4    claiming $20 billion.

5         The problem is is that this movement of money to

6    allegedly create these pools isn't a crime after the *Atilla*

7    decision in the Second Circuit.  So in an attempt to salvage

8    its Halkbank indictment from this change in law, the government

9    says don't focus on the $20 billion.  Instead, it claims that

10   $1 billion touched U.S. banks.

11        Okay.  Maybe so.  That's what the allegation says, but

12   you can't take that out of context and pretend that that's the

13   gravamen of this indictment.  It just isn't.  I mean, by

14   definition, U.S. dollar transactions were not necessary to the

15   alleged scheme or the scheme failed 95 percent of the time.  No

16   matter how the government tries to spin it, the gravamen of

17   this case just can't be five percent of the transactions in the

18   alleged scheme.

19        The government indicted Halkbank under a now-debunked

20   legal theory, and that has ramifications, your Honor.  In this

21   case, the gravamen of the lawsuit or the indictment of

22   secondary sanctions and that does not pass muster under the

23   "based upon" standard of the commercial activities exception.

24   Therefore, this Court need not reach the three individual

25   clauses in section 1605(a)(2).  But as you probably heard me

K9IPHALO

say before, your Honor, if you get there, once again, the
government can't meet its burden.

        For the first clause, which addresses commercial
activity within the United States, the government claims that
somehow a handful of discussions with Treasury officials
constitutes commercial activity in the United States.  Your
Honor, we disagree.  The government provides no support for
such a claim, and there is none.  That kind of description or
exception would swallow the rule.

        The second clause focuses on activities in the U.S.
that were made in connection with commercial activities outside
the U.S.  So the activities in the U.S. don't have to be
commercial, your Honor.  But critically here, the government's
brief omitted the standards.  These actions are limited to
actions that are themselves sufficient to form the basis for a
cause of action.

        These alleged statements to Treasury don't meet the
standard, and they can't be used to bootleg into this case the
otherwise unreachable foreign activity.  Put simply, Halkbank
didn't need to allegedly lie to the U.S. government to conduct
transactions in Turkey or the United Arab Emirates, as the
imposition of secondary sanctions would not have changed
Halkbank's ability to engage in these transactions.

        The government's sleight of hand here is this, your
Honor.  The government's alleged lies are really about access

K9IPHALO

1    to correspondent bank accounts.  Halkbank's correspondent bank

2    accounts aren't alleged to be part of the scheme.  Therefore,

3    the statements here can't be the basis for the cause of action.

4           Finally, your Honor, for the third clause of the

5    commercial activities exception, Halkbank's actions must have a

6    direct effect in the U.S.  So these are actions outside the

7    U.S. that have a direct effect on the commercial activities in

8    the U.S.  This definition has been litigated, your Honor, and

9    the results don't help the government.

10          Direct effect means there must be a "immediate

11   consequence" of Halkbank sanctions in the U.S.  But based on

12   the government's own allegations, there were no immediate

13   consequences.  First, there was this supposed pool of money

14   traded overseas.  That doesn't give rise to an immediate

15   consequence in the U.S.  And, in fact, according to the

16   government's own allegations, 95 percent of that money never

17   even made it to the U.S.  So it had no consequences whatsoever

18   in the U.S., much less an immediate consequence.

19          And given the intervening steps that occurred what

20   I'll call post-pool in Dubai, or Turkey and Dubai, that

21   depended on variables independent of Halkbank, there is no

22   argument that the U.S. dollar transactions could have been the

23   immediate consequences of Halkbank's actions.

24          So, your Honor, we submit that given the application

25   of the actual standards for the commercial activities

K9IPHALO

1    exception, as in interpreted by the Second Circuit and others,

2    Halkbank's activities do not fall within the commercial

3    activity exception.

4            Your Honor, so we would submit, I don't need to

5    summarize here, this Court has no subject matter jurisdiction,

6    and the entire indictment should be dismissed.

7            If I could, I'd like to just briefly touch on some of

8    the other arguments, your Honor?

9            THE COURT:  Sure.

10           MR. LATCOVICH:  Starting first with personal

11   jurisdiction.  This will be very quick, your Honor.  In it's

12   December 5th, 2019, order denying Halkbank's motion to enter a

13   special appearance, this Court has indicated how it intends to

14   rule on personal jurisdiction; so I don't know that it will be

15   helpful to spend any time here.

16           And so I'd like to move quickly to

17   extraterritoriality.

18           THE COURT:  Sure.

19           MR. LATCOVICH:  Regarding extraterritoriality, your

20   Honor, there is a strong foreign presumption against applying

21   criminal statutes to extraterritorial conduct.  Everyone agrees

22   with that.  It's what the Supreme Court has said.  Incidental

23   contact with the U.S. is not enough.

