

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

June 10, 2026

**BY ECF**

Honorable Richard M. Berman
United State District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007

>  Re:   ***United States v. Turkiye Halk Bankasi A.S.*,**
>         **S6 15 Cr. 867 (RMB)**

Dear Judge Berman:

The undersigned respectfully submit this letter pursuant to paragraph 2 of the Deferred Prosecution Agreement ("DPA") between the Government and the defendant, Turkiye Halk Bankasi, A.S. ("Halkbank").

The Government also submits the enclosed application for an order nolle prosequi pursuant to the DPA.

## I.    Background

The DPA provides that "Halkbank will retain the services of an anti-money laundering and compliance expert (the 'Expert'), to be mutually agreed upon by Halkbank and the Office, to review Halkbank's U.S. sanctions compliance and anti-money laundering policies, procedures and related operations (the 'Sanctions and AML-Compliance Program'), and its communications with all components of the U.S. Department of the Treasury ("Treasury") (collectively, the 'Review')." DPA ¶ 1.  The DPA further provides:

> The Expert will prepare a report on Halkbank's sanctions compliance and anti-money-laundering policies and procedures related to U.S.-dollar transactions; any individual or entity designated by the United States Department of State ("State") as a Foreign Terrorist Organization; and any individual or entity designated by State, Treasury, or Executive Order as a Specially Designated Global Terrorist (the "Compliance Report" [or "Report"]).

*Id.*

The DPA further provides that "[w]ithin 30 days of receiving the Compliance Report, Halkbank and the Office will submit a joint letter to the Court, with a request for filing under seal, regarding Halkbank's compliance programs and review, along with the proposed dismissal Order." *Id.* ¶ 2; *see also id.* ¶ 6 ("At the time of the filing of the letter described in paragraph 2, *supra,* the Government will move to dismiss the Indictment, with prejudice."). Regarding sealing, the parties have conferred and have, by mutual agreement, elected to file this letter publicly.

On March 13, 2026, Halkbank retained Ernst Young Kurumsal Finansman Danismanlik A.S. ("EY"), EY's Turkish affiliate, with EY members from EY's New York office included in the review team, as the Expert with the consent of the Government. *See* Joint Letter Dated Mar. 13, 2026, ECF #762. Prior to retention of EY, the Bank shared the proposed scope of EY's Review and Compliance Report with the government, which also shared it with Treasury. On May 11, 2026, following completion of EY's Review, its Report was completed and shared with the Bank, the Government, and Treasury. *See* DPA ¶ 1. The provision of the Compliance Report satisfies Halkbank's obligation under the DPA.

Notwithstanding the conclusion of the DPA and concomitant filing of a *nolle prosequi*, Halkbank remains committed to addressing questions from Treasury, including those regarding the Compliance Report or Halkbank's ongoing compliance with U.S. regulations more generally.

Accordingly, as required by the DPA, this joint letter is provided to the Court to provide a detailed update of EY's Report and to seek dismissal of the charges in the superseding indictment, S6 15 Cr. 867 (RMB) (the "Indictment"), against Halkbank. *See id.* ¶¶ 2, 6.

## II.    EY Review and Compliance Report

On May 11, 2026, the parties received the Compliance Report which describes the scope, methodology, and results of EY's Review of Halkbank's current Sanctions and AML-Compliance Program and its communications with Treasury.

The following summary of the report has been prepared by counsel for Halkbank.

### A.  <u>Assessment Scope</u>

The scope of EY's Review was guided principally by the terms of the DPA, and was approved in advance by the Department of Justice and OFAC. Broadly speaking, pursuant to the scope set out in the DPA and subsequent communications with the government and OFAC, EY's Review focused on: (1) the Bank's current Sanctions and AML-Compliance Program, *see id.* ¶ 1; (2) the Bank's communications with all components of Treasury, including OFAC between 2022 and February 2026, *see id.*; and (3) any transactions or attempted transactions involving U.S. persons/financial institutions, during the period of the DPA with, involving, or for the benefit of the Government of Iran, Iranian persons or entities, or any entities owned or controlled by them, *see id.* ¶ 3.