24           Now, since the Court -- since this Court, since your

25   Honor last considered this issue, not only has the Second

K9IPHALO

Circuit clarified the standard, but the government has changed

its allegations, your Honor, for the first time claiming that

there was this $20 billion pool overseas.

This new allegation puts the alleged U.S. conduct in

context and, by definition, makes it merely incidental.  And

for that reason and the plain language of these statutes, we

believe that extraterritorial application is prohibited here.

As for bank fraud, your Honor, I have only one point

to make in addition to what we set forth in our pleadings.  The

government claims in its opposition that our briefing gives no

reason for your Honor to "depart from its prior careful

conclusions" in the *Zarrab* case.

I submit, your Honor, that the government is half

right.  The best reason to depart might not be our brief, but

rather, the differences between the *Zarrab* indictment, which

the Court relied upon in denying Zarrab's motion, and the

Halkbank indictment.  Your Honor, the *Zarrab* indictment, as you

know, includes allegations regarding at least, at least, ten

specific U.S. dollar transactions.  It includes amounts,

allegations about amounts, dates, parties to the transactions,

SWIFT messages, letters from exchange houses, et cetera, and

that's all found at ECF No. 7, paragraph 14.

The same is true for Atilla's indictment, your Honor.

That's at ECF 293, paragraphs 58 through 84.  Again, U.S.

dollar transactions, amounts, dates, SWIFT messages, and

K9IPHALO

1    supposedly related communications.

2            By contrast, your Honor, the Halkbank indictment does

3    not include a single specific transaction.  Not one.  That's

4    why the government didn't properly allege the elements, which

5    we detailed in our papers.  As the government pointed out, this

6    Court previously found that the government knows how to allege

7    bank fraud.  Your Honor, it may have done so with Zarrab, but

8    it failed to do so here.  Careful consideration of these claims

9    require dismissal.

10           And finally, your Honor, one point regarding

11   multiplicity.  This is another example of how the *Atilla* Second

12   Circuit opinion created legal problems for the government in

13   this case, in an indictment that was returned before the Second

14   Circuit shifted the ground under their feet.

15           Your Honor, given that secondary sanctions aren't part

16   of this case, for the government to prove conspiracy to violate

17   IEEPA -- for Madam Court Reporter, that's I-E-E-P-A, all

18   capitals -- for the government to prove conspiracy to violate

19   IEEPA, it must prove a conspiracy to violate primary sanctions

20   which require U.S. dollar transactions.

21           But this same proof would also, by definition, prove

22   conspiracy to commit money laundering.  And, your Honor, I've

23   read the government's opposition multiple times, and it notably

24   does not state anything to the contrary.  For that reason, your

25   Honor, Count Six should be dismissed as multiplicitous of Count

K9IPHALO

1    One.

2            Thank you, your Honor.

3            THE COURT:  I got it.  And just to clarify,

4    Mr. Latcovich, when you were discussing the fact that there

5    were motions to dismiss and rulings in connection with alleged

6    co-defendants Reza Zarrab and Mr. Atilla, those were the

7    references that you were making and you are endeavoring to

8    distinguish between the basis of those motions, namely the

9    respective indictments, and you are pointing out or you are

10   contending that those indictments contain important

11   distinctions one from the other.  Is that a fair summary?

12           MR. LATCOVICH:  I think that's very close, your Honor.

13   You know, to be clear, it was the government that injected

14   these in their papers, injected the *Zarrab* and *Atilla*

15   pleadings, not us.  We think those are different indictments

16   because they are.  You can just see that by what they allege,

17   setting aside the formality of they are, in fact, a different

18   superseding indictment.

19           The contents of them differs, and the law has also

20   changed, your Honor, both in terms of extraterritoriality.  For

21   example, we think the Second Circuit has clarified some of

22   these issues, as well as the Second Circuit's *Atilla* ruling

23   regarding secondary sanctions.

24           So, yes, it is -- we don't think that even normally

25   those decisions would be binding on Halkbank, a later-indicted

K9IPHALO

1    defendant.  To the extent the Court considers them as some sort

2    of persuasive authority, we would distinguish them for many of

3    the reasons that you stated.

4              THE COURT:  I got it.  Okay.  And I'm just trying to

5    summarize what you were saying.

6              MR. LATCOVICH:  Right.

7              THE COURT:  I'm not trying to inject my point of view

8    with respect to those issues.

9              Okay.  Thanks.  That's very helpful.

10             And who is going to argue for the government?

11             MR. KAMARAJU:  Good morning, your Honor.  This is Sid

12   Kamaraju on behalf of the government, and I'll be arguing

13   Halkbank's motion to dismiss.  And with me are my colleagues

14   Michael Lockard, David Denton, Jonathan Rebold and Kiersten

15   Fletcher.  And I believe the court reporter has all of their

16   names.