<u>The Bank's Current Sanctions and AML-Compliance Program</u>

EY focused on the Bank's current Sanctions and AML-Compliance Program using data analytics and sample-based control testing covering the period from January 1, 2025, through December 31, 2025, (the "Testing Period") in order to assess compliance with applicable sanctions and AML regulations.

With respect to compliance with applicable sanctions regulations, EY's team—which was comprised of members from both Türkiye and the United States—assessed adherence to OFAC regulations; with respect to AML compliance, EY assessed adherence to regulations promulgated by the Turkish governmental authority: the Financial Crimes Investigation Board of the Ministry of Treasury and Finance of the Republic of Türkiye ("MASAK").  EY applied a variety of techniques across the Review period, including the following:

- Performing tests on respective manual or IT-based manual (semi-automatic) controls through document reviews and data analysis techniques;

- Assessing efficiency and effectiveness of the IT software used to monitor customer onboarding, sanctions and AML screening, and IT-based automatic controls;

- Performing data analytics to check whether any individuals or entities listed as a Foreign Terrorist Organization ("FTO") or Specially Designated Global Terrorist ("SDGT") was the originator, intermediary, or beneficiary of a fund transfer; and

- Reviewing documentation of communication with the Treasury Department and OFAC, and inquiring whether necessary actions were taken by the Bank.

With respect to its Review of the Bank's Sanctions and AML-Compliance Program, EY focused on five general areas:

*1.  Governance Framework and Management Oversight:* In order to review the Bank's governance framework and management oversight of its Sanctions and AML-Compliance Program, EY focused its review on a number of areas, including: (a) a review of Bank policies and procedures to identify discrepancies or gaps relating to applicable regulations; (b) an assessment of the role of the Bank's Board of Directors ("BoD") in compliance activities, including oversight, review and approvals on sanctions- and AML-related policies; (c) a review of periodic reporting made to the BoD or BoD committee by the Bank's compliance staff; and (d) an assessment of the strength of the communications channels between the Bank's compliance staff and the Board.

*2.  Sanctions & AML Risk Management Framework:* To evaluate the effectiveness of the Bank's sanctions and AML risk management framework, EY performed numerous assessments, including: (a) a review of the scope, frequency, and capabilities of the Bank's sanctions and AML risk assessment methodology; (b) an assessment of the risk rating and monitoring methodology underlying the Bank's know-your-customer ("KYC") process; (c) an examination of the Bank's sanctions screening and AML transaction monitoring tools, scenarios, and thresholds scaled to the Bank's size and overall risk profile; (d) an assessment of the Bank's list management process to ensure that the Bank timely responded to changes in FTO and Specially Designated National ("SDN") lists; and (e) a review of both internal and external assessments of sanctions and AML risks as well as the Bank's efforts to mitigate any identified risks.

3. *Monitoring and Surveillance Activities:* EY also analyzed the Bank's monitoring and surveillance activities.  In aid of that review, EY performed several assessments, including: (a) big-data analytics studies to identify whether any customer or transaction originator, intermediary, or beneficiary was listed as an FTO or SDN (including as an SDGT); (b) a review of the Bank's customer list to assess whether the Bank's KYC, diligence, and M&A monitoring activities were performed and documented in compliance with applicable regulations; (c) a review of sanctions and AML alerts to assess case management, investigation, and escalation protocols; (d) an analysis of a sample of correspondent banks' KYC files to determine if the Bank adequately ensured the correspondent bank's regulatory compliance; (e) an assessment of scenarios built for transaction monitoring and sanctions screening, as well as the underlying data; and (f) a review other transactions (*e.g.*, letters of credit and foreign trade operations) to determine the adequacy of sanctions screenings.

4. *Independent Auditing & Testing:* In order to examine the Bank's independent auditing and testing, EY undertook numerous reviews, including: (a) an assessment of the comprehensiveness, independence, timeliness, and objectivity of audits on the Bank's Sanctions and AML-Compliance Program; (b) an analysis of the timeliness and efficacy of the Bank's remediation of any identified weaknesses; (c) a review of the Bank's testing and analytics of data quality, as well as its response to any identified issues; (d) an assessment of the Bank's continuous testing and optimization of screening software to examine the Bank's management of false-positive alerts; and (e) a review of independent audit and testing reports as well as the Bank's response to any identified controlled weaknesses.