17             THE COURT:  Okay.  Thank you.

18             MR. KAMARAJU:  Thank you, your Honor.

19             So there's a common thread that runs through all of

20   the defense's arguments, which is a mischaracterization of the

21   indictment and the scheme alleged therein.  And in fact, while

22   the bank claims that the *Atilla* decision limited the government

23   and required the government to change its theory to a new one,

24   the fact is the government's allegations are the same as they

25   were against a senior executive of the bank, Atilla, and you

K9IPHALO

1    can see that in the language of the indictment.

2            Now, excluding forfeiture paragraphs, the indictment

3    contains 81 paragraphs.  Halkbank has asked you to focus on one

4    sentence in one paragraph and not even the entirety of that

5    paragraph.

6            So Halkbank directed your Honor to paragraph 6 of the

7    indictment, which discusses the purpose, in effect, in creating

8    the pool.  The very next sentence states that the purpose --

9    the very next sentence, excuse me, states that these funds were

10   used to make international payments on behalf of Iran,

11   including transfers in U.S. dollars, but passed through the

12   U.S. financial system in violation of the U.S. Sanctions laws.

13   And as counsel noted, paragraph 64 indicates that a billion

14   dollars, in fact, did pass through the U.S. financial system.

15           Now, the statutory allegations alone are sufficient to

16   show that this scheme targeted the U.S.  And I'll turn it to

17   the Second Circuit's decision in *Atilla* in a second.  But the

18   indictment does not rely solely on the statutory language, even

19   though those were sufficient.  I will turn to paragraph

20   (indiscernible) --

21           THE COURT:  Paragraph which?

22           MR. KAMARAJU:  33, your Honor.

23           THE COURT:  Okay.

24           MR. KAMARAJU:  Which makes clear that Halkbank was a

25   knowing participant in the scheme to route the money through

K9IPHALO

the United States, admittedly among other places.  That
paragraph summarizes an e-mail between senior executives at the
bank, and that e-mail was sent June 20th, 2012, near the
beginning of the scheme.  And in it Levent Balkan, one of the
bank's executives, said:  "It is understood that this gold,
which is left in Dubai, can be used in all kinds of foreign
payments of Iraq, either in gold or in foreign currency."  And
it goes on to say, in the next sentence, that "The fact that
these gold deposits are collected in the various fiduciary
accounts and used for international payments of the forbidden
Iranian banks in Dubai, such as Bank Melli, Bank Sedarat" --
and Melli is M-e-l-l-i, and Sedarat is S-e-d-a-r-a-t -- "or
Bank Mellat" -- M-e-l-l-a-t -- "in Turkey.  The gold
transaction volume has reached remarkable dimensions in terms
of international Iran sanctions."

          So the bank was clearly aware of what was going on,
and that's why the very first paragraph of the indictment notes
that the bank knowingly participated in enabling Iran's access
to the U.S. financial system.

          Now, to be sure, that wasn't all the bank did.  The
bank did facilitate $20 billion worth of Iranian money to be
pooled in a slush fund in Dubai and Turkey.  That much is true,
and it is also true that $1 billion of that flowed through the
U.S. banking system.

          Halkbank's argument that essentially the fact that

K9IPHALO

there was $20 billion here but only $1 billion went through the

U.S. is I think an analogy that helps reveal how meritless that

argument is, your Honor.  This courthouse is very familiar with

international drug trafficking prosecutions.

Halkbank's argument essentially collapses to, the

government would not be allowed to prosecute a drug cartel if

the drug cartel ships 20 tons of cocaine to Europe, but only

one ton of cocaine to the United States.  There is no court in

the United States that has ever held that, and it doesn't make

any sense because it is the shipment of the one ton to the

United States that violates U.S. narcotics laws.

The same thing is true here.  It is the routing of the

$1 billion in Iranian oil proceeds through the U.S. financial

system that violates U.S. sanctions laws and U.S. banking laws

and money laundering laws.  And the Halkbank claim that this is

somehow a new allegation that the government has just cooked up

recently is belied by the charging language of the indictment,

clearly, and it is also belied by the Second Circuit's decision

in Atilla.

In Atilla -- and this is almost never mentioned in any

of Halkbank's papers or as we heard from defense counsel in his

argument now -- the Second Circuit affirmed Atilla's

convictions.  And in affirming Atilla's convictions,

necessarily found that the scheme contemplated laundering the

money through the U.S. financial system.