5. *Training and Awareness Activities:* To assess the Bank's training and awareness activities, EY performed a number of assessments, including: (a) an analysis of sanctions and AML training and awareness programs across the Bank; (b) an assessment of the customization of training for different audiences; (c) a review of training materials' scope, comprehensibility, and currency; (d) an assessment of the audience's understanding of the training; and (e) a review of the Bank's tracking and enforcement of mandatory training.

Halkbank-Treasury Department Communications

In addition, with respect to the Bank's communications with all components of Treasury Department, including OFAC, EY expanded the temporal scope and examined communications between Halkbank and Treasury between 2022 and February 2026, as well as the Bank's internal review and quality review processes.

Transactions and Attempted Transactions Involving Iran and U.S. Persons

Finally, the DPA requires the Bank to disclose to EY any transactions (or attempts or requests to conduct transactions) with, involving, or for the benefit of the Government of Iran, Iranian persons or entities, or any entities owned or controlled by them, that involve the use of any U.S. persons, including U.S. financial institutions. *See* DPA ¶ 3.  In order to corroborate the Bank's report to EY, EY conducted an independent analysis on two verification systems that covered all SWIFT messages received during the review period.

### B.  Assessment Methodology

Twenty-five members of EY's Forensic & Integrity Services team—based in EY offices in Türkiye, Canada, and the United States—conducted the Review.  The Review entailed a wide range of techniques, including: interviews of 60 Bank employees and executives; the review of 60 relevant Halkbank policies, procedures, and supporting documentation; walkthroughs of key compliance processes; review and testing of relevant systems and tools using manual and automated controls by utilizing seven different computer systems; sample-based control testing and data analysis.  These activities encompassed the period from January 1, 2025, to December 31, 2025.[1]

Because Turkish Banking Law and related regulations limit cross-border data transfers and require data to remain local, all data analytics and document review processes took place at the Bank itself, using its own internal systems.  Accordingly, to support an independent review of Bank data without transferring data outside the Bank's environment, EY employed EY-developed scripts executed on tools including MSSQL, Oracle, and Python to analyze underlying source data independently from the Bank's existing compliance systems and embedded algorithms.  To accomplish these analyses, the Bank provided dedicated on-site desktop access and appropriate system permissions, which enabled the EY team—most of which was on-site during the entire Review period—to perform its independent work in compliance with the applicable data localization and data protection requirements.

Regarding Halkbank's communications with the Treasury Department, EY's Review included consideration of factors reflected in OFAC's enforcement framework, including the timeliness of communications, responsiveness to OFAC inquiries, and cooperation.  In this context, EY assessed the timeliness, clarity, and context of the Bank's responses to Treasury Department inquiries, as well as the extent to which the Bank's communications reflected appropriate escalation, internal coordination, and as necessary, documented follow-up actions by the Bank's governance and compliance functions.  EY also considered whether the communications demonstrated ongoing monitoring and attention to identified sanctions-related matters, including remediation efforts where applicable, in line with the Bank's sanctions compliance obligations.  Finally, the EY review assessed whether relevant information shared by the Bank was consistent with the Bank's current Sanctions and AML-Compliance Program.

### C.  Assessment Results – No Findings of Noncompliance

Across its entire Review of the Bank's Sanctions and AML-Compliance Program, EY did not identify any area of noncompliance.  Below, we review each of the areas focused on by EY during the Review.

---

[1] As described in the accompanying text, the review period for Bank communications with the Treasury Department was broader: from 2022 through February 2026.  *See supra* Section II.A.