1          In other words, necessarily not a primary sanction,

2     and it found that Atilla, a senior executive at the bank,

3     conspired to do that, so agreed.  So, for example -- the *Atilla*

4     cite, for the court reporter, is 966 F.3d 118 (2d Cir. 2020) --

5     and at page 127, the Second Circuit says Atilla's conviction

6     for bank fraud and bank fraud conspiracy, therefore,

7     established that the jury found that beyond a reasonable doubt

8     that Atilla agreed to transfer money from the United States to

9     Iran.

10          And the Second Circuit also noted that the

11    government's allegations and its proof showed that it wasn't

12    just *Atilla*.  At page 129, the court said:  The evidence showed

13    that senior-level executives at Halkbank knew the particulars

14    of the scheme, including the importance of international

15    payments and of U.S. dollar transactions.

16          So by definition, the $1 billion --

17          THE REPORTER:  I'm sorry, there was some background

18    noise.

19          THE COURT:  There was background noise, is what I

20    think what the court reporter is saying.  I just want to remind

21    everybody who is on this call that if you're not speaking, so

22    anybody actually other than Mr. Kamaraju, at this point in time

23    should be muting their telephone.

24          Is what you were driving at?

25          THE REPORTER:  Yes, your Honor.  Thank you.

K9IPHALO

1          THE COURT:  Did you want him to repeat any of his

2     remarks that you were unable to take down?

3          THE REPORTER:  Yes, your Honor.  Let me tell you where

4     I left off.

5          (Record read)

6          THE COURT:  Sid, if you could pick up there,

7     discussing the $1 billion?

8          MR. KAMARAJU:  Yes, your Honor.  No problem.

9          So the $1 billion is necessarily part of the

10    conspiracy and the scheme that Halkbank agreed to participate

11    in.  And so Halkbank's sort of repeated attempts, in multiple

12    arguments, whether it's the gravamen argument or the

13    extraterritorial argument, to minimize that is essentially

14    almost like a "what's a billion dollars worth of sanctions

15    between friends" kind of argument.  And the fact is, it is a

16    billion dollars laundered through the U.S. financial system on

17    behalf of the world's foremost state-sponsored terrorism in a

18    country that the U.S. has expressly forbidden from using its

19    financial system.

20          And so, of course, the United States has an interest

21    and the ability to punish that kind of conduct.  And I think

22    just properly characterizing the scheme deals with all of the

23    defense arguments, frankly.  This is not an extraterritorial

24    application of the statute, for example.  As in *Pasquitino*,

25    P-a-s-q-u-i-t-i-n-o, what is being punished here is the

K9IPHALO

1    domestic application, the domestic conduct in which the bank

2    participated.

3         And one of the reasons why the bank's argument misses

4    the mark is because their fundamentally trying to apply civil

5    context to a criminal prosecution.  In a criminal prosecution,

6    you have conspiracy laws and you have laws related to schemes.

7    And conspiracy law, as a matter of bedrock principle, makes

8    acts in furtherance of the conspiracy chargeable to all of the

9    co-conspirators, regardless of which co-conspirator conducts

10   those.

11        So, and we'll get to this in a little bit when dealing

12   with the commercial activities section.  So the bank's attempts

13   to sort of stop the scheme at, you know, the borders of Dubai

14   doesn't work.

15        Now, the principal problem is that they can't avoid

16   what the Second Circuit has already done in *Atilla*, and so the

17   bank, instead, relies on yet another civil defense, and that's

18   sovereign immunity under the SSIA.  That statute does not

19   apply.

20        Defense counsel essentially conceded that really the

21   question here is, where does this court get its subject matter

22   jurisdiction from?  That's the central issue as to whether the

23   SSIA even applies in the first place.  And notably, in

24   discussing the SSIA, counsel says, well, it gives jurisdiction

25   in non-jury civil actions, and then essentially excludes them

K9IPHALO

1    in everything else.

2            And the reliance on plain language that counsel is so

3    deeply invested in, does not appear to carry over to the plain

4    language of 18 U.S.C. 3231, which gives jurisdiction over all

5    offenses against the laws of the United States.  There is no

6    carve out.  There is no exception in that statute, and that

7    statute was enacted 30 years before the SSIA.

8            So to the extent defense counsel discusses the 200

9    years of former practice, the fact is that criminal

10   jurisdiction, absolute criminal jurisdiction over federal

11   offenses in District Court has been in place for decades before

12   the SSIA.

13           And, in fact, that's exactly what the only courts who

14   have considered this issue explicitly have held, and that's the

15   DC Circuit's opinion in *In Re:  Grand Jury Subpoena*, which is

16   912 F.3d 623 (D.C. Cir. 2019).  Now, what the DC Circuit did is

17   it decided not to address whether the SSIA applied to criminal

18   actions.  It simply said, we'll assume for purposes of this

19   argument that it does, but nevertheless, it still proceeded to

20   hold that a federal District Court's jurisdiction over a

21   criminal action comes from 3231, and not the SSIA, essentially

22   explicitly rejecting the argument that Halkbank would like to

23   make.  And we detail the language in our briefs, your Honor; so

24   I'm not going to go through every quote, but it is an explicit

25   rejection.