### *Governance Framework and Management Oversight*

| Assessment Step | Result |
|---|---|
| Review policies and procedures to identify discrepancies or gaps with the requirements of applicable regulations | No finding of noncompliance |
| Assess BoD's commitment to the Sanctions and AML-Compliance Program, including tone at the top, promotion of culture of compliance throughout the organization, recognition and actions through noncompliance or control weaknesses | No finding of noncompliance |
| Assess BoD's oversight, review, and approvals on policies of Sanctions and AML-Compliance Program | No finding of noncompliance |
| Review periodic reporting made to BoD or a respective committee by the Compliance Department to assess whether the leadership was well-informed in a timely manner, and any necessary actions were taken | No finding of noncompliance |
| Assess the measures taken to position the organization's Compliance Department as adequately resourced and independent with a strong communication channel to BoD; including in the form of human capital, expertise, IT, and other resources, scaled to organization's size and overall risk profile | No finding of noncompliance |

### *Sanctions & AML Risk Management Framework*

| Assessment Step | Result |
|---|---|
| Assess the sanctions and AML risk assessment methodology's scope, frequency, and capabilities | No finding of noncompliance |
| Assess the KYC process's risk rating and monitoring methodology, including due diligence and M&A monitoring activities | No finding of noncompliance |
| Review alert-generating sanctions and AML transaction monitoring tools, scenarios and thresholds scaled to Bank's size and overall risk profile | No finding of noncompliance |
| Assess the sanctions list management process to assess whether changes to FTO and SDN lists were timely considered | No finding of noncompliance |
| Review sanctions and AML risk assessment reports produced internally or externally, and assess the adequacy and completeness of mitigation steps taken in response to any identified risks | No finding of noncompliance |

*Monitoring and Surveillance Activities*

| Assessment Step | Result |
| --- | --- |
| Review the customer list to test whether KYC, due diligence, and M&A monitoring activities were performed in a manner that complies with applicable regulations | No finding of noncompliance |
| Review generated sanctions and AML alerts to assess case management, investigation, and escalation protocols | No finding of noncompliance |
| Review a judgmentally selected sample of KYC files of correspondent banks to assess whether adequate customer due diligence measures were taken to ensure the correspondent's compliance with applicable regulations | No finding of noncompliance |
| Review scenarios built for transaction monitoring and sanctions screening as well as the underlying data to identify any control weaknesses | No finding of noncompliance |
| Review other transactions (*e.g.*, letters of credit and foreign trade operations) to assess whether adequate sanctions screening measures were taken | No finding of noncompliance |
| Perform big-data analytics on customers to identify whether any entity or individual is listed as an FTO or SDN | No finding of noncompliance |
| Perform big-data analytics on SWIFT transactions to identify whether any originators, intermediaries, or beneficiaries were listed as an FTO or SDN | No finding of noncompliance |

*Independent Auditing & Testing*

| Assessment Step | Result |
| --- | --- |
| Assess comprehensiveness, independence, timeliness, and objectivity of audits on the Sanctions and AML-Compliance Program | No finding of noncompliance |
| Review timelines and effectiveness of the actions taken on the root causes of any identified weaknesses | No finding of noncompliance |
| Assess continuous testing and optimizations regarding false-positive alerts raised by the screening software | No finding of noncompliance |
| Review independent audit and testing reports, assess the actions taken or planned to be taken for any identified control weaknesses | No finding of noncompliance |

*Training and Awareness Activities*

| Assessment Step | Result |
| --- | --- |
| Review sanctions and AML training and awareness programs applied throughout the organization and determine target audience and training frequency | No finding of noncompliance |

| Assess customization and tailoring of trainings for different levels of target groups | No finding of noncompliance |
|---|---|
| Assess scope, comprehensibility, and currentness of the training materials | No finding of noncompliance |
| Review the assessment of training results that measure the understanding of the training groups | No finding of noncompliance |
| Assess training completion tracking and enforcement actions on noncompliance with mandatory trainings | No finding of noncompliance |

### Interactions with the U.S. Treasury Department

EY observed that primary ownership for communications between Halkbank and the Treasury Department resides within Halkbank's Sanctions Compliance Unit under the Compliance Department. Once a request is received, it is formally logged and reviewed by the Compliance Department, with the Head of Compliance serving as the accountable executive responsible for ensuring completeness, accuracy, and timeliness of the response. Depending on the nature and complexity of the request, subject-matter input may be solicited from internal stakeholders including the Enhanced Controls Unit, the Internal Systems Group, the Foreign Operations Department, and other relevant Bank departments. The Bank's legal counsel is also engaged where necessary, particularly for sensitive matters, applications for specific licenses, or issues with potential enforcement implications.