K9IPHALO

1          Now, the Second Circuit has applied a similar logic in

2     the case *United States v. Assa Corporation*.  And "Assa" is

3     A-s-s-a, and the cite is 934 F.3d 185 (2d Cir. 2019).  Now,

4     that case involved a civil forfeiture action against property

5     controlled in the United States by a bank owned by Iraq.

6          Now, in describing the SSIA's reach, the Second

7     Circuit held that it applied to lawsuits involving foreign

8     states, and it noted that SSIA didn't apply to civil forfeiture

9     actions against properties of foreign states because the

10    foreign property doesn't count as a foreign state under the

11    SSIA.  Notably, it found that the immunity, therefore, that is

12    discussed in the SSIA is completely inapplicable to the statute

13    because there's an independent basis, which is sections 1345

14    and 1365 of Title 18.

15         The same logic applies here, your Honor, as the DC

16    Circuit found.  The court has an independent basis for

17    jurisdiction, and since the jurisdiction comes from a different

18    statute than we have SSIA, the SSIA's immunity is simply

19    inapplicable.

20         Now, we detail at length in our brief some of the

21    textual arguments that apply, but I just want to highlight a

22    couple of them in response to what defense counsel cites.  For

23    one, defense counsel talks about federal question jurisdiction

24    and repeal.  I would recommend that the Court read what the

25    court -- the Supreme Court actually did in *Amerada Hess*

K9IPHALO

*Shipping Corporation*, where it addressed exactly the argument

that defense counsel is making by actually holding the --

THE COURT:  Could you spell the name of that case?

MR. KAMARAJU:  Yes, your Honor.  It's *Argentine*

*Republic v. Amerada Hess Shipping Corporation*, and the cite is

488 U.S. 428, 1989, and we discuss that at page 8 of our

briefs, your Honor.

THE COURT:  Okay.

MR. KAMARAJU:  But the court discusses exactly this

question of implied repeal, even as applied to the federal

question statute.  It makes no mention of Title 18 because

they're two completely different things.  In no other universe

are the civil jurisdictional rules applicable to criminal

actions.

Now, the problem with Halkbank's argument,

fundamentally, is plain language cuts both ways even under

their argument.  3231 doesn't make any exceptions.  So what

they said here is they take broad, untethered language from the

statute and argue that necessarily that must apply to criminal

actions, even though there are places in which the SSIA

specifically refers to criminal actions.

For example, section 1605 gives the Attorney General

the right to intervene to protect criminal investigations or

protections.  So Congress clearly was aware of criminal

prosecutions when it passed the statute and could have said

K9IPHALO

1   this applies to criminal prosecutions as well, but chose not

2   to.

3          And that is exactly the logic that the Supreme Court

4   followed in the *Samantar* case –– and that's S-a-m-a-n-t-a-r ––

5   where, in that case, the court was dealing with whether the

6   SSIA granted sovereign immunity to foreign officials.  And one

7   of the reasons why the court had that it didn't is because the

8   statute in other places referred to foreign officials that did

9   not include them in the definition of foreign states.  The same

10  logic holds here.

11         So, your Honor, this argument that somehow this

12  phrasing from section 1604 swallows up all of criminal

13  prosecutions and brings to mind a familiar adage from the

14  Supreme Court, which is:  Congress does not hide elephants in

15  mouse holes, and that's from *Whitman v. American Trucking*

16  *Association,* 531 U.S. 457, at page 468.

17         Congress does not make such dramatic changes without

18  so much as a whisper, and that's the logic of the *Samantar* case

19  and it's the logic of several other cases in our brief

20  including, the *Southway* case.  And that's particularly true

21  because in this case when you're talking about criminal

22  prosecutions, the fundamental interests that the SSIA were

23  intended to protect are simply irrelevant.