EY concluded that Halkbank's responses to Treasury Department and OFAC requests are developed through a coordinated internal review and quality review process. Supporting documentation is assembled and validated by the appropriate teams, reviewed for accuracy by the Bank's Compliance Department, and subject to senior management oversight where required. The Head of Compliance provides final review and sign-off on submissions, ensuring regulatory expectations around accuracy, verification, and timeliness are met prior to transmission to OFAC. Senior management, including the CEO and COO, may also be directly involved in sanctions-related meetings or high-risk matters, reinforcing governance and accountability at the highest levels of the organization.

EY reported that it did not observe any instance in which the Bank provided information to Treasury that was inconsistent with the Bank's current compliance program, and concluded that the Bank's responses to Treasury Department requests appear to align with best practices for timeliness and cooperation as outlined in OFAC's enforcement framework.

### Iran-Related Transactions During the Review Period

As described above, the DPA requires the Bank to disclose to EY any transactions (or attempts or requests to conduct transactions) with, involving, or for the benefit of the Government of Iran, Iranian persons or entities, or any entities owned or controlled by them, that involve the use of any U.S. persons, including U.S. financial institutions. *See* DPA ¶ 3.

During the review period, pursuant to this provision of the DPA, EY reported that the Bank disclosed to EY three transaction requests made by one Bank customer in relation to an Iranian business. The Bank did not process any of these three transaction requests.

In order to corroborate the accuracy of that information, EY conducted an independent analysis, including on PayGate Inspector and PayGate Search covering all SWIFT messages during the review period. Based on that independent analysis, EY did not identify any additional transaction requests or transactions beyond those reported by the Bank.

### D. EY's Observations Regarding the Bank's Mitigation Steps and Other Areas for Improvement or Implementation of Best Practices

While EY did not find any area of noncompliance by Halkbank, it did identify areas in Halkbank's Sanctions and AML-Compliance Program that would benefit from improvement or implementation of best practices, or for which EY provided feedback to the Bank during the pendency of the review and the Bank implemented effective mitigating measures.

#### 1. Governance Framework and Management Oversight

With respect to its review of Halkbank's governance framework and management oversight, EY noted that while the Bank's core regulatory processes operate effectively in practice, certain processes were not explicitly documented in writing. EY recommended that the Bank institute written guidance with respect to certain areas. In response, EY reported that the Bank developed, approved, and implemented updated procedures addressing the gap in certain identified written policies.

#### 2. Sanctions & AML Risk Management Framework

With respect to its review of the Bank's sanctions and AML risk management framework, EY made three observations. First, it observed that while the Bank's policy of classifying its customers as either "high-risk" or "standard" and then applying enhanced screening measures to "high-risk" customers complied with applicable regulations, it was best practice to also more frequently screen customers with relatively higher risk profiles within the "standard" customer segment. (Other banks divide the standard customer segment into low and medium-risk categories.) After this observation was communicated to Bank management, the Bank chose to screen all its "standard" customers more frequently (even customers-identified as low-risk), which EY concluded was a conservative approach relative to the market, because it entailed subjecting even low-risk customers to more periodic screening than is typical.

Second, EY observed that, while the Bank initially screens new customers against a list of restricted parties and begins more fulsome sanctions screenings the same day, customers that pass the initial screening may continue to be onboarded while sanctions screenings continue. EY noted that any resulting risks were mitigated by the fact that all USD transactions undergo an additional screening such that, even if a new customer's sanctions screening is not complete, USD transactions that are flagged by the Bank's sanctions screenings will be blocked. In addition, after EY communicated its observation to the Bank, the Bank implemented a new alert system that immediately suspends the onboarding process for any customers who are flagged as a potential match for parties included on the OFAC sanctions list.