24         The SSIA, as discussed in its legislative history and

25  in the *Verlinden* case –– which is V-e-r-l-i-n-d-e-n –– is

K9IPHALO

<table>
<tr><td>1</td><td>targeted at giving private litigants certainty that they won't</td></tr>
<tr><td>2</td><td>be subject to the whims of foreign sovereigns pressuring the</td></tr>
<tr><td>3</td><td>State Department.</td></tr>
<tr><td>4</td><td>That's not a problem for the U.S. government.  That</td></tr>
<tr><td>5</td><td>type of coordination already occurs and courts have repeatedly</td></tr>
<tr><td>6</td><td>recognized that.  In *Pasquitino*, for example, the court said by</td></tr>
<tr><td>7</td><td>electing to bring this prosecution, the executive has assessed</td></tr>
<tr><td>8</td><td>this prosecution's impact on the nation's relationship with a</td></tr>
<tr><td>9</td><td>foreign state.</td></tr>
<tr><td>10</td><td>In *U.S. v. Noriega*, N-o-r-i-e-g-a, the court said a</td></tr>
<tr><td>11</td><td>similar thing, by pursuing this prosecution, the executive</td></tr>
<tr><td>12</td><td>branch has manifested its clear sentiment that Noriega should</td></tr>
<tr><td>13</td><td>be denied immunity.</td></tr>
<tr><td>14</td><td>And the Second Circuit said the same thing in *Assa*</td></tr>
<tr><td>15</td><td>when it talked about how the forfeiture action brought under</td></tr>
<tr><td>16</td><td>section 981 could only be asserted by the government and, thus,</td></tr>
<tr><td>17</td><td>when the executive branch seeks the forfeiture of a foreign</td></tr>
<tr><td>18</td><td>state's property, the judiciary is in no position to second</td></tr>
<tr><td>19</td><td>guess whether the lawsuit will harm our nation's foreign policy</td></tr>
<tr><td>20</td><td>goals.</td></tr>
<tr><td>21</td><td>That's plainly what Halkbank, though, is asking your</td></tr>
<tr><td>22</td><td>Honor to do.  It is asking your Honor to save it from the</td></tr>
<tr><td>23</td><td>executive branch's decision to prosecute it.  That makes no</td></tr>
<tr><td>24</td><td>sense.  That is essentially a shotgun solution for a problem</td></tr>
<tr><td>25</td><td>that the SSIA was not even pretending to try to address.</td></tr>
</table>

K9IPHALO

1          And throughout its arguments, Halkbank never says why

2     Congress would choose to constrain the executive branch, who is

3     constitutionally mandated to handle foreign policy,

4     categorically.  The only argument that Halkbank makes is, well,

5     the executive branch apparently has never done this before.

6     The fact that the government has refrained in the past is not

7     an indication that it does not have the power to do it.  It is

8     simply a reflection on the balancing of the foreign policy

9     interests that we discuss, and so that doesn't help Halkbank.

10         Unless your Honor has any questions about that, I'd

11    like to turn to the exceptions of the statute.

12         THE COURT:  Okay.  Yes, so why don't you take another

13    five minutes or so.  Is that going to be enough for you to

14    conclude?

15         MR. KAMARAJU:  Yes, your Honor, and we have briefed

16    the remaining issues in our papers; so I just want to touch

17    briefly on the exceptions.

18         THE COURT:  Okay.

19         MR. KAMARAJU:  So I think, you know, when you properly

20    look at the scheme, the gravamen of the claim is the conspiracy

21    and the scheme to launder the money through the United States.

22    That is what gives rise to criminal liability, and so that's

23    the billion dollars.

24         Now, Halkbank has staked out, through the

25    extraordinary position that with respect to the first two

K9IPHALO

exceptions, its communications with U.S. officials about

sanctions compliance issues is not only not commercial activity

but is not even an act in furtherance of commercial activity.

That's directly contradictory to what, for example, Atilla

testified at trial when he talked about how Halkbank maintained

a sanctions compliance department and how Halkbank regularly

communicated with Treasury about its business.  So that claim,

in and of itself, I think makes no sense.

But more importantly, this idea that those

communications, in and of themselves, are insufficient for the

government's claims ignores the Klein conspiracy, which is

specifically about misleading OFAC, and also ignores the fact

that concealment and protection of the scheme is an act in

furtherance of the overarching sanctions provision and, thus,

could very much be the basis for criminal prosecution.  So I

think that --

THE COURT:  Excuse me.  Just so the record is clear,

did you say the Klein, K-l-e-i-n, conspiracy a minute or so

ago?

MR. KAMARAJU:  Yes, your Honor.  That's Count One of

the indictment.

And now with respect to the foreign conduct, the

foreign conduct prong also clearly applies, and as we noted in

our brief, the Second Circuit's decision in *Atlantica Holdings*,

A-t-l-a-n-t-i-c-a, effectively forecloses this question because

K9IPHALO

what the court held there was the locus of the injury, an

injury knowingly caused in the United States, is sufficient to

satisfy the direct affect requirement, and that's exactly what

you have here.

        You have a plan by the bank and Iran, among others, to

victimize the United States and its financial institutions,

which was successfully completed to the tune of a billion

dollars.  So there is no dispute, frankly, that there is a

direct affect.