Finally, EY observed that while the use of "safelists" is permitted to promote efficient sanctions screenings, the Bank did not document its methodology for the periodic review of those

lists.  As a mitigating factor, EY did not identify any USD transactions for safelisted parties.  Furthermore, the Bank adopted a documented framework defining the scope, frequency, approval requirements, and escalation criteria for the ongoing validation of safelist entries.

### 3.  *Monitoring and Surveillance Activities*

Through its review of the Bank's monitoring and surveillance activities, EY made three observations.  First, EY noted that while the Bank implemented policies and procedures to conduct periodic customer reviews and update KYC documentation in accordance with MASAK, some non-critical information either was outdated due to the customer's inactivity or was captured at the branch level but not centrally available.  In response, the Bank designed an automatic system to remind branches to obtain updated KYC information before the update is due, with more frequent updates required for customers categorized as "high-risk."  Failure to timely update KYC files will negatively impact a Bank branch's official performance reviews.

Second, while the Bank undertakes and documents periodic reviews of the business logic and typologies underlying transaction monitoring scenarios, the Bank did not have a formal model or scenario validation control to verify the continued accuracy of the scenarios' technical coding.  EY reviewed a sample of scenarios and identified six scenarios for which the technical coding could be improved.  In response, the Bank improved these six scenarios and implemented updated policies for performing model validation, including by having the Board of Auditors perform an independent audit of this issue, and the Bank has already applied the auditors' findings.[2]

Third, while EY reviewed all USD transactions during the Testing Period and did not identify any completed transactions with parties designated by OFAC, it identified four transmissions with parties that were designated by OFAC but were not FTOs or SDGTs.  These attempted transactions represented less than 0.00006% of the total volume of USD transactions and had an aggregate value of less than $41,000, and they were blocked by the relevant U.S. intermediary banks.  These transaction attempts were not initially flagged by the Bank due to (a) the subsequent designation of a vessel referenced in supporting documentation, (b) significant discrepancies in the beneficiary name stated in the payment order that prevented the screening system from generating an alert, (c) the relevant bank identifier code being entered incorrectly, and (d) human error.  EY reviewed these attempted transactions to determine whether there was any evidence of intentional conduct, such as an attempt to defeat U.S. sanctions.  EY concluded that it did not observe any indication of intentional conduct such as concealment, sanctions evasion, or a repeated pattern.  EY also observed that, prior to the start of EY's onsite fieldwork, the Bank had already addressed this issue by restricting certain inspection authority to designated senior personnel and implemented additional screening layers, and that the Bank has incorporated the relevant cases as case studies in its sanctions training for Bank employees.

---

[2] This same observation was also included in EY's assessment of the Bank's independent auditing and testing.  EY made no other observations under the independent auditing and testing category.

### 4. *Training and Awareness Activities*

As part of its assessment of the Bank's training and awareness activities, EY identified two areas for possible improvement.  First, while the Compliance Department meets with the Audit Committee four times per year and the BoD annually to provide updates on AML and sanctions matters, these updates are not defined training programs.  In response, the Bank held a sanctions training session for BoD and updated its training policy for BoD's annual compliance training going forward.

Second, while the Bank provides on-the-job sanctions training and holds sanctions trainings biannually for certain employees and biennially for all employees, employees in certain higher risk roles were encouraged but not required to complete specialized training.  In response, the Bank held an enhanced sanctions training for all relevant personnel and updated its training policy governing annual mandatory sanctions training.

## III.    Conclusion

Halkbank has provided a Compliance Report as required by the DPA and, accordingly, its obligation under the DPA has been satisfied. The Government thus moves to dismiss the charges in the Indictment as to Halkbank with prejudice.

Respectfully submitted,

JAY CLAYTON
United States Attorney

By: _____
Michael D. Lockard
Jonathan E. Rebold
Jacob H. Guttwillig
Assistant United States Attorneys


For TÜRKIYE HALK BANKASI A.Ş.

Williams & Connolly LLP

By: _____
Robert M. Cary
Simon A. Latcovich


KKL LLP

By: _____
Nicholas J. Lewin


Er Law

By: _____
Omer Er