        Halkbank's arguments that somehow this is sovereign

action with respect to these transactions and the gold

transactions simply ignores the Second Circuit's decision in

*Peterson*, which is 895 F.3d 194, because all that the Turkish

government did by designating Halkbank as its repository is it

triggered the further scheme.  That's not the basis for the

criminal action.  It's what Halkbank did with the money

afterwards.

        And if Halkbank's argument was true, then you would

never have an application of the commercial activity exception

because all actions are directed by a foreign sovereign that

implicate the SSIA.  So for that reason, I think this sovereign

commercial distinction makes no sense, and I think if the Court

looks at our papers, you'll see plenty of citations for that

point.

        And, finally, I'd just like to address what the bank

K9IPHALO

1    sort of attempts to do by intervening Zarrab's actions and

2    arguing that that somehow that influences --

3              THE COURT:  In arguing?  I'm sorry?

4              MR. KAMARAJU:  That Zarrab's actions somehow sever the

5    causal connection.

6              THE COURT:  I see.

7              MR. KAMARAJU:  Zarrab was one of the bank's

8    co-conspirators.  The bank cannot run away from his conduct

9    because it planned for him to engage in that conduct.  That's

10   the allegations that are founded, and that's what distinguishes

11   this case and all criminal conspiracies, frankly, from the

12   cases that the defendant relied upon.  Because in all of those

13   cases, the intervening steps are not participants in the

14   scheme.  They are innocent actors, innocent independent actors.

15   That's not what you have here.  What you have here is that you

16   have, by design, by design, Zarrab carrying the money to U.S.

17   banks.

18             So, your Honor, for all of those reasons we would

19   submit that the SSIA does not bar this.  And I think your Honor

20   has already addressed personal jurisdiction, and we've

21   addressed it in our brief.  So unless your Honor has any

22   further questions --

23             THE COURT:  I do have one, which I'm going to pose to

24   you and then also to defense counsel, and that is this.  It's

25   more of a comment.

K9IPHALO

1        So in this case, where we have Halkbank and we have

2   had Atilla, and we also have and had Zarrab, there has been a

3   ruling, as you both referred to, which is a Second Circuit

4   ruling which impacts the case that we're arguing over today,

5   which is the Halkbank situation.  That is to say, the Second

6   Circuit's decision affirming the conviction and sentence of

7   Atilla.

8        You each, that is to say the government and the

9   defense, you each point to that decision, but I would just ask

10  you, and then I'm going to ask Mr. Latcovich to do the same, to

11  summarize again how you think that Second Circuit decision

12  impacts this proceeding that we're undertaking right now.

13       MR. KAMARAJU:  Yes, your Honor.  This is Sid Kamaraju.

14  The government's position is that the Atilla decision is a

15  ruling of the Second Circuit with respect to the very scheme

16  alleged in this indictment and is controlling.

17       The Second Circuit has viewed the indictments, viewed

18  the allegations underlying the scheme, and concluded that they

19  support IEEPA conspiracy involving primary sanctions, bank

20  fraud conspiracy, money laundering conspiracy and a subsequent

21  count of bank fraud.

22       The bank is certainly entitled to its day in court,

23  but it is not entitled to its own law.  And what the Second

24  Circuit has now said clearly is that these allegations make out

25  those claims.  So I think it is a controlling decision with

K9IPHALO

1    respect to this Court.

2                THE COURT:  Got it.  Okay.  Thank you.

3                So we'll go back to Mr. Latcovich for rebuttal.  We do

4    have some time for you.  In addition to the remarks you want to

5    make, if you could also -- you did it I thought before.  I just

6    want it crystalize your position, I should say the bank's

7    position, with respect to the Second Circuit decision in

8    Atilla, how it either helps you or helps the government or vice

9    versa.

10               MR. LATCOVICH:  Sure, your Honor.  And I think I can

11   do all of that within the five minutes that you mentioned

12   earlier.

13               Let's start with your question, your Honor.  I think,

14   we submit that the Second Circuit's opinion in Atilla stands

15   for one thing, and one thing only, and that is that attempts --

16   evasion of secondary sanctions is not a crime.  And that has,

17   as I'll discuss later, implications for the government's

18   charging decisions because I don't think the government

19   described accurately the chronology of events here.

20               The Second Circuit did not look at the sufficiency of

21   Atilla's indictment, much less our indictment.  They are

22   different things, and so I don't think there is anything

23   binding about that.  Frankly, it would be odd for me to say

24   that to the extent a court examined a sufficiency of the

25   evidence, a Court of Appeals examined the sufficiency evidence

K9IPHALO

1    of one case, and argue that that is controlling on the law in

2    another doesn't make sense to me.

3            Atilla did not make the same challenges to the Second

4    Circuit that we're making right now, and for that reason, I

5    don't think it speaks to the issue.  So that is -- that's our

6    position.

7            And it actually dovetails right into my first point.

8    The government, at the beginning of its argument to set up

9    everything, created the wrong strawman.  We never claimed that

10   the Atilla decision caused the government to indict Halkbank

11   differently.  It couldn't have.  The Atilla decision in the

12   Second Circuit came out after the Halkbank indictment.

13           The issue is that the Second Circuit Atilla decision

14   changed the law, and Halkbank was indicted on the assumption

15   that that entire $20 billion, because the alleged $20 billion

16   was unlawful because it violated secondary sanctions, and the

17   Second Circuit said, no, that's not the law.  That is the

18   change in events and that makes a difference in this case.

19           The government is acting as if this 19 billion -- I

20   mean, I like the cocaine example of the 19 billion, one

21   billion.  It's clever, but it is the wrong analogy.  The

22   government in this case indicted all $20 billion as if that

23   were a crime, and it's not.  And the fact that it's not has

24   legal ramifications for this case.

25           And I think I described those at length in the

K9IPHALO

beginning, but those ramifications mean, for example, the "based upon" language in secondary -- excuse me, in the commercial activities section and the merely incidental standard and the extraterritoriality.  When the law changed, it made the majority of that scheme no longer unlawful, the government's own alleged scheme no longer unlawful.  It changed the legal analysis of all of these claims.  That's the change.  Not anything else.

Second, your Honor, the government said that we ignore conspiracy, and the idea that under a conspiracy, a co-conspirator is responsible for the acts of others.  Your Honor, with all due respect, that's not the test here.  The government is trying to use co-conspirator law to rewrite the legal tests for this.

For example, the commercial activities exception says that the direct affect must be an immediate consequence of the defendant's actions, not some third party.

Personal jurisdiction is the same.  In fact, there are cases that say it can't be based -- jurisdiction can't be based on the actions of a co-conspirator.

So the co-conspirator exception and the law around conspiracy is very powerful, but it does not change the law regarding immunity, and it does not change the law regarding personal jurisdiction.

Now, your Honor, to me, the most perplexing argument

K9IPHALO

1    the government made was this.  3231 has always provided

2    criminal jurisdiction forever and, therefore, the Foreign

3    Sovereign Immunities Act can't control here.  But notably, the

4    government didn't cite any examples in which that jurisdiction

5    was used.

6          And, in fact, I can give you an example, your Honor,

7    of where the government is wrong.  *In re:  Investigation of*

8    *World Arrangements*, 13 F.R.D. 280, that's in the (D.D.C. 1952).

9    In that, the court, on sovereign immunity grounds, dismissed a

10   grand jury subpoena against a foreign state instrumentality.

11   If the government is right that 3231 would always provide

12   jurisdiction, that grand jury subpoena never should have been

13   quashed, but it was.

14         But even more surprising to me, your Honor, is that

15   the government didn't address the argument about federal

16   question jurisdiction that completely undermines their

17   argument.  It can't be that the Foreign Sovereign Immunities

18   Act has no application if another statute says there's

19   jurisdiction, because there is a statute that says this court

20   has jurisdiction over all questions regarding federal statutes.

21   That doesn't trump the Foreign Sovereign Immunities Act any

22   more than the general criminal jurisdiction 3231.

23         Finally, your Honor, the government on a few occasions

24   implied that our reading of the statute would make the U.S.

25   powerless or the executive powerless to bring these claims.  We

K9IPHALO

1    note this in our papers, your Honor.  It can't be that we've

2    rendered the executive powerless when they've never, in fact,

3    exercised that power.

4          And more importantly, the executive still has the

5    power to prosecute individuals.  It has the power to engage

6    sanctions.  It has the power to engage in diplomacy.  So a

7    ruling here that comports with hundreds of years of common law

8    and the repeated practice of the executive branch and the plain

9    language of Congress' statute only solidifies the status quo

10   and does nothing to undermine the power of the executive

11   branch.

12         Thank you, your Honor.

13         THE COURT:  You bet.

14         Well, thank you, both sides.  Very helpful, this oral

15   argument.

16         One technical matter, if you are interested in

17   ordering a copy of the transcript of today's proceedings, it

18   might save you some time if you indicate to the court reporter

19   at this point whether you wish to do that or not.

20         I, myself, will be asking the court reporter to send a

21   copy of the transcript to chambers so that we have it in doing

22   our analysis of the motion and the response by the government.

23         So again, I thank you both.  That was excellent

24   presentations, and I think that's it for today, and we can be

25   adjourned.

K9IPHALO

1              Thank you.  Thanks very much.

2              MR. KAMARAJU:  Thank you, your Honor.

3              MR. LATCOVICH:  Thank you, your Honor.

4              (Adjourned)